1

GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (SBN 212532)
 mperry@gibsondunn.com
RACHEL S. BRASS (SBN 219301)
 rbrass@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
 jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 374-8429

2

3

4

5

6

7

*Attorneys for Apple Inc.*

8

9

10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORONAVIRUS REPORTER, CALID INC.,
on behalf of themselves and all others similarly
situated

                    Plaintiffs,

        v.

APPLE INC., FEDERAL TRADE
COMMISSION,

                    Defendants.

Case No. 3:21-CV-05567-EMC

**DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

Date:        October 14, 2021
Time:        1:30 p.m. PT
Place:       Courtroom 5, 17th Floor

The Honorable Edward M. Chen

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................................ 3

    A.    Apple's Revolutionary iPhone Ecosystem .................................................. 3

    B.    In the Face of a Pandemic and "Infodemic," Apple Ensures that Only Recognized Health Entities Can Distribute Apps Related to COVID-19 .................... 5

    C.    Apple Rejects the "Coronavirus Reporter" App for Violating Its Guidelines ............. 6

    D.    Plaintiffs Sue in January 2021, Evade a Determination on the Merits, and Wait Seven Months to Move for a Sweeping Preliminary Injunction ................................. 8

III. LEGAL STANDARD ....................................................................................................... 9

IV. ARGUMENT .................................................................................................................... 10

    A.    Plaintiffs Are Unlikely To Succeed On the Merits .................................................. 11

        1.    Plaintiffs Are Unlikely To Succeed on Their Unpleaded Tying Claim .......... 12

        2.    Plaintiffs' Other Antitrust Claims Are Likely to Fail on Multiple Grounds ................................................................................................... 14

    B.    Plaintiffs Have Not Proven a Risk of Irreparable Harm ........................................... 16

    C.    The Balance Of The Equities Favor Apple, and the Proposed Injunction Would Harm the Public Interest .......................................................................................... 18

    D.    A Preliminary Injunction May Be Issued Only If Plaintiffs Post a Bond for at least $99 Million ....................................................................................................... 20

V. CONCLUSION ................................................................................................................. 21

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

# TABLE OF AUTHORITIES

Page

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)................................................................13

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)................................................................16

*Am. Passage Media Corp. v. Cass Comm'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985)................................................................16

*In re Apple Processor Litig.*,
No. 5:18-cv-00147-EJD, 2019 WL 3533876 (N.D. Cal. Aug. 2, 2019)............................17

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013)................................................................11

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001)................................................................12

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995)................................................................15

*Cal. Comp. Prod., Inc. v. Int'l Bus. Machines Corp.*,
613 F.2d 727 (9th Cir. 1979)................................................................15

*Chase v. McMasters*,
405 F. Supp. 1297 (D.N.D. 1975)................................................................12

*City of Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir. 1992)................................................................15

*Crandall v. Starbucks Corp.*,
249 F. Supp. 3d 1087 (N.D. Cal. 2017) ................................................................11

*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*,
No. 14-CV-02770-WHO, 2014 WL 5361548 (N.D. Cal. Oct. 20, 2014)............................11

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994) ................................................................19

*Diversified Silicone Products Corporation v. Elastapro Silicone Sheeting LLC*,
No. CV 20-2010 PSG, 2020 WL 4390380 (C.D. Cal. 2020)................................16

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010)................................................................10

*Elias v. Connett*,
908 F.2d 521 (9th Cir. 1990)................................................................11

Gibson, Dunn &
Crutcher LLP

*Epic Games, Inc. v. Apple Inc.*,
493 F. Supp. 3d 817 (N.D. Cal. 2020) ...............................................................................10

*F.T.C. v. Weyerhaeuser Co.*,
665 F.2d 1072 (D.C. Cir. 1981) ...........................................................................................17

*Fed. Trade Com'n v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..................................................................................12, 13, 14

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) .....................................................................3, 10, 11

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ...............................................................................................12

*Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ..............................................................................2, 10, 14, 16

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .................................................................................................2

*Isaacs v. Arizona Bd. of Regents*,
608 F. App'x 70 (3d Cir. 2015) ...............................................................................................6

*Isaacs v. Dartmouth Hitchcock Med. Ctr.*,
No. CV198000DSFRAOX, 2020 WL 3096529 (C.D. Cal. Feb. 3, 2020) ............................7

*Isaacs v. Trustees of Dartmouth Coll.*,
No. 18-1560, 2019 WL 10837707 (1st Cir. Jan. 3, 2019) ......................................................7

*Isaacs v. U.S. Dept. of Edu.*,
No. 17-11221-FDS, Dkt. 61 (D. Mass. Mar. 8, 2019) ...........................................................7

*Isaacs v. USC Keck Sch. of Med.*,
846 F. App'x 519 (9th Cir. 2021) ...........................................................................................7

*James v. Campbell*,
104 U.S. 356 (1881) .............................................................................................................19

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016) ..................................................................................................14

*Knutson v. Daily Rev., Inc.*,
468 F. Supp. 226 (N.D. Cal. 1979) ......................................................................................18

*Kolay v. Milliken*,
No. 2-18-CV-00640 SVW KSX, 2018 WL 1942709 (C.D. Cal. Mar. 22, 2018) ................17

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) ...............................................................................................13

Gibson, Dunn &
Crutcher LLP

*Lydo Enter., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) ........................................................................................17

*Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.*,
446 F.2d 353 (5th Cir. 1971) ..........................................................................................11

*Miller v. Cal. Pac. Med. Ctr.*,
991 F.2d 536 (9th Cir. 1993) ..........................................................................................17

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ......................................................................................15

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
16 F.3d 1032 (9th Cir. 1994) ..........................................................................................20

*Oahu Gas Service, Inc. v. Pacific Resources Inc.*,
838 F.2d 360 (9th Cir. 1988) ..........................................................................................15

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
185 F.3d 957 (9th Cir. 1999) ..........................................................................................12

*Pham v. Fin. Indus. Regul. Auth. Inc.*,
No. C-12-6374 EMC, 2013 WL 1320635 (N.D. Cal. Apr. 1, 2013) ...............................14

*Pistacchio v. Apple Inc.*,
No. 4:20-CV-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021) .........................13

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
55 F. Supp. 2d 1070 (C.D. Cal. 1999) ............................................................................17

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..........................................................................................13

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
532 F.3d 963 (9th Cir. 2008) ..........................................................................................14

*Scholl v. Mnuchin*,
494 F. Supp. 3d 661 (N.D. Cal. 2020) ............................................................................10

*Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*,
190 F. Supp. 594 (S.D.N.Y. 1961) ...............................................................................4, 11

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
935 F. Supp. 2d 1069 (D. Colo. 2013) ............................................................................19

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ..........................................................................................12

Gibson, Dunn & Crutcher LLP

iv

*Sumotext Corp. v. Zoove, Inc.*,
No. 16-CV-01370-BLF, 2016 WL 6524409 (N.D. Cal. Nov. 3, 2016)................................13

*Tech. & Intellectual Prop. Strategies Grp., PC v. Fthenakis*,
No. C 11–2373 MEJ, 2012 WL 159585 (N.D. Cal. Jan. 17, 2012) ......................................16

*Tough Traveler. Ltd. v. Outbound Prods.*,
60 F.3d 964 (2d Cir. 1995)....................................................................................................17

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
964 F.2d 186 (2d Cir. 1992)..................................................................................................15

*United States v. Aluminum Co. of Am.*,
148 F.2d 416 (2d Cir. 1945)..................................................................................................13

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ................................................................................................12

*United States v. Siemens Corp.*,
621 F.2d 499 (2d Cir. 1980)..................................................................................................17

*Valeo Intellectual Prop. v. Data Depth Corp.*,
368 F. Supp. 2d 1131 (W.D. Wash. 2005) ...........................................................................17

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
No. C 12-3856 PJH, 2014 WL 4312021 (N.D. Cal. Aug. 28, 2014) ....................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...............................................................................................................9, 10

**OTHER AUTHORITIES**

Matt Richtel, *W.H.O. Fights a Pandemic Besides Coronavirus: An 'Infodemic'*, N.Y. Times (Feb. 6,
2020) .........................................................................................................................................5

*Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://tinyurl.com/3mcb6r96 ........................5

Sarah Evanega, et al., *Coronavirus Misinformation: Quantifying Sources and Themes in the COVID-19 'Infodemic'* (Oct. 2020)...................................................................................................5

**RULES**

Fed. R. Civ. P. 65(c).............................................................................................................20

**TREATISES**

11A Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.)....................10, 11

# I. INTRODUCTION

The App Store has been a remarkable success, growing from a collection of a few hundred apps at its inception in 2008 to a platform providing U.S. consumers access to about 2 million apps across twenty-seven genres.  The cornerstone of this success is the safe, reliable, high-quality experience Apple has built for its users.  The company has done so by requiring developers to abide by detailed and wide-ranging guidelines governing everything from user privacy to the app's reliability and performance.  And to ensure that developers and their apps comply with these guidelines before distributing through the App Store, Apple has built a rigorous app review process that screens every app using Apple's proprietary software and tools.

In early 2020, the COVID-19 pandemic began to spread worldwide.  Confronting not only a generational disease but also an unprecedented "infodemic" of misinformation, Apple announced that it had amended its App Review Guidelines to ensure that consumers would receive only credible information from established medical and scientific institutions via the App Store.  It explained that it would reject, and in fact has rejected, any and all apps that did not meet these widely available guidelines.  That included Plaintiffs' app—which is not affiliated with any apparent, recognized healthcare institution as Apple's guidelines required.

Plaintiffs have asserted a raft of legal theories that all, at bottom, complain that Apple erred in rejecting their app pursuant to Apple's App Review Guidelines.  By Plaintiffs' own admission, "it is reasonable to be concerned" that they "face[] an uphill battle" in this case.  Compl. ¶ 7.  Among many other things, the developer agreements make clear that Apple retains sole discretion to decide whether apps built using its intellectual property, under license, may be distributed through the App Store.  Yet without any evidence, Plaintiffs seek to eviscerate the App Store—an "economic miracle" for developers, customers, and Apple alike—through a breathtaking injunction that would force the company to abandon its business model, re-engineer iOS, relinquish any control over its intellectual property, and perhaps cause physical or mental harm to users.  The relief sought would harm developers and customers alike.  Even if it would help Plaintiffs (a threshold fact they have not proven), a mandatory injunction like the one sought here is available only in the rarest cases "when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of

the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).  Plaintiffs have not come remotely close to meeting that burden.

First, Plaintiffs have shown no likelihood to succeed on the merits.  Their motion focuses on a tying theory they did not plead (even though they are now on their *fourth* complaint) and for which they have no standing.  They have not alleged, much less proved, the requisite relevant markets, Apple's market power in one of those markets, the existence of a tie, or any anticompetitive effects. And while they have forfeited any ability to seek preliminary injunctive relief on the basis of the claims they did plead in the operative complaint, each of those claims will fail too as Apple has set forth in its motion to dismiss.  *See* Mot. to Dismiss at 6–24.

Nor can Plaintiffs establish irreparable injury.  The fact that Plaintiffs waited months—and filed three complaints in a different judicial district—before seeking any equitable relief demonstrates that there is no prospect of imminent harm.  Even if they could explain this delay, Plaintiffs must show that the rejection of their app was unlawful *and* that the rejection harmed them *and* that any such harm could not be rectified by ordinary damages.  They have not proved any of these things; indeed, they have not even tried.  Because there is no evidence that monetary relief is "inadequate," no injunction may lie.  *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

The equities also militate against an injunction.  The proposed injunction would impose enormous burdens on Apple to re-engineer iOS; fundamentally disrupt the way in which Apple and developers conduct business; endanger Apple's hard-won brand for safety, security, and reliability; and put millions of customers at risk.  This is not hyperbole: Plaintiffs ask the Court to handcuff Apple while its platform is used to distribute malware, spyware, pornography, and other malicious, dangerous, and unsavory apps to millions of consumers, including children.  And while Plaintiffs try to justify this by baldly asserting that their app could "save lives," they do not even explain what their app does, much less *prove* that distributing it on the App Store would do more good than harm—particularly in light of the sophisticated apps and services already made available by health authorities and institutions.

And Plaintiffs have failed to post adequate security for their injunctive request, a stand-alone reason to reject their motion.

1    Because Plaintiffs have utterly failed to establish that "the facts and law clearly favor the

2    moving party," the Court should deny the motion for a preliminary injunction.  *Garcia v. Google, Inc.*,

3    786 F.3d 733, 740 (9th Cir. 2015) (en banc).

4                              **II.  STATEMENT OF FACTS**

5            Plaintiffs have come to this Court with a sweeping request for injunctive relief supported by

6    exactly *zero* evidence.  But this case does not arise in a vacuum; Apple has been litigating challenges

7    to the App Store business model for several years.  Extensive evidence has been adduced that

8    demonstrates the defects with Plaintiffs' wholly unsupported motion, including documentary and

9    testimonial evidence admitted in the *Epic Games v. Apple* trial earlier this year noted in Plaintiffs'

10   Complaint.  *See* Compl. ¶ 7.  With some redactions for confidential business and third-party

11   information, those materials have been publicly available since trial.  Indeed, they easily can be

12   accessed online from the Court's website and from a public access site maintained by the parties by

13   Court order.[1]  Plaintiffs not only ignore these records in their motion but also fail to reckon with that

14   evidence's implications.  Apple sets forth the facts below from that and other evidence.

15   **A.      Apple's Revolutionary iPhone Ecosystem**

16          Apple "reinvent[ed] the phone" when it released the iPhone in June 2007.  Decl. of Rachel

17   Brass Ex. 1.  It was a revolution in hardware and software technology, providing access to the internet,

18   a real web browser, and MultiTouch—features that remain at the core of what the smartphone is today.

19   Brass Decl. Ex. 2 at 2719:20–2721:6 (*Epic* trial testimony of Apple Fellow, Philip Schiller).  While the

20   original iPhone came preinstalled with a few native apps developed by Apple, native third-party apps

21   could not be downloaded.  *Id.* at 2727:17–19, 2728:18–19 (Schiller).

22          Apple began allowing third-party developers to distribute native apps on iOS through the App

23   Store in 2008.  Brass Decl. Ex. 2 at 2728:24–2729:24 (Schiller).  The App Store thus became a two-

24   sided transaction platform, connecting app developers with customers.  Brass Decl. Ex. 3 ¶ 42.  As

25   "world-renowned" economists have explained in parallel litigation, Brass Decl. Ex. 2 at 1909:13, multi-

26   sided platform businesses are complex.  Brass Decl. Ex. 3 ¶ 27.  The platform must ensure that there

27

28   ─────────────────────────
     [1]  *See* https://cand.uscourts.gov/cases-e-filing/cases-of-interest/epic-games-inc-v-apple-inc/;
          https://app.box.com/s/6b9wmjvr582c95uzma1136exumk6p989.

DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

Gibson, Dunn &
Crutcher LLP

are a large number of participants on both sides of the platform and that transactions on the platform are as easy, safe, and reliable as possible. *Id.* ¶¶ 27, 45-46, 122-26.  Successful two-sided transaction platforms must establish pricing strategies, service provisions, and rules of behavior that ensure balanced participation of the customer groups they serve. *Id.* ¶¶ 28, 122-26.

To that end, Apple has adopted a business model that provides a curated ecosystem.  Developers who wish to distribute apps pay a $99 annual fee to join Apple's Developer Program, agree to pay a commission on some paid transactions, and promise to abide by Apple's App Review Guidelines.  Brass Decl. Ex. 2 at 2759:22–2760:9, 2761:21–25 (Schiller), Ex. 4, Ex. 5.[2]  In return, developers are licensed to use Apple's proprietary software and tools—including the software development kits (SDKs) and thousands of application program interfaces (APIs)—that are protected by patent, copyright, and trademark laws.  Brass Decl. Ex. 2 at 2757:9–2758:8 (Schiller) & Ex. 9 ¶ 23.  Apple also reviews every app developed using its intellectual property before distribution on the App Store to ensure it complies with the company's guidelines.  Brass Decl. Ex. 2 at 2835:10–15 (Schiller).  These guidelines protect users from apps that would invade their privacy, compromise the reliability of their devices, or expose them to malicious software.  Brass Decl. Ex. 6 ¶ 59 & Ex. 7.  They also increase the quality of available apps to consumers while simultaneously protecting developers from low-quality copycats.  Brass Decl. Ex. at 7 at 9, 22.  Today, consumers enjoy free access to an enormous library of safe, secure apps—83% of which are free—across twenty-seven different categories, and developers in turn have access to an enormous audience of potential customers that can trust the apps available for download.  Brass Decl. Ex. 2 at 1076:17–1077:3; 1085:1–12 (*Epic* trial testimony of Apple's Senior Director of App Review, Trystan Kosmynka), Ex. 3 ¶¶ 24, 26, 50–51, Ex. 8 ¶ 169.

---

[2]  In their motion, Plaintiffs wrongly assert (without evidence) that Apple charges developers a 35% commission.  Mot. ¶ 9.  At most, Apple charges a 30% commission; some transactions incur a smaller commission, and the vast majority of transactions incur no commission at all.  *See* Brass Decl. Ex. 8 ¶ 169 (83% of apps with at least one download are free) & Ex. 2 at 2767:8–17 (Schiller) (Apple collects no commission on free apps).  Indeed, inaccurate assertions are endemic to Plaintiffs' motion.  *See, e.g.*, Mot. ¶ 40 (wrongly asserting that no other computing platforms have used a walled garden model); *id.* ¶ 56 (misrepresenting Apple's App Store revenues).  This is one reason that courts require evidence rather than attorney argument in connection with applications for relief.  *See Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594, 601–02 (S.D.N.Y. 1961) (court may "consider only facts presented by affidavit or testimony" to support a "restraint put upon the defendant at a time before his liability has actually been adjudged").

By any measure, the App Store has thus been a phenomenal success for developers and consumers alike.  Output has soared: The number of apps, number of app transactions, and amount of revenue earned by developers has skyrocketed since the App Store's inception.  Brass Decl. Ex. 8 ¶¶ 182-83, Ex. 9 ¶ 121, Ex. 25.  Apple has outpaced its competitors in protecting consumers' privacy. Brass Decl. Ex. 6 ¶ 44; *see also* Brass Decl. Ex. 2 at 1119:2–6 (*Epic* trial testimony of Mr. Kosmynka discussing Apple's rejections of hundreds of thousands of app submissions for violating privacy standards), 2830:25–2831:3 (*Epic* trial testimony of Mr. Schiller, discussing some of Apple's innovations to protect consumer privacy), 3848:22–3849:7 (*Epic* trial testimony of Apple's CEO, Tim Cook, discussing consumer surveys reflecting the importance of privacy to consumers when choosing Apple).  Apple's ecosystem also remains secure: The iPhone platform accounted for just 0.85% of malware infections in 2018 compared to 47.15% for Android and 35.82% for Windows.  Brass Decl. Ex. 12; *see also* Brass Decl. Exs. 10–11 (showing that Android app stores have significantly higher numbers of malicious apps than the App Store).  Even Apple's litigation adversaries have conceded that Apple's security is peerless, Brass Decl. Ex. 2 at 2708:13–17 (*Epic* trial testimony of Epic's expert, Dr. James Mickens), and that they prefer Apple devices for their superior privacy, *id.* at 302:22–303:4 (*Epic* trial testimony of Tim Sweeney, Epic's CEO, about the reasons for preferring the iPhone over competitor devices).   In Tim Cook's words, the App Store is "an economic miracle," sustaining "almost 2 million people in the U.S. around the iOS job economy."  *Id.* at 3860:20–24 (Cook).

**B.    In the Face of a Pandemic and "Infodemic," Apple Ensures that Only Recognized Health Entities Can Distribute Apps Related to COVID-19**

In early 2020, the COVID-19 virus began sweeping across the world.  *See, e.g.*, Bill Chappell, *Coronavirus: COVID-19 Is Now Officially a Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://tinyurl.com/3mcb6r96.  That generational health crisis was accompanied by an "infodemic"— the rampant proliferation of false, misleading, and dangerous information about the pandemic.  *See, e.g.*, Matt Richtel, *W.H.O. Fights a Pandemic Besides Coronavirus: An 'Infodemic'*, N.Y. Times (Feb. 6, 2020), https://tinyurl.com/69bfjj3c.  Such misinformation presented a significant public health threat.  *See, e.g.*, Sarah Evanega, et al., *Coronavirus Misinformation: Quantifying Sources and Themes in the COVID-19 'Infodemic'* at 12 (Oct. 2020).

Consistent with its commitment to making the App Store a safe and trusted place for downloading apps, Apple sought to address these twin threats by critically evaluating apps related to the COVID-19 pandemic.  Brass Decl. Ex. 13.  As Apple explained:

> Communities around the world are depending on apps to be credible news sources — helping users understand the latest health innovations, find out where they can get help if needed or provide assistance to their neighbors.

> To help fulfill these expectations, we're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19.

*Id.*  In addition, Apple revised its App Review Guidelines to provide that "[a]pps that provide services in highly-regulated fields (such as banking and financial services, healthcare, gambling, and air travel) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer."  Brass Decl. Ex. 7 § 5.1.1(ix).

## C.    Apple Rejects the "Coronavirus Reporter" App for Violating Its Guidelines

Plaintiffs CALID Inc. and Coronavirus Reporter allege they are Wyoming corporations. Compl. ¶¶ 41–42.  Despite bearing the burden of proof, Plaintiffs have submitted no evidence concerning the nature of their businesses or the identity of their shareholders.  Indeed, Plaintiffs have not even filed the required Rule 7.1 Corporate Disclosure Statement and Local Rule 3-15 Certificate of Interested Entities that would allow the Court and Apple to understand who is driving this litigation, and who has a financial interest in its outcome.  Relying then on corporate records, Coronavirus Reporter Corp. was incorporated by GG Group Inc., a Nevada corporation, and CALID Inc. was incorporated by GG International, Inc., a Nevada commercial registered agent.  Brass Decl. Exs. 14– 15.

The Complaint alleges that CALID focuses on developing videoconferencing technology—not providing healthcare services.  Compl. ¶ 42.  Neither GG Group nor GG International appears to provide health services either.  Plaintiffs' only apparent connection to health or medicine is that Jeffrey Isaacs is CALID's CEO.  Brass Decl. Ex. 16; *see also* Kosmynka Decl. Ex. A (reflecting repeated communications by Mr. Isaacs on behalf of CALID).  Mr. Isaacs is a former physician "who suffers from a neuropsychiatric illness." *Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70, 72 (3d Cir. 2015).

Gibson, Dunn & Crutcher LLP

The New Hampshire Board of Medicine revoked his medical license in 2014 for his failure to disclose material facts.  Brass Decl. Ex. 17.  Since that time, Mr. Isaacs has waged an unsuccessful litigation campaign across federal courts.  *See*, *e.g.*, *Isaacs v. USC Keck Sch. of Med.*, 846 F. App'x 519, 520 (9th Cir. 2021) (affirming attorney's fees against Mr. Isaacs for violating a settlement agreement); *Isaacs v. Trustees of Dartmouth Coll.*, No. 18-1560, 2019 WL 10837707, at *1 (1st Cir. Jan. 3, 2019) (affirming dismissal of case challenging New Hampshire Board of Medicine's disciplinary action); *Isaacs v. Dartmouth Hitchcock Med. Ctr.*, No. CV198000DSFRAOX, 2020 WL 3096529, at *4 (C.D. Cal. Feb. 3, 2020) (dismissing case challenging various disciplinary and termination decisions); *Isaacs v. U.S. Dept. of Edu.*, No. 17-11221-FDS, Dkt. 61 (D. Mass. Mar. 8, 2019) (upholding agency's rejection of petition to discharge student loans).

Plaintiffs assert in their motion that they developed "five apps over five years."  Mot. ¶ 20. Aside from the "Coronavirus Reporter" app, Plaintiffs do not identify any apps they developed related to health or medicine.  Their motion instead claims that they developed "videoconference apps, telecommunications references, and games," *id.* ¶ 48, none of which are named.  The Complaint suggests one app is "CALendar IDentifier."  Compl. ¶ 42.  But Plaintiffs have refused Apple's request to confirm this, identify any of the other apps they mention, or even name the relevant developer accounts.  Brass Decl. ¶ 21 & Ex. 18.

For the single app on which Plaintiffs' motion is premised, Apple has been able to identify some information from its internal records.  For example, a correspondence log shows that CALID submitted the Coronavirus Reporter app for review in March 2020.  Kosmynka Decl. Ex. A.  Although the Complaint implies that Coronavirus Reporter Corp. developed this app, Compl. ¶ 41, Apple's records show that CALID is the developer of record.  Kosmynka Decl. Ex. A.  Because CALID was not a recognized healthcare institution, Apple rejected the Coronavirus Reporter app pursuant to its guidelines.  Kosmynka Decl. ¶ 8 & Ex. A; *accord* Compl. ¶¶ 14-16.

CALID appealed to Apple's App Review Board, an internal body that can review rejections made by Apple's frontline reviewers.  Kosmynka Decl. ¶¶ 9–10 & Ex. A.  This review confirmed that the Coronavirus Reporter app did not comply with Section 5.1.1 of Apple's App Review Guidelines. *Id.*  As Apple explained:

1
2
3
4
5
6

> We found in our review that your app related to the COVID-19 pandemic provides healthcare services or requires sensitive user information. In addition, **the seller and company names associated with your app are not from a recognized institution**, such as a governmental entity, hospital, insurance company, non-governmental organization, or university. [S]ection 5.1.1 (ix) of the App Store Review Guidelines, apps that provide services or collect sensitive user information in highly regulated fields should be submitted by a legal entity that provides these services, and not by an individual developer. Next Steps[.] To resolve this issue, your app must be published under a seller and company name of a recognized institution that provides healthcare services.

7

Kosmynka Decl. Ex. A (emphasis added).  The review board also uncovered additional software bugs

8

and design flaws that violated other guidelines.  Kosmynka Decl. ¶ 10 & Ex. A.  The App Review

9

Board therefore upheld the rejection of the app, *id.*, but encouraged CALID to "mak[e] the appropriate

10

revisions to your app and resubmit."  Kosmynka Decl. Ex. A.

11

CALID did not make the identified revisions; instead, on March 19, 2021, it sought to overturn

12

this decision a second time by asserting a collaboration with a Dr. Robert Roberts.  Kosmynka Decl.

13

Ex. A.  But Apple explained that "working with healthcare professionals" did not satisfy the App

14

Review Guidelines.  *Id.*  As Apple told CALID, "your app contains information related to the COVID-

15

19 pandemic, but the seller and company names associated with your app are not from a recognized

16

institution"; "your app presents user-generated data that has not been vetted for accuracy by a reputable

17

source"; and "[g]iven the sensitivity around this personal health information, there is a potential for the

18

app to be used in a malicious way which can spread misinformation."  *Id.*  Apple again encouraged

19

CALID to bring the Coronavirus Reporter into compliance with the App Store Review Guidelines and

20

submit it for review.  *Id.*  CALID did not do so.  Kosmynka Decl. ¶ 15.

21

**D.    Plaintiffs Sue in January 2021, Evade a Determination on the Merits, and Wait Seven Months to Move for a Sweeping Preliminary Injunction**

22

This litigation began more than seven months ago on January 19, 2021, when Coronavirus

23

Reporter filed a predecessor action in the District of New Hampshire.  *Coronavirus Reporter v. Apple,*

24

*Inc.*, No. 21-cv-47, Dkt. 1 (D.N.H.).  Apple repeatedly moved to dismiss that case, but Coronavirus

25

Reporter evaded any adjudication on the merits by twice amending its complaint.  *Coronavirus*

26

*Reporter v. Apple, Inc.*, No. 21-cv-47, Dkts. 10, 17, 26, 27, 32 (D.N.H.).  Before the court could rule

27

on Apple's most recent motion to dismiss, it ordered the case transferred under the contractual forum-

28

1   selection clause in Apple's Developer Program License Agreement.  *Coronavirus Reporter v. Apple,*

2   *Inc.*, No. 21-cv-47, Dkts. 10, 26, 32 (D.N.H.).

3          Before the District of New Hampshire's clerk could begin the transfer, Coronavirus Reporter

4   voluntarily dismissed its claims.  *Coronavirus Reporter v. Apple, Inc.*, No. 21-cv-47, Dkt. 40 (D.N.H.).

5   Plaintiffs then filed suit in this Court on July 20, 2021.  Dkt. 1.  As with their prior complaints, Plaintiffs

6   have stitched together allegations from other pending lawsuits against Apple.  *See* Mot. to Dismiss at

7   8 n.5.  They also added new parties—CALID as a plaintiff and the Federal Trade Commission as a

8   defendant (although apparently the FTC has not been served)—as well as a racketeering claim.  *See id.*

9   at 5.  But for almost three weeks after filing the complaint in this Court, Plaintiffs did not seek a

10   temporary restraining order or any other preliminary relief.  Nor did Coronavirus Reporter ever seek

11   such relief during the six months of litigation in New Hampshire.

12          Although Plaintiffs do not contend Apple has taken any new action against Plaintiffs since they

13   first filed suit in January—or, indeed, since Apple rejected the Coronavirus Reporter app in March

14   2020—they now move for a preliminary injunction.  The scope of their request is extraordinary.

15   Plaintiffs ask the Court to fundamentally change Apple's business model by compelling Apple to

16   license its intellectual property for free, Dkt. 20-1 ¶ d, while simultaneously precluding the company

17   from "[b]locking, rejecting or banning *any* App Store third-party developer app for any reason" except

18   those that violate "local, state, national, and/or global laws and treaties [sic]" or "could reasonably

19   likely cause device malfunction, incomplete execution, or device failure," *id.* ¶ c.  In addition, Plaintiffs

20   ask the Court to compel Apple to re-engineer iOS itself, *id.* ¶¶ a-b, and relinquish any control over its

21   intellectual property to unnamed "governmental level" authorities, *id.* ¶ c.  These requests, if ordered

22   by the Court, would materially impair Apple's ability to offer high-quality apps to customers.  *See*

23   Brass Decl. Ex. 2 at 3884:18–3886:1 (Cook) (discussing the implications of similar aspects of the

24   proposed permanent injunction in *Epic*).

25          Plaintiffs submit *no evidence* in support of their motion.

### III. LEGAL STANDARD

27          A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Winter v.*

28   *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The plaintiff must make a "clear showing" that (1)

"he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. This burden is "heavy." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). And the plaintiff must rely on "[e]vidence that goes beyond the unverified allegations of the pleadings," 11A Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.); "conclusory factual assertions and speculative arguments that are unsupported in the record" do not suffice. *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 682 (N.D. Cal. 2020); *see also Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (district court abuses its discretion "by relying on 'unsupported and conclusory statements'" instead of "evidence"). Because mandatory injunctions like the one sought in this case are "particularly disfavored," Plaintiffs' burden here "is doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## IV. ARGUMENT

Long before Plaintiffs filed this suit, a multi-billion-dollar app developer, Epic Games, Inc., commenced an assault upon the App Store business model. Brass Decl. Ex. 2 at 152:19–153:11, 279:19–280:3 (Sweeney). Devoting what Judge Gonzalez Rogers would call unlimited time and money, Epic spent over a year developing its litigation strategy with one of the top law firms in the country. *Id.* at 501:2-5. In that case, Epic filed a motion for preliminary injunction supported by fact and expert declarations as well as dozens of Apple documents. *Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-05640-YGR, Dkt. 61 (N.D. Cal. Sept. 4, 2020). After a hearing, Judge Gonzalez Rogers denied Epic's motion because, among other things, Epic had not demonstrated that it was likely to succeed on its claims at the "frontier edges of antitrust law." *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 833 (N.D. Cal. 2020). Thereafter, the parties exchanged millions of documents in discovery, participated in almost 50 depositions, and served thousands of pages of expert reports and supporting exhibits. Brass Decl. ¶ 2. In May 2021, Judge Gonzalez Rogers presided over a three-week trial on those claims that produced over 800 exhibits—the vast majority of which were quickly posted online for public review and use—and a 4,210 page transcript capturing testimony from not only Apple's CEO Tim Cook but also the leaders of Apple's App Store business. *Id.* ¶ 3. No decision has been issued. *Id.*

Plaintiffs acknowledge none of this history in their motion.  Yet they ask this Court to skip ahead to a different outcome even though they have tarried sixteen months after their app was rejected and through at least seven months of litigation, have submitted no evidence to support their motion, and have failed to even articulate a coherent or consistent theory of their own case.  If Epic's claims represent the frontier, Plaintiffs' claims are in the hinterlands.  There is neither a legal nor factual basis to undo Apple's entire App Store business model, and Plaintiffs' motion should be denied.

## A.    Plaintiffs Are Unlikely To Succeed On the Merits

None of Plaintiffs' claims will succeed.  To start, "the court can consider only facts presented by affidavit or testimony and cannot consider facts . . . [alleged in] the complaint but which have not been proved."  *Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961).  Accordingly, Plaintiffs "needed to submit *proof* sufficient to show [they have] a strong chance of success on the merits."  *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-CV-02770-WHO, 2014 WL 5361548, at *8 (N.D. Cal. Oct. 20, 2014) (emphasis added).  Their failure to offer *any* evidence supporting their claims is fatal.  *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990).[3]

Yet Plaintiffs' claims would fail even if taken at face value.  They focus on an unalleged tying for which they cannot meet any element of their burden—much less all of them.  Nor is there any merit to Plaintiffs' other claims.  On this basis alone, the Court should deny Plaintiffs' motion.  *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (no injunction can issue where plaintiff fails to show a "likelihood of success on the merits"); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (similar).

---

[3] Plaintiffs cannot cure this deficiency in reply as "courts typically do not consider new evidence first submitted in a reply brief."  *Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1104 (N.D. Cal. 2017).  Any such sandbagging also would violate the basic principle that "the party opposing the application [for a preliminary injunction must be given] notice and an adequate opportunity to respond."  11A Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.); *see also Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.*, 446 F.2d 353 (5th Cir. 1971) (vacating injunction entered upon affidavits submitted at hearing).

DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

Gibson, Dunn & Crutcher LLP

1

### 1.      Plaintiffs Are Unlikely To Succeed on Their Unpleaded Tying Claim

In their motion for a preliminary injunction, Plaintiffs argue that they are likely to succeed on only one claim: A supposed tie of "the App Store" to "the smartphone enhanced internet access device market."  Mot. ¶ 38.  In other words, Plaintiffs appear to contend that Apple violated Section 2 of the Sherman Act by tying the App Store to the iPhone device.  *See id.* ¶¶ 21, 38.  This argument diverges from the tying theory advanced in the Complaint, which asserts a tie between In-App Purchase and the App Store.  Compl. ¶ 259.  That is reason enough to deny the motion.  *See Chase v. McMasters*, 405 F. Supp. 1297, 1302 (D.N.D. 1975) ("[I]n deciding whether to grant a preliminary injunction," courts are "limited to examining the validity of the legal theories presented in the complaint.").  In any event, Plaintiffs have failed to establish the existence of a tying arrangement under this new theory, much less proven up the required elements under the rule of reason.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001) (rule of reason governs "tying arrangements involving platform software products"); *Fed. Trade Com'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (rule of reason applies to "[n]ovel business practices—especially in technology markets").

*First*, Plaintiffs cannot establish antitrust injury—a "threshold requirement." *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013).  Even crediting Plaintiffs' unsupported assertions, the only injury is a reduction in *consumers'* choice "amongst third-party applications." Mot. ¶ 39.  Plaintiffs identify no injury to developers like themselves.  *See Somers*, 729 F.3d at 963 (antitrust injury requires "an injury to the plaintiff").  Indeed, Plaintiffs do not even contend that they compete in either of the allegedly relevant markets: They do not seek to offer a competing app store in the supposedly tied market nor do they offer a competing "bundle of hardware and software" to the iPhone in the purported "smartphone enhanced internet access device" tying market.  Mot. ¶¶ 21, 38; *see also Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (no antitrust injury unless the plaintiff is a "participant in the same market as the alleged malefactor"); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 705 (9th Cir. 2001) (same); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 966 (9th Cir. 1999) (same).

*Second*, Plaintiffs have failed to substantiate a "smartphone enhanced internet access device market."  It is unclear who the buyers and sellers are in this market, which products are included, why

other products are excluded, and whether those boundaries rest upon economic evidence of cross-elasticity and reasonable interchangeability.  *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (dismissing antitrust claims because "the allegations of the relevant market [were] unclear").  As but one example, Plaintiffs appear to limit the market to smartphone devices, yet tablets also are purchased as a "hardware and software bundle" and allow consumers to download and use apps.  Compl. ¶ 30; *see also Pistacchio v. Apple Inc.*, No. 4:20-CV-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (rejecting alleged market that failed to explain the exclusion of potential substitutes).

*Third*, Plaintiffs are unlikely to prove Apple exercises monopoly power in this market.  *See Qualcomm Inc.*, 969 F.3d at 990 (Section 2 requires proof of monopoly power).  Apple competes against many smartphone makers.  *See* Compl. ¶ 30 (acknowledging other companies make "interchangeable" devices).  And while Plaintiffs assert that Apple "controls nearly 80% of the commerce transactions that occur over this device group," Mot. ¶ 21, that figure has no basis in evidence.  Public estimates peg Apple's share of U.S. app revenue around 40% and U.S. smartphone sales around 50%.  Brass Decl. Ex. 19 at 4–5 (estimating the App Store facilitated $138 billion of about $340 billion in the "app economy") & Ex. 20 (reflecting quarterly shares for U.S. smartphone sales between 40-65% in 2020 and 2021); *see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (the "Supreme Court has never found a party with less than 75% market share to have monopoly power"); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (90% market share is "enough" but 60–64% market share is "doubtful").  Yet even if Plaintiffs' unexplained assertion regarding market share were correct and substantiated, that would not establish monopoly power.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme.").  Plaintiffs fail to argue, much less show, that entry barriers prevent Apple's competitors—including Android behemoths like Google, Amazon, Microsoft, Samsung, LG, and many others—from competing effectively.  *See id.* at 1434.

*Fourth*, Plaintiffs cannot establish the "most fundamental requirement" of any tying claim: "[T]he existence of a tie" between two separate products.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,

836 F.3d 1171, 1178 (9th Cir. 2016).  Under their own theory, "[c]onsumers purchase [a] hardware and software bundle from Apple" that includes the "free apps [preinstalled] with the iPhone"—including the App Store app.  Mot. ¶ 21.  Neither the hardware nor software in this "bundle" work without one another.  The supposedly tied product is thus nothing more than an integrated component of the alleged tying product.  *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 974 (9th Cir. 2008) (tying claim failed because "component[s]" of a "bundled" product were not separate).  Indeed, the App Store has been preloaded onto iOS from its inception.  Brass Decl. Ex. 21 at 0880.20; *see also Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (no tie existed where the two alleged products had never been sold separately).

*Fifth*, Plaintiffs have failed to offer any evidence that the alleged tie "has a substantial and anticompetitive effect that harms consumers" in the relevant tied product market.  *Qualcomm Inc.*, 969 F.3d at 991.  Plaintiffs at most assert that "[c]ustomers are presented with less selection and competition."  Mot. ¶ 39.  "But missing from this record is any such evidence."  *Herb Reed Enters.*, 736 F.3d at 1250.  It is far from certain that consumers would have access to more quality apps if Apple could not centralize distribution through the App Store.  For one, a fractured system with many competing app stores would require developers to meet any number of competing—and potentially conflicting—requirements, diverting resources toward making more versions of the same app rather than improving the apps themselves.  And if Apple could not subject apps to review prior to distribution, as Plaintiffs seek, the market could become flooded with malware, offensive content, and other kinds of low quality apps.  *See* Brass Decl. Ex. 3 ¶¶ 29, 120 (explaining how an uncurated environment could become less desirable to users and developers, leading to a decline in the user and developer base).  All of this would harm consumers or developers, and Plaintiffs' "speculation" cannot establish otherwise.  *Herb Reed Enters.*, 736 F.3d at 1250.

### 2.    Plaintiffs' Other Antitrust Claims Are Likely to Fail on Multiple Grounds

Plaintiffs offer no cogent argument in their motion that they are likely to succeed on any of the other claims pleaded in their complaint and have therefore forfeited any ability to seek preliminary injunctive relief on the basis of those claims—notwithstanding their purported reservation to assert otherwise in the future.  Mot. ¶ 46; *see also*, *e.g.*, *Pham v. Fin. Indus. Regul. Auth. Inc.*, No. C-12-6374

EMC, 2013 WL 1320635, at *2 (N.D. Cal. Apr. 1, 2013) (plaintiffs waive argument that they do not make in their opening brief).  In any event, each of those claims fail on the face of the Complaint for the reasons set forth in Apple's motion to dismiss.  *See* Mot. to Dismiss at 6–24.  Given Plaintiffs' election not to rely on these claims in their motion for a preliminary injunction, and to avoid burdening the Court with repetitive arguments, Apple adopts those arguments by reference here.

In addition, Plaintiffs cannot show that they are likely to defeat Apple's legitimate business justifications.  *See Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 369 (9th Cir. 1988) (there can be no "antitrust liability if there was a legitimate business justification" for the defendant's conduct); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366-68 (9th Cir. 1992) (plaintiff "has the burden of proving that the defendant acted without a legitimate business justification").  To combat the virulent misinformation that accompanied the spread of the COVID-19 pandemic, Apple restricted apps related to the pandemic to recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions.  Brass Decl. Ex. 13; Kosmynka Decl. ¶ 5.  The antitrust laws do not condemn efforts to improve the credibility and reliability of public health information.  *See Cal. Comp. Prod., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (improving quality of product was legitimate business justification).

Without any evidence, Plaintiffs argue that Apple's COVID-19 policy was pretextual.  Mot. ¶¶ 10, 46.  But Plaintiffs' apparent disagreement about the wisdom of Apple's decision does not establish pretext.  Any firm is free to make decisions that "are consistent with the quality and image it wishes to project for its products." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189 (2d Cir. 1992); *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) (a firm may take measures to "maintain[] a reputation for high quality by being selective about the [developers] to whom it entrusts its customers").  Apple decided to prioritize public health and safety by restricting the sources of potential misinformation, and applied that standard to the apps in question.  Brass Decl. Ex. 13; Kosmynka Decl. ¶ 5.  That is not pretextual, and Plaintiffs have no evidence (or even argument) to the contrary.

Nor is there any evidence to support Plaintiffs' argument that Apple rejected their app to "favor[]" its own.  Mot. ¶ 9.  That would not defeat Apple's defense even if true.  *See Morris Commc'ns*

*Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296-98 (11th Cir. 2004) (evidence that a defendant was primarily pursuing its best financial interest is not enough to overcome proof that a restraint was supported by a legitimate business justification).  But Plaintiffs are wrong.  Apple has approved more than 1,500 COVID-19 apps from recognized entities.  Kosmynka Decl. ¶ 6.  Just as for other apps that did not comply with Apple's policy, *id.*, app reviewers determined that Plaintiffs failed to comply with Apple's guidelines and explained as much to Plaintiffs.  *Id.* ¶ 8.  As explained to Plaintiffs at the time, their asserted partnership with certain doctors was not enough; there is no evidence that either Coronavirus Reporter Corp. or CALID Inc. are recognized, institutional healthcare providers.  Kosmynka Decl. ¶¶ 11–13 & Ex. A; *see also* Mot. ¶ 48 (arguing that Plaintiffs developed also "videoconference apps, telecommunications references, and games").  Indeed, Apple did not even have any anticompetitive incentive to self-preference: Apple's contact-tracing software—developed in conjunction with Google to help governments and health agencies reduce the spread of COVID-19 while preserving user privacy and security—was provided for free, and Apple even released its draft technical documentation to the public.  *See* Brass Decl. Exs. 22–23 (describing free app developed by Apple in conjunction with the CDC to provide credible information about COVID-19).

Plaintiffs are not likely to prevail on any one of the claims they assert here, and on that basis, the Court should deny the motion.

**B.      Plaintiffs Have Not Proven a Risk of Irreparable Harm**

To obtain a preliminary injunction, a plaintiff also "must establish that irreparable harm is likely, not just possible."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Again, Plaintiffs' arguments fail at the gate given the total absence of proof.  *See Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (vacating injunction because a plaintiff cannot establish a risk of irreparable harm without evidence); *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (same).  But even setting this aside, none of their contentions—even if credited—justify a preliminary injunction.  *See Diversified Silicone Products Corporation v. Elastapro Silicone Sheeting LLC*, No. CV 20-2010 PSG, 2020 WL 4390380, at *2 (C.D. Cal. 2020) (failure to establish irreparable injury is "dispositive" to request for preliminary

Gibson, Dunn & Crutcher LLP

1  injunction); *Tech. & Intellectual Prop. Strategies Grp., PC v. Fthenakis*, No. C 11–2373 MEJ, 2012

2  WL 159585, at *4 n.6 (N.D. Cal. Jan. 17, 2012) (same).

3        To start, there is no "presumption" of irreparable harm as Plaintiffs suggest.  Mot. ¶ 47.  That

4  presumption arises when the government demonstrates that a merger likely violates Section 7 of the

5  Clayton Act.  *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *see also F.T.C. v.*

6  *Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C. Cir. 1981) (explaining that government agencies are not

7  always "held to the high thresholds applicable where private parties seek interim restraining orders").

8  To the contrary, Plaintiffs' seven-month delay in seeking an injunction "implies a lack of urgency and

9  irreparable harm."  *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993); *see also Lydo*

10  *Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (because "[a] preliminary

11  injunction is sought upon the theory that there is an urgent need for speedy action to protect the

12  plaintiffs rights," a plaintiff who "sleep[s] on its rights . . . demonstrates the lack of need for speedy

13  action").  Indeed, many courts have concluded that similar—or even shorter—delays are inconsistent

14  with an assertion of irreparable harm.  *See*, *e.g.*, *Valeo Intellectual Prop. v. Data Depth Corp.*, 368 F.

15  Supp. 2d 1131, 1128 (W.D. Wash. 2005) (three-month delay); *Tough Traveler. Ltd. v. Outbound*

16  *Prods.*, 60 F.3d 964, 969 (2d Cir. 1995) (four-month delay); *Playboy Enters., Inc. v. Netscape*

17  *Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (five-month delay); *Kolay v. Milliken*,

18  No. 2-18-CV-00640 SVW KSX, 2018 WL 1942709, at *4 (C.D. Cal. Mar. 22, 2018) (nine-month

19  delay).

20        None of Plaintiffs' asserted injuries are irreparable in any event.  Plaintiffs contend that

21  "epidemiological" and "biostatical" data may be lost.  Mot. ¶¶ 51–53.  But because they fail to provide

22  any information about the alleged Coronavirus Reporter app, there is no basis to understand what

23  "epidemiological" and "biostatical" data are in jeopardy, how Plaintiffs' app would preserve that data,

24  and why such data is not already preserved by existing software, research, or governmental efforts.  *See*

25  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, No. C 12-3856 PJH, 2014 WL 4312021, at *10

26  (N.D. Cal. Aug. 28, 2014) (rejecting "platitudes" of harm and denying motion for preliminary

27  injunction due to lack of evidence).  In any event, Plaintiffs do not explain how the loss of these data

28  (if any such loss could be proved) is an injury *to them* for which they could seek any remedy.  *See In*

*re Apple Processor Litig.*, No. 5:18-cv-00147-EJD, 2019 WL 3533876, at *6–8 (N.D. Cal. Aug. 2, 2019) (dismissing claims where plaintiff had not personally suffered injury alleged).

The only asserted injury Plaintiffs identify to themselves is that their apps will not be able to "obtain sufficient market share" to earn revenue in Apple's ecosystem.  Mot. ¶ 48.  But an antitrust plaintiff may seek lost profit damages and other forms of monetary relief.  *Knutson v. Daily Rev., Inc.*, 468 F. Supp. 226, 229 (N.D. Cal. 1979).  So even if the Court could ignore Plaintiffs' own allegation that they intended to offer their app for free, Compl. ¶ 94, there is no evidence establishing that lost profit damages or other monetary relief would be inadequate.  This was their burden, yet Plaintiffs have no evidence to show that an equitable remedy is warranted.  Because Plaintiffs offer nothing more than "speculation on future harm," they have not established a risk of irreparable injury and their motion should be denied.  *Herb Reed Enters.*, 736 F.3d at 1249–50.

## C.   The Balance Of The Equities Favor Apple, and the Proposed Injunction Would Harm the Public Interest.

While Plaintiffs identify no irreparable injury they would suffer without an injunction, the remedy they seek here poses an incalculable risk to the public and Apple.  The Apple ecosystem has been an enormous success in part because it is a curated space that consumers trust.  *See* Kosmynka Decl. ¶¶ 2, 18.  The injunction sought here would eviscerate that system, burdening Apple with redesigning its software infrastructure in a way that prevents the company from protecting its customers from malicious or offensive content.  And it would strip Apple of its right to choose when, where, if and how to license its intellectual property.

First, the proposed injunction would inundate consumers, including children, with malware, porn, and other malicious and offensive apps.  For example, Plaintiffs seek to bar Apple from rejecting any app except those that violate "local, state, national, and/or global laws and treatises [sic]" or "could reasonably likely cause device malfunction, incomplete execution, or device failure."  Dkt. 20-1 ¶ c. This would require Apple to allow consumers to download many apps that surreptitiously gather sensitive user data, such as bank records, health information, and other personal data stored on many mobile devices.  It also would force Apple to distribute apps filled with virulent racial epithets or other

offensive stereotypes.   Plaintiffs would even block Apple from rejecting apps that disseminate pornography, even though its devices are widely used by children.

Plaintiffs ignore these concerns, but they are not hypothetical.  Apple offers better security than any competitor.  Brass Decl. Ex. 2 at 2708:13–17 (Mickens).  That is in large thanks to the app review process that Plaintiffs seek to enjoin, which rejects thousands of apps every week precisely because they do not meet Apple's high standards for privacy, security, and quality.  Kosmynka Decl. ¶ 2.  Far from making Apple's platform "more desirable and valuable," Mot. ¶ 56, the remedy sought here would create a "toxic kind of a mess" where the "safe and trusted" App Store once stood—a result that is "terrible for the user" and "terrible for the developer."  Brass Decl. Ex. 2 at 3884:18–3885:11 (Mr. Cook testifying about the implications of a proposed injunction that would force Apple to distribute unreviewed apps); *see also id.* at 3885:19–3886:1 (Mr. Cook similarly explaining that Apple's "promise of safety, security, and privacy" to users "depends on" the app review process).

The proposed injunction also seeks to trample Apple's intellectual property rights.  Apple's software development tools, the App Store, and iOS itself are protected by patents, copyrights, and trademarks.  Brass Decl. Ex. 9 ¶ 23.  This carries with it the exclusive right to license (or not to license) that software as it determines.  *See*, *e.g.*, *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 (1st Cir. 1994) (explaining that because "[t]he Copyright Act expressly grants to a copyright owner the exclusive right to distribute the protected work, . . . '[t]he owner of the copyright, if [it] pleases, may refrain from vending or licensing and content [itself] with simply exercising the right to exclude others from using [its] property'").  Because the antitrust and intellectual property laws must be construed *in pari materia*, Apple's intellectual property rights preclude the remedy sought here— compelling Apple to distribute apps using its intellectual property without any charge.  Dkt. 20-1 ¶ d; *see also SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1082–83 (D. Colo. 2013) (rejecting Section 2 claim that would "subvert . . . the rights granted a copyright holder").  Indeed, such compelled licensing would amount to a government taking of Apple's property for which just compensation would be required.  *See James v. Campbell*, 104 U.S. 356, 358 (1881) (government cannot appropriate or use patented inventions without just compensation).  At a minimum, it would significantly increase Apple's costs, allow competitors to free-ride on the billions of dollars that Apple

has invested in the iOS ecosystem, and would chill Apple's incentives to invest and innovate—to developers' and consumers' detriment.  Brass Decl. Ex. 9 ¶¶ 61–71; Trial Tr. 3643:10–17, 3645:21–25 (*Epic* trial testimony of Apple's expert, James Malackowski).

Nor can Plaintiffs ignore the burden of compelling Apple to redesign iOS.  Dkt. 20-1 ¶¶ a-b. Without evidence or explanation, they brush the scope of their request aside as insignificant.  Mot. ¶ 55.  But overhauling iOS assuredly would require extensive software engineering, as Apple would not only have to change the fundamental code of its software but also explore new ways in which to attempt to mitigate the security and privacy risks to which its users would now be exposed.  *See* Brass Decl. Ex. 2 at 2721:18–2723:16, 2732:14–24 (Mr. Schiller describing the burden of developing and changing iOS).

The requested injunction, in short, would do unimaginable harm; yet Plaintiffs offer no evidence that it would do any good.  A court sitting in equity should not countenance such a request.

## D.    A Preliminary Injunction May Be Issued Only If Plaintiffs Post a Bond for at least $99 Million

A preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This presumptively requires plaintiffs to put a bond against which the defendant can collect if they ultimately prevail.  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994).  That sum is at least $99 million here—and likely far greater.

Under the express terms of Plaintiffs' proposed injunction, Apple could no longer charge developers the $99 annual developer program fee.  *See* Dkt. 20-1 ¶ d.  Given that there are approximately 1 million members in the Apple Developer Program, Brass Decl. Ex. 2 at 2759:14–17, 2760:10–15 (Schiller), Plaintiffs' proposed injunction would cost Apple at least $99 million a year in developer program fees.  A $99 million bond thus would cover only one year of the "damages sustained" by Apple from a wrongful injunction, Fed. R. Civ. P. 65(c)—a conservative estimate even if this case could be rushed to trial.  Therefore Plaintiffs should be ordered to post a bond of *at least* $99 million to pursue their request for injunctive relief.

Gibson, Dunn &
Crutcher LLP

1    Yet lost developer fees likely represent a small fraction of the damages Apple would suffer.
2    The proposed injunction also would force Apple to distribute apps from developers that circumvented
3    or otherwise refused to pay Apple its contractual commissions.  Dkt. 20-1 ¶ c.  These commissions
4    make up the bulk of Apple's revenue from the App Store, which was about $13.5 billion in 2019, Brass
5    Decl. Ex. 2 at 1730:17–20, and has only risen since, Brass Decl. Ex. 24 at 21.  A wrongful injunction
6    thus could inflict billions of dollars of harm to Apple.  There is no indication (much less evidence) that
7    Plaintiffs have the financial wherewithal to make good such a loss if necessary.  This must be factored
8    into the required bond as well.

9    In addition to lost revenue, Apple would also invariably suffer damage to its goodwill and brand
10   when users are inundated with malware, pornography, scams, and other malicious, dangerous, and
11   unsavory apps.  *See* Kosmynka Decl. ¶ 18.  What is more, the proposed injunction—which seeks to
12   demolish Apple's business model—could irreparably damage the attractiveness of Apple's platform.
13   *See* Brass Decl. Ex. 3 ¶¶ 29, 120 (explaining how even slight changes to a transaction platform's rules
14   and prices, let alone the wholesale transformation proposed here, can lead users to quickly abandon a
15   platform).  These intangible, yet very real, potential harms should also be considered by the Court in
16   setting the amount of the bond that Plaintiffs should be required to post before proceeding on their
17   Quixotic quest for an injunction.

18   Despite the sweeping injunction Plaintiffs asked the Court to impose, and the undeniable gravity
19   of a wrongful injunction, Plaintiffs have not offered to post *any* security.  The Court should not even
20   entertain the request for injunctive relief unless and until Plaintiffs post a bond for at least $99 million.
21   If they are unable or unwilling to do so, then the motion can and should be denied for that reason alone.

22                                        **V.   CONCLUSION**

23   For the reasons set forth above, Apple respectfully requests that the Court deny Plaintiffs'
24   motion for a preliminary injunction.

25

26

27

28

1    Dated:      August 23, 2021            Respectfully submitted,

2                                 By:     */s/ Rachel S. Brass*

3                                        Rachel S. Brass

4                              GIBSON, DUNN & CRUTCHER LLP

5                              MARK A. PERRY (SBN 212532)
                              mperry@gibsondunn.com

6                              RACHEL S. BRASS (SBN 219301)
                            rbrass@gibsondunn.com

7                              JULIAN W. KLEINBRODT (SBN 302085)
                            jkleinbrodt@gibsondunn.com

8                              555 Mission Street, Suite 3000
                            San Francisco, CA 94105-0921

9                              Telephone: (415) 393-8200
                            Facsimile:  (415) 374-8429

10                             *Attorneys for Apple Inc.*

22

DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC