Keith Mathews
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, <br> CALID INC, <br> PRIMARY PRODUCTIONS LLC, <br> DR. JEFFREY D. ISAACS, <br> on behalf of themselves and all others similarly situated <br><br>                 Plaintiffs, <br><br> vs. <br><br> APPLE INC., <br> FEDERAL TRADE COMMISSION <br><br>                 Defendants. | Case No. 3:21-cv-05567-EMC <br><br> **PLAINTIFFS' REPLY** <br> **IN SUPPORT OF MOTION FOR** <br> **PRELIMINARY INJUNCTION** <br><br> **<u>Hearing</u>** <br><br> Date:     October 14, 2021 <br> Time:    1:30PM <br> Place:    Courtroom 5, 17th Floor <br>             (videoconference) <br><br> The Honorable Edward M. Chen |

## PLAINTIFFS' REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION

1. Plaintiffs are likely to prevail on four *per se* tying arrangements with respect to the iOS Institutional App market, the iOS userbase, iOS notary stamps, and application loaders. Likewise, they are likely to prevail under the "MCI test" for conduct that denies essential facilities to competing app developers. Defendant Apple's objection to the preliminary injunction simply ignores all of these arguments. Because the Defendant waived any mention or defense to the above theories, the injunction should properly issue without delay.

2. International consensus exists that the App Store engages in the monopolistic practices described in the Amended Complaint. Senior Senator Blumenthal declared that it is "most offensive how [Apple] strangles new app development." The Congressional Subcommittee called the practices "tyranny," and calls on the courts to "better enforce the intent of the Sherman Act legislators." South Korea passed legislation just last week to terminate Apple's anticompetitive practices, and Russian Federation fined Apple earlier this summer. Thirty other countries, in the EU, UK, and elsewhere, have announced legislation to curtail App Store abuses. Apple's pleading silence on this international consensus must be viewed as an admission of guilt. Since Apple did not, and cannot, deny international consensus in their objection to the injunction, their public interest defense is estopped.

3. Instead, Apple clings to the fact that *Epic's* unsuccessful injunctive request was "on the frontier edges of antitrust law." But we now have the benefit of *Epic's* voluminous discovery and findings of fact, which are incorporated in the complaint documents. Apple has not objected to them, or even filed an Answer. Plaintiffs' claims go well beyond *Epic's*, stating vastly refined liability theories for five different downstream markets applicable to free apps which constitute 83% of the app market, and which *Epic* does not address. A key further differentiating fact is that this injunction, as opposed to *Epic's*, is about censorship of life-or-death pandemic apps, rather than a 30% game commission. Irreparable harm is obviously of a different magnitude. Finally, it is worth pointing out that many early injunctions have succeeded in antitrust, notably with Microsoft and AT&T. Nobody misses dollar-a-minute long distance, and they won't miss Apple's restriction on the app market, which makes the App

Store one-tenth (1/10) the size of competing non-restricted markets in China. Global tides have shifted and we are at a very different point than *Epic* was in filing for their preliminary injunction just one year ago.

4. As the Amended Complaint submits, a party seeking to defend a *per se* tying arrangement on the basis of competitive justifications bears a heavy burden of proof; the defense is difficult to establish and has been successful only under limited circumstances. As the motion for an injunction explained, Apple ties the App Store, and hence all retail and institutional app transactions, to the smartphone/iOS device marketplaces. The Amended Complaint further describes the improper conduct Apple engages in when it ties iOS notary stamps and "selectively leased" application loaders to the iOS device. Hence there are multiple improper ties alleged in the motion and Amended Complaint that Apple simply ignored in its opposition document, and therefore, opposition must be deemed waived.[1]

5. Instead, Defendant Apple's opposition centers almost exclusively around competitive justifications for Apple's monopoly over the US smartphone market. For convenience, we summarize Apple's objections.

a. Apple falsely contends Plaintiff Coronavirus Reporter "is not affiliated with any apparent, recognized healthcare institution as Apple's guidelines required." But Apple's own *Kosmynka Declaration* (Dkt 34-1) evidences that on March 7, 2020, Apple was informed otherwise of CALID's healthcare credentials:

> "Dr Robert Roberts is Chief Medical Officer of CALID, Inc. … [he] a) invented the gold standard screening for heart attacks used for thirty years, b) is head of University of Arizona's Translational Research Center, c) gave astronaut John Glenn medical clearance for the first earth orbit… CALID's team also includes [a physician ]who has a decade ER experience and [an MD/MBA], who is also a computer scientist from Dartmouth and has developed apps that have served over 100 million users."

Of particular relevance, CALID's developer wrote "cross-platform mRNA sequencing apps" in 1995 with academic departments linked to the Covid vaccine discovery. The Amended Complaint also cites FactMed, a

---

[1] The pending motion described the notarization stamp and iOS institutional apps markets, neither of which are addressed in Apple's response. The Amended Complaint, filed yesterday, elaborates upon additional tied markets of iOS userbase contractual rights and application loaders. Plaintiffs maintain Apple waived any opposition to the institutional app markets, and therefore, the injunction should issue regardless of their position on iOS notary stamps and userbase access rights Nonetheless, the injunction hearing is six weeks away, which allows sufficient time should the Court entertain any objection to two new, but similar, marketplace definitions raised in the Amended Complaint, which now serves as the operative complaint in this process.

"big data" bioinformatics project that Google recognized with tens of millions of search visitors, as CALID's credentials. Between all these facts, and Dr. Roberts' March 2020 letter to Apple (*Amended Complaint Exhibit B*) which explained the UA resources available to the team, there is incontrovertible evidence of deep credentials[2] that backed this institutional (i.e. corporate) project.

b. Apple's response seemingly misses the point – that startups have contributed throughout history to medical innovation. Asserting Plaintiff "violated their guidelines" for being a non-institution is precisely the conduct at issue in this lawsuit. The public does not need Apple's protection from Dr. Roberts, and grouping him work into "malware, racial epithets, and adult content" is offensive beyond tolerable standards.

c. Apple takes credit for "phenomenal success" and soaring output of apps, all from their "economic miracle." The problem with this argument is that their own evidence defeats it. Apple included graphs of the Chinese app marketplaces. In that country, the non-Apple apps are ten times (10x) the size of Apple's App Store. This is not mere coincidence; this is the premise of the underlying motion: Apple's "walled garden" can flourish, just like the open markets in China, if the Court upholds the Sherman Act.

d. Similarly, Apple's outdated graphs attributing 40% malware in Android to Apple's 1% are misleading, and even if true, don't demonstrate any actual harms that outweigh "social engineering" and other non-malware breaches that Apple devices are equally subject to. Moreover, Android malware has decreased some 80% in recent years as a market evolves for app security. Most significantly, Apple malware, such as Pegasys, is growing. Even if Apple's data were representative, the proposed injunction doesn't stop Apple from screening for malware. It

---

[2]Apple was provided CALID's health and medical credentials in a direct email to Tim Cook on March 6, 2020. Opposing counsel Gibson Dunn suppressed this plain evidence, forging an opportunity to disclose a developer's brain injury as somehow relevant to this antitrust case. Asserting that no "health or medical credential" was known to Apple, Gibson Dunn purports to have conducted a litigation search uncovering said brain injury, describing it maliciously as a "neuropsychiatric illness." In fact, there was no litigation search; Gibson Dunn is a RICO defendant in these cases, and knows them all first-hand. Gibson Dunn's use of an unrelated Apple antitrust case to advance their RICO defense in a split 1-2 dissent pending SCOTUS Ninth Circuit *certiorari* petition. This represents irrelevant, scandalous pleading conduct that has absolutely no relation to the present Apple antitrust case, unless one were to believe Apple had no knowledge of CALID's credentials.

specifically allows customers to choose – like they do on a Mac – whether or not they want Apple curated results and notary stamp checks. In free markets, the customer should have this choice.

e. Defendant Apple wrongly asserts Plaintiffs have alleged no antitrust injury to themselves of developers, despite the complaint documents seeking $200 billion in damages for improperly denied or suppressed apps, which lost vast revenue to Apple's competing apps and their cronies. Frankly, it is difficult to understand how Apple's assertion complies with Rule 11. By ignoring the institutional monopsony argument that is so central to the case, and straw-man attacking the fact Plaintiffs don't offer a competing app store, like *Epic* does (they do), Apple feigns ignorance of the "infra-competitive" prices paid to Plaintiffs for their apps. But Plaintiffs' pleadings frequently recite the fact that for decades, programmers distributed their software on their own app stores (websites), or brick-and-mortar stores. The Amended Complaint explains that any Plaintiff of class member could easily set up a website to distribute apps direct-to-consumer, but for Apple's notary stamp and application loader monopoly. So even Apple's straw-man argument that Plaintiffs don't have competing app stores fails. Developers face a drastically reduced competitive environment (10x reduced, if we look to China) that severely impacts their career earnings.

f. The company relies upon semantics to claim Plaintiffs haven't substantiated a market for smartphones. Apple falsely argues 75% market share thresholds are not met, when in fact the complaint documents clearly plead that Apple has 80% of app sales by dollar amount, and 100% in the single-market for iOS devices. Even Apple's 60% share of the US smartphone market is certainly "market power" in the upstream market, permitting downstream monopoly claims. There is no reasonable question in this case of the foremarket – the US smartphone (or iOS device single product) market – and relevant downstream markets at the heart of the Amended Complaint

g. Apple suggests the App Store can't be "tied" to the iPhone because it has always been bundled as an "integrated component" "preloaded onto iOS from its inception." That, of course, isn't true. The App Store launched after the iPhone. But more importantly, this particular straw-man argument distracts from the fact that a smartphone does not need Apple's App Store. Android does not require Apple's App Store. Android allows sideloading, and while some versions may incorporate Google Play, they certainly don't incorporate the App Store. And as the

motion plainly alleges, every major computing platform in history worked fine without an App Store. Therefore the App Store is a distinct product, and requiring end-users use the App Store in the EULA is an improper tie.

h. Apple contends that their denial of Dr. Roberts work product was permissible because, under *Trans Sport*, they sought to restrict sources of potential misinformation. But Apple does not plead, nor can they, that Dr. Roberts' app was anything other than a useful tool to facilitate transparent symptom sharing by everyday citizens. Indeed, the complaints explain how a UK app by Oxford implement Roberts' idea, and is used by five million people a day. The public didn't need protection from Dr. Roberts, who saved countless lives with his medical discoveries; conversely, Plaintiffs need this Courts' protection from Apple's predatory conduct.

i. Apple posits that Sherman Act enforcement is incompatible with the monopoly granted to them through patent law. But the Ninth Circuit recognized a limited exception to the general rule when monopolists exclude competition in the long run. *FTC v Qualcomm*, referring *to Aspen Skiing Co. v. Aspen Highlights Skiing Corp.*, 472 U.S. 585 (1985). Moreover, it is not clear here how the desired relief would infringe upon any of Apple's patents. To be sure, letting an app run on an end-user's device shouldn't constitute patent infringement, and if it somehow did, it's a perfect case for *Aspen.*

j. Finally, Apple requests a minimum $99 million bond, in the event a permanent injunction never issues. Plaintiffs assert such a bond is not required under the circumstances. Apple may still offer subscriptions to developers, and therefore there would be no losses to Apple if developers remain in their program. If developers leave the program, that itself evidences that they were reluctant members. The purpose of a bond is not to protect a monopolist against losses due to anticompetitive behavior. Apple also claims a bond should cost of implementing App Store changes. But these changes have already been mandated by South Korea, and pending bipartisan Senate legislation here. There is little question that Apple will have to, if it didn't already, make said changes to their platform, due to international consensus. Plaintiffs shouldn't have to be on the hook for these inevitable costs. In any event, Plaintiffs are willing to raise a $99 million bond if the Court so demands.

6. Apple completely ignores the motions' tying argument with regard to the iOS institutional market, and has therefore waived objection:

> "Tying arrangements are another. By using monopoly power to compel a customer to purchase a product it might prefer to purchase elsewhere, a monopolist "forecloses competition on the merits in a product market distinct from the market for the tying item." Relevant here, Apple has tied the App Store, i.e. exclusive control over institutional application purchasing and distribution, to the smartphone enhanced internet access device market. This tying is plainly forbidden under Section 2, and is a narrow target of the proposed injunctive relief. (*Mtn. Preliminary Injunction*, p. 15)

7. Rather than address Plaintiffs' iOS Institutional App market, Apple attacks Epic's IAP tying claims, which only represent an auxiliary part of this case. Defendant Apple does not address the allegation that they are a monopsony over the iOS institutional app market, and that they underpaid Plaintiffs for their work product.

8. Apple's opposition fails to dispute any of the elements specified in *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891 (1983), a case challenging AT&T's use of local telephone networks to thwart competition in the long-distance telephone service market. There, the court held that "to establish liability under the essential facilities doctrine [a plaintiff must show]: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1132-33. There is no contest that Apple controls access to notarization stamps, application loaders, the iOS userbase, or even the broader smartphone enhanced internet access device userbase. Developers cannot duplicate this trillion dollar network effect infrastructure, and Apple plainly denies these facilities to 40,000 developers each week. Apple has not responded to Plaintiffs' two key arguments that access to the essential facility is feasible: 1) The Mac offers all of these essential facilities to its userbase, in a safe fashion, and iOS is based on Mac architecture, so it is entirely feasible, and 2) a Developer requested an arbitration panel "Independent App Court" to administer notarization stamps, which is entirely feasible, but Apple refused.

9. In this instance, the Court may reasonably find the *per se* tying exists, and similarly, that developers are denied an essential facility. But even if the Court determines otherwise, Plaintiffs' broader arguments of interstate restriction prevail under the rule of reason. *Epic's* findings of facts at pages 43-52 cover this precise issue, namely the 'rule of reason' as applied to Apple's purported proprietary app safety. Those findings of facts were incorporated in both the complaint, and the Amended complaint:

> "Apple could continue to utilize these tools even if it allowed distribution outside the App Store, as it does today through the notarization process on macOS…the evidence shows that third parties could replicate (and potentially improve upon) both the human and automated features of Apple's process.

(Lee.) … security could be a vector on which alternative app stores compete if they were allowed on iOS. Apple is not the only company capable of protecting users. Indeed, alternative app stores could very well achieve better security results on iOS than Apple alone. (Lee.)"

10. Plaintiffs' allegations go even further. Not only could an alternative app store compete with Apple to improve security offerings, but Apple could implement and partner with a neutral arbitration organization to carry out due process and safety controls, meanwhile avoiding self-preferential bias. Plaintiffs' have met the standard, therefore, under rule of reason for all of its Sherman Act claims. To defeat this rule, Apple would have to argue that no competitor, and no arbitration panel, can provide app screening safety services. Furthermore, one would have to conclude that Apple's App Review, which denied Dr. Roberts life-saving app, and outright missed Pegasys, is the only such entity that exists. This would be unreasonable.

11. Apple's core argument is that they have a right to deny distribution of malware and other products the detract from the value of their ecosystem. But this argument is unpersuasive against Plaintiffs, who "had coronavirus prevention apps, videoconference apps, telecommunications references, and games, that were respectively disallowed and/or demoted by Apple's own Covid SDK, FaceTime, Whitepages, and Apple Arcade, respectively" Id. at 19. To achieve their argument, Apple embarks on a fruitless *reductio ad absurdum* that goes something like this: Apple has a mandate to protect its userbase from malware, and likewise, to assign age appropriateness ratings to content, and henceforth their app review team should also form an opinion whether an app's purpose is legitimate, and finally, to determine if an app was created by a physician whom they feel is "deeply credentialed." This results in the absurdity that Dr. Roberts' life saving coronavirus app needs Apple's policing, and is precisely why an injunction needs to be issues to prevent further potentially catastrophic decisions by Apple. What if Apple rejected an app that might have allowed reporting and prevention of some future disaster? If they could do it to Dr. Roberts, they can do it to anyone. Apple's safety concerns are uniquely one-side, to be sure.

12. For convenience of the Court, Plaintiffs summarize arguments raised in the underlying motion, that were not addressed, and therefore waived by Apple:

a. In addition to completely ignoring the institutional monopsony in the above tying case-law, their objection does not contain a single reference to the institutional/wholesale smartphone app markets, which are the core of both

the Complaint, and the Amended Complaint. Oddly, Apple acts as if those arguments don't exist, and engage in straw-man attacks on *Epic's* IAP tying market that are auxiliary to this case and Plaintiffs' overall device market definitions. The public deserved to hear Apple's response on the institutional app monopsony they hold with respect to free apps. This lawsuit is the first to address such apps, which represent 83% of all apps. Apple's silence on the matter speaks volumes.

b. Apple is equally silent on the matter of Israeli Pegasys' complete breach of iOS security defenses. If Apple's primary argument is competitive safety justification, a total breach of their system defeats that argument. It would be analogous to the makers of the Titanic claiming the vessel was unsinkable.

c. The motion asserts that the Mac is an exceptionally safe operating system, which has been open to all developers for nearly forty years. It was argued that an injunction to modify iOS back to its roots – the Mac – would result in an open, safe iOS that doesn't restrict trade. Apple waived objection to this argument.

d. Apple waived any argument about "unvetted" symptoms sharing being an important, early way to share information amongst users. The app may have prevented the "Covid deniers" problem and saved lives through such transparency. Apple's only related defense, a false one, is that Plaintiffs don't explain how the app works. But the Complaint documents clearly do show how the app functions, including screenshots. And Apple's App Review team clearly did, and had an obligation to, understand how the app worked.

e. Apple ignored Plaintiff's assertion that a version 2.0 of their system could gather valuable biostatistical data on vaccine efficacy and breakthrough cases. Apple faults Plaintiff for waiting a year to file this motion after version 1.0 was rejected, but the motion remains ripe for immediate relief. Plaintiff had no way of knowing 1) Apple's own COVID app would not even be available *eighteen months* after their own in the United States, and 2) that that a vaccine and breakthrough study would be appropriate this year.

13. The Amended Complaint contains compelling evidence the renders Apple's competitive safety justification meritless. In April 2021, Plaintiff Coronavirus Reporter engaged in a videoconference with Apple, who was represented by counsel at Paul Weiss[3]. During the call, Plaintiff proposed a compromise whereby Apple would

---

[3] Plaintiffs specifically exempted the App Court portion of their call from Evidence Rule 410, obtaining Paul Weiss' Partner Jessica Phillips agreement on the matter. Attorney Phillips and her firm Paul Weiss were removed from this case for

allow an independent App Court to manage app rejection and rank suppression appeals. Plaintiff described it as the first dedicated venue for software disputes. As an independent body, it would mitigate or eliminate self-preference and cronyism concerns, but notably allow Apple to maintain otherwise exclusive control of the App Store. Three months later, Apple rejected the proposal. This demonstrates Apple's interests are in maintaining monopoly power – and safety justifications are just that, mere pretense. Such an App Court would effectively function like arbitration panels, which this country allows to handle significant matters such as product liability, hospital malpractice, and other life-and-death matters. For Apple to assert that arbitration panels couldn't comprehend app safety, when they routinely adjudicate medical malpractice, would be futile.

14. Thus, Plaintiffs have uncovered a key fact – that Apple refused an app developers' proposal for due process, via Independent App Court arbitration on App Store app rejections. This Court can properly infer Apple's true motive in controlling the App Store is not about consumer safety and developer fairness, but maintaining control and power. Why not step aside, given the international consensus on self-preferencing and cronyism, and let an independent arbitration court carry out due process to developers? Apple, by facts alleged in the Amended Complaint, does not want due process in the vast marketplace for institutional smartphone apps. *Such obstinate withholding of due process to developers is compelling reason alone to issue the preliminary injunction*.

15. The proposed injunction permits Apple to reject apps for notarization or App Store distribution that contains malware or violates local, state, or federal law (with a developer able to appeal and receive due process of an App Court or law enforcement body). During the notarization process, Apple may assign an age rating to apps, under the terms of said injunction. Developers may still submit apps to get notarized by Apple, and to request listing on the curated portion of their store[4]. The key difference is that end-users should be able to install an unnotarized app, like macOS. If an unnotarized app does particularly well, Apple should rank it accordingly on

---

unknown reasons. Realizing the implications of this, Gibson Dunn last month threatened Plaintiffs that their disclosure violated Rule 410. Plaintiffs, by way of counsel, reminded Gibson Dunn of Phillips' assent during the call to exempt the App Court discussions from Rule 410.

[4] Just as food delivery platform marketplaces have sections curated by food critics, Apple's App Store could have their curated section. If a user prefers this curation, then the injunction would have no effect on Apple's current listings.

their App Ranking Charts. Hence free markets will ultimately dictate the success of an app, which is exactly the intent of the Sherman Act.

16. There are several variations on the proposed injunction that have been mentioned. Depending upon the Court's analysis of Apple's conduct, some variations may be more appropriate or efficient than others. These variations, of which many more could be derived, are ordered from most to least intervention:

    a. Complete platform opening (App Store accepts all submissions, full sideloading, free notary stamps).
    b. Sideloading permitted, iOS notarization requirement eliminated.
    c. Sideloading permitted, notary stamps issued at competitive cost for non-subjective reasons (malware, age rating), but App Store remains curated by Apple.
    d. Sideloading permitted, but notary remains at Apple's full discretion.
    e. App Store remains only "onboarding point." Independent App Court (i.e. arbitration) for app denial or ranking appeals. [Rejected by Apple August 2021]

17. Apple cannot claim the denial of Coronavirus Reporter, WebCaller, Caller-ID, CALID, or Bitcoin Lottery serves as competitive justification to bypass the intent of the Sherman Act. While Apple may prefer its own crony doctors over Dr. Roberts, that doesn't give them Sherman Act exemption to exclude end-users from launching his app, on a device they paid for. And Apple may favor certain political parties, that but that doesn't give them a right to stop an end user from launching Parler, in favor of Twitter and Facebook. Safety pretenses are the thinnest; law enforcement bodies and arbitration panels exist to guarantee due process. Apple's refusal to implement due process with an Independent App Court defeats every defense they muster. If Apple cared about safety, why not hand it over to an App Court/arbitration panel? This Court can properly reject Apple's self-righteousness. Nobody missed $1/minute long distance when AT&T was broken up, and nobody will miss Apple's censorship and oppression of startups like Dr. Roberts' Coronavirus Reporter. An injunction must be issued to honor the intent of the Sherman Act legislators and the international consensus, which is loud and clear.

Respectfully submitted, this 7th day of September, 2021.

                                            <u>/s/ Keith Mathews</u>
                                            Keith Mathews, *Pro Hac Vice*
                                            Attorney for Coronavirus Reporter,
                                            CALID, & Primary Productions LLC
                                            Associated Attorneys of New England
                                            PO Box 278
                                            Manchester, NH 03105
                                            Ph. 603-622-8100
                                            keith@aaone.law

# CERTIFICATE OF SERVICE

      I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

      Executed on this 7th day of September, 2021.

      /s/ Keith Mathews
      Keith Mathews, *Pro Hac Vice*
      Associated Attorneys of New England
      PO Box 278
      Manchester, NH 03105
      Ph. 603-622-8100
      keith@aaone.law