1  GIBSON, DUNN & CRUTCHER LLP
   MARK A. PERRY (SBN 212532)
2    mperry@gibsondunn.com
   RACHEL S. BRASS (SBN 219301)
3    rbrass@gibsondunn.com
   JULIAN W. KLEINBRODT (SBN 302085)
4    jkleinbrodt@gibsondunn.com
   555 Mission Street, Suite 3000
5  San Francisco, CA 94105-0921
   Telephone: (415) 393-8200
6  Facsimile:  (415) 374-8429

7  *Attorneys for Apple Inc.*

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

                **SAN FRANCISCO DIVISION**
10

11

12 CORONAVIRUS REPORTER, CALID INC.,      Case No. 3:21-CV-05567-EMC
   PRIMARY PRODUCTIONS LLC, DR.
13 JEFFREY D. ISAACS, on behalf of        **DEFENDANT APPLE INC.'S MOTION TO**
   themselves and all others similarly situated   **DISMISS AMENDED COMPLAINT AND**
14                                         **MOTION TO STRIKE; SUPPORTING**
                  Plaintiffs,             **MEMORANDUM OF POINTS AND**
15                                         **AUTHORITIES**
          v.
16
   APPLE INC., FEDERAL TRADE
17 COMMISSION,
                                          Date:      October 28, 2021
18                Defendants.             Time:      1:30 p.m. PT
                                          Place:     Courtroom 5, 17th Floor
19
                                          The Honorable Edward M. Chen
20

21

22

23

24

25

26

27

28

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        **PLEASE TAKE NOTICE** that on October 28, 2021, at 1:30 p.m., or as soon thereafter as the

3    matter may be heard, in the United States District Court, Northern District of California, 450 Golden

4    Gate Ave., San Francisco, Courtroom 5, 17th Floor, Federal Courthouse, Defendant Apple Inc.,

5    through its undersigned counsel, will, and hereby does, move to dismiss and move to strike Plaintiffs

6    Coronavirus Reporter, CALID Inc., Primary Productions LLC, and Jeffrey Isaacs' Amended Com-

7    plaint.  This Motion is supported by this Notice of Motion and Motion; the accompanying Memoran-

8    dum of Points and Authorities; the Declaration of Rachel S. Brass and exhibits thereto; the Proposed

9    Order filed herewith; the pleadings and papers on file herein; and such other matters that may be pre-

10   sented to the Court at the hearing.

11                                  By:     */s/ Rachel S. Brass*
                                             Rachel S. Brass
12

13                                  GIBSON, DUNN & CRUTCHER LLP
                                    MARK A. PERRY (SBN 212532)
14                                    mperry@gibsondunn.com
                                    RACHEL S. BRASS (SBN 219301)
15                                    rbrass@gibsondunn.com
                                    JULIAN W. KLEINBRODT (SBN 302085)
16                                    jkleinbrodt@gibsondunn.com
                                    555 Mission Street, Suite 3000
17                                  San Francisco, CA 94105-0921
                                    Telephone: (415) 393-8200
18                                  Facsimile:  (415) 374-8429

19                                  *Attorneys for Apple Inc.*

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

I.      Whether the Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because:

      A.      Plaintiffs have failed to allege antitrust standing (Counts I–VII), a relevant antitrust market (Counts I–VII), exclusionary conduct under Section 2 of the Sherman Act (Counts I, II, and IV), concerted action under Section 1 of the Sherman Act (Count III), denial of access to an essential facility under Section 2 of the Sherman Act (Count II), and/or an unlawful tie under Section 1 of the Sherman Act (Count V).

      B.      Plaintiffs have failed to state a claim for breach of contract or the covenant of good faith and fair dealing (Counts VIII and IX).

      C.      Plaintiffs have failed to plead with sufficient particularity the required elements of a claim under the Racketeer Influenced Corrupt Organization Act (Count X).

      D.      Plaintiffs have failed to plead with sufficient particularity the required elements of a fraud claim (Count XI).

II.     Whether Plaintiffs' putative class allegations should be struck under Federal Rule of Civil Procedure 12(f) because Plaintiffs have failed to allege facts establishing adequacy, typicality, commonality, predominance, or superiority under Federal Rule of Civil Procedure 23.

1

# TABLE OF CONTENTS

2

<u>Page</u>

STATEMENT OF ISSUES TO BE DECIDED...................................................................ii

I. INTRODUCTION .......................................................................................................... 1

II. BACKGROUND ........................................................................................................... 2

III. LEGAL STANDARD .................................................................................................. 5

IV. ARGUMENT ............................................................................................................... 5

    A.     Plaintiffs' Antitrust Claims Must Be Dismissed (Counts I–VII) ................................. 5

          1.     Plaintiffs Fail to Allege Plausible Antitrust Injury (Counts I–VII)................... 5

          2.     Plaintiffs Fail to Allege a Plausible Relevant Market (Counts I–VII) .............. 7

          3.     Plaintiffs Fail to Allege Exclusionary Conduct (Counts I, II, IV, VI) .............. 9

          4.     Plaintiffs Fail to Allege Concerted Action (Count III) ................................... 15

          5.     Plaintiffs Fail to Allege Unlawful Tying (Count V) ...................................... 16

    B.     Plaintiffs' Contract Claims Must Be Dismissed (Counts VIII & IX) ........................ 17

    C.     Plaintiffs' RICO Claim Must Be Dismissed (Count X)............................................. 19

          1.     Plaintiffs Fail to Allege the Claim with Particularity under Rule 9(b) ........... 19

          2.     Plaintiffs Fail to Allege that Apple Committed Any Predicate Acts ............. 20

          3.     Plaintiffs Fail to Allege an Enterprise Distinct from the RICO
               Defendant ................................................................................................... 21

          4.     Apple's Court Submissions Cannot Be the Basis for a RICO Claim ............. 21

    D.     Plaintiffs' Fraud Claim Must Be Dismissed (Count XI)............................................ 22

    E.     The FAC Should Be Dismissed Without Leave to Amend.......................................... 22

    F.     Plaintiffs' Class Allegations Should Be Struck ........................................................ 23

V. CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abraham v. Intermountain Health Care Inc.*,
131 F.3d 874 (10th Cir. 1997)......................................................................................17

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)...................................................................11, 12, 13, 16

*Agena v. Cleaver-Brooks, Inc.*,
2019 WL 11248590 (D. Haw. Oct. 31, 2019)..............................................................20

*Alaska Airlines v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991)...................................................................................13, 14

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010)......................................................................................................15

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................24

*America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*,
347 F. Supp. 328 (N.D. Ind. 1972)..............................................................................10

*Apple, Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ...................................................................................................6

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ..........................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................................5

*Aspen Skiing Co. v. Aspen Highlights Skiing Corp.*,
472 U.S. 585 (1985)......................................................................................................11

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990).......................................................................................................6

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
843 F.3d 1225 (10th Cir. 2016).....................................................................................9

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993)..........................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................6

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*Blix Inc. v. Apple Inc.*,
2020 WL 7027494 (D. Del. Nov. 30, 2020) ....................................................................10, 11, 12

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)........................................................................................11

*Brady v. Dairy Fresh Prods. Co.*,
974 F.2d 1149 (9th Cir. 1992)...................................................................................................21

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)....................................................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ....................................................................................................................6

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017)..................................................................................................7

*Butowsky v. Wigdor*,
2020 WL 4673944 (E.D. Tex. Aug. 12, 2020) ........................................................................17

*Cal. Comp. Prods., Inc. v. Int'l Bus. Machines Corp.*,
613 F.2d 727 (9th Cir. 1979).....................................................................................................15

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996).......................................................................................................25

*Chappel v. Lab'y Corp. of Am.*,
232 F.3d 719 (9th Cir. 2000).....................................................................................................23

*Cont'l Auto. Sys. Inc. v. Avanci, LLC*,
485 F. Supp. 3d 712 (N.D. Tex. 2020).......................................................................................14

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
520 F. Supp. 2d 1199 (C.D. Cal. 2007)....................................................................................17

*Delacruz v. State Bar of Cal.*,
2020 WL 227237 (N.D. Cal. Jan. 15, 2020) ............................................................................22

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019).....................................................................................................19

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012)......................................................................................................24

*Donohue v. Apple, Inc.*,
871 F. Supp. 2d 913 (N.D. Cal. 2012) ................................................................................18, 19

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*Dreamstime.com, LLC v. Google, LLC*, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ..................13, 14

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)..............................................................................................12, 20

*Epic Games, Inc. v. Apple Inc.*,
2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ........................................................... *passim*

*Ewiz Express Corp. v. Ma Lab'ys, Inc.*,
2015 WL 5680904 (N.D. Cal. Sept. 28, 2015) ...................................................................12

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
848 F.2d 976 (9th Cir. 1988)..............................................................................................12

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)..........................................................................7, 9, 10, 11

*Good v. Am. Water Works Co., Inc.*,
310 F.R.D. 274 (S.D. W. Va. 2015)....................................................................................25

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013)..............................................................................................5

*Hamilton v. Greenwich Invs. XXVI, LLC*,
126 Cal. Rptr. 3d 174 (Cal. Ct. App. 2011) ...............................................................17, 18

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018)..........................................................................................7, 9

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..........................................................................7, 8

*Hovsepian v. Apple, Inc.*,
2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) ...................................................................5

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999)..............................................................................10, 11, 12

*In re Intuniv Antitrust Litig.*,
2019 WL 3947262 (D. Mass. Aug. 21, 2019).....................................................................25

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
737 F.2d 698 (7th Cir. 1984)...............................................................................................17

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ................................................................................................................16

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*John Doe 1 v. Abbott Labs.*,
571 F.3d 930 (9th Cir. 2009) ................................................................................................14

*Kamm v. Cal. City Dev. Co.*,
509 F.2d 205 (9th Cir. 1975) ..................................................................................................5

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979) ..................................................................................................7

*Langan v. United Services Auto Ass'n*,
69 F. Supp. 3d 965 (N.D. Cal. 2014) ....................................................................................24

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) ..........................................................................................19, 21

*Lopez v. Dean Witter Reynolds, Inc.*,
591 F. Supp. 581 (N.D. Cal. 1984) .......................................................................................21

*McHenry v. Renne*,
84 F.3d 1172 (9th Cir. 1996) ................................................................................................23

*Metro Servs. Grp. v. Travelers Cas. & Sur. Co.*,
2021 WL 2633416 (N.D. Cal. June 25, 2021) ......................................................................20

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ................................................................................................9

*Muskegan Hotels, LLC v. Patel*,
986 F.3d 692 (7th Cir. 2021) ................................................................................................22

*In re NFL's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ................................................................................................6

*Nordholm v. Barkell*,
816 F. App'x 109 (9th Cir. 2020) .........................................................................................24

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ............................................................................................11

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
838 F.2d 360 (9th Cir. 1988) ................................................................................................14

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ................................................................................................19

*Official Airline Guides, Inc. v. FTC*,
630 F.2d 920 (2d Cir. 1980) .................................................................................................13

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ........................................................................................................7, 9

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................................................................10

*Pac. Recovery Sols.*,
2021 WL 1176677, at *10 .......................................................................................................20

*Pistacchio v. Apple Inc.*,
2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ........................................................................7, 9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .......................................................................................................7

*Rae v. Union Bank*,
725 F.2d 478 (9th Cir. 1984) ....................................................................................................21

*Rick-Mik Enters. v. Equilon Enters., LLC*,
532 F.3d 963 (9th Cir. 2008) ...............................................................................................16, 17

*S. Concrete Co. v. U.S. Steel Corp.*,
394 F. Supp. 362 (N.D. Ga. 1975) ...........................................................................................17

*Samaan v. Sauer*,
2008 WL 2489004 (E.D. Cal. June 17, 2008) ..........................................................................24

*Sanders v. Apple Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ..................................................................................23, 25

*Sayre v. Google, Inc.*,
2019 WL 6036703 (N.D. Cal. Nov. 14, 2019) ..........................................................................12

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ..................................................................................................21

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ......................................................................................................5

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ....................................................................................................22

*Soundgarden v. UMG Recordings, Inc.*,
2020 WL 1815855 (C.D. Cal. Apr. 6, 2020) ............................................................................19

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ......................................................................................................5

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*Sumotext Corp. v. Zoove, Inc.*,
2016 WL 6524409 (N.D. Cal. Nov. 3, 2016)...................................................................8

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001).........................................................................................8

*The Jeanery, Inc. v. James Jeans, Inc.*,
849 F.2d 1148 (9th Cir. 1988).......................................................................................15

*Townshend v. Rockwell Int'l Corp.*,
2000 WL 433505 (N.D. Cal. Mar. 28, 2000)................................................................10

*United States v. Brugnara*,
856 F.3d 1198 (9th Cir. 2017).......................................................................................21

*United States* v. *Colgate Co.*,
250 U.S. 300 (1919)....................................................................................................1, 10

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................................................................................16

*United States v. Miller*,
953 F.3d 1095 (9th Cir. 2020).......................................................................................20

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003)...........................................................................................2

*United States v. Sabre Corp.*,
452 F. Supp. 3d 97 (D. Del. 2020).................................................................................17

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
914 F.2d 1256 (9th Cir. 1990).......................................................................................15

*US Airways v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)...............................................................................................9

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................................... *passim*

*Vinole v. Countrywide Home Loans*,
571 F.3d 935 (9th Cir. 2009).........................................................................................24

*Yount v. Acuff Rose-Opryland*,
103 F.3d 830 (9th Cir. 1996).........................................................................................18

*Zoslaw v. MCA Distrib. Corp.*,
693 F.2d 870 (9th Cir. 1982).........................................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES (*continued*)

Page(s)

**STATUTES**

18 U.S.C. § 1961 .................................................................................................................21

18 U.S.C. § 1962 .................................................................................................................21

Cal. Civ. Code § 1709 ........................................................................................................22

**RULES**

Fed. R. Civ. P. 8 ..................................................................................................................17

Fed. R. Civ. P. 9 ..................................................................................................................22

Fed. R. Civ. P. 10 ................................................................................................................17

Fed. R. Civ. P. 12 ..................................................................................................................5

Fed. R. Civ. P. 23 ............................................................................................................2, 23

**TREATISES**

1 Newberg on Class Actions § 3:79 (5th ed.) ....................................................................24

Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property* § 13.03 [C][2] (3d ed. 2020 supp.) ....................................................12

# I. INTRODUCTION

Plaintiffs are three developers and the person who controls them.  Now on their *third* lawsuit and *seventh* complaint against Apple Inc. ("Apple"), their allegations remain incoherent and their claims devoid of merit.  At bottom, they allege that their apps were rejected from the App Store or subjected to so-called "ranking suppression" in search results.  From this, they launch an assault on the App Store model premised on the assertion that the ecosystem Apple created "should exist as a 'common carrier' free from Apple's control."  FAC ¶ 78.  Because iPhone users ought to be able to "enjoy unrestricted use of their smartphones," Plaintiffs reason, Apple cannot "[b]lock[], reject[], or ban[] any App Store third-party developer app submission for [almost] any reason."  *Id.* ¶¶ 5, 322.  But "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States* v. *Colgate Co.*, 250 U.S. 300, 307 (1919)).  Apple has no obligation to approve and distribute on its proprietary platform apps that are developed using its proprietary software but are inconsistent with its policies.  Plaintiffs' claims are therefore meritless and should be dismissed.

*First*, Plaintiffs' Sherman Act claims (Counts I–VII) fail because they have not alleged essential elements.  They have alleged injury only to themselves—not to competition.  Their fifteen alleged markets are contradictory, indeterminate, and unsupported by any reference to economics principles.  Their Section 2 claims (Counts I, II, IV, VI) fail because their allegations of exclusionary conduct run afoul of settled antitrust principles, including a firm's right to decide terms on which it will deal, and in any case cannot overcome Apple's legitimate business justifications.  Their Section 1 claim (Count III) flounders because it challenges unilateral conduct.  And Plaintiffs not only lack standing to assert their tying claim (Count V) but also fail to allege that a tie between two separate products even exists.

*Second*, Plaintiffs' contract claims (Counts VIII and IX) are legally and factually defective because Apple did not breach or frustrate any alleged contractual obligation.  On the contrary, the relevant contract invests Apple with sole discretion to approve, or disapprove, the distribution of apps developed using its proprietary software and other tools.

*Third*, Plaintiffs fail to plead their RICO or fraud claims (Counts X and XI) with the particularity demanded by Federal Rule of Civil Procedure 9(b).  Plaintiffs also have failed to allege a distinct RICO enterprise.  Nor have they sufficiently alleged *any* of the elements of wire or mail fraud—fatal to both their fraud and RICO theories.

Apple respectfully requests that the Court dismiss the Amended Complaint ("FAC") with prejudice.  If any of Plaintiffs' claims are not dismissed, Apple requests that the Court strike all class allegations because the FAC itself demonstrates why Plaintiffs cannot prove Rule 23 typicality, adequacy, superiority, commonality, or predominance.

## II. BACKGROUND

With the launch of the iPhone in 2007, Apple created the revolutionary and unique iOS ecosystem.  *See Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *17 (N.D. Cal. Sept. 10, 2021).  Apple introduced the App Store the following year.  *Id.* at *19.  Since then, Apple has focused on delivering to its consumers a "user-friendly, reliable, safe, private, and secure" experience.  *Id.* *54.  To this end, Apple offers a highly curated App Store in which each app available for download has gone through a rigorous process of review.  *See* FAC ¶ 1.

App developers wishing to distribute apps on the App Store must enter into two agreements with Apple: the Developer Agreement and the Developer Program License Agreement ("DPLA").  Developers must also abide by the App Store Review Guidelines (the "Guidelines").[1]  The Developer Agreement governs the relationship between a developer and Apple, *see* Ex. 1, while the DPLA governs the distribution of apps created using Apple's proprietary tools and software, *see* Ex. 2.  By signing the DPLA, developers "understand and agree" that Apple may reject apps in its "sole discretion."  *Id.* § 6.9(b).  The Guidelines set out the standards Apple applies when exercising that discretion to review and select apps for distribution on the App Store, a process known as "App Review."  *See generally* Ex. 3.

Plaintiffs allege they are developers of "a diverse group" of apps: Coronavirus Reporter,

---

[1]  The agreements and Guidelines, attached as Exhibits 1–3, are "central" to Plaintiffs' claims, FAC ¶ 273, and are incorporated by reference in the FAC.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also* FAC ¶¶ 19, 24, 56, 74, 113–14, 135, 145, 165, 186, 195–206, 245, 254–55, 258–59, 269–71.  Exhibit citations are to the attached Declaration of Rachel S. Brass.

CALID, Bitcoin Lottery, WebCaller, and Caller-ID.  FAC ¶¶ 8, 27–30.  Two of these apps, Coronavirus Reporter and Bitcoin Lottery, were never approved for distribution on the App Store.  *Id.* ¶¶ 29, 53.  According to the FAC, Coronavirus Reporter sought to collect "bioinformatics data" from users about COVID-19 symptoms that it would then share with "other users and [unidentified] epidemiology researchers."  FAC ¶¶ 48, 52.  Plaintiff CALID is a developer whose original app was a self-styled "online marketplace platform" that advertised listings for outdoor activities, car rentals, and "practically anything [else] that can be scheduled."  *Id.* ¶ 96.  When CALID submitted the Coronavirus Reporter app for review, Apple rejected it under a policy requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a government organization or medical institution—a policy that Apple adopted to combat misinformation.  *Id.* ¶¶ 54, 56, 69, 94, 96, 98; *see also* Ex. 3 § 5.1.1(ix).  Similarly, Apple rejected Bitcoin Lottery, a "blockchain app" developed by Plaintiff Primary Productions, under its alleged policy "generally block[ing] blockchain apps."  FAC ¶¶ 85–86.

Plaintiffs' other apps (CALID, Caller-ID, and WebCaller) allegedly were approved for distribution.  FAC ¶¶ 97, 103.  CALID was approved after the developer addressed several violations of Apple's Guidelines, including Apple's requirement that developers use Apple's payment system for in-app purchases.  *Id.* ¶¶ 95, 97.  Although Plaintiffs admit that they later "abandoned" the app, *id.* ¶ 97, they allege "CALID was subject to ranking suppression," *id.* ¶ 28.  Plaintiffs similarly allege that Apple "suppressed" Caller-ID and WebCaller because Plaintiff Isaacs "informed Apple he held a patent on web caller ID, and that [Apple's] crony, Whitepages . . . violated his patent."  *Id.* ¶¶ 104–07.  But as the FAC concedes, Isaac's patent was invalidated.  *Id.* ¶ 305.

Plaintiffs have carved a tortuous litigation path.  On January 19, 2021, Plaintiff Coronavirus Reporter filed the first iteration of this lawsuit in the District of New Hampshire.  *Coronavirus Reporter v. Apple, Inc.* ("DNH Dkt."), No. 21-cv-47, Dkt. 1 (D.N.H.).  Coronavirus Reporter twice amended its complaint to avoid responding to then-pending motions to dismiss, only to then voluntarily dismiss the case when the court ordered it transferred to this jurisdiction.  DNH Dkts. 17, 19, 26–27, 32–33, 39–40.  Meanwhile, Plaintiff Primary Productions—represented by the same counsel—filed a separate, nearly identical lawsuit in the District of Maine on May 17, 2021.  *Primary Prods. LLC v. Apple Inc.*

("D. Me. Dkt."), No. 21-cv-137, Dkt. 1 (D. Me.). There too, Primary Productions amended its complaint to avoid responding to Apple's motion to dismiss. D. Me. Dkts. 17, 21. The case was then transferred to this Court, and Apple has since moved to dismiss. *See Primary Prods. LLC v. Apple Inc.*, No. 3:21-cv-6841-EMC, Dkts. 27 & 32 (N.D. Cal.). Plaintiff has apparently voluntarily dismissed that action rather than respond to Apple's motion. *Primary Prods.*, No. 3:21-cv-6841-EMC, Dkt. 36.

Plaintiffs Coronavirus Reporter and CALID filed this putative class action on July 20, 2021, raising substantially similar claims to the prior two actions. Dkt. 1. They then moved for a preliminary injunction, Dkt. 20; Apple moved to dismiss the complaint, but plaintiffs *again* amended their complaint to avoid responding, Dkt. 41. The FAC—a putative class action now brought on behalf of Coronavirus Reporter, CALID, Primary Productions LLC, and Jeffrey Isaacs—is thus the *seventh* complaint filed by one or more of these related plaintiffs, all making similar allegations and claims. This is Apple's sixth motion to dismiss the complaints filed, in three courts, by these plaintiffs. Plaintiffs are out of amendments; they now must attempt to defend the FAC.

The FAC is a ragbag. Plaintiffs advance their own "claim theory" that they say is "[n]otably differentiated from other pending Apple antitrust litigation." FAC ¶¶ 9, 15. But they also purport to incorporate by reference the "causes of action" and "all supporting facts" from *Cameron v. Apple Inc.*, No. 19-cv-3074-YGR (N.D. Cal.), as well as the "complaint and findings of fact relevant to and supporting this case" from *Pepper v. Apple Inc.*, No. 11-cv-6714-YGR (N.D. Cal.)—even though no proposed findings of fact have been filed in that case. FAC ¶¶ 36, 243. As to *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-5640-YGR (N.D. Cal.), Plaintiffs seek to incorporate "eighteen [unidentified] pages of non-IAP, non-Epic specific anticompetitive proposed conclusions of law," *id.* ¶ 36, unidentified excerpts about "Apple's lock-in conduct publicly disclosed by [Epic's counsel] Cravath," *id.* ¶ 111, "practices . . . detailed in Epic's discovery," *id.* ¶ 143, or, perhaps, the entirety of "Epic['s] findings of fact," *id.* ¶ 237. The results are often incongruous. By way of example, Plaintiffs allege no fewer than fifteen relevant markets, *see infra* pp. 7–9, not one of which acknowledges that the App Store is a two-sided transaction platform—as Judge Gonzalez Rogers recently recognized. *See Epic*, 2021 WL 4128925, at *83. That alone is sufficient to warrant dismissal. But there's much more.

Cutting through the FAC's inconsistencies, indecipherable flowcharts, and irrelevant asides,

the crux of Plaintiffs' claims is that Apple allegedly monopolizes an "institutional smartphone application software marketplace" in which Apple "purchase[s]" apps from developers—by approving or rejecting them through the App Review process—and then effectively resells them to consumers.  FAC ¶¶ 9–11.  Because the "vast network capabilities" of Apple's ecosystem are "the property of the citizens," Plaintiffs say, Apple cannot impose *any* restrictions on the distribution of native iOS apps, *id.* ¶¶ 5, 11, nor charge developers to license its intellectual property, *id.* ¶ 235.  On this foundation of sand, Plaintiffs attempt to erect eleven counts against Apple.  Not one of these claims states a cause of action on which relief possibly could be granted.  They all should be dismissed with prejudice.[2]

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Courts are not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Under Federal Rule of Civil Procedure 12(f), a court may "strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained."  *Hovsepian v. Apple, Inc.*, 2009 WL 5069144, at *2 (N.D. Cal. Dec. 17, 2009); *see also Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212–13 (9th Cir. 1975) (affirming order striking class allegations).

### IV. ARGUMENT

**A.    Plaintiffs' Antitrust Claims Must Be Dismissed (Counts I–VII)**

**1.    Plaintiffs Fail to Allege Plausible Antitrust Injury (Counts I–VII)**

Antitrust injury is a threshold pleading requirement.  *Somers v. Apple, Inc.*, 729 F.3d 953, 963–64 & n.5 (9th Cir. 2013).  A plaintiff must allege injury to "competition in the market as a whole"—

---

[2]  Plaintiffs also accuse the Federal Trade Commission (which apparently has not been served) of violating the Administrative Procedure Act.  FAC ¶¶ 324–35.  Because this claim is not asserted against Apple, it is not addressed further herein.

such as marketwide reduction in output or increase in prices—"not merely injury to itself as a competitor" in the market. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013). This alleged harm also must be "'attributable to an anticompetitive aspect of the practice under scrutiny'"; "harm that could have occurred under the normal circumstances of free competition" does not suffice. *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (quoting *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990)).

Plaintiffs' theory of injury is that *their* apps were rejected from the App Store or subjected to alleged ranking suppression. FAC ¶¶ 28–30, 53, 87. Yet there is no allegation that Apple's conduct excluded competitors, suppressed output, increased prices, or otherwise harmed competition *marketwide*. The most Plaintiffs offer is a stray allegation that Apple's decision "to deny the Coronavirus Reporter app, and all other COVID startups for public distribution . . . represented damage to an entire market of COVID startups." FAC ¶ 81. But there is no relevant market of "COVID startups"—a premise Plaintiffs never revisit. *See infra* pp. 7–9. And even if there were, conclusory allegations of "damage to an entire market," FAC ¶ 81—or unadorned references to "restricted output, quality, and innovation," *id.* ¶¶ 115, 191—are "a formulaic recitation of the elements of a cause of action [that] will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[3]

Equally problematic, Plaintiffs ignore the very nature of the App Store platform. For every app that is allegedly "suppressed" in search rankings, another app's visibility is lifted. Ranking necessarily means that some apps are higher, and others lower. Under Plaintiffs' theory, it is impossible for ranking manipulation to harm competition across a relevant market; and effects on plaintiffs' apps alone do not an antitrust violation make. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors." (quotation marks omitted)). Nor can Plaintiffs plausibly allege that Apple restricts "consumer choice" every time it rejects an app, *see, e.g.*, *id.* ¶¶ 89, 123, 198, as Apple's restrictions "enhance[] consumer appeal"

---

[3] Plaintiffs also cannot claim an injury tied to Apple's commission because, even if CALID paid it, none of the claims relate to that commission. FAC ¶ 28. Indeed, Plaintiffs explicitly state that this case is about *free apps*. *Id.* ¶ 131. Nor can they, as developers, assert standing "[f]or the same reasons consumers have standing in *Pepper*." *Id.* ¶¶ 36, 218. Those consumers allege they paid supracompetitive prices for iPhone apps—a "fundamentally different theor[y] of harm" than those available to developers. *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1519, 1525 (2019).

by "providing a safe and trusted user experience on iOS, which encourages both users and developers to transact freely." *Epic*, 2021 WL 4128925, at *102. And Plaintiffs offer no allegations that an eco-system infested with scams, malware, and unsavory or untrustworthy apps would offer consumers a more attractive slate of choices. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2281 (2018) (making a platform less attractive "risk[s] a feedback loop of declining demand"). Because Plaintiffs have failed to allege a cognizable antitrust injury, Counts I–VII should be dismissed.

### 2. Plaintiffs Fail to Allege a Plausible Relevant Market (Counts I–VII)

Defining the relevant market is another pleading "threshold" under Section 1 and 2. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Market definition is an essential predicate to the entire case, for "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Amex*, 138 S. Ct. at 2285. Plaintiffs therefore "cannot arbi-trarily choose the product market relevant to [their] claims." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017). They instead "must look at all relevant sources of supply," *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979), and draw the market's boundaries by reference to reasonable interchangeability of use and cross-elasticity of demand, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *accord Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997). A complaint that fails to do so must be dismissed. *See*, *e.g.*, *Hicks*, 897 F.3d at 1120; *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1147–48 (N.D. Cal. 2020).

Plaintiffs' approach in this case bears no sign of the requisite rigor. They allege *at least fifteen* markets: (1) a "Smartphone Enhanced National Internet Access Devices" market; (2) a "smartphone market"; (3) a "single-product iOS Smartphone Enhanced Internet Access Device" market; (4) "[t]he iOS market"; (5) the "market for smartphone enhanced commerce and information flow (devices and apps) transacted via the national internet backbone"; (6) the "institutional app market"; (7) the "iOS institutional app market"; (8) the "iOS notary stamps" market; (9) the "iOS onboarding software" mar-ket; (10) the market for access rights to the iOS userbase; (11) the "national smartphone app distribution market"; (12) the "iOS App market"; (13) the "US iOS Device App market"; (14) the "market of COVID startups"; and (15) "the App Market." FAC ¶¶ 11, 12, 17–18, 81, 121, 135–37, 142, 165–66,

---

7

168, 233, 235 & n.1.  The FAC does not allege sufficient facts about any of these markets: What they are, how they relate to one another, or whether they are even relevant is anyone's guess.

Consider "the App Market"—twice mentioned but never defined.  FAC ¶¶ 109, 183.  Is this the same as the "national market of apps for smartphone enhanced internet access devices," *id.* ¶ 121; "the US consumer-facing market for smartphone apps," *id.*; or the undefined "app submarkets," referenced elsewhere, *id.* ¶¶ 168, 235.  The FAC does not say.  Plaintiffs suggest at one point that these "app markets . . . are downstream from the smartphone enhanced device market."  *Id.* ¶ 183.  But that runs contrary to the allegations that hardware and software are "bundle[d]" together in a single "Smartphone Enhanced Internet Information and Commerce Access Device" market, *id.* ¶¶ 15–16, which itself is an apparent sub-market of the "market for smartphone enhanced commerce and information flow (devices and apps) transacted via the national internet backbone," *id.* ¶ 234.  Plaintiffs do not appear to under-stand themselves what these markets encompass: The FAC first alleges Apple controls between 60-80% of "Smartphone Enhanced National Internet Access Devices," for example, only to later claim that Apple's share is "slightly over half."  *Id.* ¶¶ 9, 15, 124; *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001) (affirming dismissal based on contradictory market definitions).

These are far from the only inscrutable markets in Plaintiffs' "claim theory."  FAC ¶ 15.  For example, Plaintiffs allege "institutional app" and "U.S. iOS Device App Institutional" markets in which Apple "buy[s]" apps from developers by approving or rejecting them for distribution on the App Store—a notion that by Plaintiffs' own admission is "hypothetical" and untethered to the licensing arrangement on which the App Store is actually built.  *Id.* ¶¶ 19, 121.  As noted above, Plaintiffs also make a fleeting reference to a "market of COVID startups" that they never revisit or explain.  *Id.* ¶ 81.  And as but one last example, the alleged "iOS notary stamps" or "iOS onboarding software" markets are not markets at all, *id.* ¶¶ 135–37, as it "is illogical to argue that there is a market for something that is not licensed or sold to anyone."  *Epic*, 2021 WL 4128925, at *29 (rejecting alleged "'foremarket' for Apple's own operating system" as "'artificial,'" "entirely litigation driven, misconceived, and bear[ing] little relationship to the reality of the marketplace"); *see also Sumotext Corp. v. Zoove, Inc.*, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (dismissing antitrust claims because the alleged "relevant market [was] unclear").

Like a Gordian knot, these tangled contradictions cannot be unraveled—only cut.  The App Store is a two-sided transaction platform.  *Epic*, 2021 WL 4128925, at *83.  As such, it is "best understood as supplying only one product—transactions—which is jointly consumed" by developers and consumers on opposing sides of the platform.  *Amex*, 138 S. Ct. at 2286 n.8.  Therefore, the relevant market must be some category of "transactions" between developers and consumers.  *Epic*, 2021 WL 4128925, at *83–86; *accord Amex*, 138 S. Ct. at 2280; *US Airways v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019).  The relevant market cannot encompass "all app transactions" (because they are not substitutes) and cannot be limited to iOS transactions alone.  *Epic*, 2021 WL 4128925, at *85–88.

Plaintiffs ignore these principles.  None of their proposed markets are drawn according to reasonable interchangeability of use and cross-elasticity of demand.  *See Hicks*, 897 F.3d at 1120.  Indeed, the FAC's few economic references are incoherent. *See*, *e.g.*, FAC ¶ 122 (nonsensically alleging "vast barriers in terms of price elasticity").  As a result, it remains unclear who the participants are in the recited markets, what universe of products or services they include, and why they are (or are not) interchangeable.  *See Pistacchio*, 2021 WL 949422, at *2 (dismissing antitrust claims because the "sparse supporting allegations" failed to substantiate alleged market).  Many markets purport to encompass every category of apps, eight are single-brand markets—"disfavored" and "at a minimum, extremely rare" in antitrust law, *Epic*, 2021 WL 4128925, at *87 (collecting cases)—and none are defined by reference to the two-sided transactions between developers *and* consumers actually facilitated by the App Store.  A proper market definition "provide[s] the framework" for the case's economic analysis. *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016).  Because Plaintiffs' vague, overlapping, and conflicting definitions preclude such analysis, their antitrust claims should be dismissed.

### 3.      Plaintiffs Fail to Allege Exclusionary Conduct (Counts I, II, IV, VI)

To state a Section 2 claim, a plaintiff must plead willful acquisition or maintenance of monopoly power in a relevant market.  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).  This requires the plaintiff to allege "exclusionary conduct," *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004), "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," *Verizon Commc'ns Inc. v. Law Offs. of Curtis V.*

9

*Trinko, LLP*, 540 U.S. 398, 407 (2004).  Plaintiffs fail to allege any actionable conduct.

### a.    Plaintiffs Do Not Allege an Actionable Refusal to Deal (Count I)

Plaintiffs' chief complaints focus on Apple's decisions to reject their apps for distribution on the App Store.  *See*, *e.g.*, FAC ¶¶ 2–3, 11, 14, 81, 74, 112, 118, 149, 168–69.  They allege that Apple "unreasonably disallow[s] perfectly legal and legitimate apps that meet all standards and requirements."  *Id.* ¶ 118.  But Apple's refusal to do business on terms *Plaintiffs* believe are wise or fair does not violate Section 2.  Every firm is "free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Trinko*, 540 U.S. at 408; *United States v. Colgate Co.*, 250 U.S. 300, 307 (1919); *Qualcomm*, 969 F.3d at 993.  And as intellectual property carries "the legal right to refuse to license . . ., the existence of a predicate condition to a license agreement cannot state an antitrust violation."  *Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000).

Plaintiffs' own analogy points up the problems with their claim.  They liken app rejections "to a movie studio, or streaming service, refusing to buy a film."  FAC ¶ 11.  But a movie studio need not buy any particular film, just as a newspaper need not publish in its classifieds an advertisement that violates its content policies.  *America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.*, 347 F. Supp. 328, 333-34 (N.D. Ind. 1972).  Every "business may set conditions for dealing unilaterally and refuse to deal with anyone who does not meet those conditions."  *Epic*, 2021 WL 4128925, at *99.  After all, "prohibited conduct must be directed toward *competitors* and must be intended to injure *competition*."  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (emphasis added).  Plaintiffs' apps do not compete with the App Store itself; any purported competition among Apple's own apps and Plaintiffs' is irrelevant as this case challenges Apple's alleged restrictions on its platform.  Apple's alleged conduct is simply enforcement of the business terms it created (as operator of a proprietary platform) for developers that seek to distribute apps through the App Store.  *See* FAC ¶¶ 68–70, 86–87, 89.  So even if Plaintiffs view the decisions to reject their apps and approve other developers' apps as "arbitrary," "incorrect[]," and "inconsistent[]," *id.* ¶¶ 20, 36–41, 74, that does not give rise to antitrust liability.  Moreover, the notion that Apple must cede unfettered use of its platform to Plain-

tiffs' invented "right" to distribute apps, *id.* ¶¶ 5, 71, 90, 322, "is inconsistent with prevailing intellectual property law," *Epic*, 2021 WL 4128925, at *105, and the governing contracts.

A recent case illustrates the point.  In *Blix Inc. v. Apple Inc.*, the plaintiff alleged that Apple's removal of an app from the Mac App Store for violating Apple's Guidelines was actionable under Section 2 because it "abus[ed] power over key distribution channels."  2020 WL 7027494, at *1, 8 (D. Del. Nov. 30, 2020) (quotation marks omitted).  The court dismissed these claims as an "abuse of distribution channels" theory would create a "new form of antitrust liability never before recognized by the Supreme Court."  *Id.* at *8 (quotation marks and alteration omitted); *cf. Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 623 (S.D.N.Y. 2013) (dismissing similar claim that Amazon did not allow plaintiffs "to sell e-books on Amazon's devices and apps").

Nor have Plaintiffs alleged a duty to deal under the "one, limited exception" articulated in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  *Qualcomm*, 969 F.3d at 993.  Again, Plaintiffs lack the "competitive relationship" with Apple that "is fundamental to invoking the Sherman Act to force access to the property of another" under *Aspen*.  *Intergraph*, 195 F.3d at 1357.  And even if they could allege such a relationship, Apple did not "unilaterally terminat[e] a voluntary and profitable course of dealing" with Plaintiffs, nor does the FAC support the inference that Apple's "*only conceivable . . . purpose*" was to "sacrifice short-term benefits" to profit from the long-term exclusion of competition.  *Qualcomm*, 969 F.3d at 993–94.  To the contrary, Plaintiffs admit that Apple either rejected their apps upon submission—under content policies designed to protect its users from unvetted health information (Coronavirus Reporter) and risky gambling apps (Bitcoin Lottery)—or approved them for distribution in the Store.  FAC ¶¶ 53, 56, 69, 86–87, 97, 106.  This is not conduct "irrational but for its anticompetitive effect."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.).  Absent a duty to deal, Apple's refusal to do so is lawful.

### b.     Plaintiffs Fail to Allege an Essential Facility Claim (Count II)

An essential facilities "theory is a variation on a refusal to deal claim," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).  The doctrine has never been recognized by the Supreme Court, and Apple disputes its viability.  *See Trinko*, 540 U.S. at 411.  But even if such a claim can exist, Plaintiffs have failed to allege one.

To begin, Plaintiffs cannot settle on what the supposed "essential facility" is. In describing the cause of action, "notary stamps and application loaders" are alleged essential facilities, FAC ¶ 185; but elsewhere "[t]he iOS market" itself is "an essential facility," *id.* ¶ 124; *see also id.* ¶ 188 (essential facility is "the entire infrastructure for the iOS userbase"). By forcing Apple to guess what the essential facility is, these vacillating allegations deprive Apple of "fair notice" and the ability "to defend itself effectively." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). This alone is fatal. *See, e.g.*, *Ewiz Express Corp. v. Ma Lab'ys, Inc.*, 2015 WL 5680904, at *7 (N.D. Cal. Sept. 28, 2015) (dismissing claim where "conflicting allegations" deprived defendant of "notice of who committed what misconduct, where, and how").

In any event, the essential facility claim—which Plaintiffs borrowed from Epic—fails, as it did there, "for myriad reasons." *Epic*, 2021 WL 4128925, at *112. First, only competitors may bring essential facilities claims, *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988), but under Plaintiffs' "institutional" marketplace theory they are sellers and Apple is a buyer—that is, they are not competitors. *See Intergraph*, 195 F.3d at 1354.

Second, iOS is not an essential facility. There has been "no case in which a United States court consciously held that an intellectual property right was itself an essential facility that must be licensed on reasonable and nondiscriminatory terms." Herbert Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property* § 13.03 [C][2] (3d ed. 2020 supp.). And as the FAC admits, Apple allegedly controls access to only "60% to 80% of the overall smartphone market," FAC ¶ 124, "[a]ny developer may write an Android app," *id.* ¶ 238, and developers may reach consumers through web apps or websites, *see, e.g.*, *id.* ¶ 105. "The availability of these other avenues of distribution, even if they are not the preferred or ideal methods, is dispositive of [Plaintiffs'] claim." *Epic*, 2021 WL 4128925, at *113; *see also Blix*, 2020 WL 7027494, at *7; *Sayre v. Google, Inc.*, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019).

Third, Plaintiffs *do have* access to iOS. Developers need merely comply with the terms of the DPLA and App Review Guidelines to access iOS and submit apps for distribution through the App Store, FAC ¶ 145, and at least three of Plaintiffs' apps *were approved* for distribution. *Id.* ¶¶ 97, 104, 106–07. The real basis for Plaintiffs' claim is that they do not like the *terms* of access. But merely

---

12

refusing to deal in a manner "conducive to [Plaintiffs'] existing business model" or on their preferred terms is not unlawful.  *Aerotec*, 836 F.3d at 1185; *see also Epic*, 2021 WL 4128925, at 113 ("The [essential facilities] doctrine does not demand an ideal or preferred standard.").  Because "access exists" here, "the [essential facility] doctrine serves no purpose." *Trinko*, 540 U.S. at 411; *see also Aerotec*, 836 F.3d at 1185.

### c.   "Ranking Suppression" Is Not Actionable Under Section 2 (Count IV).

Plaintiffs also allege that Apple has monopolized the "institutional" markets for smartphone apps through "app ranking suppression."  FAC ¶¶ 209-10.  Plaintiffs accuse Apple of omitting apps from "critical" App Store rankings or ranking apps "below where [they] should fairly be."  FAC ¶¶ 209-10; *see also id.* ¶¶ 28, 30 (alleging "ranking suppression").  But favoring one developer over another harms only individual participants in Plaintiffs' incoherent market, not *competition itself.  See*, *e.g.*, *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 886–87 (9th Cir. 1982) (charging more favorable prices to plaintiff's rivals did not violate the Sherman Act); *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 925–28 (2d Cir. 1980) (rejecting claim that dominant flight schedule-provider favored major airlines over smaller carriers).

Again, a recent decision has rejected the very theory advanced by Plaintiffs here.  In *Dreamstime.com, LLC v. Google, LLC*, a stock image company sued Google under Section 2 after its website plummeted in Google's search rankings.  2019 WL 341579, at *3 (N.D. Cal. Jan. 28, 2019).  The plaintiff claimed that Google's suppression of stock photo suppliers allowed it to maintain a monopoly in the market for search advertising.  *Id.*  But the Court rejected this argument, concluding that such conduct is "not in and of itself injurious to competition in the relevant market" for search advertising; rather "the only harm to competition alleged is that [Google] hurt [the Plaintiff] and [its] ability to act as a consumer in that market." *Id.* at *6.  Because "showing harm to one customer does not on its own demonstrate anticompetitive conduct," no exclusionary conduct was alleged.  *Id.* at *7.

This Court should reach the same conclusion.  Plaintiffs do not allege that Apple's alleged ranking suppression harmed competition in the so-called "institutional" market in which Apple purportedly purchases developers' apps.  *See* FAC ¶¶ 121, 209.  If anything, such conduct would *disadvantage* Apple because it prevents "consumers [finding] developers through their preferred means of

search," and thus makes the App Store less attractive on one side of the platform. *Id.* ¶ 211; *see also Alaska Airlines v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) ("Every act exploiting monopoly power to the disadvantage of the monopoly's customers hastens the monopoly's end by making the potential competition more attractive."). Regardless of Apple's alleged ranking suppression, "no rival and no competition has been excluded from the [relevant] market, and therefore, no anticompetitive conduct has been adequately alleged." *Dreamstime.com*, 2019 WL 341579, at *7.[4]

### d.     Allegedly Excessive Prices Are Not Actionable (Count VI)

The FAC also challenges Apple's $99 annual Developer Program fee on the basis that Apple "maintains its monopoly power[] . . . by issuing an illegal demand of money from 20 million aspiring developers." *See* FAC ¶¶ 231–40. This claim rests on the mistaken premise that iOS "should exist as a 'common carrier' free from Apple's control." *Id.* ¶ 78. But nothing in antitrust law requires Apple to give away its intellectual property for free. *See Epic*, 2021 WL 4128925, at *105 ("Apple is entitled to license its intellectual property for a fee, and to . . . guard against the uncompensated use of its intellectual property."). In any event, even assuming Apple is a monopolist (which it is not) and that this fee is supracompetitive (which it is not), the Supreme Court has made clear that "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. Accordingly, black-letter law holds that "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2." *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934 (9th Cir. 2009); *see also, e.g.*, *Cont'l Auto. Sys. Inc. v. Avanci, LLC*, 485 F. Supp. 3d 712, 732-34 (N.D. Tex. 2020) (rejecting claim that "extract[ing] supra-competitive royalty rates" violated Section 2). Plaintiffs' claim runs afoul of this "basic rule," *Abbot Labs.*, 571 F.3d at 934, and should be dismissed.

### e.     Plaintiffs Cannot Overcome Apple's Legitimate Business Justifications

Even if Plaintiffs had identified exclusionary conduct under Section 2, their claims should be dismissed because there can be no "antitrust liability if there was a legitimate business justification" for the defendant's conduct. *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 369 (9th Cir. 1988).

---

[4] To the extent Plaintiffs assert a claim that Apple "leverag[es] its monopoly in the device market," FAC ¶ 210, such a "monopoly leveraging" theory is foreclosed. *Alaska Airlines*, 948 F.3d at 547–49.

Both Coronavirus Reporter and Bitcoin Lottery were rejected under generally applicable policies—the former under Apple's requirement that pandemic-related apps be submitted by recognized entities and health institutions, FAC ¶¶ 69–74, and Bitcoin Lottery under Apple's policy that "generally blocked blockchain apps," *id.* ¶ 86.  It is beyond dispute that both policies serve a legitimate objective: Improving the credibility and reliability of public health information and reducing potential risks to the iPhone's integrity or incentivizing "risk-gambling" behavior.  *Id.* ¶¶ 69–74, 87; *see also Cal. Comp. Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (improving product quality is legitimate justification).  Plaintiffs may disagree with the merits of Apple's policies, *see* FAC ¶ 206, but they allege no facts that they are pretextual.  To the contrary, they identify numerous instances in which Apple "stayed firm" to its COVID-19 policy.  *Id.* ¶ 54; *see also, e.g., id.* ¶¶ 58, 66, 73, 75.[5]  As to Plaintiffs' observation that Mac users can "mine bitcoin," *id.* ¶ 86, nothing suggests that they can do so through the Mac App Store (as opposed to the open Internet).  Because even exclusionary "conduct is redeemed by a legitimate business purpose," none of Plaintiffs' Section 2 claims can proceed.  *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990).

### 4.  Plaintiffs Fail to Allege Concerted Action (Count III)

Section 1 of the Sherman Act prohibits only concerted action.  *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).  But Plaintiffs challenge Apple's rejection of their apps pursuant to the DPLA, Apple's Guidelines, and other App Store policies.  FAC ¶ 201.  Such rejections are an exercise of Apple's sole discretion—unilateral conduct that is not actionable under Section 1.  *See, e.g., The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1160 (9th Cir. 1988) ("This termination was pursuant to James Jeans' announced policy as reiterated in its conversations with its dealers" and therefore "was unilateral, independent action taken by James Jeans . . . , [a]nd it did not violate section 1").  And while Plaintiffs point to the DPLA as proof of concerted action, FAC ¶ 198, the Court in *Epic* held that this very agreement could not be challenged under Section 1 because the DPLA "is a unilateral contract" which "a developer must accept" to distribute apps on iOS.  2021 WL 4128925, at *99.  Because "[u]nilateral conduct by a single firm, even if it appears to restrain trade unreasonably, is not unlawful

---

[5]  Plaintiffs allege that "Apple did approve a fledgling Florida startup's COVID app" but not that this developer failed the criteria for distributing COVID-related apps under Apple's policy.  FAC ¶ 74.

1    under [S]ection 1," *The Jeanery*, 849 F.2d at 1152, Plaintiffs' Section 1 claim should be dismissed.

2         **5.**       **Plaintiffs Fail to Allege Unlawful Tying (Count V)**

3         To state a tying claim, a plaintiff must allege that: (1) the tying and tied products are actually

4    two distinct products; (2) that the defendant "possesses enough economic power in the tying product

5    market to coerce its customers into purchasing the tied product"; and (3) "that the tying arrangement

6    affects a not insubstantial volume of commerce in the tied product market." *Aerotec*, 836 F.3d at 1178.

7    Contrary to Plaintiffs' claim (FAC ¶ 224), "the rule of reason, rather than per se analysis" governs

8    Plaintiffs' tying claims because they "involve software that serves as a platform for third-party appli-

9    cations." *United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001).

10        Because tying involves the linking of two separate products from two separate markets, *Jeffer-*

11   *son Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 21 (1984), "a tying claim cannot be sustained where

12   the alleged good is not a 'separate and distinct product.'" *Epic*, 2021 WL 4128925, at *108 (quoting

13   *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 974 (9th Cir. 2008)).  In the FAC, Plaintiffs

14   abandon their previous tying theory and replace it with one in which "the App Store" is tied to "access

15   to [the] iOS device," FAC ¶ 217, and "iOS device features and network effects" are tied to "notary

16   stamps" and "onboarding software," *id.* ¶¶ 219, 221.  The FAC scarcely defines or describes these

17   alleged "products" and offers a fanciful view of how iOS operates.  Even on its own terms, this theory

18   fails, as iOS "is a single platform which cannot be broken into pieces to create artificially two prod-

19   ucts." *Epic*, 2021 WL 4128925, at *109 (rejecting claim that Apple ties IAP to app distribution).

20        Nothing in the FAC suggests that the purportedly tied products—the App Store, "notary

21   stamps," and "onboarding software"—are distinct.  Rather, the allegations confirm that these suppos-

22   edly tied products (to the extent they are even products) are in fact components of a single technically

23   integrated ecosystem.  Plaintiffs allege that Apple sells users an "amalgamation" of hardware and soft-

24   ware, FAC ¶¶ 4, 34, and that "consumers essentially purchase" a "bundle" of device features and an

25   operating system, *id.* ¶ 145.  Notary stamps, according to Plaintiffs, are "digital encryption signa-

26   ture[s]" required to launch apps, *id.* ¶ 135, and are "algorithmically" bound to apps through "the iOS

27   kernel," *id.* ¶ 219.  And "iOS onboarding software," meanwhile, is "an 'installation program to launch

28   an app." *Id.* ¶ 222.  These supposed products are "not bought or sold" but are "integrated into the iOS

devices." *Epic*, 2021 WL 4128925, at *109; *see also* FAC ¶ 172 (Apple "does not sell [onboarding software] to end users"); *id.* ¶ 220 ("most other platforms" do not require notary stamps); ¶ 219 (developers are "unable to purchase [notary stamps]").

"Almost every product"—a pair of shoes, a car with tires—can be viewed as a package of component products; but antitrust law does not hold that "every composite product is a tie-in." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703 (7th Cir. 1984). Here, Plaintiffs merely identify different "component[s] of the full suite of services offered by iOS and the App Store." *Epic*, 2021 WL 4128925, at *109 &  n.619; *see also Rick-Mik*, 532 F.3d at 974 (no tying claim when alleged products are "integral components of the business method being" provided); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 139-42 (D. Del. 2020) (rejecting attempt to "dissect[]" two-sided platform into constituent "services"), *vacated on other grounds*, 2020 WL 4915824 (3d Cir. July 20, 2020).

Plaintiffs also lack standing to bring this claim.  In general, only "two types of parties may have standing to challenge illegal tying arrangements—the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying plaintiff), and the competitor who is restrained from entering the market for the tied product." *Abraham v. Intermountain Health Care Inc.*, 131 F.3d 874, 887 (10th Cir. 1997).  Plaintiffs do not allege that they were required to purchase any of the purported tied products or would compete with Apple to provide them.  *See* FAC ¶¶ 219, 226 (alleging "[d]evelopers are unable to purchase [notary stamps]" and "lack the ability to onboard" their software). Instead, their allegations focus entirely on contrafactual sales to *consumers*.  *See id.* ¶¶ 217–21.  Because Plaintiffs do not allege that they suffered injury from Apple's supposed ties, claims based on this alleged conduct must be dismissed.  *See Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210-11 (C.D. Cal. 2007) (plaintiff lacked antitrust standing when it neither sold nor purchased the tied product); *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 369–70 (N.D. Ga. 1975) (same).[6]

## B.   Plaintiffs' Contract Claims Must Be Dismissed (Counts VIII & IX)

To state a breach of contract claim under California law, Ex. 2 § 14.10, a plaintiff must plead: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) breach; and (4) damages.

---

[6]  Any attempt by Plaintiffs to assert different theories of liability by purported incorporation of the entire complaint in *Cameron v. Apple Inc.*, FAC ¶¶ 36, 241–43, violates Rules 8 and 10.  *See Butowsky v. Wigdor*, 2020 WL 4673944, at *3 (E.D. Tex. Aug. 12, 2020).

*Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011). To start, Plaintiffs fail to square their claim for breach with their allegation that the DPLA is void. FAC ¶ 259. In any event, Plaintiffs fail to "identify the specific provision of the contract" at issue, much less allege facts establishing breach. *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012).

Plaintiffs allege that Apple breached the 'promise[]' in its "Developer Agreement as amended in March 2020 . . . that entities with 'deeply rooted medical credentials' were permitted to publish COVID apps on the App Store." FAC ¶ 245, 254. But nothing in the Developer Agreement (or any other contract) contained such a promise, much less *obligated* Apple to distribute any particular app through the App Store, including those submitted by institutions. *See Donohue*, 871 F. Supp. 2d at 931 (rejecting argument that a user guide contained contractual promises because it "includes no 'promises' which plaintiff could have 'accepted'"). Nor have Plaintiffs alleged their own performance or excuse for nonperformance—another requirement of a breach of contract claim and thus an independent basis for dismissal. *See Hamilton*, 126 Cal. Rptr. 3d at 183. Despite Apple raising this issue in a half-dozen motions to dismiss, Plaintiffs continue to mis-identify the contract that governs app distribution: They assert the "Developer Agreement as amended" (in gross) is the relevant contract, FAC ¶ 245, but the DPLA and App Review Guidelines govern app distribution, *see, e.g.*, Ex. 2 §§ 3.2(g), 6.3.

Nor can Plaintiffs state a claim by reading extratextual terms into the DPLA (a separate contract from the Developer Agreement) that would limit Apple's discretion to approve or disapprove apps for distribution on the App Store. *See* FAC ¶ 255. To the contrary, the DPLA states expressly that approval decisions are in Apple's "*sole discretion*." Ex. 2 §§ 3.2(g), 6.8 (emphasis added); *see also Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 836 (9th Cir. 1996) ("Contract interpretation is governed by the objective intent of the parties *as embodied in the words of the contract*.") (emphasis added). Plaintiffs explicitly agreed to this arrangement in exchange for access to Apple's propriety software, tools, and services. *See* Ex. 2 § 1.1 (developers must "accept and agree to the terms" of the DPLA to "use the Apple Software or Services"). They used those tools to develop their apps. *See* FAC ¶¶ 77, 136, 163. Having received their benefit of the bargain, they cannot now complain that Apple has exercised its agreed-upon discretion—or ask this Court to second-guess Apple's business decisions.

1  Plaintiffs' claim for breach of the covenant of good faith and fair dealing, which merely re-
2  hashes Plaintiffs' breach allegations (*compare* FAC ¶¶ 254, 260, *with id.* ¶¶ 263, 26), should be dis-
3  missed for the same reasons. *See Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855, at *17
4  (C.D. Cal. Apr. 6, 2020) ("no additional claim is actually stated" where allegations "do not go beyond
5  the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same
6  damages or other relief"). Moreover, the "implied covenant is limited to assuring compliance with the
7  express terms of the contract, and cannot be extended to create obligations not contemplated by the
8  contract." *Donohue*, 871 F. Supp. 2d at 932 (quotation marks omitted). Plaintiffs do not allege that
9  Apple frustrated any specific contractual term. *See Soundgarden*, 2020 WL 1815855, at *17.

10  **C.      Plaintiffs' RICO Claim Must Be Dismissed (Count X)**

11  Plaintiffs allege that Apple and mostly unnamed "individuals within Apple," FAC ¶¶ 269, 273,
12  formed a RICO enterprise and "engaged in a distinct pattern of predicate acts over a multi-year
13  timespan," *id.* ¶ 274. To plead a civil RICO claim under § 1962(c), Plaintiffs must allege "(1) conduct
14  (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5)
15  causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours &*
16  *Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted). They have not done so.

17  **1.      Plaintiffs Fail to Allege the Claim with Particularity under Rule 9(b)**

18  Plaintiffs' RICO claim sounds in fraud and must be pled with particularity under Rule 9(b).
19  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc). The FAC therefore "must
20  identify the who, what, when, where, and how of the misconduct charged, as well as what is false or
21  misleading about the purportedly fraudulent statement, and why it is false." *Depot, Inc. v. Caring for*
22  *Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quotation marks omitted).

23  Plaintiffs' RICO allegations fall far short of this demanding standard. First, in their RICO count
24  and elsewhere, Plaintiffs rely on vague, conclusory allusions to Apple's alleged practice of "assigning
25  junior App Review members to issue false, pretextual reasons for rejection to small developers." FAC
26  ¶ 275; *see also, e.g.*, *id.* ¶¶ 42, 87, 104, 257. These general allegations do not identify the specific who,
27  what, when, where, and how. Plaintiffs' apparent attempts to describe discrete instances of fraud fare

28

no better.  For example, Plaintiffs point to a communication from Apple stating that Coronavirus Reporter was rejected because it contained "data that has not been vetted for accuracy by a reputable source" and was not associated with a "recognized institution." *Id.* ¶ 278.  There is no plausible allegation that this was false, *id.* ¶ 277, only that Apple's requirements were poorly considered, *id.* ¶¶ 277–78; *see also supra* pp. 14–15.  Similarly, Plaintiffs suggest that Apple rejected Bitcoin Lottery because its "primary purpose" was to "encourage users to watch ads or perform marketing-oriented tasks," which was "not appropriate for the App Store." *Id.* ¶ 280.  But here too, Plaintiffs do not dispute that the rejection was made pursuant to Apple's Guidelines.  *See* Ex. 3 § 3.2.2(vi).  That Plaintiffs repeat the word "pretext" dozens of times does not make it plausible, nor does it explain *how* Apple's decisions were pretextual as Rule 9(b) requires.  *See Metro Servs. Grp. v. Travelers Cas. & Sur. Co.*, 2021 WL 2633416, at *7 (N.D. Cal. June 25, 2021) (dismissing RICO claim where plaintiff "alleged only conclusory statements" that defendant "used the interstate mails and wires to further its pattern of racketeering"); *Agena v. Cleaver-Brooks, Inc.*, 2019 WL 11248590, at *8 (D. Haw. Oct. 31, 2019) (similar).  The RICO claim is "subject to dismissal based on these deficiencies alone." *Pac. Recovery Sols. v. Cigna Behavioral Health, Inc.*, 2021 WL 1176677, at *10 (N.D. Cal. Mar. 29, 2021).

### 2. Plaintiffs Fail to Allege that Apple Committed Any Predicate Acts

Plaintiffs also have not alleged that Apple committed wire or mail fraud—the purported predicate acts.  FAC ¶ 275.  "The mail and wire fraud statutes are identical . . . and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC*, 751 F.3d at 997.  In addition, "a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020).

Plaintiffs have established none of these elements.  Their most obvious failure is that none of their allegations "support a reasonable inference that [Apple or its employees] acted with specific intent to deceive or defraud." *Pac. Recovery Sols.*, 2021 WL 1176677, at *11.  The only goal or intent that Plaintiffs (wrongly) attribute to Apple or its employees in the FAC is to "limit competition and reward business partners (cronies)." FAC ¶ 312; *see also*, *e.g.*, *id.* ¶ 294 (alleging that Apple acted to "suit[]"

20

its "own interests"). But those are not the requisite allegations that Apple acted to "deprive a victim of money or property." *Miller*, 953 F.3d at 1101. For the same reason, Plaintiffs have not alleged "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017) (quotation marks omitted). Because Plaintiffs did not allege even a single predicate act with specificity—let alone multiple acts as required, 18 U.S.C. § 1961(5)—their claim should be dismissed.

### 3. Plaintiffs Fail to Allege an Enterprise Distinct from the RICO Defendant

Plaintiffs also must allege an enterprise that is *separate* from the "person employed by or associated with" that enterprise who engaged in the unlawful RICO conduct. 18 U.S.C. § 1962(c); *see also Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1396 (9th Cir. 1986). In other words, "[i]f [a corporation] is the enterprise, it cannot also be the RICO defendant." *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984). Despite Plaintiffs' *assertions* to the contrary, FAC ¶ 270, their allegations make clear that the alleged enterprise *is* Apple itself. According to the FAC, it consists of "Apple," *id.* ¶ 269, "Apple's App Review team," and "senior Apple management," *id.* ¶ 270. The result of the enterprise was "the most profitable corporation in history, Apple." *Id.* ¶ 269. And there was "official sanctioning" of at least some parts of the enterprise, *id.* ¶ 270, of which Apple itself was the locus, *see, e.g, id.* ¶¶ 275, 294, 302. Where, as here, the "enterprise consist[s] only of [the corporation] and its employees, the pleading . . . fail[s] for lack of distinctiveness." *Living Designs, Inc.*, 431 F.3d at 361; *see also Lopez v. Dean Witter Reynolds, Inc.*, 591 F. Supp. 581, 585–86 (N.D. Cal. 1984).[7]

### 4. Apple's Court Submissions Cannot Be the Basis for a RICO Claim

In a last-ditch effort to prop up their baseless RICO claim, Plaintiffs also accuse "Apple and their counsel" of filing "false pleadings in court." FAC ¶ 296. This unsupported allegation violates this Court's conduct standards. *See* N.D. Cal. Prof'l Conduct Guidelines ¶ 7. The Court can review any of Apple's filings in this case (or the related cases brought by these plaintiffs) to see that they were

---

[7] For the same reasons, Plaintiffs' *respondeat superior* theory is meritless as it applies only "when the employer is distinct from the enterprise." *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992). Nor can Plaintiffs include in the alleged enterprise Apple's "crony app developers," "law firms," and "PR firms" who allegedly "divert profits," "spread Apple's gospel," or obfuscate "Apple's anticompetitive agenda." FAC ¶¶ 271–72. Even if true (it is not), none of these groups are alleged to have participated in an alleged enterprise involving wire and mail fraud. *See id.*

made in good faith.  Indeed, Plaintiffs have spent more than *eight months* avoiding a response on the merits.  In any event, a corporation defending itself in court is not "racketeering activity" because "[u]nder the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  Because a "successful RICO claim" based on litigation or prelitigation activity "would quite plainly burden" Apple's ability to freely engage in future litigation, *id.* at 932, the First Amendment precludes liability here.  *Delacruz v. State Bar of Cal.*, 2020 WL 227237, at *9 (N.D. Cal. Jan. 15, 2020); *see also Sosa*, 436 F.3d at 939–42.

Plaintiffs also are wrong to the extent they suggest that Apple's counsel could itself be named as a RICO defendant.  They allege that counsel "filed false pleadings in court and relayed to media outlets" statements about Plaintiffs' legal filings.  FAC ¶ 296.  They do not substantiate this scurrilous accusation, pointing only to routine legal argument.  In any event, Apple's counsel's alleged role is "limited to providing legal services"—not "operat[ing] or manag[ing]" an alleged enterprise.  *Baumer v. Pachl*, 8 F.3d 1341, 1344–45 (9th Cir. 1993); *see also Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 699 (7th Cir. 2021) ("a law firm [that] performed legal work" is not part of an enterprise); *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008) (allegations that an attorney "allegedly wrote emails, gave advice, and took positions on behalf of her clients" cannot satisfy the conduct element).

## D.     Plaintiffs' Fraud Claim Must Be Dismissed (Count XI)

For the same reasons as the RICO claim, Plaintiffs' tacked-on fraud claim should be dismissed.  That claim also must be pled with particularity, Fed. R. Civ. P. 9(b), and nothing in the FAC suffices.  For instance, Plaintiffs allege that "[a] clear case of intent to defraud was Apple's demoting Caller-ID two hundred ranking spots," FAC ¶ 312, without identifying a misrepresentation much less the time or place on which it was made.  Likewise, Plaintiffs simply repeat the fraud allegations from their RICO claim in this Count, again without alleging that Apple had any intent other than to profit, such as an intent to deprive Plaintiffs of anything, *see id.* ¶ 312, or an intent to "induce [Plaintiffs] to alter [their] position to [their] injury or risk," Cal. Civ. Code § 1709.  This claim should be dismissed.

## E.     The FAC Should Be Dismissed Without Leave to Amend

This case should be dismissed with prejudice.  Despite *seven* attempts to challenge the same

alleged conduct, *see supra* pp. 3–5, Plaintiffs have fixed none of the fatal defects in their claims.  In-deed, they have already told Apple—before seeing this motion—that they intend to seek yet another amendment.  Brass Decl. ¶ 6.  Plaintiffs have now been on notice for at least six months—based on *six* motions to dismiss—that their proposed market definitions are inadequate, that their Section 1 claim challenges unilateral conduct, and that their Section 2 claims do not allege exclusionary conduct.  *See* D.N.H. Dkt. 26-1.  That these fundamental problems remain proves that "amendment would be futile." *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 726 (9th Cir. 2000); *see also McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996).

**F.      Plaintiffs' Class Allegations Should Be Struck**

If the Court allows any portion of the FAC to survive dismissal, it should strike the class alle-gations.  Plaintiffs bring claims on behalf of two overly broad and conflict-ridden classes: (1) "All U.S. iOS developers of any app that was excluded through disallowance and/or ranking suppression on the App Store" and (2) "Any iOS developer who paid a $99 annual subscription fees [sic] to Apple for access to the iOS userbase and/or app notarization."  FAC ¶¶ 149–50.  Even as alleged, the FAC does not meet Rule 23's requirements of typicality, adequacy, manageability, superiority, and predominance necessary to certify these classes.  *See Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990-91 (N.D. Cal. 2009) (striking class allegations where class cannot be maintained "on the facts alleged").

*First*, Plaintiffs are neither typical nor adequate.  To the contrary, the FAC rests on the alleged *atypical* nature of Plaintiffs' experiences on the App Store—such as the fact that Apple rejected Coro-navirus Reporter and Bitcoin Lottery from the App Store, while allowing other allegedly similar apps (whose developers are also in at least the putative "subscription fee" class, if not members of both). FAC ¶¶ 58, 72-74, 91-92, 204.  Indeed, throughout the FAC, Plaintiffs take aim at Apple's "crony" developers, who allegedly benefited from Apple's policies and conduct at the expense of developers such as the Plaintiffs.  *Id.* ¶¶ 28, 29, 74, 104, 119, 127, 199, 210, 269, 312.  But Apple's supposed "cronies" are *also members of the putative classes* Plaintiffs seek to represent. Conflicts between puta-tive class members are also inherent to Plaintiffs' theory of app ranking "suppression" because, as noted above, for every app that is "suppressed" in a search ranking, another app's visibility is neces-sarily lifted—and all of those developers are necessarily members of Plaintiffs' "subscription fee"

class.  Where, as here, "some [class] members"—*i.e.*, those whose apps were allegedly suppressed—"claim to have been harmed by the same conduct that benefitted other members of the class"—*i.e.*, Apple's alleged cronies—a "fundamental conflict" of interest exists that prevents Plaintiffs from "adequately protect[ing] the interests of the class."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (no adequacy where "interests of those within the single class are not aligned").

Further, by proposing to serve as "both class representative and class counsel," Mr. Isaacs is "not adequate to do either job."  1 Newberg on Class Actions § 3:79 (5th ed.); *see also* FAC at 107 (Mr. Isaacs signing the amended complaint as "pro se").  It is universally accepted that pro se litigants have no authority to represent a class and are therefore inadequate.  *See, e.g.*, *Nordholm v. Barkell*, 816 F. App'x 109, 110 (9th Cir. 2020) (upholding denial of class certification because, as a pro se litigant, plaintiff "has no authority to represent anyone other than himself."); *Langan v. United Services Auto Ass'n*, 69 F. Supp. 3d 965, 988–89 (N.D. Cal. 2014) (similar).[8]

*Second*, Plaintiffs' proposed class action is neither manageable nor superior because, as Plaintiffs admit, litigating it would require sifting through "supporting documentation" for "every rejected app"—of which Plaintiffs claim there are 40,000 per week, FAC ¶ 30—to support their theory of harm. *Id.* ¶ 115 ("Plaintiffs' first discovery request to Defendant Apple will be a list of every rejected app team and supporting documentation.").  There is simply no feasible way to determine when an app is "ranked below where it *fairly* should be," *id.* ¶ 210 (emphasis added), without an individualized review against every similar app ranked on the App Store.  Likewise, there is no possible common evidence that could feasibly allow Plaintiffs to identify which developers had apps rejected as a result of "reasonable discretion" as opposed to "unfair competitive advantage or discriminatory bias."  *Id.* ¶ 255; *see also id.* ¶ 118 (distinguishing apps that are "legal and legitimate" and "meet all standards and requirements" from those that are not).  Judicial economy does not favor a class action "when there are *too many* individual issues to be resolved."  2 Newberg on Class Actions § 4:67 (5th ed.).

---

[8]  Indeed, it is improper for Isaacs to proceed pro se at all.  He is already represented in this litigation as the principal of the other three plaintiffs.  The "largess" of such hybrid representation is "dispensed sparingly," and not where, as here, it puts Apple's counsel "in an ethical dilemma" as they cannot "know when it is permissible to contact [Isaacs] and when it is not."  *Samaan v. Sauer*, 2008 WL 2489004, at *2 (E.D. Cal. June 17, 2008).

*Third*, individualized issues will predominate because determining injury here requires a "fact-intensive individual analysis." *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 947 (9th Cir. 2009). Plaintiffs' FAC is indicative of what a class trial in this matter would look like: A parade of *individual* "stories," "examples," and evidence about how certain *individual* developers like Coronavirus Reporter, CALID, and Primary Productions were harmed in unique (*i.e.*, uncommon) ways.  *See*, *e.g.*, FAC ¶ 115 ("We expect many more stories to emerge . . .").  For example, Plaintiffs allege that "[e]xpert analysis will be presented at jury trial showing that Apple's refusal of Plaintiff's [Coronavirus Reporter] app caused no less than two-thousand deaths in the United States," *id.* ¶ 49, and point to alleged "contractual losses" of "five million users/day over a two-year period," *id.* ¶ 260.  But such evidence would speak only to the alleged harm of Apple's rejection of the Coronavirus Reporter app. It would say nothing about harm to the millions of other apps whose developers are putative class members.  Whether a given app would have achieved "five million users/day" or just five is an "inherently individualized" question unsuited for class-wide resolution.  *Compare* FAC ¶ 147 ("Plaintiffs were damaged through lost opportunities") *with Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331, 342-43 (4th Cir. 1998) (lost profits claims are "not a natural candidate for classwide resolution; the calculation of lost profits is too dependent upon consideration of . . . unique circumstances" (quotation marks omitted)); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 290 (S.D. W. Va. 2015) (similar).  Claims of fraud are likewise "rarely certified" given the inherently individualized issue of reliance.  *Sanders*, 672 F. Supp. 2d at 991; *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance is an issue.").

Thus, even assuming that Plaintiffs have stated actionable theories of harm (and they do not for the reasons discussed above), the FAC demonstrates that identifying injured developers "with any degree of confidence would require an assessment of individual-specific facts," rendering class treatment inappropriate.  *In re Intuniv Antitrust Litig.*, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019); *see also In re Asacol Antitrust Litig*., 907 F.3d 42, 53 (1st Cir. 2018).

## V. CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court dismiss the FAC with prejudice and, to the extent any claims remain, strike Plaintiffs' class allegations.

1   Dated:      September 20, 2021                Respectfully submitted,

2                                                By:     /s/ Rachel S. Brass
                                                        Rachel S. Brass
3

4                                                GIBSON, DUNN & CRUTCHER LLP
                                                MARK A. PERRY (SBN 212532)
5                                                 mperry@gibsondunn.com
                                                RACHEL S. BRASS (SBN 219301)
6                                                 rbrass@gibsondunn.com
                                                JULIAN W. KLEINBRODT (SBN 302085)
7                                                 jkleinbrodt@gibsondunn.com
                                                555 Mission Street, Suite 3000
8                                                San Francisco, CA 94105-0921
                                                Telephone:  (415) 393-8200
9                                                Facsimile:   (415) 374-8429

10                                               *Attorneys for Apple Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT APPLE INC.'S MOTION TO DISMISS AND STRIKE AMENDED COMPLAINT
CASE NO. 3:21-CV-05567-EMC