# COUNT XII
# CALIFORNIA UNFAIR COMPETITION LAW

1. Apple's conduct, realleged here as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

2. Plaintiffs have standing to bring this claim because they suffered injury in fact and lost money as a result of Apple's unfair competition. Specifically, Plaintiffs develop and (could) distribute apps for iOS, but Apple's conduct has unreasonably restricted their ability to fairly compete in the relevant markets with these products.

3. Apple's conduct violates the Sherman Act and RICO, and California criminal fraud statutes, and thus constitutes unlawful conduct under § 17200.

4. A recent POLITICO article by Emily Birnbaum exposed a *quid pro quo* to rescind Apple's $25 million donation to an historically black college (HBCU) in Georgia, alleged to be the most disgraceful scandal in Apple's forty-year history:

*'Apple lobbyists told legislators that the company could pull out of a $25 million investment in a historically Black college in ... if the [antitrust] legislation went through... The threats in Georgia came from third-party Apple lobbyists. "Apple has been able to intimidate and use a lot of money to kill legislation ... They do it in different ways in each state, but it all comes down to strong-arming the legislature... Apple used its power to not only deprive American consumers of greater innovation and options, but also to silence critics and prevent the debate of these critical issues from even happening."'*

5. The conduct exposed by POLITICO represents a pattern of RICO predicate acts violating United States Code Section 201 (bribery), Section 1503 (obstruction of justice), Section 1510 (obstruction of criminal investigation), Section 1511 (Obstruction of State law enforcement), Section 1512 (witness tampering), and Section 1513 (witness retaliation). As such, Count X above is hereby supplemented with these predicate acts, and the enterprise shall include the lobbyists and law firms that improperly lobbied (using financial threats and other *quid pro quo*) and intimidated State Legislators. Plaintiffs conducted, or intended to conduct, business in states

where legislation was improperly blocked by Apple, and thereby suffered anti-competitive losses similar to the FAC national claims.

6. Apple's conduct is also "unfair" within the meaning of the Unfair Competition Law.

7. This District recently found Defendant Apple guilty of violating UCL, with respect to a mobile games transaction marketplace. Apple conducted themselves in a way that "threaten[] an incipient violation of an antitrust law" by preventing informed choice among users of the iOS platform. *Cel-Tech*, 20 Cal. 4th at 187; *cf. FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (requiring that "consumers ha[ve] a free and informed choice" under the FTC test for unfairness). Apple violated the "policy [and] spirit" of these laws because their own product "prevented substitution." (*Epic Verdict*, p.163) District Judge Yvonne Gonzalez-Rogers unambiguously declared:

*"In the context of technology markets, the open flow of information becomes even more critical. As explained above, information costs may create "lock-in" for platforms as users lack information about the lifetime costs of an ecosystem.. In these circumstances, the ability of developers to provide cross-platform information is crucial."*

8. In this case, Apple prevents open, cross-platform information when it disallows valid apps such as Coronavirus Reporter[1], Bitcoin Lottery, or Caller-ID. Just like forbidding *Epic* to communicate with users about their platform, here, Plaintiffs are forbidden by Apple from informing the iOS user about their platform & applications, which were potentially lifesaving in the case of Coronavirus Reporter. Apple's conduct harms Plaintiffs and violates UCL, as they are unreasonably prevented from distributing valid and important mobile apps. Injunctive relief is hereby requested under the Unfair Competition Law.

---

[1] Coronavirus Reporter would have released a cross-platform Android version, had Apple approved their app. For the reasons stated in the FAC, a pandemic app that covered less than half the population was not medically appropriate, so the Plaintiff had to abandon the cross-platform capability. Caller-ID, nonetheless, has a cross-platform offering, so Plaintiffs have standing to seek UCL under almost the exact same determination in their respective marketplace as the "mobile games transaction" marketplace.

TECHNOLOGY

## How the Apple lobbying machine took on Georgia, and won

Poorly resourced state governments are no match for the lobbying firepower of Apple, the most valuable company in the world.



Georgia state legislators in the Senate chamber at the State Capitol in Atlanta. | Brynn Anderson/AP Photo

By **EMILY BIRNBAUM**
08/20/2021 04:30 AM EDT

When Apple wanted to kill off two bills in Georgia this year, it rushed lobbyists to the state legislature, threatened to abandon key economic projects and persuaded the state attorney general to push for an Apple-friendly amendment.

Two months later, the bill that had appeared to have the most momentum stalled in the Georgia House Judiciary Committee. The committee chair did not bring the legislation to a vote during this year's legislative session, effectively killing it in the lower chamber.

Apple's aggressive lobbying efforts in Georgia, the extent of which were previously unreported, highlight a pattern that has played out with little national attention across the country this year: State lawmakers introduce bills that would force Apple and its fellow tech giant Google to give up some control over their mobile phone app stores. Then Apple, in particular, exerts intense pressure on lawmakers with promises of economic investment or threats to pull its money, and the legislation stalls.

"Apple has been able to intimidate and use a lot of money" to kill legislation, said Rep. Regina Cobb, a Republican state lawmaker in Arizona who championed an app store bill that didn't pass her state's Senate. Cobb said she has been closely following Apple's playbook in other states. "They do it in different ways in each state, but it all comes down to strong-arming the legislature."

"They've thrown those dollars around, people have seen that and I think legislators are running a little scared and saying, 'I'm not touching this, I'm not going to put my fingers in this because it could be a negative impact on me in the future," Cobb said.

State legislatures are often quicker-moving and more flexible than the federal government, meaning they can be better-placed to take action on complex and controversial issues. But poorly resourced local lawmakers have struggled to brush aside Apple's lobbying firepower as the company hires key state lobbyists and focuses on killing legislation that threatens the company's bottom line.

While Google has also lobbied against many of the state-level bills, Apple has been the more aggressive and visible opponent across multiple states — a shift for a company that has long been seen as taking a quieter approach to lobbying than its competitors.

At issue is how big of a cut independent app developers should have to give Apple and Google of revenue they earn through the companies' app stores. State lawmakers behind the bills say they want to attract app developers, who might be more likely to bring business to their states if friendly laws are on the books. Both Apple and Google charge developers 30 percent of any revenue on digital purchases and don't allow developers to give users any alternative ways to pay.

At least seven states including Minnesota, New York, Illinois and Hawaii are considering such legislation. Democrats and Republicans in the U.S. House and Senate have also introduced proposals to rein in Apple's and Google's control over their app stores, although [tech reform legislation faces an uphill battle](#) in both evenly divided chambers.

An Apple spokesperson argued its app store model delivers privacy and security for users, along with a business opportunity for app developers. "This legislation threatens to break that very successful model," the spokesperson said, adding that it could discourage innovation and open the door for consumer fraud.

There are heavyweights on the other side as well. Major app developers, including Match Group and Spotify, have aggressively pushed for app store bills across the country. [A lobbyist representing Match Group handed the legislation to Cobb in Arizona](#), and the Coalition for App Fairness — which counts Epic Games, Match Group and Spotify as members — has been hiring lobbyists in multiple states. But even the most powerful members of that coalition don't have anywhere near the resources of Apple.

Apple, the world's most valuable company with a $2.1 trillion market capitalization, has successfully wielded its money in the states in a way that most companies would not be

able to, threatening jobs and offering massive investments — a tactic that has prompted its opponents to claim they are engaging in unethical behavior and potentially violating state ethics laws in at least one instance, in North Dakota.

It's a particularly striking dynamic for a company that has a less public federal lobbying presence than its tech peers Facebook, Google and Amazon. (Last quarter, Facebook and Amazon each spent more than $4.5 million in federal lobbying, while Apple spent $1.6 million.)

"Apple used its power to not only deprive American consumers of greater innovation and options, but also to silence critics and prevent the debate of these critical issues from even happening," said Meghan DiMuzio, executive director of the Coalition for App Fairness, the industry group fighting for the app store legislation.

Apple's hard-charging tactics [attracted national attention in Arizona](#) and [North Dakota](#), but the approach has also been effective in smaller states such as Louisiana and Georgia.

When Georgia legislators introduced a pair of app store bills in early February, Apple immediately hired five new lobbyists to advocate against the legislation in the state. And during the frenzied debate following the bill's introduction, Apple lobbyists told legislators that the company could pull out of two important economic development projects in Georgia — [a $25 million investment](#) in a historically Black college in Atlanta and a [potential multibillion-dollar partnership with Kia](#) to build autonomous vehicles in the city of West Point — if the legislation went through, according to two people familiar with the conversations. They spoke anonymously in order to discuss private discussions.

Apple denied making statements about pulling back on investments. The threats in Georgia came from third-party Apple lobbyists, said one of the people familiar with the conversations.

Meanwhile, three Apple lobbyists reached out to the Georgia attorney general's office to argue the legislation would put the state in legal jeopardy, according to emails obtained through a [public records request by tech watchdog group Tech Transparency Project](#) and shared with POLITICO.

One lobbyist emailed the attorney general's office three days after the bill was introduced to stress that the legislation was "being pushed by our competitors." Another chatted up Attorney General Chris Carr in a hallway, listing off statistics showing Georgia app developers generally pay lower fees, then supplied a detailed legal analysis citing court cases as evidence the bill could be unconstitutional. The third sent an email to Carr's chief of staff saying he was "interested in potential legal cost/exposure to the state given existing legal action, and "if passage of these bills would put the state in a legal bind." He followed that with "Not an attorney so I probably said that incorrectly."

Several weeks after the bills were introduced, Carr's director of external affairs, Jordan Watson, shared Apple's concerns with a Georgia House Judiciary Committee lawyer. The lawyer sent back an amendment that would water down the legislation. "Here is the

substitute for HB 229, the app store bill, which we spoke about earlier this week," the lawyer said in an email to Watson. "I know you were getting questions on it. Let me know if this new version alleviates concerns or creates new ones."

Ultimately, the session ended without lawmakers acting on the Georgia app store legislation. Katie Byrd, communications director for Carr, said the attorney general's office "does not take positions on general legislation, and, in keeping with that policy, we did not take a position on these bills."

"There were a few routine conversations about the bills making their way through the legislative process, and our staff forwarded the information that was shared with our office to those in the legislature who asked for it," Byrd said.

But the emails with the attorney general's office show a friendly back and forth with Apple, and staffers actively checking in with the lobbyists. In an email with the bills' names in the subject line, Watson, the Carr staffer, wrote to one lobbyist, Rufus Montgomery. "How's it going, my man?" and "What are you hearing?"

At another point, Carr's chief of staff Travis Johnson wrote to Montgomery, "Feel free to share any information you're able to."

Montgomery is a longtime Georgia lobbyist with close ties across the state and a [reputation for brokering big deals](). The other lobbyists include Tyler Stephens, who is registered to lobby for Apple at the federal level with GOP-aligned firm Fierce Government Relations, and Matt Konenkamp, who is registered to lobby for Apple in North Dakota. Asked why they were not registered in Georgia, both said they had not spent enough time lobbying officials in the state to meet the threshold that would require them to register under state law.

The legislation in Georgia could have another shot next year after app store-related provisions were appended to a separate bill in the Senate. But one lobbyist for an app developer in the state told POLITICO they don't expect it to go anywhere.

The playbook was similar in North Dakota. Apple representatives held a closed-door meeting with nearly every member of the Senate Industry, Business and Labor Committee the day before it held a hearing on their version of the app store legislation without providing any public agenda or information on the gathering. The committee did not provide public notice or minutes of the meeting — a [potential violation]() of state ethics law. Apple confirmed that it met with the committee.

Soon after, the North Dakota Senate [voted against the bill]().

In Louisiana, Apple proactively offered to invest significant resources into boosting the state's educational system — while convincing the state lawmaker behind an app store bill to stand down. Rep. Daryl Deshotel, the Louisiana state lawmaker who introduced one of the app store bills, ran ads to raise awareness about Apple's and Google's control over the app store. But ultimately, he agreed to pull his bill in May.

During the hearing in which he stood down on the legislation, Deshotel said he had spoken to Apple lobbyists extensively.

"During those talks, I had an opportunity to talk about Louisiana, to talk about where we were falling behind and our communities that were suffering," Deshotel said. "Throughout those talks, we found we had common goals of empowering the underserved and connecting people."

"We set up a tentative meeting … where they're committed to flying in their K-12 specialist, their higher ed specialist, engineers and broadband experts," Deshotel said at the May hearing. Apple said it is continuing to have conversations about education programs in Louisiana and that it believes in reminding lawmakers about the positive contributions the company has made in their states.

As state efforts wither, the federal government could be app developers' best bet. A bipartisan trio of senators — [Richard Blumenthal](#) (D-Conn.), Marsha Blackburn (R-Tenn.) and Amy Klobuchar (D-Minn.) — earlier this month introduced legislation that would force Apple and Google to allow developers to use alternative app stores and tell consumers about cheaper prices online.

"As mobile technologies have become essential to our daily lives, it has become clear that a few gatekeepers control the app marketplace, wielding incredible power over which apps consumers can access," said Klobuchar, the chair of the Senate Judiciary antitrust subcommittee. Companion legislation was also introduced in the House.

It's unclear if that legislation has a path forward, particularly in a Senate that requires significant Republican sign-on and during a congressional session with many higher priorities.

Cobb, the Arizona lawmaker, said she has "limited faith" that the federal government can act more quickly than the states. She's working on finding a path forward for her legislation next session.

"Waiting is not an option," Cobb said. "Why would we wait and hope and put all our eggs in the basket of the federal government when we know they haven't been able to do anything up to this point?"