S. Michael Kernan, State Bar No. 181747
mkernan@kernanlaw.net
THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
Telephone: (310) 490-9777
Facsimile: (310) 861-0503

Attorneys for Plaintiffs


Keith Mathews, *Pro Hac Vice*
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105

Attorneys for Plaintiffs

UNITED STATED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, CALID INC, PRIMARY PRODUCTIONS LLC, DR. JEFFREY D. ISAACS, on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>APPLE INC., FEDERAL TRADE COMMISSION<br><br>Defendants. | Case No. 3:21-cv-05567-EMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO STRIKE**<br><br>**Hearing**<br>Date:    November 4, 2021<br>Time:    1:30PM<br>Place:   Courtroom 5, 17th Floor<br>         (videoconference)<br><br>The Honorable Edward M. Chen |

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

## <u>TABLE OF CONTENTS</u>

**I.   INTRODUCTION** ................................................................................................ 1

**II.   FACTS PLEAD IN THE FIRST AMENDED COMPLAINT** ........................ 3

**III.   LEGAL STANDARD FOR A MOTION TO DISMISS** .................................. 4

**IV.   PLAINTIFFS HAVE SUFFICIENTLY PLEAD THE ELEMENTS OF ALL**
**OF THEIR CLAIMS IN THE FIRST AMENDED COMPLAINT** ............... 5

    **A.   Plaintiffs Have Sufficiently Plead Violations of Sherman Act § 2 (Counts I,**
    **II, IV, VI)**................................................................................................... 5

        **1.   Defendant's Monopoly Power in the Relevant Markets is Plead in the**
        **FAC** ................................................................................................. 6

        **2.   Defendant's Willful Maintaining of Monopoly Power is Plead in the**
        **FAC** ................................................................................................. 8

        **3.   Antitrust Injuries are Plead in the FAC** .................................... 11

    **B.   Plaintiffs have sufficiently plead violations of Sherman Act § 1 (Counts**
    **III, V)** ...................................................................................................... 12

        **1.   Unreasonable Restraint of Trade (Count III)** .......................... 12

        **2.   Tying (Count V)** ......................................................................... 13

    **C.   Plaintiffs Have Sufficiently Plead Their Breach of Contract Claim (Count**
    **VIII)** ........................................................................................................ 17

    **D.   Plaintiffs Have Sufficiently Pled Their Breach Of The Implied Covenant**
    **Of Good Faith And Fair Dealing Claim** ............................................... 17

    **E.   Plaintiff Have Sufficiently Plead Their RICO Claim (Count X)** ............... 18

        **1.   Plaintiffs Have Complied With Rule 9(b) in Pleading Their**

i

RICO Claim ....................................................................................................... 19

    2.    **Plaintiffs Have Alleged Multiple Predicate Acts Sufficient to State a**

          **RICO Claim** ......................................................................................... 21

    3.    **Plaintiffs Have Alleged an Enterprise Distinct from Defendant** ........... 22

  F.    **Plaintiff have sufficiently plead their Fraud claim (Count XI)** ................. 23

V.    **IN THE ALTERNATIVE, IF THE COURT IS INCLINED TO GRANT**

       **DEFENDANT'S MOTION TO DISMISS, PLAINTIFFS RESPECTFULLY**

       **REQUEST LEAVE TO AMEND** ................................................................ 24

VI.    **DEFENDANT'S ARGUMENTS AGAINST THE CLASS ALLEGATIONS**

      **ARE PREMATURE** ..................................................................................... 24

VII.    **CONCLUSION** .............................................................................................. 25

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**Cases** **Page(s)**

2672 CRB,
  2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) .................................................... 21, 22

3500 Sepulveda, LLC v. Macy's West Stores, Inc.,
  980 F.3d 1317 (9th Cir. 2020) ................................................................................ 18

Allied Orthopedic Alliance Inc. v. Tyco Health Care Group LP,
  592 F.3d 991 (9th Cir. 2010) ............................................................................. 9, 10

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ................................................................................................. 5

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007) ........................................................................................Passim

Berkey Photo, Inc. v. Eastman Kodak Co.,
  603 F.2d 263 (2d Cir. 1979) ................................................................................... 10

Brady v. Dairy Fresh Products Co.,
  974 F.2d 1149 (9th Cir. 1992) ................................................................................ 23

Broam v. Bogan,
  320 F.3d 1023 (9th Cir. 2003) .................................................................................. 5

Brown Shoe Co. v. U.S.,
  370 U.S. 294 (1962) ................................................................................................. 8

Careau & Co. v. Security Pacific Business Credit, Inc.,
  (1990) 222 Cal.App.3d 1371 .................................................................................. 17

Celebrity Chefs Tour, LLC v. Macy's, Inc.,
  16 F. Supp. 3d 1141 (S.D. Cal. 2014) .................................................................... 21

Corley v. Rosewood Care Ctr., Inc.,
  142 F.3d 1041 (7th Cir. 1998) ................................................................................ 20

Cost Mgmt. Servs. v. Wash. Natural Gas,
  99 F.3d 937 (9th Cir. 1996) ...................................................................................... 6

Dimidowich v. Bell & Howell,
  803 F.2d 1473 (9th Cir. 1986) ................................................................................ 13

Eastman Kodak v. Image Technical Services, Inc.,
  504 U.S. 451 (1992) ................................................................................................ 13

Epic Games,
  2021 WL 4128925 ..................................................................................................... 8

First Commercial Mortgage Company v. Reece,
  (2001) 89 Cal.App.4th 731 ..................................................................................... 17

Foremost Pro Color, Inc. v. Eastman Kodak Co.,
  703 F.2d 534 (9th Cir.1983) ..................................................................................... 9

Forsyth v. Humana, Inc.,
  114 F.3d 1467 (9th Cir. 1997) .................................................................................. 1

Goel v. Bunge, Ltd.,
  820 F.3d 554 (2d Cir. 2016) ..................................................................................... 1

Hall v. Santa Barbara,
  833 F.2d 1270 (9th Cir. 1986) .................................................................................. 5

Hirata Corp. v. J.B. Oxford and Co.,
  193 F.R.D. 589 (S.D. Ind. 2000) ............................................................................ 20

*Hurd v. Monsanto Co.,*
    908 F. Supp. 604 (S.D. Ind. 1995) .................................................................. 19, 20

*Image Tech. Srvs., Inc. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) ...................................................................... 9, 10, 11

*Immobiliare, LLC v. Westcor Land Title Ins. Co.,*
    424 F. Supp. 3d 882 (E.D. Cal. 2019) ................................................................... 20

*In re Wal-Mart Stores, Inc.,*
    505 F. Supp. 2d 609 (N.D. Cal. 2007) .................................................................. 25

*Jarvis v. Regan,*
    833 F.2d 149 (9th Cir. 1987) .............................................................................. 19

*Jepson, Inc. v. Makita Corp.,*
    34 F.3d 1321 (7th Cir. 1994) .......................................................................... 19, 20

*Lachmund v. ADM Investor Servs., Inc.,*
    191 F.3d 777 (7th Cir. 1999) .............................................................................. 19

*Lazar v. Superior Court,*
    (1996) 12 Cal.4th 631 ................................................................................... 23, 24

*Living Designs, Inc. v. E.I. Dupont De Nemours and Co.,*
    431 F.3d 353 (9th Cir. 2005) .............................................................................. 23

*McDonald v. Schencker,*
    18 F.3d 491 (7th Cir. 1994) ............................................................................... 21

*McDonald v. Sup. Ct. (Flintkote Co.),*
    180 Cal.App.3d 297 (1986) ................................................................................ 24

*MCI Communications Corp. v. American Tel. & Tel. Co.,*
    708 F.2d 1081 (7th Cir. 1983) ............................................................................ 11

*Midwest Commerce Banking Co. v. Elkhart City Centre,*
    4 F.3d 521 (7th Cir. 1993) ................................................................................. 20

*Midwest Grinding Co. v. Spitz,*
    976 F.2d 1016 (7th Cir. 1992) ............................................................................ 20

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 ................................................................................................... 13

*Moore v. Kayport Package Exp., Inc.,*
    885 F.2d 531 (9th Cir. 1989) .............................................................................. 20

*Navarro v. Block,*
    250 F.3d 729 (2001) .......................................................................................... 5

*Nelson v. Quimby Island Reclamation Dist. Facilities Corp.,*
    1978 WL 1059 (N.D. Cal. Feb. 3, 1978) ............................................................... 25

*Neubronner v. Milken,*
    6 F.3d 666 (9th Cir. 1993) ................................................................................. 20

*Pelfresne v. Stephens,*
    35 F. Supp. 2d 1064 (N.D. Ill. 1999) ................................................................... 20

*Racine & Laramie, Ltd. v. Department of Parks & Recreation,*
    (1992) 11 Cal. App. 4th 1026 ............................................................................. 18

*Rae v. Union Bank,*
    725 F.2d 478 (9th Cir. 1984) .............................................................................. 22

*Republic of the Philippines v. Marcos,*
    862 F.2d 1355 (9th Cir.1989) ............................................................................. 22

*River City Markets, Inc. v. Fleming Foods West, Inc.,*
    960 F.2d 1458 (9th Cir. 1992) ............................................................................ 22

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

iv

**OPPOSITION TO MOTION TO DISMISS**

*Rodriguez v. Cal. Highway Patrol*,
  89 F. Supp. 2d 1131 (N.D. Cal. 2000)..................................................... 25

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997) ....................................................... 19, 20

*Soundgarden v. UMG Recordings, Inc.*,
  2020 WL 1815855 ................................................................................. 18

*Standard Oil Co. of New Jersey v. U.S.*,
  221 U.S. 1 (1911) ................................................................................... 6

*Theme Promotions, Inc. v. News America Marketing FSI*,
  539 F.3d 1046 (9th Cir. 2008) ................................................................. 1

*United States v. Bagnariol*,
  665 F.2d 877 (9th Cir.1981) .................................................................. 22

*United States v. Benny*,
  786 F.2d 1410 (9th Cir.) ....................................................................... 22

*United States v. Feldman*,
  853 F.2d 648 (9th Cir.1988) .................................................................. 22

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)................................................................. 10

*United States v. Oracle Corp.*,
  331 F.Supp. 2d 1098 (N.D. Cal 2004)..................................................... 1

*United States v. Redwood City*,
  640 F.2d 963 (9th Cir. 1981) ................................................................... 5

*United States v. Stapleton*,
  293 F.3d 1111 (9th Cir. 2002) ............................................................... 21

*United States v. Turkette*,
  452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)......................... 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP,
  540 U.S. 398 (2004) .............................................................................. 10

*Vess v. Ciba–Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ............................................................... 19

*Wabash Valley Power Ass'n*,
  678 F. Supp............................................................................................ 20

*William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*,
  588 F.3d 659 (9th Cir. 2009) ................................................................... 5

Statutes

15 U.S.C.A. § 2 ......................................................................................... 6
18 U.S.C. §§ 1341, 1343 ......................................................................... 21
Bus. & Prof. Code Section 17200 ............................................................ 1

Rules

Fed. R. Civ. P. 8(a)(2)............................................................................... 5
Fed. R. Civ. P. 15(a) ............................................................................... 24
Fed. R. Civ. P. 23(c)(1)........................................................................... 25
Federal Rules of Civil Procedure, Rule 8 ................................................ 5
Rule 9(b) of the Federal Rules of Civil Procedure ..................... 19, 20, 23

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

v

1

Other Authorities

2

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.
   2004) ..................................................................................................................................... 5

*Epic Games v. Apple: Tech-Tying and the Future of Antitrust*,
   41 Loy. L.A. Ent. L. Rev. 215 (2021) .............................................................................. 14

Manual for Complex Litigation § 21.133 (4th ed. 2006) .......................................................... 25

or 100 ......................................................................................................................................... 4

Smizer,
   41 Loy. L.A. Ent. L. Rev. at 216–51 ................................................................................. 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**OPPOSITION TO MOTION TO DISMISS**

1

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.     INTRODUCTION

Despite a congressional report acknowledging its monopolist practices, Defendant Apple, Inc. ("Defendant") requests this Court try this case on a 12(b)(6) motion.  Certain factual findings made at trial in *Epic Games, Inc. v. Apple, Inc.* (currently on appeal) are cited to resolve disputed factual issues here, such as the relevant market.  Different markets are alleged than in the Epic trial.  Of course, "[t]he definition of the relevant market is a question of fact for the jury."[1]  Ironically, the one section of the *Epic* case that could apply (the Bus. & Prof. Code Section 17200 claim) was the one which Apple lost in that trial.  Regardless, Apple attempts to create a "bespoke factual record, tailor-made to suit [their] needs," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016), which is not permissible on a Rule 12(b)(6) motion to dismiss.  The Epic case is factually different from this case and they alleged different factual claims. So, here, we are at the factual allegations stage, and Plaintiffs factual allegations are taken as true for the purposes of this motion.  In any case, the Antitrust market is defined by the five areas below and alleged in the complaint.

To the contrary, Plaintiffs' First Amended Complaint (the "FAC") sufficiently pleads facts for each and every one of their causes of action. At this stage of the litigation, the facts are defined by what is in the pleadings and taken as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Defendant's request to decide disputed facts is not limited to the relevant marketplace, and also includes Defendant's anticompetitive conduct and antitrust injuries.  Defendant cannot escape the fact that Plaintiffs are bringing forth new claims and new theories that have yet to be explored in any prior lawsuit against Apple.

---

[1] *Theme Promotions, Inc. v. News America Marketing FSI,* 539 F.3d 1046, 1053 (9th Cir. 2008) (citing *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997)). Defining the relevant market is a question of fact for the jury, in part, because "[d]etermining the relevant market can involve a complicated economic analysis, including concepts like cross-elasticity of demand, and 'small but signatory nontransitory increase in price' ('SSNIP') analysis." *Id.* (citing *United States v. Oracle Corp.,* 331 F.Supp. 2d 1098 (N.D. Cal 2004) (Walker, C.J.)).  In the *Epic* case, ultimately the judge decided as a factual matter at trial the claims over the Fortnite game were defined by the market for gaming. That was a factual decision that was made *at trial*.  Here, we are at the 12b6 stage of the pleadings.  The matters alleged in the FAC are taken as true.

Plaintiffs have alleged antitrust standing. They have alleged that they are competitors, and that Apple's monopolistic approach to apps preferences affiliated app developers over others such as the Plaintiffs. For example, paragraph 53 of the FAC alleges Defendant rejected Plaintiffs' applications in favor of strategic partners who did not even have apps ready, but had them simply in the pipeline. Separately, Plaintiffs also have standing because Plaintiffs are both competitors and consumers in this instance. For example, Apple requires developers (consumers in this instance) obtain from Apple a notary stamp through a costly $99 annual subscription program, which is what app developers need to publish apps on Defendant's platform. Separately, Defendant is essentially selling to app developers consumer access (to the users). Both consumers and competitors have standing, and Plaintiffs have alleged themselves to be both.

Moreover, Defendant preferences strategic partners over apps like Plaintiffs. It is alleged in the complaint the notary requirement, for example, has no benefit in the case of competing (non-malware) apps other than to protect Defendant's monopoly. There is no real purpose for it to exist for apps that are not categorized as spam, malware, or objectively harmful software. Defendant gives factual reasons why it exists, but again, that gets into the factual argument which is not appropriate for this stage. Additionally, denying access to the iOS users is exclusionary conduct, directed against a competitor, as alleged in the complaint. That conduct is a factual argument which, of course, is taken as true.

In terms of the concerted action, that applies to a Sherman Section 1 claims only. It does not apply to the Sherman Section 2 claims or any other claim. Apple's position that certain factual claims from another case were applied to Apple's contract have no bearing on this case with different factual allegations, which meet the Sherman 1 standard. The application of the facts to contract itself is not something that can be done at this stage. Also, unilateral conduct can state Sherman 1 claim if there is coercion, which is specifically alleged as a factual matter in the complaint. For example, paragraph 199 of the FAC alleges that coercion.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

2

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

1    Tying is specifically alleged below and in the complaint.  In fact, an excellent law

2  review article (addressed below) explains how tying should have been alleged in Epic, and

3  those are the allegations here.

4    Finally, each of the state law claims have all the elements pled, and as those allegations

5  are taken as true, they dispose of this motion.  Therefore, Plaintiffs request that Defendant's

6  Motion to Dismiss be denied in its entirety, or in the alternative, leave to amend be granted to

7  address whatever inadequacies are found in the FAC.[2]

8    **II.    FACTS PLEAD IN THE FIRST AMENDED COMPLAINT**

9    Examples of Facts plead in the First Amended Complaint:

10
11   53. Apple rejected Coronavirus Reporter on March 6, 2020, knowing apps from
     large institutions and strategic partners were in the pipeline but not yet ready.
12   Apple specifically strategized to prevent the Coronavirus Reporter app, and all
     COVID startup firms, from setting a precedent or amassing a user base, which
13   could jeopardize its own pipeline and/or the first-mover advantage of desirable
     institutional partners of a monopolistic trust.
14
15   163. Apple holds monopoly power in the market for developer access to the
     smartphone enhanced internet device userbase. In the US geographic market,
16   iPhone/iPad users represent slightly over half of this market. Apple controls
     most access to these users, given their strong preference for local apps (versus
17   websites) and limited functionality of browser SDKs. In other words, a
     developer of an app that requires SDK cannot access the iOS userbase, without
18   Apple's permission.

19   164. A developer cannot reasonably substitute another userbase, such as
     Android. They would forego 80% of profits, or 60% of users. For a public
20   health app such as Coronavirus Reporter, this would defeat the functionality of
     the app. For Bitcoin Lottery, it would halve the lottery size. For CALID and
21   WebCaller, it would curtail a critical mass needed to make the app successful.
22
23   171. Operating system notary stamps is Apple's algorithmic invention to create
     an artificial monopoly, not unlike the "taxicab medallion" monopoly. There
24   was, and is, no need for such notary stamps in nearly every other computing
     platform in history. The iOS requirement of notary stamps is an algorithmic
25   violation of the Sherman Act, and is done so purely with the intent to create a
     monopoly on such stamps. These stamps are only sold via the iOS Developer
26   Program, which is precisely why some twenty-million developers, mostly

27   _____
     [2] In addition, Plaintiffs filed a Motion to Strike Defendant's Motion to Dismiss, which
28   Plaintiffs request Judicial Notice of and incorporate it herein by reference.  (See concurrently
     filed Request for Judicial Notice).

**OPPOSITION TO MOTION TO DISMISS**

students, have had to join this program at an average cost to them of nearly one thousand dollars.

173. Apple's refusal to sell notarization stamps or onboarding software (which is available in Mac Finder, Android, Windows, and nearly every other major computing platform in history) is intended to harm competition app developers, like Plaintiffs and Class Members.

174. The artificial monopoly created by notarization stamps and software onboarding results in damages to nearly twenty million proposed class members of approximately one thousand dollars each. Under treble damages, Sherman Act mandates recovery of $80 billion USD to these class members. When the stamps aren't issued, further damages accrue from lost app revenues. . . .

200. Apple's conduct and unlawful contractual restraints harm a market that forms a substantial part of the domestic economy, the smartphone enhanced internet device app market. Apple holds approximately 60-80% of total commerce in that market, or 100% of the iOS app market alternatively.

204. Apple's conduct caused Plaintiffs substantial injury. Non-startup, permitted apps from recognized institutions that were allowed in March 2020 obtained millions of downloads and a top rank in the App Store, demonstrating the strong demand for COVID information applications at that time.

Plaintiffs disagree that the elements for the counts are not alleged.  In addition to the above, the counts themselves lay out the elements.  The marketplace definitions are set forth in paragraphs 15-23 and 134-147. The Motion for Preliminary Injunction, filed last week, devotes four entire pages to further elaborate upon the marketplace definition. And the effect on each and damages are set forth in the following paragraphs:  ¶¶ 46-82 (Coronavirus Reporter);  ¶¶ 83-93 (Primary Productions)  ¶¶ 94-102 (Calid); and  ¶¶ 103-108 Isaacs.  Apple failed to respond to the Cameron claims, and any argument on that is waived.

## III.    LEGAL STANDARD FOR A MOTION TO DISMISS

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all material factual allegations in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

4

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

Courts have viewed motions to dismiss under Rule 12(b)(6) with "disfavor" because of the lesser role pleadings play in federal practice and the liberal policy regarding amendment. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) ("Dismissal without leave to amend is proper only in "extraordinary" cases"); see also, *Navarro v. Block*, 250 F.3d 729, 732 (2001) (Holding dismissal for failure to state a claim is proper only where there is no cognizable legal theory or where there is an absence of sufficient facts to support a cognizable legal theory). "It is axiomatic that 'the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.' " *Hall v. Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986). Thus, "it is only the extraordinary case in which dismissal is proper." *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004).

Pursuant to Federal Rules of Civil Procedure, Rule 8, Complaints filed in federal court are not required to have "detailed factual allegations," (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), but rather, only require a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint is sufficient if it gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. A court may not dismiss an antitrust complaint for failure to state a claim if plaintiff has stated a claim that is "'plausible' in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009). Here, Plaintiffs' allegations sufficiently plead each of their claims, and Defendant fails to demonstrate that Plaintiffs' claims are not plausible under the antitrust laws.

## IV.   PLAINTIFFS HAVE SUFFICIENTLY PLEAD THE ELEMENTS OF ALL OF THEIR CLAIMS IN THE FIRST AMENDED COMPLAINT

### A.   Plaintiffs Have Sufficiently Plead Violations of Sherman Act § 2 (Counts I, II, IV, VI)

Section 2 of the Sherman Act makes it an offense to monopolize, attempt to monopolize, or combine or conspire to monopolize any part of the nation's interstate or foreign commerce. 15 U.S.C.A. § 2. Plaintiffs sufficiently plead all three elements of their

5

monopolization claims: (1) defendant possesses monopoly power in the relevant markets; (2) defendant has willfully acquired or maintained that power; and (3) defendant's conduct has caused antitrust injury. *See Cost Mgmt. Servs. v. Wash. Natural Gas*, 99 F.3d 937, 949 (9th Cir. 1996).

**1.   Defendant's Monopoly Power in the Relevant Markets is Plead in the FAC**

Plaintiffs have plainly laid out the two relevant foremarkets on the face of the FAC. (See, e.g., FAC ¶¶ 16, 18.) From these two foremarkets, five downstream markets exist and are also plead on the face of the FAC. (*See, e.g.,* FAC ¶ 8, fn. 1) Each of these markets satisfy the relevant market inquiry.

The relevant market inquiry has two dimensions. *Standard Oil Co. of New Jersey v. U.S.*, 221 U.S. 1, 61 (1911) First, it is necessary to identify the cluster of products or services with which the defendant's product or service effectively competes, termed the "relevant product market." *Id.* Second, it is necessary to identify the geographic area within which the defendant practicably competes in marketing its product or service, termed the "relevant geographic market." *Id.* All of the relevant markets plead in the FAC have a clear geographic area – the United States, as plead in paragraph 128 of the FAC.[3] This is further evident by the description of the markets as "US" or "national" markets throughout the FAC. (*See, e.g.,* FAC ¶¶ 8, 16, 18, 76, 121, 129, 197, 209, 233.) The Preliminary Injunction offers additional evidence of FCC geographic licensure and applicable product SKU numbers, which the Court is given judicial notice thereof. Furthermore, Defendant's Motion does not argue a lack of geographic market, and is solely focused on the product market. (Motion p.9, lines 9-22.) As discussed in greater detail below, all of the relevant markets plead in the FAC have well defined product markets.

---

[3] "The relevant geographic market is the United States. The United States is a relevant geographic market for iOS Institutional App transactions. The apps, prices, and rules for software purchases vary on a country-by-country basis. For example, encryption software is highly regulated for export. Nonetheless, most antitrust claims asserted in this Amended Complaint would apply to many overseas markets, perhaps with the exception of China. Likewise, US developers frequently sell their apps to international end-users, so damages to US developers go well beyond the US iOS Institutional App marketplace. Plaintiffs' reserve the right to address those damages upon completion of discovery." (FAC ¶ 128.)

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**OPPOSITION TO MOTION TO DISMISS**

1    Put simply, the two relevant foremarkets are 1) the smartphone internet access device

2 market ("US smartphone market"); and 2) US iOS smartphone market, which is an alternative

3 single-product market to the US smartphone market. The product in these markets is

4 smartphones. Both of these foremarkets are plead on the face of the FAC. (See FAC ¶¶ 16, 18.)

5 From these foremarkets, five downstream markets are plainly delineated in footnote 1 of

6 paragraph 8 of the complaint which states:

7
        Five downstream markets are also first-to-file in this pleading:
8       1) the institutional app market (i.e. wholesale app competition),
        2) the iOS institutional app market (iPhone app single-product wholesale
9       marketplace),
        3) iOS notary stamps market (permission tokens to launch iOS apps),
10      4) iOS onboarding software ("Mac Finder" capability disabled on all non-
        enterprise iOS devices), and
11      5) access rights to the iOS userbase.

12 (FAC ¶ 8, fn.1) Item 2 on this list is a single-brand alternative to item 1. (FAC ¶ 125.) The

13 product in the institutional app market are smartphone apps, which is plead in the FAC. (FAC

14 ¶ 209.) The products included in the other markets are further discussed throughout the FAC.

15 The product of the notary stamps market is the notary stamps, as plead in the FAC. (FAC ¶

16 171.) The product of the onboarding software market is the software onboarding, as plead in

17 the FAC. (FAC ¶ 172.) The product of the iOS userbase market is access to the userbase, as

18 plead in the FAC. (FAC ¶ 163.) Each and every one of these markets is a valid antitrust

19 product market or submarket, and an alleged lack of cross-elasticity is not fatal to Plaintiffs'

20 claims as Defendant would have the Court believe, as explained by the Supreme Court:

21
        The outer boundaries of a product market are determined by the reasonable
22      interchangeability of use or the cross-elasticity of demand between the product
        itself and substitutes for it. However, well-defined submarkets may exist which,
23      in themselves, constitute product markets for antitrust purposes. The boundaries
        of such a submarket may be determined by examining such practical indicia as
24      industry or public recognition of the submarket as a separate economic entity,
        the product's peculiar characteristics and uses, unique production facilities,
25      distinct customers, distinct prices, sensitivity to price changes, and specialized
        vendors.
26

27 *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). Discovery should be allowed to commence

28 to allow a proper determination of whether there is industry or public recognition of the

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

7

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors for the submarkets plead in the FAC.

Defendant solely relies on *Epic Games* for its contention that "[t]he relevant market cannot encompass 'all app transactions' (because they are not substitutes) and cannot be limited to iOS transactions alone." (Motion p. 9, lines 7-8.) However, *Epic Games* is currently on appeal (a fact Defendant must have known when it filed its Motion here) and the determinations of Epic, vis-à-vis California UCL (see below) are in fact favorable to this case not being dismissed. The cases pertain to different markets, so regardless, the Court in *Epic Games* never held that "the relevant market cannot be all app transactions because they are not substitutes," but instead decided the relevant market in that case was the digital game transactions market for three completely different reasons, none of which are applicable here, and none of which would deny the existence of the relevant markets plead and dismiss the claims.[4] The Court in *Epic Games* decided as a factual matter at trial that the claims were defined by the market for gaming. That was a factual decision that was made at trial.  Here, a motion to dismiss is being considered. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556.

**2. Defendant's Willful Maintaining of Monopoly Power is Plead in the FAC**

To satisfy the requirement for alleged willful conduct, Plaintiffs must allege facts showing that Defendant engaged in anticompetitive conduct, with the intent to control prices or destroy competition. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir.1983). The House Subcommittee on Antitrust expressed concerns about Defendant. In fact,

---

[4] Specifically, the Court held: "Accordingly, between digital game transactions and all app transactions, the relevant product is game transactions. Contrary to Epic Games' suggestion, that is not because plaintiff sells games. **Rather, it is because game transactions are disproportionately affected by Apple's challenged conduct, overwhelmingly subsidize other apps, and are recognized as a distinct submarket.**" *Epic Games*, 2021 WL 4128925, at *85 (emphasis added).

8

1    it noted the continued monopolization by a small group of tech companies, including

2    Defendant, has substantially reduced "consumer choice, eroded innovation and

3    entrepreneurship in the U.S. economy, weakened the vibrancy of the free and diverse press,

4    and undermined Americans' privacy."  This House Subcommittee report is attached as Exhibit

5    A to the Complaint and is incorporated into the FAC. (See FAC ¶ 36) This Report explains

6    Defendant anticompetitive conduct in greater detail, but regardless, the face of the FAC

7    contains facts establishing anticompetitive conduct. Here, on the face of the FAC, Plaintiffs

8    contend that Defendant used its overwhelming monopoly power to restrict others from

9    publishing competing apps, or becoming app distributors, by restricting the iOS notary stamps

10   market and iOS onboarding software.[5] Defendant did not do this based on any meritorious

11   reasoning. Instead, Defendant abused its monopoly power and intentionally excluded

12   competition from these markets.

13       Plaintiffs' claims are analogous to the Section 2 violations recognized by the Ninth

14   Circuit in *Image Tech. Srvs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), and, in

15   *Allied Orthopedic Alliance Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010).

16   In *Eastman Kodak*, the Ninth Circuit affirmed the jury's finding that Kodak violated Section 2

17   by taking steps to exclude independent service organizations ("ISOs") from competition in the

18   market for servicing Kodak copying machines. "Section 2 of the Sherman Act prohibits a

19   monopolist's unilateral action ... if that conduct harms the competitive process in the absence

20   of a legitimate business justification." *Eastman Kodak*, 125 F.3d at 1209. Just as Defendant

21   does here, Kodak argued that it was entitled to exclude competitors from the market in order to

22   protect its intellectual property rights. *Id.* at 1214-20. However, the jury rejected Kodak's

23   purported business justification as pretextual. *Id.* at 1218-19. Similarly, as Plaintiffs allege in

24   the FAC, Defendant refused to sell notarization stamps, onboarding software, or access to

25   userbases in order to harm competing app developers. (FAC ¶ 173.) Likewise, they offered

26   infra-competitive wholesale prices for free apps. The FAC furthers pleads that there was no

27   legitimate business justification for Defendant's conduct. (FAC ¶ 191.) Defendant's alleged

28   _____
[5] See, e.g., FAC ¶¶ 168, 169, 171, 172.

T H E   K E R N A N   L A W   F I R M
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

9

**OPPOSITION TO MOTION TO DISMISS**

procompetitive justification is pretextual and cannot support a motion to dismiss. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 n.30 (2d Cir. 1979) (product introductions are not immune from antitrust scrutiny); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 408 (2004) ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2.").

The Ninth Circuit affirmed these principles in *Tyco*. There, the court distinguished between a monopolist's design change that "improves a product by providing a new benefit to consumers" from one that serves no purpose "other than protecting [the defendant's] monopoly." *Tyco*, 592 F.3d at 998-99. While the former does not violate Section 2 unless the product innovation is accompanied by additional anticompetitive conduct, the latter "may constitute an unlawful means of maintaining a monopoly under Section 2." *Id.* at 998 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 65-67 (D.C. Cir. 2001)). Here, the issue is not a design change, but the overall design that has always existed; however, the same principles apply. The FAC pleads that the design of the app store, notary stamps, onboarding software, and restrictions to userbase access here serves no purpose other than protecting defendant's monopoly. (FAC ¶¶ 173, 176) If the facts of the FAC are taken as true, Plaintiffs' have established anticompetitive conduct. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556. Any business justification offered by Apple requires a factual finding to determine whether or not it is pretextual, similar to the jury finding that Kodak's purported business reason was pretextual in *Image Tech. Srvs., Inc. v. Eastman Kodak Co. See Eastman Kodak*, 125 F.3d at 1218-19.

Additionally, an essential facility (Count II) has been sufficiently plead. Denial of access to an essential facility is a widely recognized form of anticompetitive conduct, which has the following elements: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). Each

10

1    of these elements is plead on the face of the FAC.[6] Defendant argues that it is not on notice as

2    to what the essential facilities are, yet cites to the portions of the FAC which plainly state what

3    the different essential facilities are. (Motion p. 12, ln. 1-4.) Defendant presumably wants to the

4    Court to believe that Plaintiffs' FAC should be dismissed simply because they are pleading

5    more than one essential facility. On the face of the FAC, Plaintiffs plainly plead what the three

6    different essential facilities at issue are. (See FAC ¶ 185, "Notary stamps, application loaders,

7    and contractual iOS userbase access are therefore essential facilities under Apple's control.")

8    Moreover, Plaintiffs' plead that they are competitors to Defendant (FAC ¶ 183), so they have

9    standing to bring forth this claim.

10        Defendant again uses its IP rights to argue that it is entitled to exclude competitors from

11   these essential facilities, citing only an antitrust textbook (Motion p. 12, ln. 15-24.) However,

12   this reason alone cannot be used as a basis for deciding a Motion to Dismiss because this

13   purported business justification can be found to be pretextual, similar to what the jury found

14   regarding Kodak's IP justification in *Eastman Kodak Co. v. Image Technical Servs., Inc. See*

15   *Eastman Kodak*, 125 F.3d at 1218-19. Clearly, it is too early to resolve this factual question at

16   this stage of the proceedings, and the Motion to Dismiss should be denied. Whether or not a

17   patent gives a Big Tech company "Big Brother" control over the final end-user is a choice for

18   the jury to determine.

19                    **3.  Antitrust Injuries are Plead in the FAC**

20        Plaintiffs have plead injuries to themselves and other competitors resulting from

21   Defendant's anticompetitive conduct, contrary to what Defendant suggests. A plain example of

22   Defendant's conduct's harm to Plaintiffs and other competitors is in paragraph 53 of the FAC.

23   (FAC ¶ 53.) Thus, the FAC alleged an injury not only to Plaintiff Coronavirus Reporter, but to

24   other competitors who were hoping to enter the app market. The relevant market here is the US

25   institutional app market, COVID start-up firms are just participants in that market. Harm to

26   competitors other than Plaintiffs or harm to the market are further plead throughout the FAC.

27   _____

28   [6] See FAC ¶¶ 183-185 for the first element, ¶ 188 for the second element, ¶ 186 for the third element, and ¶ 188 for the third element.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

11

(FAC ¶¶ 81, 173, 174,179, 200.) It is enough that Plaintiffs plead that there was harm to Plaintiffs and competition marketwide. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556.  The descriptions of the harm to competition stemming from Defendant's behavior is explained in great detail in Exhibit A of the FAC, which includes the Congressional Subcommittee report, and the allegations in these reports are incorporated into the FAC. (FAC ¶ 36.)

### B.  Plaintiffs have sufficiently plead violations of Sherman Act § 1 (Counts III, V)

#### 1.  Unreasonable Restraint of Trade (Count III)

The elements for a violation of Section 1 of the Sherman Act are: (1) the existence of a contract, combination, or conspiracy between or among at least two separate entities; (2) that the contract, combination, or conspiracy unreasonably restrains trade; (3) that the restraint affects interstate or foreign commerce; and (4) that the restraint caused plaintiff to suffer an injury to its business or property. (ABA Antitrust Jury Instructions)

The face of the FAC contains facts supporting all of these elements. Plaintiffs have sufficiently plead the existence of a contract that unreasonably restrains trade.  (FAC ¶ 198.) The effect of limiting competition in the US institutional app marketplace was plead to affect interstate or foreign commerce. (FAC ¶ 191.) The damage to plaintiffs' business due to the restraint is also plead on the face of the FAC. (FAC ¶ 204) Thus, the facts plead on the face of the FAC establish this claim. The only argument provided by Defendant to suggest otherwise is a lack of concerted action. Yet again, Defendant is solely depending on the holding from *Epic Games*, a District Court case currently on appeal, for its assertion that the DPLA is a unilateral contract. (Motion p. 15, lines 22-25.) This is the only case that has held this, and it is currently on appeal. This should not be enough to dismiss Plaintiffs' claim with prejudice.

Regardless, unilateral conduct is not itself enough to dismiss this claim. Where the unilateral conduct extends beyond announcing a policy and refusing to deal with non-compliant partners **to coercing an agreement**, the conduct falls under Section 1. *See*

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**OPPOSITION TO MOTION TO DISMISS**

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765; *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (recognizing an exception to the "unilateral refusal to deal" rule where a party "imposes restraints on dealers or customers by coercive conduct and they involuntarily adhered to those restraints"). Plaintiffs' FAC pleads coercion. (FAC ¶ 199) This allegation would be conduct that falls under Section 1. *Monsanto,* 465 U.S. at 765. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556.

### 2.  Tying (Count V)

The elements of a tying claim are: (1) that the purportedly tied and tying items entail separate products or services in the sense that there is separate market demand for each of them without the other; (2) that the availability of the tying item has been conditioned upon purchase, rental, or license of the tied item or on not dealing with the defendant's competitors in the market for the tied item; (3) that the party imposing the tie has sufficient market power in the market for the tying item to "appreciably restrain free competition" in the tied market; and (4) that a "not insubstantial" amount of commerce in the tied item is affected by the tying arrangement. *Eastman Kodak v. Image Technical Services, Inc.*, 504 U.S. 451, 462-4 (1992).

Defendant's Motion does not contest that elements two (2) through four (4) have been established[7], but rather focuses on two alleged issues – the separateness of the tied and tying products (the first element) (Moton p. 16, ln. 10-28; p. 17, ln. 1-11.) and Plaintiffs' standing to bring this claim (Motion p.17, ln. 12-23.) As discussed in greater detail below, neither of these arguments are enough to warrant granting a motion to dismiss.

Plaintiffs plead the separateness of the tied and tying products throughout the FAC. (FAC ¶¶ 218, 220, 222.) Note that the tying product is always Defendant's iOS device (i.e. an Apple iPhone), while different tied products are plead (the App Store, notary stamps, and onboarding software). Moreover, Plaintiffs explain the consumer interest/demand for each of

---

[7] Regardless, Plaintiffs have plead facts establishing these elements on the face of the FAC. (See, e.g., FAC ¶¶ 217, 219, 221 for the second element, FAC ¶ 216 for third element, and FAC ¶223 for the fourth element.)

13

these tied products on the face of the FAC.[8] Defendant would have the court believe that *Epic Games* (a case currently on appeal) should be used to determine a lack of a separate product. (Motion p. 17, ln. 6-8.) However, the Court in *Epic Games* made a factual decision on this issue at trial, and the purported tied product in Epic Games (in-app purchases) differs from the tied products plead by Plaintiffs (the app store, notary stamps, and onboarding software). Moreover, *Epic Games* should not be used to decide this issue because Defendant's conduct here constitutes "tech-tying" and competitors like Plaintiffs should be permitted to enter the aftermarkets of both iOS app distribution and iOS in-app payments processing. See analysis on this issue in Emma C. Smizer*, Epic Games v. Apple: Tech-Tying and the Future of Antitrust*, 41 Loy. L.A. Ent. L. Rev. 215, 216–51 (2021).  That article adds:

> Apple pre-installs their own software on their phones as a means … [to] block other developers from creating competing software products for their phones.  In fact, Apple creates both the phone or other mobile device, then it creates the mobile device operating system and then it creates applications that "sit on top of" its own platforms. Additionally, Apple directly controls iOS mobile app distribution through the App Store. By funneling all app downloads and purchases through the App Store, Apple can also require its consumers to use Apple's LAP system.

Smizer, 41 Loy. L.A. Ent. L. Rev. at 216–51 (internal citations omitted). As noted in the law review article, Epic's claims did "not capture the full scope of Apple's tying conduct." *Id.* at 242.  For example, that article states:

---

[8] "The U.S. Supreme Court has held that 'the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of demand for the two items.' Thus, the most important factor in determining whether two distinct products are being tied together is whether customers want to purchase the products separately. If customers are not interested in purchasing the products separately, there is little risk the tie could foreclose any separate sales of the products. **Here, all three tied products meet the SCOTUS requirement for consumer interest. Clearly, consumers are interested in purchasing apps separately from smartphones. Consumers also want permission to run these apps (notary stamps), and fought for 'jailbreaking rights' to SCOTUS, which was granted. Lastly, there is little question of demand for convenient, reasonably priced 'onboarding software:'** The Mac 'Finder' revolutionized such an easy-to-use launching GUI, and arguably, is the reason Apple exists today." (FAC ¶ 228, emphasis added.)

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

The tying appears to be happening twofold: first, Apple conditions the use of its mobile iOS operating system with the App Store as the sole means of iOS-compatible app distribution; and second, Apple ties the App Store to its IAP system for making app-related purchases for virtual goods. Apple compels the consumer to utilize its App Store without any competing alternatives and prohibits users from deleting the Apple App Store. As a result, Apple is able to maintain its "gatekeeper" status over the app distribution market for iOS devices and therefore require consumers and app developers alike to use Apple's IAP system. App developers allege that Apple "actively undermines the open web's progress" on its own iOS devices in order to "to push developers toward building native apps on iOS rather than using web technologies." Apple maintains complete control over iOS smartphones by disallowing any competitors in the aftermarkets of iOS app distribution.

*Id.* at 242-3. The article adds:

Apple creates an absolute barrier to entry for third parties that either wish to distribute iOS-compatible apps or provide alternative payment processing systems for digital commerce on iOS smartphones. The Apple App Store's net revenue alone was estimated at $17.4 billion for the 2020 fiscal year. Analytics have shown that, on its own, the App Store would rank at 64 in the Fortune 500. Apple also has yet to produce any evidence that its App Store is not the exclusive method of app distribution for iOS devices or that Apple does not maintain monopoly control of these aftermarkets.

*Id.* at 243-4. The article adds:

The issue is that Apple has unparalleled discretion to implement arbitrary rules or fees--the "our bat, our ball, our rules" approach--to the detriment of other would-be competitors in the aftermarkets of iOS app distribution and in-app payment processing. Apple's 30% commission on the sale of digital goods is "non-negotiable." Apple owns each adjacent market which relies on the former, thus leveraging its complete market power over these iOS aftermarkets. Should an app developer disagree with Apple's policies, they risk losing access to over one-billion iOS users.

*Id.* at 245. That article concludes with:

Apple has every right to operate its own App Store and offer services exclusive to its devices, Apple cannot be permitted to continue this "forced bundling." The solution is clear: allow iOS users to download iOS-compatible apps from other sources and allow app developers to use alternative payment processing systems. This does not preclude Apple from offering both its own App Store as a means of iOS app distribution and Apple's LAP system as an in-app payment mechanism. Both may serve as *competing* options for iOS users.

*Id.* Here, Plaintiffs should be allowed to fully pursue their tying theories, and *Epic Games*

should not be used as a basis for dismissal. Moreover, discovery should commence to

determine consumer demand for the tied products, so the claims should not be dismissed at this

**OPPOSITION TO MOTION TO DISMISS**

stage of the proceedings, because if the allegations regarding consumer demand in the FAC are taken as true, then the separateness of the products is established. When considering a motion to dismiss, a court must accept as true the complaint's allegations and reasonable inferences to be drawn from them. *Twombly*, 550 U.S. at 556.

Additionally, Plaintiffs have standing to bring this claim. Defendant's Motion admits that competitors who are restrained from entering the market for the tied product have standing to bring forth this claim. (Motion p. 17, ln. 12-15.) Plaintiffs' have alleged that they are competitors who are restrained from entering the market for the tied product on the face of the FAC. Plaintiffs are developers, who are competitors that could open their own app stores (one of the tied products alleged) if not for Defendant's EULA and notarization requirements. (See FAC ¶ 218.) It follows that if Plaintiffs (and other developers like them) were allowed to open their own app stores, they would also be in the market for their own notary stamps (one of the tied products alleged) to use for the apps in their app stores, making Plaintiffs' competitors in the notary stamp market. (See FAC ¶ 219.) Similarly, it follows that if Plaintiffs (and other developers like them) were allowed to open their own app stores, they would be in the market for their own onboarding software (one of the tied products alleged) to launch the apps. (See FAC ¶ 222.) If the allegations of the FAC are taken as true, then app stores, notary stamps, and onboarding software are all tied products. Furthermore, if the allegations of the FAC are taken as true, then Plaintiffs were competitors in the market for each of these tied products, who were restrained from entering the market for the tied product by Defendant's conduct. Thus, based on the authority used by Defendant itself, Plaintiffs have standing to bring this claim based on the facts on the face of the FAC. (See Motion p. 17, ln. 12-15.) Similarly, Defendants' argument against Counts IV and VI depend on factual conclusions and dependance on *Epic Games* (currently on appeal), for contentions such as "But nothing in antitrust law requires Apple to give away its intellectual property for free." (Motion p. 14, ln.11-12.)  Not only is this not the stage of proceedings to decide this issue, but as noted in Plaintiffs' Motion to Strike, judicial notice of which has been requested, the Court in Epic Games rejected Defendant's IP argument. (See RJN p.9)

**OPPOSITION TO MOTION TO DISMISS**

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**C.  Plaintiffs Have Sufficiently Plead Their Breach of Contract Claim (Count VIII)**

The elements of a claim for breach of contract are: (i) the existence of a valid contract; (ii) performance by the plaintiff or excuse for non-performance; (iii) breach by the defendant; and (iv) damages.  *See First Commercial Mortgage Company v. Reece* (2001) 89 Cal.App.4th 731, 745; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.  As shown below, Plaintiffs have plead each of the elements of a claim for breach of contract.

Plaintiffs pled the existence of the contract.  (FAC ¶ 245.)  Plaintiffs pled their performance under the contract.  (FAC ¶¶ 246 – 249, 251 – 253.)  Plaintiffs plead breach of the contract by Defendant.  (FAC ¶¶ 250, 254 – 258.)  Plaintiffs plead damages.  (FAC ¶ 260).  For purposes of pleading, Plaintiffs have sufficiently plead a claim for breach of contract.

As Defendant has attempted to do throughout its 12(b)(6), Defendant ignores the fact that the factual allegations of Plaintiff's First Amended Complaint must be deemed as true.  Defendant is completely rewriting Plaintiff's allegations in the First Amended Complaint and under the allegations of the Breach of Contract cause of action.  Plaintiffs pled the contract, Plaintiffs' performance, Defendant's breach and damages.  Accepting as true that some contractual clauses violate Sherman and UCL, the contract claim may not be dismissed under Apple's suggestion they have "sole discretion" to deny any app. The contract claim must be viewed in the context of the entire lawsuit, not a vacuum. If a jury may find some of the contract represented an "adhesion agreement," a downstream jury determination of breach may be inevitable. Plaintiffs met the pleading requirements of a claim for breach of contract and Defendant's Motion should be denied.

**D.  Plaintiffs Have Sufficiently Pled Their Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claim**

The elements of a claim for breach of implied covenant of good faith and fair dealing are: (1) existence of a contract between the parties; (2) the plaintiff's performance of that contract; (3) conduct by the defendant that breached the implied covenant of good faith and fair dealing; and (4) damages. *See Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal. App. 4th 1026, 1031-32.

17

In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. *3500 Sepulveda, LLC v. Macy's West Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020).

Here, Plaintiffs pled the existence of the contract. (FAC ¶ 245.) Plaintiffs pled their performance under the contract. (FAC ¶¶ 246 – 249, 251 – 253.) Plaintiffs plead conduct by Defendant breaching the implied covenant of good faith and fair dealing by Defendant. (FAC ¶¶ 263 – 265.) Plaintiffs plead damages. (FAC ¶ 266.) For purposes of pleading, Plaintiffs have sufficiently plead a claim for breach of the implied covenant of good faith and fair dealing.

Defendant is again impermissibly attempting to rewrite Plaintiffs' allegations. Plaintiff's allegations have to be taken as true. Furthermore, Defendant's argument is contradictory. On the one hand, Defendant is arguing that Plaintiffs' Breach of the Covenant of Good Faith and Fair Dealing cause of action "merely rehashes Plaintiffs' breach allegations." (Motion, p. 19, ll. 1 – 2.) On the other hand, Defendant argues that a specific contractual term that was breached by the implied covenant must be alleged. In fact, the case cited by counsel for Defendant, which counsel for Defendant briefed and argued, specifically held "'breach of a specific provision of the contract is not a necessary prerequisite' to establishing breach of the implied covenant of good faith and fair dealing. . .'" *Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855, 17. Defendant's own case, a ruling on a 12(b)(6) contradicts Defendant's arguments. Plaintiffs have sufficiently pled a claim for breach of the implied covenant and, therefore, Defendant's Motion should be denied.

**E.  Plaintiff Have Sufficiently Plead Their RICO Claim (Count X)**

To allege a claim under RICO, a plaintiff must allege facts establishing four elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Jarvis v. Regan,* 833 F.2d 149, 151-52 (9th Cir. 1987). The FAC properly alleges facts demonstrating all of these elements in the context of a classic and destructive RICO scheme: an-ongoing scheme to exploit the work of developers by screening their ideas for purported compliance with DPLA, meanwhile lifting and appropriating their ideas into their own competing apps and

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

18

suppressing the original creators' work by blocking distribution.

       **1.   Plaintiffs Have Complied With Rule 9(b) in Pleading Their RICO Claim**

Rule 9(b) of the Federal Rules of Civil Procedure applies to allegations of mail and wire fraud. *See, e.g., Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir. 1994). Therefore, for at least two acts of mail or wire fraud, "a plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications," in order to state a RICO claim. *Id.* at 1328; *Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 784 (7th Cir. 1999) ("a plaintiff must allege with particularity two predicate acts"). Further, "[t]he allegations must be specific enough to provide the defendants with a *general outline* of how the alleged fraud scheme operated and of their purported role in the scheme." *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 347 (N.D. Ill. 1997) (emphasis added). In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

Because Rule 9(b)'s particularity requirement "contrasts significantly with the general standard enunciated in Rule 8 .... we must take care not to permit the more demanding standard of Rule 9(b) to encroach unduly on the general approach to pleading that Congress has established in Rule 8." *Lachmund v. ADM Investor Servs., Inc.,* 191 F.3d 777, 783 (7th Cir. 1999); *see Hurd v. Monsanto Co.,* 908 F. Supp. 604, 613 (S.D. Ind. 1995). Moreover, "Rule 9(b) does not require that the complaint explain the plaintiffs theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent." *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir. 1993). Regarding mail and wire fraud, "[a]ll Rule 9(b) require[s] ... [is] that [plaintiff] set forth the date and content of the statements or omissions that it claim[s] to be fraudulent. [Plaintiff is] not required to go further and allege the facts necessary to show that the alleged fraud was actionable." *Id.; Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992); *Hurd,*

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

19

908 F. Supp. at 614, n.9.

Certain additional principles relating to the application of Rule 9(b) are also well-recognized. "[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties." *Corley v. Rosewood Care Ctr., Inc.,* 142 F.3d 1041, 1051 (7th Cir. 1998); *see Hirata Corp. v. J.B. Oxford and Co.,* 193 F.R.D. 589, 592 (S.D. Ind. 2000); *Pelfresne v. Stephens,* 35 F. Supp. 2d 1064, 1071-72 (N.D. Ill. 1999) (predicate acts maybe pled more generally when facts are exclusively known to defendants).

Further, specific actors need not be identified when the "role of each corporate defendant in the scheme is reasonably clear." *Rohlfing,* 172 F.R.D. at 348; *see Jepson, Inc.,* 34 F.3d at 1329 (collective allegations permissible when corporate defendants were "related corporations that can most likely sort out their involvement without significant difficulty"); *Wabash Valley Power Ass'n,* 678 F. Supp. at 762 (allegations of collective actions by unidentified senior officials of a business are adequate).  in "instances of corporate fraud [where it is] difficult to attribute particular fraudulent conduct to each defendant as an individual[,] the allegations should include the misrepresentations themselves with particularity and, *where possible*, the roles of the individual defendants in the misrepresentations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)

*See Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (noting that elements of fraud claim can be pleaded "on information and belief" when plaintiff provides basis for that belief and fact is one that is within defendant's knowledge); *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 890 (E.D. Cal. 2019) (noting that plaintiffs must allege the names of employees that made fraudulent statements or, "at a minimum identify them by their titles and/or job responsibilities") (citation omitted).

Applying these standards and principles, there can be no doubt that Plaintiffs more than adequately plead a pattern of racketeering activity. As previously noted, the racketeering activity here involves predicate acts of fraud which requires a scheme to defraud, intent to defraud and

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**OPPOSITION TO MOTION TO DISMISS**

1
2
3
4
5

use of wire communications or the mail in furtherance of the scheme. Plaintiffs specifically allege all such elements.  (FAC ¶¶ 267 – 308). *See, e.g.*, *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1150 (S.D. Cal. 2014) (concluding that the plaintiff had alleged false representations with specificity by identifying which statements were false, detailing who made the statements, the date on which they were made, and in what form they were said).

6
7

### 2.   Plaintiffs Have Alleged Multiple Predicate Acts Sufficient to State a RICO Claim

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

RICO's "predicate acts" are certain listed federal and state offenses, including mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. By way of addendum, Plaintiffs have incorporated state law violations in Georgia and other elsewhere tantamount to bribery and corruption of public officials. To state a claim for mail or wire fraud, a plaintiff must allege "(1) that [defendant] engaged in a scheme to defraud, (2) with the intent to defraud, and (3) that [defendant] used the mails or interstate wires in furtherance of that scheme." *McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir. 1994). "[A] defendant may be held liable for mail or wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB, 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) (citing *United States v. Stapleton*, 293 F.3d 1111, 1117–18 (9th Cir. 2002)). The Ninth Circuit in *Stapleton* reasoned that the "scheme to defraud" element of the mail and wire fraud statutes is akin to conspiracy. *Stapleton*, 293 F.3d at 1116–17.  The predicate acts of mail and wire fraud themselves do not require use of the mail or wire by each member of the scheme. *See In re Volkswagen*, 2017 WL 4890594, at *12.  Additionally, there are numerous predicate acts of wire communication and mail fraud specifically alleged in the First Amended Complaint.  (FAC ¶¶ 275 – 303). In the Plaintiff's Motion to Strike, these wire fraud pleadings are specifically identified.

26    / / /
27    / / /
28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

21

### 3.  Plaintiffs Have Alleged an Enterprise Distinct from Defendant

Defendant relies heavily on *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir. 1984), which was limited and explained in *River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1460 – 61 (9th Cir. 1992).  According to the court in *River City*:

> For Rule 12 purposes, plaintiffs' generalized allegations state a claim for which relief could be granted. *See Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1358 (9th Cir.1989) (en banc). Plaintiffs allege that Alpha Beta and Fleming *1461 combined to form an "association-in-fact" enterprise under RICO. In *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court held that RICO applied not only to the infiltration of legitimate businesses by racketeers but also to the activities of informal associations that did not constitute legal entities. After quoting section 1961(4), the Court observed that "[t]here is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." *Id.* at 580, 101 S.Ct. at 2527. . . . Following Turkette, we have recognized that a group of individuals or corporations may together constitute a RICO enterprise even though they do not incorporate or otherwise form a legal entity. *See, e.g., United States v. Bagnariol*, 665 F.2d 877, 890–91 (9th Cir.1981), cert. denied, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).
>
> . . . *Rae* simply embodies the maxim that an individual cannot associate or conspire with himself, and in subsequent decisions we have adhered to this narrow reading of *Rae. See United States v. Feldman,* 853 F.2d 648, 656 (9th Cir.1988) (characterizing the *Rae* rule as providing that a defendant cannot be convicted of associating with himself); *United States v. Benny,* 786 F.2d 1410, 1415–16 (9th Cir.) (holding that although an individual defendant could not associate with himself for RICO purposes, he could associate with his own sole proprietorship), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986).

*Id.*

Here, Plaintiffs pled the enterprise as being not only Defendant, but other persons and entities working in concert with Defendant, including PR firms, law firms, and rival developers.  (FAC ¶ 270). Lobbyists that corruptly influence state legislative pleadings also form the enterprise, as explained in the Motion for Preliminary Injunction filed last month. Plainly from the face of the First Amended Complaint, the enterprise is not limited to Defendant.  Defendant is again trying to rewrite Plaintiff's Complaint.

Additionally, Defendant Apple is named as defendant for this RICO claim under the principle of *respondeat superior*. The Ninth Circuit has adopted the reasoning of *Petro-Tech* and *Liquid Air*, holding that liability may arise under § 1962(a) under *respondeat superior* principles when the individual or entity is benefited by its employee or agent's RICO

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

22

violations. *See Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992) Here, Defendant's App Review team carried out the enterprise, along with senior Apple management, PR firms, law firms/lobbying firms, and a select group of crony rival developers. Plaintiff alleged this theory of liability in the First Amended Complaint as well.  (FAC ¶ 270).

Moreover, when a when a corporation engages in a pattern of racketeering activity through legal entities beyond its control, such as independent banks, law firms, accounting firms, or public relations firms, the person / enterprise distinction will more than likely be satisfied. *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 362 (9th Cir. 2005). This is precisely the conduct alleged against Defendant as discussed in the First Amended Complaint.  Named Defendant works with other numerous other entities to form the RICO enterprise.  (FAC ¶ 271).

### F.  Plaintiff have sufficiently plead their Fraud claim (Count XI)

As pointed out above under Section IV.E.1, Plaintiffs' sufficiently alleged their fraud claim under Rule 9(b) of the Federal Rules of Civil Procedure.  In addition, as pointed out in the First Amended Complaint, The elements of fraud are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.  A plaintiff must show that he or she changed position in reliance upon the alleged fraud and was damaged by that change of position. Civ. Code, § 1709. For example, in *Lazar*, evidence that the plaintiff had quit his job and moved across the country in reliance upon the defendant's misrepresentations, would have been sufficient to demonstrate a detrimental change of position. *Lazar v. Superior Court*, supra, 12 Cal.4th at p. 639.

In addition, as pointed out in Section IV.E.1 above, Plaintiffs must allege who, what, when, where and how the representations were made to the best of Plaintiffs' ability.  Plaintiffs identified who made the fraudulent misrepresentations, when they were made and what was said sufficient to state a claim for fraud when dealing with a corporate defendant as discussed above.  (FAC 275 – 303, 311 – 318).  Therefore, as Defendant's Motion should be denied

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

1  concerning Plaintiffs' RICO claim, Defendant's Motion should be denied as well concerning

2  Plaintiffs' fraud claim.

3  **V.      IN THE ALTERNATIVE, IF THE COURT IS INCLINED TO GRANT
            DEFENDANT'S MOTION TO DISMISS, PLAINTIFFS RESPECTFULLY**
4  **        REQUEST LEAVE TO AMEND**

5          If the Court is inclined to grant any part of Defendant's Motion to Dismiss, the

6  opportunity to amend should be provided. Pursuant to Fed. R. Civ. P. 15(a), leave to amend

7  "shall be freely given when justice so requires." *See McDonald v. Sup. Ct. (Flintkote Co.)*, 180

8  Cal.App.3d 297, 303–304 (1986) ("Unless the complaint shows on its face that it is incapable

9  of amendment, denial of leave to amend constitutes an abuse of discretion, irrespective of

10  whether leave to amend is requested or not.").

11          Here, as pointed out above, Plaintiffs have sufficiently factually alleged the claims

12  challenged by Defendant's 12(b)(6).  Defendant attempts to rewrite the factual allegations of

13  the First Amended Complaint which is impermissible.  The facts alleged by Plaintiffs need to

14  be accepted as true.  Even if this Court were to accept Defendant's argument that Plaintiffs

15  failed to state claims for relief—which it should not for the reasons previously stated—

16  dismissal with prejudice is not appropriate here, as Plaintiffs' contentions concern factual

17  allegations that could be resolved by amendment.  Defendant admits that there has been no

18  ruling on a 12(b)(6) concerning Plaintiff's Complaint and that this would be the first ruling

19  testing Plaintiff's Complaint.  It would be draconian to deny leave to amend on the first

20  hearing.[9]

21  **VI.     DEFENDANT'S ARGUMENTS AGAINST THE CLASS ALLEGATIONS
            ARE PREMATURE**
22

23          Rule 23(c)(1) states that the Court must determine whether to certify an action as a

24  class action "at an early practicable time." Fed. R. Civ. P. 23(c)(1). Class certification

25  determinations, however, must be based on sufficient evidence to support an informed decision

26          [9] In addition, Plaintiffs have added an addendum to their Complaint based on
    California's Unfair Competition Law, which is set to be heard on November 4, 2021 in
27  conjunction with Plaintiffs' Motion to Strike and Motion for Preliminary Injunction, which
    also warrants permitting of amending the FAC, in the event the proposed addendum is not
28  already considered part of the FAC by way of judicial notice.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

after the parties have had the opportunity to develop an adequate record. See Manual for Complex Litigation § 21.133 (4th ed. 2006). Courts have repeatedly held that removing class allegations at the pleading stage "should be done rarely and that the better course is to deny such a motion because 'the shape and form of a class action evolves only through the process of discovery.' " *In re Wal-Mart Stores, Inc.,* 505 F. Supp. 2d 609, 615 *(N.D. Cal. 2007).*

Defendant fails to adequately explain why the Court should take the extraordinary step of engaging in piecemeal litigation and striking the class allegations at this stage before class discovery is complete, as opposed to deciding the issue at a class certification hearing and upon an adequate record. *See Nelson v. Quimby Island Reclamation Dist. Facilities Corp*., No. C-77-0784, 1978 WL 1059, at *2 (N.D. Cal. Feb. 3, 1978) ("Defendant does not contend that no class would be proper; rather, it objects to the dimensions of the class alleged by the plaintiffs. Defendant's objections should be interposed when plaintiffs move to certify their classes."); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1143 (N.D. Cal. 2000) (denying motion to strike class allegations because "the appropriateness of [the class allegations] will be tested in the context of a motion for certification of the class"). In addition to being premature, Defendant's arguments to strike the class allegations also fail for various reasons outlined in Plaintiffs' motion to strike. (See RJN pp. 13-14.) Thus, this premature motion to strike the class allegations should be denied.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion to Dismiss and Motion to Strike be denied in their entirety, or in the alternative, that Plaintiffs' be given leave to amend.

DATED:  October 4, 2021                    THE KERNAN LAW FIRM

                                           By: */s/ S. Michael Kernan*
                                               S. Michael Kernan
                                           Attorneys for Plaintiffs

                                           By:*/s/ Jeffrey Isaacs*
                                               Jeffrey D. Isaacs M.D., M.B.A.
                                           Pro se

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**OPPOSITION TO MOTION TO DISMISS**

**CERTIFICATE OF SERVICE**

I, R. Paul Katrinak, hereby declare under penalty of perjury as follows:

On October 4, 2021, I caused the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO STRIKE** to be electronically filed with the Clerk for the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on October 4, 2021.

/s/ *R. Paul Katrinak*
R. Paul Katrinak

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777