S. Michael Kernan, State Bar No. 181747
mkernan@kernanlaw.net
THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
Telephone: (310) 490-9777
Facsimile: (310) 861-0503

Attorneys for Plaintiffs

Keith Mathews, Pro Hac Vice
ASSOCIATED ATTORNEYS OF NEW ENGLAND
PO Box 278
Manchester, NH 03105

Attorneys for Plaintiffs

UNITED STATED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>APPLE INC.,<br>FEDERAL TRADE COMMISSION<br><br>Defendants. | Case No. 3:21-cv-05567-EMC<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS**<br><br>**Hearing**<br>Date:   November 4, 2021<br>Time:   1:30PM<br>Place:  Courtroom 5, 17th Floor<br>         (videoconference)<br><br>The Honorable Edward M. Chen |

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Pursuant to Federal Rule of Evidence 201, Plaintiffs hereby request the Court take judicial notice of the following documents, attached as Exhibit 1, in support of Plaintiffs' Opposition to Defendant Apple, Inc.'s Motion to Dismiss Amended Complaint and Motion to Strike ("Opposition Brief"):

1. Plaintiffs' Notice of Motion & Motion to Strike Apple's Motion to Dismiss, case no. 3:21-cv-05567-EMC, dated September 24, 2021, a true and correct copy of which is attached hereto as Exhibit 1.

Under Federal Rule of Evidence 201, judicial notice is proper when a fact is not subject to reasonable dispute and capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 966 (C.D. Cal. 2005); Fed. R. Evid. 201. A Court may take judicial notice of a matter of public record. Moore v. Navarro, 2004 U.S. Dist. LEXIS 6039, *5 (N.D. Cal. March 31, 2004).

**Plaintiffs' Notice of Motion & Motion to Strike Apple's Motion to Dismiss (Exhibit 1)**

This document is necessary for Plaintiffs' Opposition Brief because it contains facts necessary to properly oppose Defendant's Motion to Dismiss. This document is a matter of public record and can be judicially noticed.

DATED: October 4, 2021                    THE KERNAN LAW FIRM

                                                               By: */s/ S. Michael Kernan*
                                                                  S. Michael Kernan
                                                                  Attorneys for Plaintiffs

                                                               By:*/s/ Jeffrey Isaacs*
                                                                 Jeffrey D. Isaacs M.D., M.B.A.
                                                                Pro se

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

# EXHIBIT 1

Keith Mathews
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>                      Plaintiffs,<br><br>vs.<br><br>APPLE INC.,<br>FEDERAL TRADE COMMISSION<br><br>                      Defendants. | Case No. 3:21-cv-05567-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION &**<br>**MOTION TO STRIKE APPLE'S**<br>**MOTION TO DISMISS**<br><br>**Hearing**<br><br>Date:     November 4, 2021<br>Time:    1:30PM<br>Place:   Courtroom 5, 17th Floor<br>             (videoconference)<br><br>The Honorable Edward M. Chen |

**NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANT APPLE'S MOTION TO DISMISS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30PM on Thursday November 4, 2021, or as soon thereafter as possible, in Courtroom 5 of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, and/or by videoconference, Plaintiffs will and hereby do move the Court to strike Apple's Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(f).

          Respectfully submitted, this 24th day of September, 2021.

          /s/ Keith Mathews
          Keith Mathews, *Pro Hac Vice*
          Counsel for Coronavirus Reporter, Primary Productions,
          CALID Inc, and Proposed Class Members
          Associated Attorneys of New England
          PO Box 278
          Manchester, NH 03105
          Ph. 603-622-8100
          keith@aaone.law

## PLAINTIFFS' MOTION TO STRIKE; OBJECTION TO DEFENDANT APPLE'S MOTION TO DISMISS

1. A District Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading. *FRCP Rule 12(f)(2)*. Defendants' Motion to Dismiss under FRCP 12(b)(6) is redundant and immaterial in light of Plaintiffs' simultaneously filed "Motion for Preliminary Injunction and To Append UCL." Because it contains numerous conclusory allegations, Defendants' 12(b)(6) motion fails to meet the heightened pleading standards of *Twombly/Iqbal*, which equally apply to affirmative defenses. The Motion to Dismiss is fatally flawed for a host of other reasons, and striking it is in the interests of judicial economy. Alternatively, this pleading serves as the Plaintiffs' objection to the 12(b)(6) motion, and Plaintiffs request the motion be promptly denied so that this case may progress. Apple's motion was filed for improper, dilatory reasons. Plaintiffs have been awaiting an answer for a considerable time; Apple should not be allowed another opportunity to delay filing their Answer.

2. Last week, Apple was found guilty of violating the California Unfair Competition Law, in the highly publicized *Epic* case. Also recently, a POLITICO article exposed what is believed to be the worst scandal in Apple's forty-year history, involving a shameful *quid pro quo* to pull HBCU funding in exchange for dropping antitrust state legislation in Georgia.

3. In light of the foregoing events, Plaintiffs today filed an injunctive motion that also introduces a proposed addendum to the FAC. The proposed addendum is two-pages in length and succinctly raises the above UCL and RICO developments, which were simply unavailable to Plaintiffs at time of filing the FAC. As such, under appropriate guidelines leave shall be freely granted to append this two-page addendum to the FAC. Under this Court's inherent authority,

a two-page addendum to the FAC is permissible, because Apple has not yet answered the FAC.

4. There exist compelling judicial economy interests to add the UCL claims to this case. We have learned that *Cameron Plaintiffs* spent over $30 million to prosecute discovery in that case. By conservative estimates, *Epic* must have spent over $60 million to prosecute an entire bench trial of their Sherman and UCL case. Likewise, Apple must have spent an equal amount. As such, the *Epic* Court spent nearly five months reaching a UCL verdict, after the parties spent over $120 million on the bench trial. It would be entirely wasteful not to allow the Plaintiffs' injunction to include a claim (and guilty verdict) that warranted such considerable corporate and tax-payer funded debate. The UCL claim is directly analogous to this case in that both cases concern the "open flow of information" that is restricted by Apple's "incipient monopoly." In Epic's case, the information pertained to payments; in Plaintiffs' case, the information pertained to the availability of free-app platforms for information exchange regarding COVID-19 and other fundamental issues.

5. Generally, our case is differentiated from *Epic* because in that case, the Court determined that the relevant market was the global market for digital mobile gaming transactions. In that market, Apple possesses less than 55% market share, and *Epic* failed to meet its burden to demonstrate Apple's monopoly. In our case, Apple holds a 60% share of the US Smartphone Market by volume, and a 75%-80% share by revenue and/or profit. There can be little question Apple holds a 100% monopsony as the only buyer of free iPhone apps, which is exactly why Apple opposed the separate-track of Plaintiffs' consolidated claims from *Cameron*. Similarly, Apple holds a 100% share on iOS notary stamps, application loaders, and iOS userbase access. As the Honorable Yvonne Gonzalez-Rogers stated, *Epic's* failure to demonstrate "reduced output" and other "factually intensive" monopolistic evidence is "not impossible" in another case Hopefully, that is this case as there is no debate on "reduced output" of free apps such as Dr. Roberts' Coronavirus Reporter, and with Apple's 75%-100% market shares in our relevant markets, the facts of this case don't succumb to the pitfalls of *Epic*.

6. Specifically, the *Epic* court found that a notarization model such as that sought in our injunction is "particularly compelling." (*Id.* at page 113). Plaintiffs' core assertion is that the Mac is a safe architecture, and their apps should be allowed using an open notarization model on an iPhone, like on a Mac. It is noteworthy that the *Epic* court "affords [Apple's] Federighi testimony little weight" as to said Mac notarization model being unsafe. As such, evidence gleaned from the *Epic* verdict supports this case.

7. Apple's Motion to Dismiss is effectively moot with the UCL claim and additional RICO information. Given Apple's guilty verdict on UCL, in the above context it is clear Plaintiffs' state a claim for relief at the very least – if not a claim ready for a preliminary injunction.

8. Similarly, the new RICO information plainly extends Apple's enterprise to lobbyists, and adds many predicate acts based upon the improper lobbying. Apple's Motion to Dismiss for the RICO claim, which relies on identity of party and enterprise, simply isn't the case (and never was) and hence isn't worth the Court spending much time on a moot 12(b)(6).

9. Because UCL and RICO now unquestionably state a claim for relief, the entire 12(b)(6) claim fails as immaterial and redundant. But there are other reasons to deny Apple's 12(b)(6) motion, and Plaintiffs identify these issues below, specifically, Apple's failure to meet the *Twombly* requirements. Notably, Apple refused five requests for a meet & confer on the 12(b)(6) motion. They finally agreed, but cut short the meet & confer after thirty minutes. In this half-hour meeting, Apple only had time to address Counts I-VI, with no mention of the remaining Counts. In short, Apple abandoned a proper Meet & Confer on their MTD. Moreover, Apple's MTD doesn't even address Plaintiffs' auxiliary claim (*Cameron*) for the paid-app out-out from that Class. The Plaintiffs with paid apps have stated a claim (moved to Exhibit A, for clarity and brevity of the free-app claims). Apple has a proposed settlement pending for *Cameron*, and it would seem improper for Apple to be settling a case for $100 million that doesn't state a claim for relief. Hence, *Cameron* states a claim for relief, and Plaintiffs' paid-apps here state the same claim as class opt-outs. Apple should go on record as saying *Cameron* doesn't state a claim for relief, or completely abandon and withdraw their

Case 3:21-cv-05567-EMC   Document 58   Filed 10/05/21   Page 9 of 18
Case 3:21-cv-05567-EMC   Document 51   Filed 09/24/21   Page 6 of 15

12(b)(6) motion. It isn't permissible to have it both ways, under the doctrine of judicial estoppel.

**Plaintiffs Allege Vast, Plausible, Substantiated Antitrust Injury to National Competition**

10. Plaintiffs' pleadings dedicate much length to describing the lost consumer choice and quality that results from their "walled garden." The FAC explains that all COVID-19 startups (not just Plaintiffs) were blocked from publishing Apps. Apple's own exhibits demonstrate that in China, Apple's App Store is one-tenth the size of more open app markets. Moreover, Plaintiff attaches *ad nauseum* exhibits (Congressional Subcommittee reports, etc) describing the harm to competition that stems from Apple's behavior. As such, Apple's assertion that "no harm is alleged" is laughable at best, and probably warrants sanctions. At the very least, it warrants this motion to strike and a Court order for a prompt Answer without delay.

**Plaintiffs Allege Valid Sherman Act Marketplaces**

11. Plaintiffs allege a Sherman Act market, the foremarket, for US smartphone enhanced internet access devices ("US Smartphones"). An alternate single-brand foremarket is stated, for US iOS smartphone enhanced internet access devices ("US iOS Smartphones").

12. Four downstream markets are alleged, which by definition, Apple has 100% control over: The iOS Institutional App Market, the iOS notary stamp market, the iOS application loader market, and the iOS userbase market.

13. As such, Plaintiffs define a foremarket, an alternate foremarket for single-brand, and four "downstream" markets. This is completely in line with other pending smartphone/mobile operating system lawsuits. Apple falsely suggests *fifteen* markets are alleged, because Plaintiffs employ synonyms for reading clarity and quality (i.e. Institutional App Marketplace referred to as "B2B app Buy-Side Monopsony", or smartphone enhanced internet access devices simply abbreviated as "smartphones."). Plaintiffs utilize synonyms to help the reader understand some seemingly complex (and not so complex) marketplaces for digital goods. Apple's focus on semantics is distractive noise that should be ignored.

14. Likewise, the pleadings (and all exhibits) clearly demonstrate Apple's competition in the smartphone arena (Samsung, LG, Motorola), and even if they didn't, this has become general

Coronavirus Reporter *et al v.* Apple Inc. *et al*
Case No. 21-CV-5567-EMC

common knowledge. Similarly, specific lock-in and barriers to substitutability are described throughout the FAC. The injunction further exemplifies "small but significant" changes from price and quality changes i.e. demand elasticity, as opposing counsel seems fixated on use of archaic boilerplate terms that most experts agree don't even apply to digital goods. But even the SSNIP terms are referred in Plaintiffs' pleadings and attached exhibits, as they have been important historically in Sherman case proceedings. In sum, every element to the smartphone market is included in Plaintiffs' complaint. Notably, Gibson Dunn refused a Meet & Confer to itemize what elements that considered present/missing in the marketplace definition.

15. Apple then tries to confound the user by bringing up misinterpretations of Plaintiffs' marketplace diagrams, meant to aide understanding. Because a smartphone may be bundled with some apps, Apple invokes a straw-man argument that no app markets exist beyond Plaintiffs phone bundle depiction. Apple similarly and falsely suggests that Plaintiff ignores the *Epic* Court determination that the "Mobile Gaming App Transaction marketplace" is two-sided. Of course, Plaintiffs' free apps are not bound by such a tightly functioning two-sided transaction platform. But nonetheless, the FAC contains *five* references to two-sided app marketplaces. This is a matter for discovery, but the claim is stated: Apple holds a monopsony on the institutional (free) app markets. Apple's assertions to the contrary are patently false. They are not only false, but insult the intelligence to any reader who understands Plaintiffs' rightful intent and meaning. Apple's straw-man arguments, which have gone on now for nine months against this case, amount to legal bullying, to wit.

**Alleged Exclusionary Conduct Satisfies all the *MCI* Test Elements**

16. Apple again ignores hundreds of pages of exhibits documenting the international consensus on Apple's exclusionary practices, with regard to app developers. Apple instead cites a completely irrelevant *Blix* ruling about the Mac app store, where that developer had numerous distribution channels. Here, Coronavirus Reporter simply didn't have those distribution channels, and such difference between computers and smartphones is more than amply documented by the Subcommittee and other Exhibits.

17. Instead, Apple relies on cherry-picked language from the *Aspen* holding that ignores Plaintiffs very simple (and correct) assertion that a competing app developer cannot replicate Apple's entire iOS userbase. First, Apple doesn't dignify Plaintiffs as app competitors, which is again contradictory to numerous exhibits and claims in the FAC. But moreover, Apple claims the *Aspen* holding requires a "short term loss of profit for long term competitive gain." This was a fact of *Aspen*, but not an elemental requirement. Even so, Plaintiff has pleaded such facts. The FAC states Apple gained "goodwill" and other intangible benefits from denying Coronavirus Reporter. Indeed, goodwill is a long-term gain, precisely as identified in *Aspen*. And Apple sacrificed short term revenues from Coronavirus Reporter (IAPs, annual subscriptions, etc) to achieve this long-term gain.

18. Perhaps the most dishonest claim in Apple's MTD is that the iOS userbase cannot be an essential facility, because "There has been "no case in which a United States court consciously held that an intellectual property right was itself an essential facility that must be licensed on reasonable and nondiscriminatory terms." *Herbert Hovenkamp et al.*, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property § 13.03 [C][2] (3d ed. 2020 supp.).

19. In Plaintiffs' TV example, this would be akin to a TV manufacturer saying a consumer violates TV company patent rights if they watch a movie on their TV that isn't sanctioned and approved by the company. A patent does not grant an interminable extension to an end-user dictatorship, and Apple's argument to the contrary falls flat on its face. Apple cites exactly zero case law of any such 'dictatorship like' control of end-users. The end-users have already paid for the IP, as part of the purchase price, and a TV company can't then claim a film produced as "infringing upon their patent." Apple's absurd argument is based upon citing an Antitrust textbook in a completely out-of-context manner.

20. To be sure, Plaintiffs wish to publish apps to end-users of iPhones. Nobody is asking Apple to forego patent royalties or other infringement. Apple is simply using 'big words' like IP, patent, and 'exclusionary behavior' as smoke-and-mirror to pull the wool over the eyes of the general public.

21. Moreover, the *Epic* Court already rejected Apple's IP argument:

> *"Further, Apple cannot hide behind its lack of clarity on the value of its intellectual property. Not all functionality benefits all ... Apple has actually never correlated the value of its intellectual property to the commission it charges. Apple is responsible for the lack of transparency and whole-cloth arguments untethered to its rates do not ultimately persuade.... Epic Games does not venture to argue that Apple is not entitled to be paid for its intellectual property, but rather claims that these investments have nothing to do with the App Store specifically. Apple disagrees. ... the record is devoid of evidence that Apple set its 30% commission rate as a calculation related to the value of its intellectual property rights. ... More specifically, the evidentiary record is silent as to whether the $99 fee paid by developers whose entire app is "free," like banks or other commercial entities, is correlated to the intellectual property as compared to the gaming developers who are paying 30% on each IAP transaction and who appear to be subsidizing most of the other app developers. Thus, the Court finds that with respect to the 30% commission rate specifically, Apple's arguments are pretextual. (Epic at p. 115)*

22. In sum, Apple raises a scary proposition that patent law allows it to control the behavior of every citizen consumer, and every small developer. This is the heart of this case, and Apple has already lost the argument (*res judicata*) in *Epic*.

**Apple's Objection to Count VI Likewise Has Already Been Adjudicated in Epic**

23. Apple objects to Plaintiff's claim for excessive $99 annual developer fee subscriptions, on the basis that "nothing in antitrust law requires Apple to give away its intellectual property for free." As stated above, nobody, including Plaintiffs, is asking Apple to give away anything for free. Nobody is asking to infringe upon Apple's patents. Apple's resort to patent law as a defense to block publication of competing apps reeks of desperation. The argument is a "scary proposition" as asserted above. Developers may continue to pay $99 if they *voluntarily* choose to do so. Developers are simply asking for unfettered access to the consumers who

paid for their devices and the related network effect. Such an unrestricted marketplace is the way business has been done so for decades in computers, the TV industry, and so forth.

24. Despite Apple's attempt to throw IP law up and "see what sticks," their argument has been rejected by the *Epic* Court. It has also been rejected by an international consensus of lawmakers. Smartphone owners are entitled to transact freely with app developers. End Apple's tyranny, and end Apple's never-ending frivolous defenses to this lawsuit's progression.

**Plaintiffs Do Not Need to Allege Concerted Action**

25. Apple's 12(b)(6) hinges on the frivolous assertion that no claim for relief is stated under Section 1 of Sherman Act, because the DPLA is unilateral. This part of Apple's motion, like others, is so frivolous as to warrant Rule 11 Sanctions, which Plaintiffs' reserve the right. As the *Epic* Court elucidated "the Sherman Act distinguishes between concerted conduct and unilateral conduct and "treat[s] concerted behavior more strictly than unilateral behavior." Thus, even unreasonable unilateral restraints are not subject to antitrust scrutiny unless "they pose a danger of monopolization." *Copperweld Corp.*, 467 U.S. at 768. Hence Apple is well aware that unilateral conduct is not itself a failure to state a claim.

26. The *Epic* Court elaborates on the matter: "Given this distinction, a business may set conditions for dealing unilaterally and refuse to deal with anyone who does not meet those conditions. See. *Monsanto*, 465 U.S. at 761. However, where the conduct extends beyond announcing a policy and refusing to deal with non- compliant partners to coercing an agreement, the conduct falls under Section 1. See id. at 765; see also *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (recognizing an exception to the "unilateral refusal to deal" rule where a party "imposes restraints on dealers or customers by coercive conduct and they involuntarily adhered to those restraints").

27. Here, Plaintiffs have in no uncertain terms made it clear that they were unwillingly bound by the DPLA. The facts of this case differ from *Epic*, in that Epic has numerous distribution channels globally. Plaintiff Coronavirus Reporter required Apple's 60% (80% by dollar

spending) userbase to make a valid app. As such, it is clear that Coronavirus Reporter, at the very least, has a claim under Sherman 1 regarding the DPLA.

28. It should also be noted that the recently filed *State AGs vs. Google* brings almost the same claim of unilateral contract for the Android DPLA equivalent. Plaintiffs' DPLA Sherman 1 claim simply cannot be dismissed for failure to state a claim, Apple knows it, and the Court should reprimand them for even bringing this frivolous motion.

**Plaintiffs' Tying Claims Are Properly Alleged (Count V)**

29. Apple makes the conclusory allegation that the App Store is not a distinct product, and hence, no tying exists. But the App Store, despite its immense size, is "just one store." Google Play, brick and mortar, and developers own websites all represent alternative stores. Indeed, the Mac finder, DOS, and Windows are all referenced in the FAC as points for app loading/onboarding that in face were the true "inherent components" of an operating system. Apple moved an "inherent component" away from the consumer and into their own store. That conduct is at the core of this lawsuit, and it is circular (and dishonest) to now argue that the App Store is an inherent component. Apple removed this inherent component, to set up their own Monopoly Store. Hence Apple's logic is both circular and conclusory that the App Store isn't a distinct product. It is not a required part of a smartphone, plain and simple. At the very least, this is a matter for discovery and expert opinion, and is not appropriate to dismissal at this early stage. Likewise, Apple's notary stamp, application loaders, and iOS userbase access rights are distinct products, all introduced by Apple's anti-competitive re-write of MacOS to make iOS.

30. Apple's argument that developers lack standing also fails, because developers are indeed competitors with their own stores. The FAC is clear that it is "trivial" for an app developer to make a website for app downloads, as is possible on Android. The fact is Apple doesn't allow developers the facility to compete – that is quite different from concluding a developer is not a competitor in the 'app store' arena.

**Plaintiffs' Contract Claims Survive in light of Sherman Act DPLA Violations**

Apple asserts Plaintiffs' contracts claims fail because "Plaintiffs fail to square their claim for breach with their allegation that the DPLA is void. In any event, Plaintiffs fail to "identify the specific provision of the contract" at issue. But the FAC is almost entirely devoted to references the DPLA is a contract of adhesion under Sherman, and hence Apple's provisions of "sole discretion" are illegal provisions that do not apply to the proper interpretation of the contract. Apple has set up a straw-man argument once again that Plaintiffs "accepted and agreed" to this provision, and hence "received their benefit of the bargain." This conclusory statement violates the spirit of *Twombly,* in that Apple outright dismisses and/or ignores the crux of Plaintiffs complaint re DPLA adhesion.

**The FAC Demonstrates "Who What When Where and How" Wire Fraud**

31. The FAC contains screen shots of multiple false transmissions by Apple, containing false, pretextual reasons for App Store denials. These documents all clearly evidence the "who what when where and how" requirements of Wire Fraud. The documents are date stamped, are signed by Apple employees, stem from Apple HQ in Cupertino, and conveyed knowingly false information. The FAC documents how Coronavirus Reporter was denied because Apple purported the App Store didn't allow "user vetted" symptom data, when in fact, it did with an Oxford app. The same applies to Bitcoin Lottery, and Caller-ID (whose transmissions were deleted by Apple, and therefore must be inferred at this point to meet the wire fraud requirements). In short, Apple's lack of due process subjects it to fraud claims – when an app is rejected for certain reasons, and other apps are accepted for the same reasons, a false statement has been made. This liability would be remedied if Apple allowed due process in the App Store, in the form of arbitration.

**RICO Enterprise and Defendant are Not Identical.**

32. It is clear with the FAC + UCL Addendum, the RICO enterprise extends to lobbying firms and law firms. But even the FAC alone is sufficient because news agencies and cronies participated in the profits and functioning of the enterprise. The FAC also states it is striving to avoid naming an Apple shareholder or executive, which would remedy this trivial technicality. For these reasons, the RICO enterprise is valid, or could easily be amended.

**All Elements of Civil Fraud Are Met (And criminal fraud, for UCL purposes)**

33. Apple and Gibson Dunn don't even begin to attack the elements for civil fraud (all seven of them), and instead assert a brief, conclusory *single paragraph* that Plaintiffs' fraud elements must be dismissed. Apple argues it is for the "same reasons" as the RICO claim needing dismissal, which is simply unclear and doesn't meet the *Twombly* standard. Nonetheless, Plaintiffs have asserted each element for fraud. Apple made false communications to Plaintiffs that is alleged throughout the FAC. Plain and simple, Apple made knowingly false representations to Plaintiffs that their app contained material that was not allowed on the App Store, when in fact it was. Plaintiffs relied on these false statements, and suffered damages. The false statements (other than the spoliated Caller-ID correspondence) are plainly incorporated in the FAC.

**Class Allegations Are Typical, Adequately Represented, and not "Too Numerous."**

34. Defendants request to strike Plaintiffs' putative class allegations is based upon flawed logic. Apple purports that because a small number of cronies exists, such as the Caller-ID copycat, twenty million other innocent developers cannot bring a class action. This is an invalid argument. Procedures can be put in place, after discovery, to identify any "cronies" that may be exempt from the class. Moreover, Apple's argument misses the point – anticompetitive behavior by their monopoly impacted all developers – even cronies – and a class action is an appropriate way to redress the loss of competition. In short, Apple's argument is conclusory, and violates *Twombly,* to suppose no developer class action could adequately represent a monopolist who worked with a small number of cronies.

35. Apple also asserts that the class allegations cannot be adequately represented by Plaintiff Dr. Jeffrey Isaacs, because he is a self-represented party. But Dr Isaacs does not represent the class, nor did he ever claim to. Attorney Keith Mathews signed the complaint, in the capacity of representative for the class members. To be clear, Dr. Isaacs has no intention to represent either the class, or the corporate parties in this case. Dr. Isaacs solely represents his wholly-owned apps, WebCaller and Caller-ID. Dr. Isaacs asked Apple to Meet & Confer on moving

his claims to a separate action, which would seem to be against the interests of judicial economy.

36. Finally, Apple makes the conclusory assertion that the class action is simply too large to be manageable, because it covers 40,000 weekly app rejections. But the *Cameron* lawsuit conducted discovery on billions of IAP purchase receipts, at a discovery cost of $30 million. Hence discovery of App Store transactions *is* possible, and conclusory assertions to the contrary fail. Moreover, in light of the evidence spoliation of the Caller-ID correspondence, prompt certification of the class and evidence preservation is necessary.

**Conclusion**

37. The time has come for Apple to answer the allegations raised in the FAC + UCL Addendum. If the Court doesn't outright strike the pending MTD, it should deny the motion based upon the above objections. Alternatively, Plaintiffs request the Court instruct them to amend any deficiencies in the underlying complaint with prompt leave to amend, which is to be granted as justice requires.

Respectfully submitted, this 24th day of September, 2021.

/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*
Counsel for Coronavirus Reporter, Primary Productions, CALID Inc, and Proposed Class Members
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## CERTIFICATE OF SERVICE

I, R. Paul Katrinak, hereby declare under penalty of perjury as follows:

On October 4, 2021, I caused the foregoing **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS** to be electronically filed with the Clerk for the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on October 4, 2021.

/s/ *R. Paul Katrinak*
R. Paul Katrinak