GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (SBN 212532)
 mperry@gibsondunn.com
RACHEL S. BRASS (SBN 219301)
 rbrass@gibsondunn.com
JULIAN W. KLEINBRODT (SBN 302085)
 jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile:  (415) 374-8429

*Attorneys for Apple Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CORONAVIRUS REPORTER, CALID INC., on behalf of themselves and all others similarly situated<br><br>                    Plaintiffs,<br><br>        v.<br><br>APPLE INC., FEDERAL TRADE COMMISSION,<br><br>                    Defendants. | Case No. 3:21-CV-05567-EMC<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Date:        November 4, 2021<br>Time:       1:30 p.m. PT<br>Place:       Courtroom 5, 17th Floor<br><br>The Honorable Edward M. Chen |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................... 2

    A.     Apple's Revolutionary iPhone Ecosystem .................................................. 3

    B.     In the Face of a Pandemic and "Infodemic," Apple Ensures that Only
        Recognized Health Entities Can Distribute Apps Related to COVID-19 .................... 5

    C.     Apple Rejects the "Coronavirus Reporter" App for Violating Its Guidelines ............. 6

    D.     Plaintiffs Sue in January 2021, Evade a Determination on the Merits, and Wait
        Nine Months to Move for a Second, Sweeping Preliminary Injunction ...................... 8

III. LEGAL STANDARD ........................................................................................ 9

IV. ARGUMENT ..................................................................................................... 9

    A.     Plaintiffs Cannot Succeed Without Any Evidence Supporting Their Claims ............. 10

    B.     Plaintiffs Are Unlikely To Succeed On the Merits .................................... 11

        1.     Plaintiffs Are Unlikely To Succeed on Their Tying Claim .......................... 11

        2.     Plaintiffs' Other Antitrust Claims Are Likely to Fail on Multiple
            Grounds ........................................................................................ 14

        3.     Plaintiffs' Cannot Prevail On Unpleaded Theories In An Addendum ........... 20

    C.     Plaintiffs Have Not Proven a Risk of Irreparable Harm ............................. 21

    D.     The Balance Of Equities And Public Interest Weigh Against An Injunction ............. 22

    E.     A Preliminary Injunction May Issue Only If Plaintiffs Post At Least A $99
        Million Bond ..................................................................................... 24

V. CONCLUSION ................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)..................................................................13

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)..................................................................21

*Am. Passage Media Corp. v. Cass Comm'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985)..................................................................21

*Americans for Prosperity Found. v. Harris*,
809 F.3d 536 (9th Cir. 2015)....................................................................10

*Ameritech v. Voices for Choices, Inc.*,
2003 WL 21078026 (N.D. Ill. May 12, 2003) .........................................21

*Apple Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................16

*In re Apple Processor Litig.*,
2019 WL 3533876 (N.D. Cal. Aug. 2, 2019).............................................22

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013).....................................................................11

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995).....................................................................18

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)...................................................................11

*Cal. Comp. Prod., Inc. v. Int'l Bus. Machines Corp.*,
613 F.2d 727 (9th Cir. 1979).....................................................................18

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)...................................................................................18

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,
885 F.3d 560 (9th Cir. 2018).....................................................................14

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008).....................................................................14

*Chase v. McMasters*,
405 F. Supp. 1297 (D.N.D. 1975)..............................................................14

*City of Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir. 1992)...................................................................17

ii

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**

Page

*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC,*
    2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) .................................................................................10

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
    36 F.3d 1147 (1st Cir. 1994) .........................................................................................................24

*Diversified Silicone Prods. Corp. v. Elastapro Silicone Sheeting LLC,*
    2020 WL 4390380 (C.D. Cal. 2020) .............................................................................................21

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
    967 F.2d 1280 (9th Cir. 1992) ......................................................................................................21

*Earth Island Inst. v. Carlton,*
    626 F.3d 462 (9th Cir. 2010) ...........................................................................................................9

*Elias v. Connett,*
    908 F.2d 521 (9th Cir. 1990) ........................................................................................................10

*Epic Games, Inc. v. Apple Inc.,*
    2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ...................................................................... *passim*

*F.T.C. v. Weyerhaeuser Co.,*
    665 F.2d 1072 (D.C. Cir. 1981) ....................................................................................................21

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ........................................................................................11, 12, 13, 14

*FTC v. Staples,*
    190 F. Supp. 3d 100 (D.D.C. 2016) ..............................................................................................17

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) (en banc) ..................................................................................2, 3, 9

*Glen Holly Entm't, Inc. v. Tektronix, Inc.,*
    352 F.3d 367 (9th Cir. 2003) ........................................................................................................12

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,*
    736 F.3d 1239 (9th Cir. 2013) ..................................................................................................... *passim*

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ..........................................................................................................1

*Hicks v. PGA Tour, Inc.,*
    897 F.3d 1109 (9th Cir. 2018) .................................................................................................16, 17

*Hocking v. City of Roseville,*
    2007 WL 3240300 (E.D. Cal. Nov. 2, 2007) ................................................................................20

*Image Tech Serv., Inc. v. Eastman Kodak Co.,*
    903 F.2d 612 (9th Cir. 1990) ........................................................................................................18

iii

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page

*Isaacs v. Dartmouth-Hitchcock Med. Ctr.*,
    2014 WL 1572559 (D.N.H. Apr. 18, 2014) ............................................................................6

*Isaacs v. USC Keck Sch. of Med.*,
    853 F. App'x 114 (9th Cir. 2021) .........................................................................................8

*Isaacs v. USC Keck Sch. of Med.*,
    No. 19-8000 DSF, Dkt. 112 (C.D. Cal. May 15, 2020) ........................................................8

*Isaacs v. USC Keck Sch. of Med.*,
    No. 19-8000 DSF, Dkt. 93 (C.D. Cal. Feb. 3, 2020) ...........................................................20

*James v. Campbell*,
    104 U.S. 356 (1881) ............................................................................................................24

*Knutson v. Daily Rev., Inc.*,
    468 F. Supp. 226 (N.D. Cal. 1979) ....................................................................................22

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) .............................................................................................12

*Kottle v. North-west Kidney Centers*,
    146 F.3d 1056 (9th Cir. 1998) ...........................................................................................20

*Lydo Enter., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ...........................................................................................21

*Miller v. Cal. Pac. Med. Ctr.*,
    991 F.2d 536 (9th Cir. 1993) .............................................................................................21

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
    117 F. Supp. 2d 1322 (M.D. Fla. 2000) .............................................................................17

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) .........................................................................................19

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) .......................................................................................................18

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ...........................................................................................................21

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
    16 F.3d 1032 (9th Cir. 1994) .............................................................................................24

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988) .............................................................................................17

*Ocean State Phys. Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
    883 F.2d 1101 (1st Cir. 1989) ...........................................................................................18

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ...................................................................................15, 18, 23

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ...............................................................................14, 20

*Pistacchio v. Apple Inc.*,
  2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ..............................................................12

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
  55 F. Supp. 2d 1070 (C.D. Cal. 1999) ........................................................................22

*Proofpoint, Inc. v. Vade Secure, Inc.*,
  2020 WL 836724 (N.D. Cal. Feb. 20, 2020) ...............................................................10

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ........................................................................................16

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ........................................................................................13

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
  532 F.3d 963 (9th Cir. 2008) ........................................................................................13

*Saumaan v. Sauer*,
  2008 WL 2489004 (E.D. Cal. June 17, 2008) .............................................................20

*Scholl v. Mnuchin*,
  494 F. Supp. 3d 661 (N.D. Cal. 2020) .....................................................................9, 10

*Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dept. Stores, Inc.*,
  190 F. Supp. 594 (S.D.N.Y. 1961) ...............................................................................10

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
  935 F. Supp. 2d 1069 (D. Colo. 2013) .........................................................................24

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ........................................................................................11

*Sumotext Corp. v. Zoove, Inc.*,
  2016 WL 6524409 (N.D. Cal. Nov. 3, 2016) ...............................................................12

*Tech. & Intellectual Prop. Strategies Grp. v. Fthenakis*,
  2012 WL 159585 (N.D. Cal. Jan. 17, 2012) ................................................................21

*Tough Traveler. Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ...........................................................................................22

# TABLE OF AUTHORITIES

Page

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992)..................................................................................18

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)...................................................................................15

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945)................................................................................12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .............................................................................11

*United States v. Siemens Corp.*,
    621 F.2d 499 (2d Cir. 1980)................................................................................21

*Valeo Intellectual Prop. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005) ..........................................................22

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    2014 WL 4312021 (N.D. Cal. Aug. 28, 2014)....................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................9

**OTHER AUTHORITIES**

Bill Chappell, *Coronavirus: COVID-19 Is Now Officially a Pandemic, WHO Says*, NPR (Mar. 11,
    2020) .......................................................................................................................5

David S. Evans & Richard Schmalensee, *Matchmakers* (2016)..............................................15

Ian Sherr, *Apple, Google, Amazon Block Nonofficial Coronavirus Apps from App Stores*, CNET
    (Mar. 15, 2020) ....................................................................................................18

James Coker, *Apple Releases Urgent Patch Following Discovery of Pegasus Spyware*, Infosecurity
    (Sept. 14, 2021).....................................................................................................19

Matt Richtel, *W.H.O. Fights a Pandemic Besides Coronavirus: An 'Infodemic'*, N.Y. Times (Feb. 6,
    2020) .......................................................................................................................5

Sarah Evanega, et al., *Coronavirus Misinformation: Quantifying Sources and Themes in the COVID-
    19 'Infodemic'* (Oct. 2020)......................................................................................5

**RULES**

Fed. R. Civ. P. 65 ..............................................................................................................24, 25

**TREATISES**

11A Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.).......................9, 10

DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

Gibson, Dunn &
Crutcher LLP

# I. INTRODUCTION

On August 8, 2021, Coronavirus Reporter and CALID Inc. moved for a preliminary injunction, having already amended their complaint three times over the course of seven months and three jurisdictions.  Mere days after that motion was fully briefed, and before it was even heard, they, now joined by Primary Productions LLC (collectively, "Plaintiffs"), moved for a preliminary injunction for the second time based on yet another amended complaint (their seventh).  The new motion, like the old, asks the Court to dismantle or expropriate Apple's App Store without a shred of evidence to support such drastic relief.  And while Plaintiffs' legal theories are even more expansive and varied than their predecessors, they possess no greater merit.  There is simply no basis in fact or law to eviscerate the App Store—an "economic miracle" for developers, customers, and Apple alike—through a breathtaking injunction that would force the company to abandon its business model, re-engineer iOS, relinquish any control over its intellectual property, and perhaps cause physical or mental harm to users.

The cornerstone of the App Store's remarkable success has been the safe, reliable, high-quality experience Apple has built for its users.  Apple has achieved this by requiring developers to abide by detailed and wide-ranging App Review Guidelines governing everything from user privacy to the app's reliability and performance.  And when the COVID-19 pandemic began to spread worldwide in early 2020—accompanied by an "infodemic" of misinformation—Apple revised its guidelines to ensure that consumers would receive only credible information from established medical and scientific institutions via the App Store.  It explained that it would reject, and in fact has rejected apps that did not meet these widely available guidelines.  That included the Coronavirus Reporter app—which is not affiliated with any apparent, recognized healthcare institution as Apple's guidelines required.

A mandatory injunction like the one sought here is available only in the rarest cases "when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'"  *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).  Plaintiffs have not come remotely close to meeting that burden.

First, Plaintiffs have shown no likelihood of success on the merits.  Their motion focuses on a tying theory premised on a counterfactual description of the App Store.  Moreover, Plaintiffs have not

DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

alleged, much less proved, a relevant market or that Apple's COVID-19 policy was pretextual—foreclosing liability on any theory.  And these are but a few of the fatal defects in Plaintiffs' claims, as Apple has explained in its Motion to Dismiss.  *See* Mot. to Dismiss FAC at 6–24.  The Court need look no further than Judge Gonzalez Rogers' recent rejection of all antitrust claims in *Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021), a pathmarking decision with which Plaintiffs fail to grapple.

Nor have Plaintiffs otherwise demonstrated their entitlement to equitable relief.  Rather, they repeat the same unsubstantiated assertions of irreparable harm and public interest made in their first preliminary injunction motion without acknowledging, much less overcoming, the substantial evidence adduced by Apple.  As that *evidence* shows, Plaintiffs have not and cannot prove the rejection of their app was unlawful *and* that the rejection harmed them *and* that any such harm could not be rectified by ordinary damages.  Nor have they explained how their sweeping injunction would do anything but impose enormous burdens on Apple; fundamentally disrupt the way in which Apple and developers conduct business; endanger Apple's hard-won brand for safety, security, and reliability; and put millions of customers at risk.  Indeed, it is undisputed that Plaintiffs' proposed injunction would handcuff Apple while its platform is used to distribute malware, spyware, pornography, and other malicious, dangerous, and unsavory apps to millions of consumers, including children.  While Plaintiffs attempt to argue that those inevitable harms are justified because their app could "save lives," they do not even explain what their app does, much less *prove* that distributing it on the App Store would do more good than harm.  And Plaintiffs have failed (again) to post adequate security for their injunctive request, another independent ground on which their motion should be rejected.

Because Plaintiffs have utterly failed to establish that "the facts and law clearly favor the moving party," the Court should deny the motion for a preliminary injunction.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## II.  STATEMENT OF FACTS

Plaintiffs have come again to this Court with a request for sweeping injunctive relief supported by *zero* evidence.  In doing so, Plaintiffs have not only ignored the growing evidentiary record Apple has cited in this case but also the extensive evidence adduced in parallel litigation that exposes the

Gibson, Dunn &
Crutcher LLP

defects with Plaintiffs' wholly unsupported motion.  Indeed, almost all of the evidence from the recent *Epic* trial has been publicly available online for months on the Court's website as well as a public access site maintained by the parties by Court order.  *See* Dkt. 32 at 3 & n.1.  Despite Apple directing Plaintiffs to this evidence, *id.*, inaccurate and unsupported assertions remain endemic to Plaintiffs' motion.  Therefore, Apple again sets forth the relevant facts below with citations to evidence.[1]

## A.  Apple's Revolutionary iPhone Ecosystem

Apple "reinvent[ed] the phone" when it released the iPhone in June 2007.  Dkt. 33-1.  It was a revolution in hardware and software technology, providing access to the internet, a real web browser, and MultiTouch—features that remain at the core of what the smartphone is today.  Dkt. 33-2 at 2719:20–2721:6 (*Epic* trial testimony of Apple Fellow, Philip Schiller).  While the original iPhone came preinstalled with a few native apps developed by Apple, native third-party apps could not be downloaded.  *Id.* at 2727:17–19, 2728:18–19 (Schiller).

Apple began allowing third-party developers to distribute native apps on iOS through the App Store in 2008.  Dkt. 33-2 at 2728:24–2729:24 (Schiller).  The App Store thus became a two-sided transaction platform, connecting app developers with customers.  Dkt. 33-3 ¶ 42.  The multi-sided platform business model is complex.  Dkt. 33-3 ¶ 27.  The platform must ensure that there are a large number of participants on both sides of the platform and that transactions on the platform are as easy, safe, and reliable as possible.  *Id.* ¶¶ 26-27, 45-46, 122-26.  Successful two-sided transaction platforms must establish pricing strategies, service provisions, and rules of behavior that ensure balanced partic-ipation of the customer groups they serve.  *Id.* ¶¶ 28, 122-26.

To that end, Apple has adopted a business model that provides a curated ecosystem.  Developers who wish to distribute apps pay a $99 annual fee to join Apple's Developer Program, agree to pay a commission on some paid transactions, and promise to abide by Apple's App Review Guidelines.  Dkt. 33-2 at 2759:22–2760:9, 2761:21–25 (Schiller), Dkt. 33-4, Dkt. 33-5.  In return, developers are licensed

---

[1]  Because Plaintiffs' motion reiterates many of the same, unsupported assertions from the August 8, 2021, Motion for Preliminary Injunction, Apple sets forth many of the same facts previously outlined in its August 23, 2021, Opposition.  *See* Dkt. 32 at 3–9.  Apple's statements of facts are not identical, however, to account for the few changes Plaintiffs have made to their motion as well as subsequent developments.  For the Court's reference, Apple has attached to this opposition a redlined comparison of Plaintiffs' Preliminary Injunction Motions.

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC

to use Apple's proprietary software and tools—including the software development kits (SDKs) and thousands of application program interfaces (APIs)—that are protected by patent, copyright, and trademark laws. Dkt. 33-2 at 2757:9–2758:8 (Schiller); Dkt. 33-9 ¶ 23. Apple also reviews every app developed using its intellectual property before distribution on the App Store to ensure it complies with the company's guidelines. Dkt 33-2 at 2835:10–15 (Schiller). These guidelines protect users from apps that would invade their privacy, compromise the reliability of their devices, or expose them to malicious software. Dkt. 33-16 ¶ 59; *see also generally* Dkt. 33-7. They also increase the quality of available apps to consumers while simultaneously protecting developers from low-quality copycats. Dkt. 33-3 ¶ 52; Dkt. 33-6 ¶ 94; Brass Decl. Ex. 2 at 1089:14–1090:16 (*Epic* trial testimony of Apple's Senior Director of App Review, Trystan Kosmynka). Thus, "Apple provides a safe and trusted user experience on iOS, which encourages both users and developers to transact freely and is mutually beneficial." *Epic*, 2021 WL 4128925, at \*102. Today, consumers enjoy free access to an enormous library of safe, secure apps—83% of which are free—across twenty-seven different categories; developers in turn have access to an enormous audience of potential customers who can trust in those apps. Dkt. 33-2 at 1076:17–1077:3, 1085:1–12 (Kosmynka); Dkt. 33-3 ¶¶ 24, 26, 50–51; Dkt. 33-8 ¶ 169.

By any measure, the App Store has been a phenomenal success for developers and consumers alike. The number of apps, volume of app transactions, and amount of revenue earned by developers have skyrocketed since the App Store's inception. Dkt. 33-8 ¶¶ 182-83; Dkt. 33-9 ¶ 21; Dkt. 33-25. At the same time, Apple has outpaced its competitors in protecting consumers' privacy. Dkt. 33-6 ¶ 44; *see also* Dkt. 33-2 at 1119:2–6 (*Epic* trial testimony of Mr. Kosmynka discussing Apple's rejections of hundreds of thousands of app submissions for violating privacy standards), 2830:25–2831:3 (*Epic* trial testimony of Mr. Schiller, discussing some of Apple's innovations to protect consumer privacy), 3848:22–3849:7 (*Epic* trial testimony of Apple's CEO, Tim Cook, discussing consumer surveys reflecting the importance of privacy to consumers when choosing Apple). And Apple's ecosystem remains secure: The iPhone platform accounted for just 0.85% of malware infections in 2018 compared to 47.15% for Android and 35.82% for Windows. Dkt. 33-12; *see also* Dkts. 33-10 & 33-11 (showing that Android app stores have significantly more malicious apps than the App Store). Even Apple's litigation adversaries concede that Apple's security is peerless, Dkt. 33-2 at 2708:13–17 (*Epic* trial

4

testimony of Epic's expert, Dr. James Mickens), and that they prefer Apple devices for their superior privacy, *id.* at 302:22–303:4 (*Epic* trial testimony of Tim Sweeney, Epic's CEO, about the reasons for preferring the iPhone).  In Tim Cook's words, the App Store is "an economic miracle," sustaining "almost 2 million people in the U.S. around the iOS job economy."  *Id.* at 3860:20–24 (Cook).

**B.**     **In the Face of a Pandemic and "Infodemic," Apple Ensures that Only Recognized Health Entities Can Distribute Apps Related to COVID-19**

In early 2020, the COVID-19 virus began sweeping across the world.  *See*, *e.g.*, Bill Chappell, *Coronavirus: COVID-19 Is Now Officially a Pandemic, WHO Says*, NPR (Mar. 11, 2020), https://tinyurl.com/3mcb6r96.  That generational health crisis was accompanied by an "infodemic"—the rampant proliferation of false, misleading, and dangerous information about the pandemic.  *See*, *e.g.*, Matt Richtel, *W.H.O. Fights a Pandemic Besides Coronavirus: An 'Infodemic'*, N.Y. Times (Feb. 6, 2020), https://tinyurl.com/69bfjj3c.  Such misinformation presented a significant public health threat.  *See*, *e.g.*, Sarah Evanega, et al., *Coronavirus Misinformation: Quantifying Sources and Themes in the COVID-19 'Infodemic'* at 12 (Oct. 2020).

Consistent with its commitment to making the App Store a safe and trusted place for downloading apps, Apple sought to address these twin threats by critically evaluating apps related to the COVID-19 pandemic.  Dkt. 33-13.  As Apple explained:

> Communities around the world are depending on apps to be credible news sources — helping users understand the latest health innovations, find out where they can get help if needed or provide assistance to their neighbors.
>
> To help fulfill these expectations, we're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19.

*Id.*  Similarly, as part of this commitment, in June 2021 Apple revised its App Review Guidelines to provide that "[a]pps that provide services in highly-regulated fields (such as banking and financial services, healthcare, gambling, and air travel) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer."  Dkt. 33-7 § 5.1.1(ix).

Gibson, Dunn & Crutcher LLP

C.      **Apple Rejects the "Coronavirus Reporter" App for Violating Its Guidelines**

Despite bearing the burden of proof, Plaintiffs have submitted no evidence concerning the nature of their businesses or the identity of their shareholders.  Nor have they filed the required disclosures that would allow the Court and Apple to understand who is driving this litigation and who has a financial interest in its outcome.  *See* Dkt. 32 at 6 (notifying Plaintiffs of this deficiency).  Corporate records, however, indicate that Coronavirus Reporter Corp. was incorporated by GG Group Inc., a Nevada corporation, Dkt. 33-15; CALID Inc. was incorporated by GG International, Inc., a Nevada commercial registered agent, Dkt. 33-14; and Primary Productions has at least one individual member named Robert Fleisher, Brass Decl. Ex. 3.

Plaintiffs allege they are developers of five apps: Coronavirus Reporter, CALID, Bitcoin Lottery, WebCaller, and Caller-ID.  FAC ¶¶ 8, 27–30.  But their motion discusses only one, Coronavirus Reporter.  *See* Mot. ¶¶ 1, 10–12, 17, 27, 40, 42, 52, 55.  At least before this app, Plaintiffs' app businesses were not health-services focused.  CALID's original app was a self-styled "online marketplace platform" that advertised listings for outdoor activities, car rentals, and "practically anything [else] that can be scheduled."  FAC ¶ 96.  Primary Productions is a self-described "edutainment media production company" that developed a "blockchain giveaway app" called "Bitcoin Lottery."  *Id.* ¶ 29.  And neither GG Group nor GG International appears to provide health services.

Plaintiffs' primary connection to health or medicine appears to be that Plaintiff Jeffrey Isaacs is CALID's CEO.  Dkt. 33-16; *see also* Dkt. 34-1 (reflecting repeated communications by Isaacs on behalf of CALID).  Isaacs alleges that he "is a Dartmouth-trained medical doctor" who also "matriculated at the Vanderbilt Law JD program."  FAC ¶ 30.  The FAC omits that Isaacs "was enrolled [at Vanderbilt Law School] for just under a year," Brass Decl. Ex. 4 at 12, "was suspended and ultimately dismissed for harassing a classmate" in his first year of medical school and then also was dismissed from his Dartmouth Medical College residency program less than a year after it began, *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2–5 (D.N.H. Apr. 18, 2014), and that the New Hampshire Board of Medicine revoked his medical license in 2014 for his failure to disclose material facts, Dkt. 33-17.  Since that time, Isaacs has waged an unsuccessful litigation campaign across federal courts.  *See* Dkt. 32 at 6–7 (collecting exemplar cases).

Gibson, Dunn &
Crutcher LLP

1     A correspondence log shows that CALID submitted the Coronavirus Reporter app for review

2 in March 2020.  Dkt. 34-1.  Although the Complaint implies that Coronavirus Reporter Corp. developed

3 this app, FAC ¶ 46, Apple's records show that CALID is the developer of record.  Dkt. 34-1.  Because

4 CALID was not a recognized healthcare institution, Apple rejected the Coronavirus Reporter app pur-

5 suant to its guidelines.  Dkt 34 ¶ 8 & Dkt. 34-1; *accord* FAC ¶¶ 54, 56, 69, 94, 96, 98.  CALID appealed

6 to Apple's App Review Board, an internal body that can review rejections made by Apple's frontline

7 reviewers.  Dkt. 34 ¶¶ 9–10 & Dkt. 34-1.  This review confirmed that the Coronavirus Reporter app

8 did not comply with Section 5.1.1 of Apple's App Review Guidelines.  *Id.*  As Apple explained:

> We found in our review that your app related to the COVID-19 pandemic provides healthcare services or requires sensitive user information. In addition, **the seller and company names associated with your app are not from a recognized institution**, such as a governmental entity, hospital, insurance company, non-governmental organization, or university.  Per [S]ection 5.1.1 (ix) of the App Store Review Guidelines, apps that provide services or collect sensitive user information in highly regulated fields should be submitted by a legal entity that provides these services, and not by an individual developer . . . To resolve this issue, your app must be published under a seller and company name of a recognized institution that provides healthcare services.

Dkt. 34-1 (emphasis added).  The review board also uncovered additional software bugs and design

flaws that violated other guidelines.  Dkt. 34 ¶ 10 & Dkt. 34-1.  It therefore upheld the rejection, *id.*,

but encouraged CALID to "mak[e] the appropriate revisions to your app and resubmit."  Dkt. 34-1.

     CALID did not make the identified revisions; instead, on March 19, 2021, it sought to overturn

this decision a second time by pointing to its alleged collaboration with a physician, Dr. Robert Roberts.

Dkt. 34-1.  But Apple explained that "working with healthcare professionals" did not satisfy the App

Review Guidelines.  *Id.*  As Apple told CALID, "your app contains information related to the COVID-

19 pandemic, but the seller and company names associated with your app are not from a recognized

institution"; "your app presents user-generated data that has not been vetted for accuracy by a reputable

source"; and "[g]iven the sensitivity around this personal health information, there is a potential for the

app to be used in a malicious way which can spread misinformation."  *Id.*  Apple again encouraged

CALID to bring the Coronavirus Reporter app into compliance with the App Store Review Guidelines

and submit it for review.  *Id.*  CALID did not do so.  Dkt. 34 ¶ 15.

**D.     Plaintiffs Sue in January 2021, Evade a Determination on the Merits, and Wait Nine Months to Move for a Second, Sweeping Preliminary Injunction**

As Apple has explained in multiple briefs, this litigation began more than nine months ago on January 19, 2021, and has since wended its way through seven separate complaints in three judicial districts.  *See* Dkt. 32 at 8–9; Dkt. 45 at 3–4.  Plaintiffs first moved for a preliminary injunction on August 8, 2021—almost three weeks after filing their complaint in this Court and seven months after litigation began.  *See* Dkt. 20.  Plaintiffs have since amended their complaint again to moot yet another motion to dismiss.  Dkt. 41.  They did not withdraw their first motion for a preliminary injunction, grounded in the prior complaint; it remains pending.  *See* Dkt. 42.  Nevertheless, Plaintiffs now move again for *the same* preliminary injunction—*nine months* after litigation began and *nineteen months* after Apple rejected the Coronavirus Reporter app.  Without requesting—much less receiving—leave to amend, Plaintiffs also submit a "proposed addendum" purporting to add a claim under California's Unfair Competition Law (UCL), *see* Mot. ii, based on an August 20, 2021 article on Apple's alleged lobbying of state legislatures.  *See* Dkt. 53.[2]

Although Plaintiffs suggest at least five "variations of [their] proposed injunction" could be adopted by the Court, Mot. ¶ 56, their proposed injunction is identical to the one submitted with their still-pending August 8 motion.  *Compare* Dkt. 20-1 *with* Dkt. 52-1.  Whichever "variation[]" is considered, the scope of Plaintiffs' request is extraordinary.  Mot. ¶ 56.  By their proposed injunction's own terms, Plaintiffs ask the Court to compel Apple to license its intellectual property for free, Dkt. 52-1 ¶ d, while simultaneously precluding the company from "[b]locking, rejecting or banning *any* App Store third-party developer app for any reason" except those that violate "local, state, national, and/or global laws and treaties [sic]" or "could reasonably likely cause device malfunction, incomplete

---

[2]  Plaintiffs claim that they "simultaneously fil[ed] a Notice of Possible Disqualification" because "Gibson Dunn is currently a RICO defendant in a longstanding controversy with this Counsel and Plaintiffs' team member."  Mot. ¶ 67 n.2.  To be clear, no notice has been filed and Apple's counsel are aware of no conflict.  Brass Decl. ¶ 3.  Plaintiffs appear to refer to a case in which Isaacs alleged a RICO claim against Gibson, Dunn & Crutcher LLP but not any individual lawyers, much less Apple's attorneys of record in this case.  That case was dismissed—with fees awarded to the defendants—and all appeals are exhausted.  *See Isaacs v. USC Keck Sch. of Med.*, 853 F. App'x 114, 117–18 (9th Cir. 2021); *Isaacs v. USC Keck Sch. of Med.*, No. 19-8000 DSF, Dkt. 112 (C.D. Cal. May 15, 2020).  There is no evident reason why any attorney from Gibson Dunn would "be called as a witness in this case."  Mot. ¶ 67 n.2.  And while undersigned counsel have refused Plaintiffs' repeated overtures to reveal privileged communications about what "Apple has been informed," *id.*, counsel have abided by their ethical obligations.

Gibson, Dunn &
Crutcher LLP

execution, or device failure," *id.* ¶ c.  In addition, Plaintiffs ask the Court to compel Apple to re-engineer iOS itself, *id.* ¶¶ a-b, and relinquish any control over its intellectual property to unnamed "governmental level" authorities, *id.* ¶ c.  These requests, if ordered by the Court, would materially impair Apple's ability to offer high-quality apps to customers.  *See* Dkt. 33-2 at 3884:18–3886:1 (Cook) (discussing the implications of similar aspects of the proposed permanent injunction in *Epic*).

For the second time, Plaintiffs submit *no evidence* in support of their motion.

### III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The plaintiff must make a "clear showing" that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest."  *Id.* at 20, 22.  This burden is "heavy."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  And the plaintiff must rely on "[e]vidence that goes beyond the unverified allegations of the pleadings," 11A Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2949 (3d ed.); "conclusory factual assertions and speculative arguments that are unsupported in the record" do not suffice.  *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 682 (N.D. Cal. 2020); *see also Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (district court abuses its discretion "by relying on 'unsupported and conclusory statements'" instead of "evidence").  Because mandatory injunctions like the one sought in this case are "particularly disfavored," Plaintiffs' burden here "is doubly demanding."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

### IV.  ARGUMENT

Without addressing any of the defects in their last motion for a preliminary injunction, Plaintiffs move again for the same relief.  The only material difference now is that the court in *Epic Games Inc. v. Apple Inc.* has confirmed that Apple's distribution restrictions and app review processes improve security and privacy and do not violate the antitrust laws implicated in this case.  2021 WL 4128925, at *70–73, 96–113 (N.D. Cal. Sept. 10, 2021).  Because there is neither a legal nor factual basis to undo Apple's entire App Store business model—which would inflict untold harm to Apple and the iOS community—Plaintiffs' motion should be denied.

9

Gibson, Dunn & Crutcher LLP

1

**A.      Plaintiffs Cannot Succeed Without Any Evidence Supporting Their Claims**

2        When Plaintiffs first moved for a preliminary injunction, Apple emphasized that evidence, not

3   assertion, is required to obtain relief.  Dkt. 32 at 11.  To reiterate: "[T]he court can consider only facts

4   presented by affidavit or testimony and cannot consider facts . . . [alleged in] the complaint but which

5   have not been proved."  *Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alex-*

6   *ander's Dept. Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961).  This is hornbook law, 11A Wright

7   & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed.), confirmed by innumerable cases.  *See*, *e.g.*, *Ameri-*

8   *cans for Prosperity Found. v. Harris*, 809 F.3d 536, 540 (9th Cir. 2015); *Herb Reed Enters.*, 736 F.3d

9   at 1250; *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990); *Proofpoint, Inc. v. Vade Secure, Inc.*, 2020

10  WL 836724, at *2 (N.D. Cal. Feb. 20, 2020); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 682 (N.D. Cal.

11  2020); *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548, at *8 (N.D.

12  Cal. Oct. 20, 2014).

13        Although Plaintiffs have not disputed their evidentiary burden—in either their prior reply brief

14  or current motion—they nonetheless fail to meet it.  There is no excuse for this: Extensive litigation

15  concerning the App Store has unfolded in the public sphere.  *See* Dkt. 32 at 10–11.  The *Epic* litigation

16  alone has produced a voluminous record in connection with a motion for preliminary injunction and

17  three-week trial.  *See id.*  The vast majority of that evidence is available online for free, as is the court's

18  185-page opinion.  *Id.*; *see also* Dkt. 34 ¶¶ 2–3.  That Plaintiffs can marshal nothing in support of their

19  motion is not only fatal now but also ominous for their chances of ever succeeding.

20        Nor can Plaintiffs discharge their burden by inventing a presumption from "the procedural pos-

21  ture of this case."  Mot. ¶ 65.  There is no basis in law or logic to do so.  If anything, the procedural

22  history cuts against Plaintiffs: Whereas Apple has repeatedly sought an adjudication on the merits,

23  Plaintiffs have time and again avoided one.  *See supra* p. 8.  As but the most recent example, Plaintiffs

24  have submitted a "proposed addendum" to yet again "moot" Apple's pending motion to dismiss.  Dkt.

25  51 ¶¶ 3, 7–8.  And they have offered a pretextual basis for doing so: They claim to submit the addendum

26  with this motion because the "UCL and RICO developments . . . were simply unavailable to Plaintiffs

27  at time of filing the FAC," Mot. ii, yet POLITICO published the source article *seventeen days* before

28  they filed the FAC, Dkt. 53 at ECF Page 3.  The only inference that can be drawn from this case's

1    procedural history corroborates what the factual record shows—that Plaintiffs have no interest in trying

2    to *prove* their claims, only in harassing Apple with unsubstantiated and vexatious accusations.

3    **B.     Plaintiffs Are Unlikely To Succeed On the Merits**

4            In advancing their request, Plaintiffs put all their eggs in the basket of a single claim:  That

5    Apple ties "the App Store" and three other supposed products, "notary stamp, application [loaders],

6    and iOS userbase access," to the iPhone device.  Mot. ¶¶ 21, 39.  Plaintiffs devote all of two paragraphs

7    to this theory, *see id.* ¶¶ 38–39, and, even crediting their unsubstantiated allegations, do not come close

8    to establishing the existence of a tying arrangement, much less proving up the required elements of this

9    claim.  Nor are Plaintiffs likely to succeed on any of their other claims.  By failing to even argue them,

10   Plaintiffs have waived any contention that they can support the injunction sought here.  Regardless,

11   these claims fail on multiple grounds.  Because no injunction can issue where plaintiff fails to show a

12   likelihood of success on the merits, the Court should deny Plaintiffs' motion on this basis alone.  *Ass'n*

13   *des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013).

14          **1.     Plaintiffs Are Unlikely To Succeed on Their Tying Claim**

15          Even if Plaintiffs' failure of proof could be excused, they have shown no likelihood of prevail-

16   ing on their tying claim.  To start, Plaintiffs are wrong to the extent they assert a *per se* tying theory.

17   *See* Mot. ¶ 38; FAC ¶ 217.  "[T]ying arrangements may promote rather than injure competition."

18   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-200 (9th Cir. 2012).  Because that is particularly

19   true for "arrangements involving platform software products," the rule of reason therefore applies.

20   *United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001); *see also FTC v. Qualcomm Inc.*,

21   969 F.3d 974, 990 (9th Cir. 2020) (rule of reason applies to "[n]ovel business practices—especially in

22   technology markets").  Plaintiffs are unlikely to succeed on such a claim.

23          *First*, Plaintiffs cannot establish antitrust injury—a "threshold requirement."  *Somers v. Apple,*

24   *Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013).  Even crediting Plaintiffs' unsupported assertions, the only

25   injury is a reduction in *consumers'* choice "amongst third-party applications."  Mot. ¶ 40.  Plaintiffs

26   identify no injury to developers like themselves.  *See Somers*, 729 F.3d at 963 (antitrust injury requires

27   "an injury to the plaintiff").  Indeed, Plaintiffs do not even contend that they compete in any of the

28   allegedly relevant markets: They do not seek to offer a competing app store in the supposedly tied

market, much less "notary stamp[s]," "onboarders" and "iOS userbase access"—whatever those are supposed to be.  Nor do they offer a competing device in the purported tying market.  Mot. ¶¶ 22, 39; *see also Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (no antitrust injury where plaintiff is not a "participant in the same market as the alleged malefactor").

 *Second*, Plaintiffs have failed to substantiate any of the four relevant markets allegedly affected by these supposed ties.  *See* Mot. ¶¶ 21, 39, 56.  As set forth below and in Apple's Motion to Dismiss, it is unclear who the buyers and sellers are in these markets, which products are included, why other products are excluded, and whether those boundaries rest upon economic evidence or just Plaintiffs' say-so.  *See Sumotext Corp. v. Zoove, Inc.*, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016) (dismissing antitrust claims because "the allegations of the relevant market [were] unclear").  As but one example, Plaintiffs appear to limit the tying product market to smartphone devices, yet tablets are also "portable electronic devices that allow users to perform myriad communications and computing functions."  Mot. ¶ 22; *see also Epic*, 2021 WL 4128925, at *39 (rejecting Epic's expert's exclusion of tablets from the relevant market); *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (rejecting alleged market that did not explain the exclusion of potential substitutes).

 *Third*, Plaintiffs are unlikely to prove that Apple exercises monopoly power in the alleged tying market.  *See Qualcomm Inc.*, 969 F.3d at 990 (Section 2 requires proof of monopoly power).  To start, this assertion is contrary to Judge Gonzalez Rogers' finding in *Epic* that "Apple does not have market power in the smartphone market."  2021 WL 4128925, at *29.  Nor is it even supported by Plaintiffs' allegations in this case.  They acknowledge that Apple competes against many smartphone makers.  Mot. to Strike ¶ 14.  And while Plaintiffs assert that Apple enjoys "80% by revenue/profit of the entire US smartphone market," Mot. ¶ 21, these figures have no basis in evidence.  Public estimates peg Apple's share of U.S. smartphone sales around 50%, Dkt. 33-19 at 4–5, and, globally, Apple's share is far lower.  *Epic*, 2021 WL 4128925, at *29 (Apple has 15% share in a global "smartphone market").  Other assertions in Plaintiffs' papers, meanwhile, disprove monopoly; they state that Apple purportedly "holds a 60% share of the US Smartphone Market by volume," Mot. at 4, but the "Supreme Court has never found a party with less than 75% market share to have monopoly power." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014); *see also United States v. Aluminum*

*Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (monopoly power with 60–64% market share is "doubt-ful").  And even if Plaintiffs' unexplained assertions regarding market share were correct and substan-tiated, that would not establish monopoly power.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme.").  Plaintiffs fail to argue, much less show, that entry barriers prevent Apple's competitors—including Android behemoths like Samsung, LG, and Google—from competing effectively.  *See id.* at 1434.

*Fourth*, Plaintiffs cannot establish the "most fundamental requirement" of any tying claim: "the linking of two separate products from two separate product markets."  *Epic*, 2021 WL 4128925, at *107–108; *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). As explained in Apple's motion to dismiss, the purportedly tied products are not "separate and distinct" but rather technically integrated "component[s] of the full suite of services offered by iOS and the App Store."  *Epic*, 2021 WL 4128925, at *108–109; *see also* FAC ¶ 4, 34, 135, 222 (alleging that Apple sells an "amalgamation" of hardware and software, notary stamps are "digital encryption signature[s]," and onboarding software is an "installation program to launch an app").  As such "components" of a single platform, they cannot be tied.  *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 974 (9th Cir. 2008); *see also* Mot. to Dismiss FAC at 15–16.

*Fifth*, Plaintiffs have failed to offer any evidence that the alleged ties "ha[ve] a substantial and anticompetitive effect that harms consumers" in the relevant tied product markets.  *Qualcomm Inc.*, 969 F.3d at 991.  Plaintiffs at most assert that "[c]ustomers are presented with less selection and com-petition."  Mot. ¶ 40.  "But missing from this record is any such evidence," *Herb Reed Enters.*, 736 F.3d at 1250, and *Epic* confirms the opposite.  By subjecting apps to review prior to distribution, "Apple provides a safe and trusted user experience" which "encourages" more app transactions and "enhances consumer appeal."  *Epic*, 2021 WL 4128925, at * 102 (alteration omitted).  If "unfettered app distribu-tion" were allowed, as Plaintiffs seek, "'mayhem' would result," with malware, offensive content, and other kinds of low quality apps flooding the market.  *Id.* (quoting Epic's security expert); *see also* Dkt. 33-3 ¶¶ 29, 120 (explaining how an uncurated environment could become less desirable to users and

Gibson, Dunn &
Crutcher LLP

developers, leading to a decline in the user and developer base). Plaintiffs' "speculation" cannot establish otherwise. *Herb Reed Enters.*, 736 F.3d at 1250.[3]

### 2. Plaintiffs' Other Antitrust Claims Are Likely to Fail on Multiple Grounds

Plaintiffs also argue in conclusory fashion that "Apple's DPLA agreements requiring any developer to submit an app to Apple before it can be approved" violate Section 2 because "[t]hey draw on Apple's monopoly power to exclude competition on a basis other than efficiency" and "violate Section 1's proscription on employing anticompetitive agreements to maintain monopoly power." Mot. ¶ 35. It is not clear which theories of liability they intend to argue—a fatal deficiency in its own right. *See Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) ("Inadequately briefed and perfunctory arguments are . . . waived."). Insofar as they diverge from the FAC, none can support the relief sought here. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). Further, to the extent they adhere to Plaintiffs' pleading, they fail as a matter of law for the reasons set forth in Apple's Motion to Dismiss. *See generally* Mot. to Dismiss FAC at 6–24 (explaining why the claims pleaded in the FAC fail as a matter of law). But all of Plaintiffs' antitrust claims—whatever they are—fail for two reasons in particular: Plaintiffs can neither establish a relevant market nor disprove Apple's legitimate business justifications.

### a. Plaintiffs Are Unlikely to Prove Their Alleged Relevant Markets

Plaintiffs are unlikely to succeed at the "threshold" of any Section 1 or 2 claim: Market definition. *Qualcomm*, 969 F.3d at 992. Plaintiffs now claim to allege *six* relevant markets, including two alternative "foremarket[s]" and as many as four "downstream," single-brand aftermarkets. Mot. ¶¶ 21, 28. That these markets diverge from the *fifteen* markets identified in the FAC—themselves fatally vague and unsupported by the pleadings—is reason enough to deny Plaintiffs' motion. Mot. to Dismiss at 7–9; *see also Chase v. McMasters*, 405 F. Supp. 1297, 1302 n.1 (D.N.D. 1975) (courts are "limited to examining the validity of the legal theories presented in the complaint.").

Plaintiffs' alleged markets also fail on their own terms. The most fundamental error is Plaintiffs' attempt to split apart Apple's single platform into several upstream and downstream markets.

---

[3] For many of the same reasons—including their failure to prove antitrust injury, a relevant market, monopoly power, or the existence of separate products—even a *per se* tying claim would fail. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).

Plaintiffs' contrafactual contortions stem from their refusal to recognize that the App Store is a two-sided transaction platform, *Epic*, 2021 WL 4128925, at *83—a platform that "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018).  This conclusion is common ground among several "'world-renowned' experts." Dkt. 33-2 at 1909:13; *see also*, *e.g.*, Dkt. 33-3 ¶¶ 41–58; Dkt. 33-8 ¶ 22.  That is because the App Store exhibits every defining feature of a two-sided transaction platform: It "needs to attract both consumers and developers" to succeed; "there are clear bilateral indirect network effects" in which "consumers want access to good apps . . . and developers want access to as many potential customers as possible"; and "the App Store generates value for both groups of customers when there is a transaction between a consumer and a developer." Dkt. 33-3 ¶ 44.  Indeed, the iOS ecosystem has long been held up as a paradigmatic example of "a two-sided platform connecting users and app developers." David S. Evans & Richard Schmalensee, *Matchmakers* 117 (2016); *accord* Dkt. 33-3 ¶ 42.

As a two-sided transaction platform, the App Store is best understood as a "single platform," *Epic*, 2021 WL 4128925, at *109, selling "only one product—transactions" to developers and users simultaneously,  *Amex*, 138 S. Ct. at 2286; *accord Epic*, 2021 WL 4128925, at *83.  There are of course many facets to this platform; a two-sided platform by definition "offers different products or services to two different groups." *Epic*, 2021 WL 4128925, at *109.  But that does not mean it can "be broken into pieces"—much less alleged pieces such as notary stamps, application loaders, or the iOS userbase—which are "not licensed or sold to anyone." *Id.* at *29, 109.  Because Plaintiffs' multiple markets are "inconsistent with [the] recognition that the App Store constitutes a two-sided transaction platform," *id.* at *86, Plaintiffs are certain to fail on the merits. *See Amex*, 138 S. Ct. at 2287 (defining a two-sided market as one-sided precludes liability); *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) (same).

While this misconception taints every aspect of Plaintiffs' case, *Amex*, 138 S. Ct. at 2285, it is far from the only decisive error in Plaintiffs' "claim theory," Mot. ¶ 28.  Another is Plaintiffs' attempt to invoke an "Epic/Kodak single-market theory." *Id.* at ¶ 36.  The *Epic* court rejected this very theory on a full trial record despite the best efforts of Epic's "seasoned antitrust counsel," 2021 WL 4128925,

Gibson, Dunn &
Crutcher LLP

* 91, with unlimited resources, Brass Decl. Ex. 2 at 501:2–5.  Plaintiffs add nothing—much less the requisite proof of "reasonable interchangeability" and "cross-elasticity of demand"—that could change the outcome here.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).

Take their supposed foremarkets.  Plaintiffs claim Apple has monopoly power in the markets for "US smartphones" and "iOS smartphones" because consumers are "lock[ed] in" to Apple devices and therefore "highly unlikely to switch."  Mot. ¶¶ 21, 25; *see id.* ¶ 24.  But the *Epic* Court found nothing to suggest that iOS "users are locked-in or would not switch to Android devices" in the event of a price increase, 2021 WL 4128925, at *33, and Plaintiffs provide no evidence of lock-in here.  In fact, up to 26% of smartphone users switch brand each cycle, and low switching rates "stem[] from overall satisfaction with existing devices, rather [than] any 'lock-in.'"  *Id.*  Plus, Plaintiffs' themselves admit that evidence "clearly demonstrate[s] . . . competition in the smartphone arena" between Apple, Samsung, LG, and others.  Mot. to Strike ¶ 14.  Their claim for a "single product marketplace for iOS smartphones," Mot. ¶ 21, is therefore implausible.  *See Epic*, 2021 WL 4128925, *29.

The purported single-brand aftermarkets fare no better.  *See* Mot. ¶¶ 21, 26.  Sound economics teaches that "a manufacturer's own products do not themselves comprise a relevant market," *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008), and here that principle is backed up by fact.  "[T]he App Store competes against other platforms for both consumers and developers."  *Epic*, 2021 WL 4128925, at *90.  Notably, Apple "has always viewed Google Play as a significant competitor," *id.* at 48—which is unsurprising when most popular mobile apps "are available on both Android and iOS, with similar functionality," *id.* at *34; *see also* Dkt. 33-8 at Fig. 2.  And Apple faces ever more competition from across the technology sector.  *See Epic*, 2021 WL 4128925, at *54–55.  Plaintiffs' "sole focus on iOS devices simply ignores th[at] reality."  *Id.* at *90; *see also Hicks*, 897 F.3d at 1120 (market "must encompass . . . all economic substitutes").

Nor have Plaintiffs alleged that the challenged restrictions were not "sufficiently disclosed to consumers" purchasing the primary product (here, smartphones)—a prerequisite to establishing a single-brand aftermarket.  *Epic*, 2021 WL 4128925, at *87–89; *see also PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997).  No "post-purchase policy change" is even alleged.  *Epic*, 2021 WL 4128925, at *88.  And none could be proven: The DPLA's material restrictions have been in

effect since the App Store's inception. Brass Decl. Ex. 5 at 880.021–.032 (App Store product launch transcript). Indeed, the extensive trial record in *Epic* "show[ed] no material change in the conditions for accessing the App Store for either side of the platform." 2021 WL 4128925, at \*89.

Plaintiffs' "iOS app" market has another fundamental defect: It is vastly overbroad. Relevant markets must include products that are reasonably interchangeable for one another. *Hicks*, 897 F.3d at 1120. But just like Epic, Plaintiffs wrongly lump into one "iOS institutional app market" all manner of app transactions that cannot possibly be viewed as substitutes. *See, e.g.*, 2021 WL 4128925, at \*41–43, 83 (rejecting an "aftermarket … defined to include all apps"). Such aggregation is permissible only when products "are subject to the same competitive conditions." *FTC v. Staples*, 190 F. Supp. 3d 100, 125 (D.D.C. 2016). But *Epic* shows the opposite: At a minimum, game app transactions are "a distinct product" with "peculiar characteristics and uses," 2021 WL 4128925, at \*41, "distinct consumers and producers," *id.* at \*42, "specialized vendors," *id.* at \*42, and particular business models, *id.*; *see also id.* at \*84 n.571 (subscription apps "are a separate submarket"). Plaintiffs cannot fuse together "recognized . . . separate market[s]." *Id.* at \*84.

> **b.    Plaintiffs Are Unlikely To Prove Apple's Justifications Are Pretextual**

In addition, Plaintiffs "cannot create antitrust liability if there was a legitimate business justification" for Apple's conduct. *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988). Accordingly, Plaintiffs bear the burden of showing that Apple acted without any justification. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1366–68 (9th Cir. 1992); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."). And "at this stage in these proceedings, any doubts regarding the legitimacy of [Apple's] proffered justification should be weighed in [Apple's] favor." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1327 (M.D. Fla. 2000).

Unrebutted evidence establishes Apple's legitimate justification. To combat the virulent misinformation that accompanied the spread of the COVID-19 pandemic, Apple restricted apps related to the pandemic to recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Dkt. 33-13; Dkt. 34 ¶ 5. There can be no reasonable dispute that this policy served legitimate aims. As the Supreme Court

has held, "preventing misleading or false claims" is decidedly procompetitive.  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 778 (1999).  Nor do the antitrust laws restrict a firm's freedom to make decisions "consistent with the quality and image it wishes to project for its products."  *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2d Cir. 1992); *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (a firm may take measures to "maintain[] a reputation for high quality by being selective about the [developers] to whom it entrusts its customers"); *Cal. Comp. Prod., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (improving quality of product was legitimate business justification).  Indeed, safeguarding the reliability and quality of apps is critical to the App Store's integrity because even slight reductions in quality risk a "feedback loop of declining demand."  *Amex*, 138 S. Ct. at 2281.

Plaintiffs cannot impeach Apple's justification by contending Apple's policy was too broad.  *See* Mot. ¶¶ 3–4 (grousing that Apple "blocked the entire class of startup COVID apps").  Section 2 has "no least restrictive alternative requirement."  *Image Tech Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990).  And "antitrust courts must give wide berth to business judgments before finding liability."  *NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021).  There is no evidence that Apple's decision was anything but "bona fide" when made.  *Ocean State Phys. Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1111 & n.11 (1st Cir. 1989).  Indeed, Apple's policy was one of many efforts among technology companies following "pleas from the White House . . . to help stop misinformation and disinformation about the coronavirus from spreading online."  Ian Sherr, *Apple, Google, Amazon Block Nonofficial Coronavirus Apps from App Stores*, CNET (Mar. 15, 2020), *available at*: https://tinyurl.com/35tmz6f6.  And under this policy, over 1,500 COVID-19 apps were approved for the App Store, belying any assertion of consumer harm.  Dkt. 34 ¶ 6.

Rather than contesting the legitimacy of Apple's applicable policy, Plaintiffs question the security justifications for the App Store's closed model.  *See* Mot. ¶¶ 45, 48.  These arguments are irrelevant.  They also are wrong.  As the *Epic* court found, "centralized app distribution enables Apple to conduct app review," which "protect[s] security" and prevents "fraud, privacy intrusion, and objectionable content."  *Epic*, 2021 WL 4128925, *102; *see also* Dkt. 33-6 ¶¶ 29–61.  This in turn "enhance[s] consumer appeal," encouraging "users and developers to transact freely"—to their "mutual[] benefi[t]."

18

Gibson, Dunn &
Crutcher LLP

1  *Epic*, 2021 WL 4128925, at *102.  Moreover, Apple's approach enriches the market by differentiating

2  the App Store from its competitors.  *Id.*

3         Plaintiffs' attempts to undermine Apple's security decisions are ineffectual.  They emphasize,

4  for example, that Apple's iOS restrictions are not identical to those in macOS.  Mot. ¶¶ 6, 44.  But far

5  from finding this argument "compelling," Mot. to Strike ¶ 6, the *Epic* court rejected it, 2021 WL

6  4128925, at *102.  Mobile devices are different than computers, face different threats, and have differ-

7  ent customer expectations.  Dkt. 33-6 ¶¶ 70–76.  Nor can a single spyware attack by a sophisticated

8  state actor demonstrate that Apple's "safety argument is pretextual."  Mot. ¶ 48.  These attacks are

9  "used to target specific individuals" and do not pose "a threat to the overwhelming majority of [iOS]

10  users."  James Coker, *Apple Releases Urgent Patch Following Discovery of Pegasus Spyware*, Infose-

11  curity (Sept. 14, 2021), *available at*: https://tinyurl.com/yent7mu3.  And Apple's centralized model

12  enabled it to "quickly release[] [a] patch" for all users.  *Id.*  In any event, Apple needs robust security

13  measures precisely *because* it faces constant threats.  *See* Dkt. 33-6 ¶¶ 3–6.  Anecdotes aside, the An-

14  droid app stores that Plaintiffs hold up, Mot. ¶ 45, are infested with far more malware and malicious

15  apps than the App Store.  Dkt. 33-6 ¶¶ 45–52, 55; Dkt. 33-10 at 4401.003–004; Dkt. 33-11 at 4934.008.

16  As the *Epic* trial revealed, no company does security better than Apple.  Dkt. 33-2 at 2708:13–17.

17         Finally, there is no evidence that Apple rejected Plaintiffs' app to "favor[]" its own.  Mot. ¶ 9.

18  Even if that were true, it would not defeat Apple's justifications.  *See Morris Commc'ns Corp. v. PGA*

19  *Tour, Inc.*, 364 F.3d 1288, 1296–98 (11th Cir. 2004) (a defendant's pursuit of its own financial interest

20  does not overcome a legitimate business justification).  But Plaintiffs are wrong.  Apple has approved

21  more than 1,500 COVID-19 apps from recognized entities.  Dkt. 34 ¶ 6.  Just as for other apps that did

22  not comply with Apple's policy, *id.*, app reviewers determined that Plaintiffs failed to comply with

23  Apple's guidelines and explained as much to them.  *Id.* ¶ 8.  As Apple told Plaintiffs at the time, their

24  asserted partnership with certain doctors was not enough; there is no evidence that either Coronavirus

25  Reporter Corp. or CALID Inc. are recognized, institutional healthcare providers.  Dkt. 34 ¶¶ 11–13 &

26  Dkt. 34-1; *see also* Mot. ¶ 50 (arguing that Plaintiffs developed "videoconference apps, telecommuni-

27  cations references, and games").  Indeed, Apple had no anticompetitive incentive to self-preference:

28  Apple's contact-tracing software—developed with Google to help governments and health agencies

1   fight the spread of COVID-19 while preserving user privacy and security—was provided for free, and

2   Apple even released its draft technical documentation to the public.  *See* Dkts. 33-22 & 33-23.

3   **3.   Plaintiffs' Cannot Prevail On Unpleaded Theories In An Addendum**

4   In tacit recognition that the FAC fails to assert any viable claim, Plaintiffs argue they are likely

5   to succeed on RICO and unfair competition claims asserted for the first time in a "proposed addendum."

6   Mot. ii & ¶ 42.  At the outset, these claims are not properly before the court as Plaintiffs have not

7   noticed a motion for leave to amend the FAC.  *See Hocking v. City of Roseville*, 2007 WL 3240300, at

8   *5 (E.D. Cal. Nov. 2, 2007).  Moreover, Plaintiffs cannot pursue a preliminary injunction on an un-

9   pleaded claim—particularly where, as here, they are belatedly asserted on a pretextual basis.  *See supra*

10   pp. 10–11; *see also Pac. Radiation Oncology*, 810 F.3d at 633.

11   In any event, there is no merit to Plaintiffs' proposed claim.  The *Noerr-Pennington* doctrine

12   precludes liability arising from alleged lobbying.  *Kottle v. North-west Kidney Centers*, 146 F.3d 1056,

13   1059 (9th Cir. 1998).  And Plaintiffs should know better: This is not the first time Isaacs, represented

14   by the same counsel, has attacked protected speech and petitioning activity through a claim with "vir-

15   tually no chance of success."  *Isaacs v. USC Keck Sch. of Med.*, No. 19-8000 DSF, Dkt. 93 at 7 (C.D.

16   Cal. Feb. 3, 2020), *aff'd* 853 F. App'x at 117–18.  Indeed, Isaacs' claim in that case was that Gibson,

17   Dunn & Crutcher LLP's litigation-related correspondence violated RICO—a meritless theory that

18   Plaintiffs have made clear they are asserting again here.  Dkt. 60 ¶ 6.[4]  This is the clearest of many

19   grounds on which Plaintiffs' proposed claim is futile, as Apple will explain in its forthcoming Opposi-

20   tion to Plaintiffs' Motion to Strike and Reply in Support of its Motion to Dismiss.

21   Moreover, the proposed injunction has no connection to the lobbying that Plaintiffs purport to

---

[4]  Contrary to Plaintiffs' assertion, Dkt. 60 ¶ 6, Apple's counsel has not in its correspondence engaged in any witness intimidation.  The Court may inspect for itself the letter in question.  *See* Brass Decl. Ex. 1.  As that letter makes clear, Apple is instead confirming that it will not communicate directly with an individual it knows to be represented.  The letter also explains that Isaacs cannot proceed *pro se* when he is also the represented principal of the entity plaintiffs precisely because his attempts to communicate with Apple put its counsel with the "ethical dilemma" of not "know[ing] when it is permissible to contact [him] or when it is not."  *Saumaan v. Sauer*, 2008 WL 2489004, *2 (E.D. Cal. June 17, 2008).  And, as that letter explains, the suggestion that Isaacs is somehow distinct from the other defendant entities (Dkt. 60 ¶ 6) is contrary to objective record evidence.  Brass Decl. Ex. 1.  For these reasons, leave of the court is required for such hybrid representation—which Isaacs has neither sought nor obtained.  *See Saumaan*, 2008 WL 2489004, at *2.  Nothing about the letter, which Plaintiffs elected not to lodge in support of their accusations, supports their latest attempt to smear Apple and its counsel with baseless accusations of misconduct.

1   challenge.  The injunction seeks to wrest control of the App Store away from Apple and change the

2   nature of the platform.  *See* Dkt. 52-1.  So even if Apple's lobbying was somehow unfair, the proposed

3   injunction is not "tailored to eliminate only the specific harm alleged."  *E. & J. Gallo Winery v. Gallo*

4   *Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992).  And any injunction tailored to the allegedly unfair

5   conduct would be a prior restraint—"the most serious and the least tolerable infringement on First

6   Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976).  Enjoining "public

7   lobbying" of state legislatures not only "offend[s] the First Amendment's guarantee to free speech" but

8   also "would detrimentally affect democracy generally."  *Ameritech v. Voices for Choices, Inc.*, 2003

9   WL 21078026, at *1–2 (N.D. Ill. May 12, 2003).  Plaintiffs have not and cannot justify such relief.

10   **C.      Plaintiffs Have Not Proven a Risk of Irreparable Harm**

11          A plaintiff also "must establish that irreparable harm is likely, not just possible."  *Alliance for*

12   *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  As Apple has explained before, Dkt.

13   32 at 16–17, Plaintiffs' arguments fail at the gate given the total absence of proof.  *See Herb Reed*

14   *Enters.*, 736 F.3d at 1250 (vacating injunction because a plaintiff cannot establish a risk of irreparable

15   harm without evidence); *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1473 (9th

16   Cir. 1985) (same).  In any event, none of their contentions—all of which are unchanged from their last

17   motion—justify a preliminary injunction.  *See Diversified Silicone Prods. Corp. v. Elastapro Silicone*

18   *Sheeting LLC*, 2020 WL 4390380, at *2 (C.D. Cal. 2020) (failure to establish irreparable injury is

19   "dispositive"); *Tech. & Intellectual Prop. Strategies Grp. v. Fthenakis*, 2012 WL 159585, at *4 n.6

20   (N.D. Cal. Jan. 17, 2012) (same).

21          To start, as in their first motion, Plaintiffs are wrong to suggest a "presumption" of harm.  Mot.

22   ¶ 49.  A presumption arises only when the government shows a merger likely violates Section 7 of the

23   Clayton Act.  *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980); *see also F.T.C. v.*

24   *Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C. Cir. 1981) (explaining that government agencies are not

25   always "held to the high thresholds applicable where private parties seek interim restraining orders").

26   The actually operative presumption here is the "implie[d] . . . lack of urgency and irreparable harm"

27   from Plaintiffs' nine-month delay in seeking an injunction.  *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d

28   536, 544 (9th Cir. 1993); *see also Lydo Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir.

Gibson, Dunn &
Crutcher LLP

1984) (plaintiff who "sleep[s] on its rights . . . demonstrates the lack of need for speedy action").  Courts find even shorter delays than Plaintiffs' to be inconsistent with irreparable harm.  *See*, *e.g.*, *Valeo Intellectual Prop. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three months); *Tough Traveler. Ltd. v. Outbound Prods.*, 60 F.3d 964, 968–69 (2d Cir. 1995) (four months); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1080 (C.D. Cal. 1999) (five months).

None of Plaintiffs' asserted injuries are irreparable in any event.  Plaintiffs contend that "epidemiological" and "biostatical" data may be lost.  Mot. ¶¶ 53–55.  But they provide no basis to understand what data are in jeopardy or how Plaintiffs' app alone would preserve it—imploring the Court to simply take their word for it.  *Id.* ¶ 53; *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 2014 WL 4312021, at *10 (N.D. Cal. Aug. 28, 2014) (rejecting "platitudes" of harm and denying motion for preliminary injunction due to lack of evidence).  Nor is there any remediable injury to the extent they claim data was not collected over the past 19 months.  In any event, Plaintiffs do not explain how the unproven loss of these data is an injury *to them* for which they could seek any remedy.  *See In re Apple Processor Litig.*, 2019 WL 3533876, at *6–8 (N.D. Cal. Aug. 2, 2019).

The only asserted injury Plaintiffs identify to themselves is that their apps will not be able to "obtain sufficient market share" to earn revenue in Apple's ecosystem.  Mot. ¶ 50.  But an antitrust plaintiff may seek lost profit damages and other forms of monetary relief.  *Knutson v. Daily Rev., Inc.*, 468 F. Supp. 226, 229 (N.D. Cal. 1979).  So even if the Court could ignore Plaintiffs' own allegation that they intended to offer their app for free, FAC ¶ 9, there is no evidence establishing that monetary relief would be inadequate.  Because Plaintiffs offer nothing more than "speculation on future harm," their motion should be denied.  *Herb Reed Enters.*, 736 F.3d at 1249–50.

**D.    The Balance Of Equities And Public Interest Weigh Against An Injunction**

While Plaintiffs identify no irreparable injury they would suffer without an injunction, the remedy they seek here poses an incalculable risk to the public and Apple.  The proposed injunction would require Apple to redesign its software infrastructure to *forego* the protections against malicious or offensive content—or wrest away control of the App Store altogether.  *See* Mot. ¶ 56.

First, the proposed injunction would allow wrongdoers to inundate consumers, including children, with malware, porn, and other malicious and offensive apps.  For example, Plaintiffs seek to bar

22

Gibson, Dunn &
Crutcher LLP

Apple from rejecting any app except those that violate "local, state, national, and/or global laws and treatises [sic]" or "could reasonably likely cause device malfunction, incomplete execution, or device failure." Dkt. 52-1 ¶ c.  This would require Apple to allow the many apps that surreptitiously gather sensitive user data, such as bank records, health information, and other personal data stored on many mobile devices.  *See Epic*, 2021 WL 4128925, at *73 (noting that "privacy, more than other issues, likely benefits from some app distribution restrictions").  It also would force Apple to distribute apps filled with virulent racial epithets, offensive stereotypes, or pornography—even though its devices are widely used by children.  *See id.* at *39, 74.  And it could eviscerate Apple's safeguards against "social engineering attacks," such as phishing and ransomware, which are "the main vector of malware distribution" and are "thwart[ed]" by centralized distribution and app review.  *Id.* at *71–73, 102.

Plaintiffs ignore these concerns, but they are not hypothetical.  Apple offers better security than any competitor.  Dkt. 33-2 at 2708:13–17 (Mickens).  That is in large thanks to the app review process that Plaintiffs seek to enjoin, which rejects thousands of apps every week precisely because they do not meet Apple's high standards for privacy, security, and quality.  Dkt. 34 ¶ 2.  Far from making Apple's platform "more desirable and valuable," Mot. ¶ 58, the remedy sought here would create a "toxic kind of a mess" where the "safe and trusted" App Store once stood—a result that is "terrible for the user," "terrible for the developer," , and would imperil the integrity of Apple's ecosystem itself.  Dkt. 33-2 at 3884:18–3885:11 (Mr. Cook testifying about the implications of a proposed injunction that would force Apple to distribute unreviewed apps).  "The witnesses [in the *Epic* trial] [were] unanimous that user security and privacy are valid procompetitive justifications."  2021 WL 4128925, at *75.  Beyond the benefits they deliver to users and developers, security and privacy are "competitive differentiator[s] for Apple" and among the "top factors [for] people [who] choose" its devices.  *Id.*  Impairing the App Store's competitive differentiators could "discourage[] investments in [the platform] and ultimately harm[] both [users] and [developers]."  *Amex*, 138 S. Ct. at 2289.

The proposed injunction also seeks to trample Apple's intellectual property rights.  Apple's software development tools, the App Store, and iOS itself are protected by patents, copyrights, and trademarks.  Dkt. 33-9 ¶ 23.  This carries with it the exclusive right to license (or not to license) that

Gibson, Dunn &
Crutcher LLP

software as it determines.  *See Epic*, 2021 WL 4128925, at *103 ("Apple is entitled to license its intellectual property for a fee, and to guard its intellectual property from uncompensated use by others."); *see also*, *e.g.*, *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 558 U.S. 154 (2010).  Because the antitrust and intellectual property laws must be construed *in pari materia*, Apple's intellectual property rights preclude the remedy sought here—compelling Apple to distribute apps using its intellectual property without any charge.  Dkt. 20-1 ¶ d; *see also SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1082–84 (D. Colo. 2013) (rejecting Section 2 claim that would "subvert . . . the rights granted a copyright holder").  Indeed, such compelled licensing would amount to a government taking of Apple's property for which just compensation would be required.  *See James v. Campbell*, 104 U.S. 356, 358 (1881) (government cannot appropriate or use patented inventions without just compensation).  At a minimum, it would significantly increase Apple's costs, allow competitors to free-ride on the billions of dollars that Apple has invested in the iOS ecosystem, and chill Apple's incentives to invest and innovate—to developers' and consumers' detriment.  Dkt. 33-9 ¶¶ 61–71.

Nor can Plaintiffs ignore the burden of compelling Apple to redesign iOS.  Dkt. 20-1 ¶¶ a-b.  Without evidence or explanation, they brush the scope of their request aside as insignificant.  Mot. ¶ 57.  But overhauling iOS would require extensive software engineering, as Apple would not only have to change the fundamental code of its software but also explore new ways in which to attempt to mitigate the security and privacy risks to which its users would now be exposed.  *See* Dkt. 33-2 at 2721:18–2723:16, 2732:14–24 (Mr. Schiller describing the burden of developing and changing iOS).

The requested injunction, in short, would do serious and immeasurable harm; yet Plaintiffs offer no evidence that it would do any good.  A court sitting in equity should not countenance such a request.

**E.     A Preliminary Injunction May Issue Only If Plaintiffs Post At Least A $99 Million Bond**

A preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  This presumptively requires plaintiffs to post a bond in case the defendant ultimately prevails.  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994).  At least a $99 million bond is needed here—and likely far greater.

Gibson, Dunn &
Crutcher LLP

Under the express terms of Plaintiffs' proposed injunction, Apple could no longer charge developers the $99 annual developer program fee. *See* Dkt. 20-1 ¶ d. Given that there are approximately one million members in the Apple Developer Program, Dkt. 33-2 at 2759:14–17, 2760:10–15 (Schiller), Plaintiffs' proposed injunction would cost Apple at least $99 million a year in developer program fees. A $99 million bond thus would cover only one year of the "damages sustained" by Apple from a wrongful injunction, Fed. R. Civ. P. 65(c)—a conservative estimate even if this case could be rushed to trial. These lost developer fees likely represent a small fraction of the damages Apple would suffer. The proposed injunction also would force Apple to distribute apps from developers that circumvented or otherwise refused to pay Apple its contractual commissions. Dkt. 20-1 ¶ c. Commissions make up the bulk of Apple's revenue from the App Store, which was about $13.5 billion in 2019, Dkt. 33-2 at 1730:17–20, and has only risen since, Dkt. 33-24 at 21. A wrongful injunction thus could inflict billions of dollars of harm to Apple. This must be factored into the required bond as well.

In addition to lost revenue, Apple would also invariably suffer damage to its goodwill and brand when users are inundated with malware, pornography, scams, and other malicious, dangerous, and unsavory apps. *See* Dkt. 34 ¶ 18. What is more, the proposed injunction—which seeks to demolish Apple's business model—could irreparably damage the attractiveness of Apple's platform. *See* Dkt. 33-3 ¶¶ 29, 120 (even slight changes to a transaction platform's rules and prices, let alone the wholesale transformation proposed here, can lead users to quickly abandon a platform). These intangible, yet very real, potential harms should also be considered by the Court in setting the amount of the bond that Plaintiffs should be required to post before proceeding on their quixotic quest for an injunction.

For their part, Plaintiffs have not offered to post *any* security. The Court should not even entertain the request for injunctive relief unless and until Plaintiffs post a bond for at least $99 million. If they are unable or unwilling to do so, then the motion can and should be denied for that reason alone.

## V.   CONCLUSION

Apple respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction.

Gibson, Dunn &
Crutcher LLP

1    Dated:      October 8, 2021                    Respectfully submitted,

2                                                   By:    _/s/ Rachel S. Brass_____

3                                                              Rachel S. Brass

4                                                   GIBSON, DUNN & CRUTCHER LLP
                                                    MARK A. PERRY (SBN 212532)
5                                                     mperry@gibsondunn.com
                                                    RACHEL S. BRASS (SBN 219301)
6                                                     rbrass@gibsondunn.com
                                                    JULIAN W. KLEINBRODT (SBN 302085)
7                                                     jkleinbrodt@gibsondunn.com
                                                    555 Mission Street, Suite 3000
8                                                   San Francisco, CA 94105-0921
                                                    Telephone:  (415) 393-8200
9                                                   Facsimile:  (415) 374-8429

10                                                  *Attorneys for Apple Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S OPPOSITION
TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:21-CV-05567-EMC