# Appendix A

Keith Mathews
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| CORONAVIRUS REPORTER, CALID INC, PRIMARY PRODUCTIONS LLC, DR. JEFFREY D. ISAACS, on behalf of themselves and all others similarly situated , | ~~CAND~~Case No. 3:  21-cv-05567-EMC |
| | **PLAINTIFFS' NOTICE OF MOTION** ~~AND~~ **& MOTION FOR PRELIMINARY INJUNCTION AND TO APPEND UCL COUNT** |
| Plaintiff, | **Hearing**: |
| vs. | Date:    ~~September 9~~November 4, 2021 |
| APPLE INC., FEDERAL TRADE COMMISSION, | Time:    1:30PM |
| Defendant. | Place:    Courtroom 5, 17th Floor (videoconference) |
| | ~~Judge:        Hon.~~The   Honorable   Edward   M. Chen |

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND TO APPEND CALIFORNIA UNFAIR COMPETITION LAW CAUSE OF ACTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30PM on Thursday ~~September 9~~November 4, 2021, or as soon thereafter as possible, in Courtroom 5 of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, and/or by videoconference, ~~Plaintiff Coronavirus Reporter~~Plaintiffs will and hereby ~~does~~do move the Court to issue a Preliminary Injunction preventing Defendant Apple Inc from restricting public access to competing apps, including lifesaving Coronavirus ~~information software operating over the smartphone enhanced national internet backbone~~Reporter, in violation of Sherman Act, RICO, and California Unfair Competition Law.  To accomplish this, Apple shall be restrained from denying third-party apps as ordered in the proposed injunction.

~~MOTION FOR PRELIMINARY INJUNCTION~~

The Plaintiff now moves the United States District Court for the Northern District of California to issue a Preliminary Injunction restraining Defendant Apple from restricting public access to ~~lifesaving coronavirus information software operating over the smartphone enhanced national internet backbone.  The Class Action Complaint filed on July 20, 2021 serves as the operative complaint for this motion.  The operative complaint is incorporated herein in its entirety; each and every fact, allegation, and/or claim stated in the Class Action Complaint shall be considered legally pleaded and asserted via this motion.  Additionally, this motion is based upon any and all documents filed in this action, and evidentiary materials to be presented at the hearing~~competing apps, in violation of Sherman Act, RICO, and California Unfair Competition Law.

On August 8, 2021, a motion for preliminary injunction was filed before this Court.  That motion is scheduled for hearing on November 4, 2021.  Since the motion was filed, a number of important events have transpired.  First and foremost, Apple was found guilty of violating the California Unfair Competition Law, in the highly publicized *Epic* case.  Second, a POLITICO article exposed what is believed to be the worst scandal in Apple's forty-year history, involving a shameful *quid pro quo* to pull HBCU funding in exchange for dropping antitrust state legislation in Georgia.  Third, Apple and *Cameron* developers reached a proposed settlement for developers of non-zero priced apps, and similarly, Judge Yvonne Gonzalez-Rogers declared this case (pertaining to zero-priced apps primarily) to be adjudicated separately from Cameron.  As a result, Plaintiffs filed an FAC removing all Cameron language to this lawsuit's auxiliary.  Additionally, Plaintiff's FAC introduced novel Sherman Act marketplaces for iOS userbase access, iOS notary stamps, iOS application loaders, to complement the institutional app monopsony definitions.

In light of the foregoing events, Plaintiffs sought Apple's assent to streamline motion practice and stipulate that the already pending motion for PI be amended to incorporate the above issues.  Because that hearing is over six weeks away, there was ample time for Apple to respond to the Amended Preliminary Injunction motion.  Apple declined to meet & confer on this issue, which necessitates this re-filing of the injunction, along with a proposed addendum to the FAC.  The proposed addendum is two-pages in length and succinctly raises the above UCL and RICO developments, which were simply unavailable to Plaintiffs at time of filing the FAC.  As such, under appropriate guidelines leave shall be freely granted to append this two-page addendum to the FAC.  Likewise, the Amended Preliminary Injunction is hereby filed, based upon the assumption that the operative complaint for the motion is now the "FAC + UCL Addendum."

Under this Court's inherent authority, a two-page addendum to the FAC is permissible, because Apple has not yet answered the FAC, and a simultaneously filed Motion to Strike would allow Apple to respond on any issues raised by the UCL claim.

There exist compelling judicial economy interests to add the UCL claims to this case. We have learned that *Cameron Plaintiffs* spent over $30 million to prosecute discovery in that case. By conservative estimates, Epic must have spent over $60 million to prosecute an entire bench trial of their Sherman and UCL case. Likewise, Apple must have spent an equal amount. As such, the Epic Court spent nearly five months reaching a UCL verdict, after the parties spent over $120 million on the bench trial. It would be entirely wasteful not to allow the Plaintiffs' injunction to include a claim (and verdict) that warranted such considerable corporate and tax-payer funded debate. The UCL claim is directly analogous to this case in that both cases concern the "open flow of information" that is restricted by Apple's "incipient monopoly." In Epic's case, the information pertained to payments; in Plaintiffs' case, the information pertained to the availability of free-app platforms for information exchange regarding COVID-19 and other fundamental issues.

To clarify, Plaintiffs assert the UCL claim should assist the Court in determining that "probably of success" injunction threshold is almost certain in this case, as it was in *Epic*. Plaintiffs also assert that new information makes clear that their Sherman Act and RICO claims are likely to succeed even under their higher standard. There seem to be erroneous reports in the press that the *Epic* verdict absolved Apple of all Sherman Act claims and liability, as some sort of *res judicata*. To the contrary, Plaintiffs Sherman claims are distinct from those adjudicated in Epic. To the best of Plaintiffs' knowledge, this case is the last remaining Sherman Act case against Apple with subject matter that has not yet been adjudicated. As a result, Apple bombards

Plaintiffs and counsel with similar threats the monopoly employed against state legislators faced – accusations that our claims are "in disregard for the law" and Constitution (see Politico Exhibit).  It is time Apple's bullying and threats be curtailed by the Court.

Generally, our case is differentiated from *Epic* because in that case, the Court determined that the relevant market was the global market for digital mobile gaming transactions.  In that market, Apple only less than 55% market share, and Epic failed to meet its burden to demonstrate Apple's monopoly.  In our case, Apple holds a 60% share of the US Smartphone Market by volume, and a 75%-80% share by revenue and/or profit.  There can be little question Apple holds a 100% monopsony as the only buyer of free apps, which is exactly why Apple opposed the separate-track of Plaintiffs' consolidated claims from Cameron.  Similarly, Apple holds a 100% share on iOS notary stamps, application loaders, and iOS userbase access.  Hence, as the Honorable Yvonne Gonzalez-Rogers stated, Epic's failure to demonstrate "reduced output" and other "factually intensive" monopolistic evidence is "not impossible" in another case.  Plaintiffs submit that their case just might be that case; there is no debate on "reduced output" of free apps such as Dr. Roberts' Coronavirus Reporter, and with Apple's 75%-100% market shares in our relevant markets, the facts of this case don't succumb to the pitfalls of Epic.

Specifically, the Epic court found that a notarization model such as that sought in our injunction is "particularly compelling." (Id. at page 113).  Plaintiffs' core assertion is that the Mac is a safe architecture, and their apps should be allowed using an open notarization model on an iPhone, like on a Mac.  It is noteworthy that the Epic court "affords [Apple's] Federighi testimony little weight" as to said Mac notarization model being unsafe.  As such, evidence gleaned from the Epic verdict supports an early injunction in this case.

Respectfully submitted, this ~~8~~24th day of ~~August~~September, 2021.

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## MEMORANDOM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION

## FOR PRELIMINARY INJUNCTION

### FACTUAL BACKGROUND

1.  Everybody knows a loved one or a friend whose life was touched by Dr. Roberts, Plaintiff Coronavirus Reporter's Chief Physician.  Anyone who ever had a cardiac bypass, stenting procedure, or was admitted to an Emergency Department on concern of myocardial infarction ("heart attack") almost certainly had laboratory blood analysis to detect damaged cardiac muscle tissue.  In the 1980s, Dr. Roberts pioneered the MBCK blood test used for two decades as a "gold standard," and which directly laid the foundation for the subsequent troponin test widely used today. Dr. Roberts' CV, Exhibit A in this lawsuit, narrates a career of saving lives.  Notably absent from this CV is the Coronavirus Reporter app, the lives it could have saved, and could still save, because Apple improperly blocked this app in February 2020 to develop their own.

2.  Apple's own SARS-CoV-2 tracing system is still widely unavailable in the United States, some eighteen months later.  In England, it is derided as "Pingdemic" and many British citizens have deleted the app in some sort of digital revolt.

3.  Dr. Roberts' voluntary symptom "situational reference" app was exactly the app needed a year and a half ago.  At the very least, there was room to allow the presence of such a critically important app; instead Apple blocked the entire class of startup COVID apps.

4.  As Dr. Roberts declared during his CNBC interview with Kif Leswing, startups – i.e., individual or small groups of scientists, changed the course of human history through their medical discoveries and other contributions to mankind.  Imagine, as Dr. Roberts suggested, Apple had been around to block the discovery of penicillin by a startup.

Fortunately this is inconceivable, and is precisely why this injunction – and perhaps a TRO – should immediately issue.

5. Today, Apple wields authoritarian control over the vast network of interconnected smartphones that, combined, represent an extraordinary computational-communications capability ("network effect").  Our ~~Complaint~~FAC calls this the smartphone enhanced national Internet backbone.  The United States government spent decades building what is now known as the Internet.  Subsequently, we as a nation collectively invested in putting a smartphone, an amalgamation of sensors, software, and communication devices, in the hands of nearly every citizen, forming a network with capabilities amounting to fantasy of science-fiction of prior generations.

6. We, the Plaintiffs, assert that these vast network capabilities are the property of the citizens – the end users of Apple's iPhone.  These users should enjoy unrestricted use of their smartphones to run the innovative applications, written by third party developers, that ultimately are the raison d'être of this network.

7. Two decades ago, the United States Department of Justice expended considerable resources to prosecute the Microsoft Corporation for alleged anti-competitive activity that amounted to bundling the Explorer web browser too prominently with the Windows operating system.  Notably, Microsoft did not restrict each and every software developer from directly selling software to PC consumers.  Microsoft did not require programmers to submit their applications for approval, in order to distribute software in a brick-and-mortar store.  Microsoft did not reject 40,000 software applications per week, wasting millions of person-hours of labor.  Microsoft did not demand an economically inefficient 33% tax on all PC software.  And Microsoft did not charge $99/year to every

aspiring computer programmer, many of whom are students or entrepreneurs with no income or benefits, simply to access the Windows SDK.  There seems to be little question that had Microsoft committed the above antitrust violations, public outrage would have ensued, the company would have been broken up, and likely, faced criminal charges.

8. Apple, by breathtaking comparison, has secured its position as the wealthiest company in the world by committing all of those enumerated crimes under the guise of popularity and commitment to quality.  There can be little doubt that Tim Cook sought to compensate for the tragic loss of Steve Jobs – and his gift for innovation – by seeking reckless profits on the heels of the success that Apple enjoyed with the iPhone.  This stealth transition occurred relatively quickly, over the last ten years.  As NPR coined it, Apple enjoys a "good guy" reputation that has been placed under scrutiny.

9. There exists rapidly growing public concern over Apple's grip over our daily lives.  ~~The world is awaiting a decision from this District regarding the 35% commission Apple takes from anyone using a paid application on their devices.  Just last week, Elon Musk correctly stated "Apple app store fees are a de facto global tax on the Internet.  Epic is right."~~International consensus exists that the App Store engages in the monopolistic practices described in the Amended Complaint.  Senior Senator Blumenthal declared that it is "most offensive how [Apple] strangles new app development." The Congressional Subcommittee called the practices "tyranny," and calls on the courts to "better enforce the intent of the Sherman Act legislators." South Korea passed legislation just last week to terminate Apple's anticompetitive practices, and Russian Federation fined Apple earlier this summer.  Thirty other countries, in the EU, UK, and elsewhere, have announced legislation to curtail App Store abuses.  Apple's silence on this international consensus

must be viewed as an admission of guilt.  Since Apple did not, and cannot, deny international consensus to the injunction, their public interest defense is estopped.

10. Moreover, as discussed the Epic verdict found Apple to be guilty of UCL unfair practices. Even if for some reason the Court was not convinced on the international Sherman Act (and equivalent) consensus, the UCL holding is binding that Apple's "incipient monopoly" squelches information flow – such as Coronavirus Reporter.

11. ~~10.~~ The matter of commissions was raised over eight years ago in the *Pepper* lawsuit, and most other cases challenging Apple's anticompetitive behavior focus on these fees. Notably differentiated, we assert first-to-file class action claims that Apple's censorship of free apps, such as Dr. Roberts', constitutes Sherman Act and RICO violations directed against the institutional application software marketplace.  These claims are long overdue. Apple's dictatorship like control over free apps – from Coronavirus Reporter to Parler, where Apple notoriously squelched an entire political party's open information flow[1], must come to an end.

12. ~~11.~~ The world cannot wait eight more years, the time Pepper has taken to challenge de facto taxation fees, to address application software censorship.  This is a matter of life-or-death, in the case of Coronavirus Reporter, and freedom of speech, in the case of Parler.  The injunction we seek can and must be granted to immediately end Apple's authoritarian control that so clearly violates antitrust and racketeering laws.

INJUNCTIVE RELIEF SOUGHT

13. ~~12.~~ The proposed injunction immediately and unambiguously ends Apple's unilateral control over the software permitted to run on its user's devices.  To be clear, this

---

[1] Apple pretextually claims they blocked Parler due to violence incitement. But Facebook, Twitter, and other platforms (all legally exempt from liability for such acts, even if true) foster illegal activity every day, and Apple doesn't shut them down. Apple is on a power-grab to advance their own causes, make no mistake.

effectively ends Apple's exclusive monopoly, and monopsony, over access to the ~~smartphone enhanced Internet backbone, and institutional software marketplace, respectively~~institutional app marketplaces defined in the FAC, and respective markets for iOS userbase access, notary stamps, and application loaders. No longer will Apple reject apps by the hundreds of thousands weekly. After this injunction is granted, the increased selection of innovative apps brought on by this newfound freedom will be truly breathtaking. In China, the App Store is 1/10 the size of competing open markets. Our citizens deserve the same openness that exists in China, with respect to digital goods. The incremental network effect, i.e. the improved utility of the smartphone enhanced Internet, will substantially contribute to the economy, and moreover, quality of experience of smartphone owners. They will finally derive the full benefit of the global device infrastructure they paid for. Apple's "walled garden" will finally be allowed to flourish.

14. ~~13.~~ From a technical perspective, the injunctive redress is accomplished by restraining and enjoining Apple from disabling software app installation on end-user iOS devices and refusal to grant notary stamps. Apple currently exerts their control over each and every iPhone by adding software code into the iOS Operating System ("kernel") that requires "signing" with Apple's encryption key for an application to launch. Generally, that signature occurs on the App Store once the App Review team approves an app for distribution.

15. ~~14.~~ There are several mechanisms by which Apple would therefore comply with the proposed injunction. First, the operating system must remove the signing requirement that censors/disables third-party apps from launching. After the signature requirement is

removed, an iPhone user could download any app via their web browser, or receive an app via AirDrop, email, or other communication transfer techniques.  In other words, the App Store would no longer be required to download and run an app, because iOS no longer mandates signing from the App Store.

16. ~~15.~~ Additionally, the App Store itself would be modified to comply with the injunction. Presently, a developer must pay $99 fee to access the App Store and upload an app for approval, or denial, by the App Review team.  Under the terms of the injunction, Apple would be enjoined from denying any app submitted to the App Store platform.  Apple would also be enjoined from charging the excessive $99 fee, as determined by the Congressional Subcommittee, to upload proposed apps.

17. ~~16.~~ The proposed injunctive relief would have vast, instantaneous observable benefits to the consumer.  The App Store would immediately benefit from improved selection, as it would include apps, such as Dr. Roberts' Coronavirus Reporter, and many others limited only by the imagination of creative developers.

18. ~~17.~~ Moreover, these developers could market their apps in venues other than the App Store, which would result in more efficient distribution of novel applications.  As stated, a user could interact directly with a developer's own store on the web, for example, and directly install their app, bypassing any need to use the App Store.

19. ~~18.~~ This, of course, is how software programs were sold for decades until the App Store launched in 2008.  Prior to that, end users could go to a brick-and-mortar software store, or online forums dedicated to different niches, and discover useful software – all without Apple's excessive policing, curating, and censorship.

20. 19. It is rather striking that over the last decade we, as a society, let Apple take away these rights for us to choose what sorts of programs we could run on computers (i.e. smartphones) that we paid for.  This is analogous to purchasing a TV and only being allowed to watch films approved by that TV manufacturer.  Or buying a car and being told by the car manufacturer what neighborhoods it can be driven to.  We trusted Apple because we trusted the genius of Steve Jobs and Wozniak.  Enthralled by the great power of the "smartphone enhanced Internet," we assumed dedication to technological progress and American freedom was an inherent a goal of Apple.  Unfortunately, Apple today has become the single greatest threat to free enterprise and technological progress, under Tim Cook's so-called leadership.  Lives were lost by the now eighteen-month delay in rolling out critically needed COVID-19 software.  This is the right time and place to end Apple's practices with this proposed preliminary, and ultimately, permanent injunction.

20. Plaintiffs marketplace claim theory, and RICO, have not been litigated to date. Commission rate disputes are locked in a decade long appellate posture, re *Pepper* and *Cameron,* and just finally have moved for class certification for non-zero priced apps. Our present case was filed initially in January, when Parler, and our own Coronavirus Reporter app, along with 40,000 apps weekly, faced censorship by Apple.  It became abundantly clear to Plaintiffs, who collectively had five apps over five years, that Apple was guilty of Sherman and RICO civil and criminal violations were.  The FTC and DOJ have been apprised of Plaintiffs' collective claims, and their joinder to this case is imminent.

### Marketplace Overview and Definitions

21. Two marketplaces must be defined to plead a *prima facie* Sherman claim that adequately covers Apple's conduct.  The first marketplace is the smartphone enhanced Internet access device.  Reasonable interchangeability is easily achieved by noting the existence of

~~Windows Phone, Blackberry, and Android.  Apple controls nearly 80% of the commerce transactions that occur over this device group, by dollar volume (See *Congressional Subcommittee* report).  In this depiction, Apple sells to the consumer a bundle of hardware and software, i.e. the~~ The FAC describes a relevant national foremarket of the US smartphone internet access device (i.e. smartphone ~~network access device.  The consumer is unaware of the existence of developers, if they aren't approved and promoted by Apple.  The merchant of record for all iPhone app purchases is indeed Apple.  Counsels' review of other pending antitrust claims in this District, and others nationally, neglect to formulate Sherman definitions that equally apply to free apps — a major component of the ecosystem and a significant source of lost "person years" of work~~), and an alternative single-product marketplace for iOS smartphones (60% by volume, 80% by revenue/profit of the entire US smartphone market).  Downstream from those markets, the FAC describes the National Institutional App marketplace, and respective single-product iOS National Institutional App marketplace.  The FAC describes the iOS National Institutional App marketplace as a tied product to the iOS smartphone.  Also tied to the iPhone are three other markets, the iOS userbase access market, the iOS notary stamps market, and the iOS application loader market.

~~**Monopsony Theory for iPhone**
The iPhone exists within the marketplace for smartphones.
•Apple bundles its *own apps* with the iPhone, e.g. FaceTime.
•Apple bundles *free apps* with the iPhone,
usually purchased at a price of $0 from developer.
Developer rewarded with advertising stream revenue.
•Apple bundles (at IAP price) 3rd Party *paid apps*, e.g. MS Word.
Apple conveys 66.6% commission to 3rd Party.
**Anti-Competitive App Distribution (Sherman Violation)**
•Apple buys some free apps at substantial prices(e.g. weather prediction).
•Apple disallows or ranking suppresses competitor apps.
•Apple assists some developers (e.g. Chinese Government),
blacklists others (Class Action Plaintiffs).
•Apple retains 33% off all paid app IAPs.
•Developer and consumer are at a full disconnect —
only way to get an iPhone app is "bundled" with the iPhone,~~

*i.e. approved by Apple.*
*A disallowed or suppressed app is underpaid by the Apple monopsony*

22. The ~~second marketplace definition is the institutional app marketplace, aka the market for software purchased from developers.  In Apple's case, they are a monopsony because they are the only entity that can buy (approve) software from a developer for iOS users :~~foremarket for US smartphone internet access devices represents the ubiquitous handheld, portable electronic devices that allow users to perform myriad communications and computing functions, such as browsing the internet, navigating traffic, paying bills, accessing social media, playing games, and streaming videos and music.  For many consumers, smartphones have largely replaced laptop and desktop computers for a wide variety of computing tasks.  To be useful, a smartphone requires an FCC licensed telephone modem (i.e 5G radio) and an operating system which facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the device.  Smartphones in the US are made by companies like Apple, Samsung, LG, and Motorola.  Apple's products are unique in that they don't have a licensable operating system, rather, they use the proprietary iOS.  Smartphones are designed to work on specific frequencies, which vary by country, and hence require regulatory (i.e. FCC) approval.

~~**Anticompetitive App Marketplace Dominated by Apple**~~
~~•Apple buys most *free apps* at a price of $0 from developer.~~
~~Developer rewarded with advertising stream assignment.~~
~~•Apple buys 3rd Party *paid apps*, e.g. MS Word.~~
~~Price paid equals volume * 66.6% * IAP price~~
~~•Apple occasionally purchases free apps for~~
~~own brand portfolio. Dark Sky weather app bought~~
~~for undisclosed sum, removed from Android.~~
~~•Apple frequently copies apps (i.e. Flashlight) eliminating rivals.~~
~~•Preferred partners (China Baidu, Stanford, etc) offered valuable chaperoning.~~
~~•Apple adds SDK functions permitting new classes~~

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

of apps , favoring own (Tile / AirTag).
•Cronyism by App Store employees obtains kick backs from friends' apps.
Not officially sanctioned by Apple shareholders
•Rejects 40,000 apps a week; developers work
**millions of person-hours for no pay or benefits.**

*Competition would usually Inerese app quality & developer fairness*

23. Apple, of course, does not acknowledge this marketplace in their DPLA agreements.  We refer to it as a "hypothetical" marketplace, but in fact, it is a very real and severely bottlenecked marketplace that would otherwise be thriving, but for Apple's restrictions on interstate commerce.  The company has spent a decade writing consumer and developer "agreements" which use wholly different terms, shield Apple of vast liability from third-party apps, while simultaneously collecting the bulk of profits.  The DPLA and App Store employ language that a free app is "For Sale" or "Available" through the App Store, after gaining "approval" by Apple for "adherence to iOS standards." Herein lies the confusion, thus far, with other claim theories.  As is, developers do not sell apps to consumers.  The only marketplace, the only seller of apps to consumers, is Apple itself.  If Apple is the only seller of apps to end-users, then we understand that Apple is a monopsony buyer of apps from developers.  The vast majority of apps are purchased through coercion for a zero-dollar ($0) price from Apple.  In other words, vast amounts of labor – millions of person years of developers – compete to sell their apps for free to Apple[1]Therefore, there is a relevant market for licensed, United States smartphones that operate using carrier frequencies that have been commissioned in this Country.  Apple iPhones sold in the US have different product SKUs than those sold in China, or Europe, evidencing the different markets for different country-products.  The US smartphone market excludes simple cell phones, "flip phones," or feature phones, or other electronic

---

[1] The actual terms of an app sale from an independent developer to Apple are rather complex. Apple receives a license to distribute a particular version of an app's source code, in a bundle that is free to purchasers of the iOS ecosystem. It would appear patents, trademarks, advertising assignments and other intellectual property are retained by the developer.

devices (such as laptop computers, desktop computers, and gaming consoles, e.g., Nintendo DS, Xbox, PlayStation) that are not mobile smartphones.  As such, Apple and several Android OEMs (LG, Samsung, Motorola) comprise the bulk of the substitutable products in this market.

24. ~~The reward is an assignment of advertising identifier code to the developer.  This is a wholly separate marketplace from the purchase of the app, and thus far, has confounded legal theorists from correctly defining Apple's monopsony, with respect to free apps~~However, for the reasons expounded in the FAC, such as work/family compatibility, financial constraints, and others to be revealed in discovery, the smartphone market has high barriers to user switching and to market entry.  Large companies such as Microsoft and Amazon have attempted to enter and gain viable scale in the market, with only very limited success.  As such, Apple currently possesses durable monopoly power in the market for US smartphones, estimated at over 75% by revenue.

25. ~~Apple might claim they never purchase apps, because their DPLA agreement doesn't use this terminology.  Again, Plaintiffs assert the DPLA is a legally void, monopolistic contract, in large part because it uses false terms and definitions to purport the existence of an "independent, voluntary developer" base.  The reality is, developers are told how to run their business, and labor to sell their apps for free to Apple - hence increasing the value of the Apple ecosystem at their expense~~In the face of a small price increase (or a small reduction of quality) in smartphone prices, a consumer would be highly unlikely to switch from an Apple device to a substitute for the following reasons.  First, the consumer who would switch would lose much of her financial investment in the previously purchased devices—often hundreds of dollars—as well as digital content

consumable only through iOS apps.  The consumer may also lose efficient, or any, access to many kinds of data on that device or data associated with those apps.  Because of the functional and data integration between devices within the same ecosystem many consumers owning multiple Apple devices would be reluctant to switch to an Apple device unless committing to switching all devices—a significant financial commitment.  Third, as the FAC states many Americans pay for their devices under installment contracts, limiting their ability to switch mobile ecosystems.  These and other costs of switching smartphones cause "lock-in" to the Apple ecosystem, and this leverage is used to exploit further downstream markets.

26. ~~It should also be noted that Apple does purchase apps for non-zero prices, and routinely so.  In the above diagram, it is noted the Dark Sky weather prediction app was purchased by Apple at an undisclosed price estimated between $100million and $1billion to bring the app to Apple's ecosystem, and exclude it from Android.  Apple also finances the development of apps to assist other countries (Chinese government Baidu) and other "partners" it feel deserve direct reimbursement for helping improve the iPhone~~Because of this leverage, Apple likewise has monopoly power in all of the downstream and tied product markets, such as the Institutional App Market, notary stamps market, and userbase market.  As the sole buyer/seller in these markets, and with a substantial portion of the US population locked in (see above), there are simply no substitutes for these products.

27. In all of the above markets, the United States is a relevant geographic market.  As stated, FCC approves a US-version of the iPhone.  In the downstream app markets, the apps available, and desirable, to consumers vary on a country-by-country basis.  For instance,

app stores frequently have country-specific "storefronts," and U.S. consumers cannot access the storefront available to users in another country.  Language barriers are another obvious difference.  Cultural norms and legal regulations for medical treatment (in the case of Coronavirus Reporter) likewise apply.  Apple sets certain app distribution and payment requirements for developers on a country-by-country basis, including in-app sales currency and price range requirements.  Institutional app markets available in other countries are not reasonable substitutes for app markets in the United States.  Likewise, notary stamps, application loaders, and iOS userbase are downstream from the US smartphone market, and therefore only apply to that geography.

28. 27. In short, our ~~marketplace definition posits Apple sells the "iPhone" as a bundle of software and hardware.  This results in a disturbance to both the enhanced smartphone device marketplace, and equally, the institutional app distribution marketplace.  By using~~ claim theory definitions cover the Sherman Act marketplace for US smartphones, the single product iOS device(iPhone) market, and downstream markets for Institutional App purchases, notary stamps, application loaders, and userbase access.  The resulting disturbance in all of these markets stems from crafty DPLA agreements and other political lobbying tactics.  In sum, Apple has thus far pulled off what is the most profitable business model in history – albeit an illegal one under Sherman.

## MEMORANDUM OF LAW

29. 28. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  Winter v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively,

"serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance *for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) .  Plaintiffs qualify pursuant to either standard, as discussed herein.

30. 29. Underlying Plaintiffs' allegations in this case are Apple's anticompetitive and exclusionary efforts to hinder opportunities of independent developers as a way to maintain and extend its monopoly over smartphone enhanced internet access devices, and the related monopsony over the institutional ~~smartphone application~~app marketplace. Apple's anticompetitive agreements violate Section 1 of the Sherman Act; and its conduct, viewed both individually and in the aggregate, also violates Section 2 of the Sherman Act.

31. 30. To establish monopolization in violation of Section 2, the Plaintiffs must show two elements:  (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  Plaintiffs v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also *Southern Pacific Comm*. Co. v. AT&T, 740 F.2d 980, 1000 (D.C. Cir. 1984).

32. 31. The first element of a monopolization claim – monopoly power – is "the power to control market prices or exclude competition." United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 391 (1956). "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded, but

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

that power exists to raise prices or to exclude competition when it is desired to do so." American Tobacco Co. v. *United States*, 328 U.S. 781, 811 (1946).

33. ~~32.~~ The second element of a monopolization action is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 570-71. This requires the Court to determine whether the monopolist "impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Ibid.* Furthermore, "[w]here a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or that might even be viewed as procompetitive -- can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) (citing 3 P. Areeda & D. Turner, Antitrust Law ¶ 813, at 300-02 (1978)).

34. ~~33.~~ A monopolist also violates Section 2 when it enters into anticompetitive agreements that serve to maintain its market power. Such agreements also violate Section 1 of the Sherman Act, and it is settled that a monopolist violates Section 2 if the monopolist has "maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under [Sherman Act] § 1." *United States v. Griffith*, 334 U.S. 100, 106 (1948).

35. ~~34.~~ Here, Apple's DPLA agreements requiring any developer to submit an app to Apple before it can be approved to run on end-user devices plainly and unlawfully maintain

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

Apple's monopoly power in violation of Section 2 on both grounds:  They draw on Apple's monopoly power to exclude competition on a basis other than efficiency, thereby tightening Apple's grasp on the institutional application software market; and they violate Section 1's proscription on employing anticompetitive agreements to maintain monopoly power.

36. ~~35.~~ There is no reasonable dispute that Apple has monop~~so~~ly power in the ~~smartphone application~~institutional app market.  Under the Epic/Kodak single-market theory, Apple exerts 100% control over the iOS institutional app market.   Under Plaintiffs' US smartphone enhanced access device definition, Apple's market share is approximated to be 80% ~~off all information and commerce, nationally~~.  (*See Congressional Subcommittee Report, Epic Findings of Fact*).

37. ~~36.~~ Apple's monopoly creates barriers to competitors that are magnified and reinforced by network effects and increasing returns in consumption which result from the fact that the value to users of a particular good or service increases with the use of that good or service by others.  In other words, the vast benefits that end-users should receive by investing in the smartphone enhanced Internet backbone accrue to Apple, rather than the economy as a whole.  For this reason, an injunction is appropriate to maintain the status quo and prevent irreparable harm to the competitive economy that is being siphoned to Apple's advantage.

Apple's Anticompetitive Conduct Violates Sections 1 And 2

38. ~~37.~~ Apple has engaged, and plans to continue to engage, in a variety of exclusionary and predatory practices to protect its operating system monopoly.  Section 2 prohibits a firm from "wield[ing]" its monopoly power "to tighten its hold on the market." *Berkey Photo*,

Inc. v. *Eastman Kodak Co*., 603 F.2d 263, 275 (2d Cir. 1979), *cert.denied*, 449 U.S. 1093 (1980). "A variety of techniques may be employed to achieve this end -- predatory pricing, lease-only policies, and exclusive buying arrangements, to list a few." Id. at 274. Tying arrangements are another.  By using monopoly power to compel a customer to purchase a product it might prefer to purchase elsewhere, a monopolist "forecloses competition on the merits in a product market distinct from the market for the tying item." Tying is per se evidenced herein, and Plaintiffs are likely to prevail.  Apple's only defense to tying appears to be the argument that the App Store is not a distinct digital product.  But it is.

39. 38. Relevant here, Apple has tied the App Store, i.e. exclusive control over institutional application purchasing and distribution, to the smartphone enhanced internet access device market.  This tying is plainly forbidden under Section 2, and is a narrow target of the proposed injunctive relief.  Also pleaded herein are the ties to the related notary stamp, application, and iOS userbase access, all completely controlled by Apple as a result of their US monopoly in the smartphone market.

40. 39. The economic consequences of the illegal DPLA agreement and the end-user App Store tying arrangement are straightforward.  Customers are presented with less selection and competition amongst third-party applications, such as Dr. Roberts' Coronavirus Reporter.  In this particular case, an application serving as a pandemic emergency response was blocked from consumer choice, which according to Apple's own research, cost lives.  Hence, there are ramifications beyond the economic scope of Sherman; restricting innovation can cost lives, in addition to economic loss.

41. 40. Apple's App Store restrains trade by creating a bottleneck on the institutional smartphone app market, plain and simple.  No other major computing platform in history has attempted such monopolization; this unequivocally violates Sherman by "restraining interstate trade."  Apple simply cannot deny that they restrain interstate trade in this market, and hence, there is no reason to wait for conclusion of this trial to "open up" the App Store to third-parties.

42. Under UCL and RICO, Plaintiffs' claims are equally likely to prevail and warrant injunctive relief.  The Epic Court (see introduction) ruled that open information flow was blocked by Apple's "unfair" practices that create an "incipient monopoly." This ruling is directly applicable to apps such as Coronavirus Reporter, where Apple has absolutely no justification in disallowing them.  These are competing apps "unfairly" withheld – they are not spamware, malware, offensive material, or other such "uncontroversial" categories determined by the Epic court.  There is international consensus that Apple "strangles" competing apps as a monopolist, and this Court has ample and compelling evidence under UCL or RICO to grant the injunction.

Apple's Exclusionary Conduct Lacks Legitimate Business Justification

43. 41. Conduct that excludes rivals and lacks legitimate business justification -- either because it does not advance competition on the merits or because it excludes competitors in an unnecessarily restrictive way -- violates Section 2.  See, *e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 502 U.S. 452 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 587 (1985).  Apple's total bottleneck control over the institutional app marketplace lacks any legitimate business justification.

44. 42. For starters, Apple's own Mac line does not restrict third-party applications.  Android devices do not require signing by Google – an end-user may download an app from the web, beam an app to a friend over Bluetooth, etc.  Nearly every computer platform in history, with the exception of iOS, permitted direct purchase of software from independent developers.  There is no legitimate reason for Apple to exclude rivals.

45. 43. Apple, by way of Mr. Cook, has defended its practice in the PR world in recent days by claiming it excludes rivals in the name of safety.  But this dishonest argument falls flat on its face for multiple reasons.  There is no plague of safety issues on the Mac, or Android – user satisfaction ratings for those platforms are statistically in line with Apple's iOS users.  We simply do not see harmful effects that could be ascribed to Mac and Android users, absent from iOS users.  Craig Federighi's testimony to the Epic court was afforded "little weight," and as such, Plaintiff's argument on exclusionary behavior is almost certain to meet the four elements of the MCI test.  There is simply no valid, non-pretextual argument for excluding a doctor such as Dr. Roberts' from attempting to help with COVID-19 – even if Apple could somehow refute the app was likely to save lives.

46. 44. Last week, Amnesty International reported about Pegasys Software, an Israeli iPhone surveillance program.  Pegasys completely opens up any iPhone device and turns it into a full-fledged spy machine, relaying sound, video, and private data back to the spy.  As reported, the software does not require any user intervention to infect an iPhone, which it does apparently through a simple text message.  While many malware/spyware and foreign surveillance threats require "human intelligence vulnerability" i.e. tricking an end-user into installing the code, Pegasys infects even the most cautious end-users.

47. 45. What this means is that, as of August 2021, the iPhone remainswas completely vulnerable to malicious safety threats. Logically, Apple cannot claim their exclusionary practices enhance security, when the platform is routinely completely exposed and vulnerable to the most aggressive forms of spyware.

48. 46. In short, the safety argument is pretextual at best, and at worst, forms the substance of Plaintiffs' wire fraud RICO causes of action in their dealings with Apple. While the *Epic* court found some safety arguments to be valid, the Court was clear that there were "noncontroversial" areas such as malware, spam, "bandwidth hogs," none of which apply to Plaintiffs' competing apps. In other words, the *Epic* ruling left open for factual determination as to how far Apple can take their safety defense. This injunction allocated the majority of its twenty-five page on a prima facie Sherman 1 and Sherman 2 antitrust claims, which is typically the burden of proof for a Plaintiff's motion for preliminary injunction to succeed (*See United States v. Shine Chain Theaters*). Nonetheless, Plaintiffs reserve the right to argue at the scheduled hearing that this injunction is equally indicated under RICO statutory law and UCL. In brief, fivemultiple Plaintiffs here observed and report the same wire fraud directed at them by the App Store team as Dr Roberts faced: The was told his app was disallowed because end users couldn't be trusted in a pandemic to share self-reported symptoms. Several months later, Apple allowed a crony to publish an app that shared self-reported symptoms. Plaintiffs also suffered similar threats as reported by POLITICO made to state legislators: 'cease with your antitrust enforcement because it is in "disregard for the law" and Constitution.' This abhorrent mistreatment of Plaintiffs, legislators, and the general public must come to an end with this injunction. The Congressional Subcommittee is clear that digital goods

cannot evade Sherman's intent, simply because of their novelty. Left unchecked, there can be little doubt that Apple will spend decades (i.e. Pepper) trying to subvert Sherman with endless attacks on "non-existent" digital goods like the App Store and mind-numbing marketplace contour disputes. Enough is enough – Plaintiffs' claims are no more complex than a TV manufacturer (see FAC) claiming their "patents" and "economic miracle" somehow bestow upon them "Big Brother" status to dictate what TV owners can, and cannot, watch on their TV. The pretextual and unethical wire fraud directed at app developers is the entire basis upon which Apple enforces the DPLA and end-user App Store tying, and must be enjoined under RICO.

The Balance of The Equities Warrants Granting The Requested Preliminary Relief

49. 47. The evidence and analysis set forth above and in our Complaint amply demonstrates that the Plaintiffs have shown a clear likelihood that Apple's ongoing and impending conduct violates Sections 1 and 2 of the Sherman Act, as well as RICO predicate acts including wire fraud. Accordingly, irreparable harm to the public interest in competition may be presumed. *See United States v. Siemens Corp., 621 F.2d 499, 506 (2d Cir. 1980); cf. FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1082 & n.22 (D.C. Cir. 1981).* But this Court need not rest on the presumption. Apple's anticompetitive conduct, and racketeering practices directed against small developers threatens to work significant and irreparable harm to competition. Plaintiffs, small developers, have standing here to protect not just COVID apps, but the health and competition of the entire institutional app marketplace. Without it, their career as developers will be permanently damaged. As citizens, they have standing to enjoin Apple from behavior that inflicts macroeconomic and public health harm. The imposition of preliminary relief will eliminate the threats of

ongoing harm; the requested relief will not impose a significant burden on Apple and will benefit, rather than harm, third parties; and granting such relief is in the public interest. Accordingly, the Court should enter the requested preliminary injunction.

<u>Apple's Conduct Threatens Irreparable Harm to Plaintiffs, Competition, Public Health,</u>

<u>National Innovation & Growth</u>

50. 48. Apple's unlawful conduct threatens irreparable harm to the Plaintiffs, marketplace competition, and in this case, public health and overall macroeconomic wellbeing. Apple's forced DPLA and App Store exclusivity inhibits competing software applications ("apps") from developing into full-fledged competitors to Apple's own competing apps, or in some cases, Apple's cronies. The durability of Apple's monopoly is in large measure due to network effects that cause users to demand a ubiquitous smartphone platform and its bundled apps, often referred to as the "Apple ecosystem." By way of example, Plaintiffs in this case had coronavirus prevention apps, videoconference apps, telecommunications references, and games, that were respectively disallowed and/or demoted by Apple's own Covid SDK, FaceTime, Whitepages, and Apple Arcade, respectively. By foreclosing the channels through which consumers obtain competing applications, Apple substantially reduces the probability that competing apps can obtain sufficient market share, or any market share. Left unchecked, i.e. without injunctive relief, any competition left in this marketplace is likely to suffer imminent harm as the "Apple ecosystem" – and record $80 billion quarterly profits (at 44% usury margin!) eat into the overall economy.

51. 49. Given the difficulty in overcoming the network effects that secure Apple's monopoly, the lack of direct competitive threats, and the extent to which Apple's ongoing and

impending practices threaten to foreclose the major indirect competitive challenge to its monopoly, the threat to the public interest in competition is acute.

52. 50. Significantly, as mentioned earlier, in the case of Coronavirus Reporter, economic effects are just part of the problem.  Lives have been lost by Apple's blanket ban on "startups" from contributing to COVID-19 relief.  Judicial notice can observe from Apple's own research – publications where Apple touted the lives saved by its own COVID SDK.  While Dr. Roberts' app was ready for launch in February 2020, Apple's SDK is unavailable to much of the United States population as of today's filing for injunction.  This is unacceptable.  If a COVID awareness tool such as Apple's saves lives, by their own research, it is evident that blocking Dr Roberts' app for eighteen months cost lives.

53. 51. As Dr. Roberts declared in his interview with CNBC's Kif Leswing, "epidemiological data was lost" during the time in which his app was disallowed, and no other comparable apps were available to iPhone users.  This fact is incontrovertible, and would not have occurred had Apple not been allowed to exclude rival apps from the App Store.  The Court needs no other expert opinion beyond Dr. Roberts' statement that epidemiological data was lost.  This is already a medical travesty, and it would be a legal travesty to deny this injunction and allow Apple to recklessly endanger lives.

54. 52. Counsel notes that this action was initially filed in January, and we have diligently engaged in settlement discussions with Apple to remove their exclusionary restrictions. Apple only gave an answer last weekrecently, rejecting such compromise.  As such, this injunction is requested at the earliest possible moment, and any delay was the result of Apple's false suggestion they were considering some sort of settlement.  The injunction

was refiled for good cause (see introduction), which caused no delay in the scheduled hearing.

55. ~~53.~~ Despite the fact that biostatistical data was irretrievably lost for Coronavirus Reporter 1.0, Plaintiff has an immediate need to distribute an updated app to gather critically important epidemiological data with regards to "breakthrough" cases and vaccination events.  CDC admitted last week that data for breakthrough cases is extremely limited from June and beyond, the time during which the Delta variant has swept the country.  Once again, Coronavirus Reporter is being actively restricted from employing innovative data collection techniques that could save lives, or at the very least, provide valuable epidemiological insight.  Plaintiffs here, and related case in Maine, account for five restricted apps , a small amount of the 40,000 apps rejected weekly.  It is impossible for us to conceive of all the lost innovation and economic value from these other apps, but believe our example is representative of the Class.  Plaintiffs had sought expedited discovery in the New Hampshire district to identify, or at least preserve, information about these other app rejections.  That motion will be re-filed in parallel with this injunction, to ultimately support a permanent injunction.  Nonetheless, as developers, Plaintiffs are likely to suffer permanent harm if the overall health and competition of the institutional app marketplace is allowed to decline because of Apple's conduct.

<u>The Requested Preliminary Relief Appropriately Preserves Competition</u>

56. ~~54.~~ The traditional function of a preliminary injunction "is to prevent irreparable injury." *Ross-Whitney Corp. v. Smith Klein & French Labs*., 207 F.2d 190, 199 (9th Cir. 1953); *see also e.g.,Toledo AA & NM Ry. v. Pennsylvania* Co., 54 F. 730, 741 (C.C.N.D. Ohio) (Taft, J.), *appeal dismissed*, 150 U.S. 393 (1893).  *See generally* 11A Charles A. Wright

et al., Federal Practice and Procedure § 2948, at 137-38 (2d ed. 1995).   The relief proposed by the Plaintiffs is appropriately tailored to that aim.   The Plaintiffs seek as preliminary relief to enjoin Apple during the pendency of this action from:

a.   Executing code in  the iOS kernel that, when a user requests to launch an app, checks for the presence of Apple's digital signature, and disables launch if such signature is nonexistent.

b.   Executing code in the iOS kernel that prevents a user from downloading, transferring, or otherwise receiving and installing an application from sources other than the App Store, including the Safari browser, Airdrop/Bluetooth, and other routine file transfer mechanisms.

c.   Blocking, rejecting, or banning any App Store third-party developer app submission for any reason.  By way of exception, Apple may prohibit any app if:

i)   the submitted app clearly executes instructions or contains content that violates local, state, national, and/or global laws and treatises.   Due Process must exist at the governmental level to determine such violation; Apple may not employ editorial censorship, political fact checking, and other such purported law enforcements devoid of Due Process.

ii)   the submitted app executes instructions that could reasonably likely cause device malfunction, incomplete execution, or device failure.

d. Taxing developers a $99 annual subscription fee to access App Store submission protocols.

Depending upon the Court's analysis of Apple's conduct, and Apple's forthcoming response, variations of this proposed injunction may be more appropriate or efficient than others. These variations, of which many more could be derived, are ordered from most to least intervention:

1. Complete platform opening (App Store accepts all submissions, full sideloading, free notary stamps).

2. Sideloading permitted, iOS notarization requirement eliminated.

3. Sideloading permitted, notary stamps issued at competitive cost for non-subjective reasons (malware, age rating), but App Store remains curated by Apple.

4. Sideloading permitted, but notary remains at Apple's full discretion.

5. App Store remains only "onboarding point." Independent App Court (i.e. arbitration) for app denial or ranking appeals. [Rejected by Apple August 2021]

Preliminary Relief Will Not Impose a Significant Burden on Apple and Is Beneficial To Third Parties

57. 55. The proposed preliminary relief will not impose on Apple any significant burden, let alone inflict irreparable harm. The relief sought by the Plaintiffs principally requires Apple to cease from blocking the installation of reasonable, valid and legal third-party applications. As demonstrated, Apple's current restrictions are not supported by any

efficiency justification and, therefore, prohibiting their enforcement will not cause Apple any harm.

58. 56. Third parties – far from suffering harm from the proposed relief – will in fact greatly benefit.  To the contrary, the proposed relief serves the interests of third parties, and the public generally, by creating greater consumer choice and by ensuring that competition on the merits, rather than Apple's monopoly power, determines which applications succeed.  This is how every major computing platform has operated throughout history, with the exception of iOS.  Not only will Apple not be harmed, but indeed their platform may become more desirable and valuable as it matures to allow greater diversity of applications.  Plaintiffs concede that Apple's earnings, an historical $80 billion last quarter, are largely derived from App Store services and their own competing apps.  As such, there may be a transition period where Apple's anticompetitive rents, accrued from the aforementioned Sherman violations, cause a transient reduction in Apple's profitability.  Of course, lost profitability from monopolistic rents is not a valid reason to deny this injunction.  Apple's staggering 44% profitability on $80 billion quarterly is itself evidence of anticompetitive profit accrual.

The Public Interest And The Balance Of The Equities Strongly Favor Enjoining Apple's Anticompetitive Practices

59. 57. The public interest to issue this injunction is compelling.  There has been a recent national, and international mandate to reign in technological abuses such as Apple's exclusionary App Store.  The "Executive Order on Promoting Competition in the American Economy" signed into law by President Biden last month specifically tasks the federal government to use its statutory rulemaking authority to address "unfair

competition in Major internet marketplaces." The term 'major internet marketplaces' is effectively synonymous with Apple's App Store, and should be interpreted by this Court as a mandate to give utmost consideration to requests for relief such as this proposed injunction and the underlying Complaint.

60. 58. Overseas ~~last week, the UK government~~recently, the South Korea, EU, Russian Federation and UK governments all issued new regulation to ~~ensure digital platforms such as~~reign in the "App Store," ~~are not dominated by one particular company.~~ The US should not lag behind foreign governments in implementing inevitable antitrust regulations against Apple; this gives the impression of bias, and harms consumers in our country and globally.

61. 59. To be sure, threatened with an Epic lawsuit, a new FTC chair, and other antitrust scrutiny nationally and internationally, Apple relaxed some commission rates for small developers.  But as our Complaint makes clear, these supra-competitive rents, being litigated in *Cameron* and *Pepper*, are just a fraction of the damages to our economy, small developers, and consumers.  Apple is far from abandoning its exclusionary DPLA agreements which have cost lives, in the case of our app, and threaten the whole economy and technological progress of the Internet.  The world cannot wait for years as Apple delays antitrust cases.  This injunction is needed today.  Apple has somehow enthralled us with the iPhone, but as argued earlier, this injunction should issue as easily as one against a TV or car manufacturer that tried to tell us how to live our lives with our purchases. Preliminary relief is urgently needed to ensure that Apple's exclusionary conduct does not during the pendency of this litigation further eliminate competition and create other untold effects.

<u>Both Serious Question and Sliding Scale thresholds met in this injunction</u>

62. ~~60.~~ Per Winter v. *Natural Resources Defense Counsel, Inc*, 555 US 7 (2008) the granting of injunction requires the Court find irreparable harm must be likely, not just possible. Given the public concerns over digital marketplace competition voiced by the *Congressional Subcommittee* report (incorporated herein), foreign governments, and President Biden's recent order on competition, the Court is compelled to acknowledge the substantial, permanent harm that could ensue should Apple's current practices be left unchecked.

63. ~~61.~~ The Ninth Circuit has accepted both "serious question" as well as "sliding scale" approaches post- *Winter. Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131-32 (9th Cir 2011). The Court in that case found that "serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 citing. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). There can be no serious objection to the fact that Plaintiffs have presented a serious question going to the merits. The hardship on Defendant Apple is close to nil, as explained above~~.~~, because the Mac is safe and no patents are violated by people simply being allowed to use the iPhones they paid for. In contrast, Apple likely will benefit in the long-term from greater utility of their devices~~.~~, the market in China is 10X the size of the App Store, and Apple could actually become more competitive as a result of the proposed injunction. Hence under the serious question approach the Plaintiffs request for an injunction must be granted.

64. ~~62.~~ Because the Plaintiffs have a strong probability of success on the merits, and because the requested relief prevents irreparable harm to the public interest and imposes on Apple no significant burden, the balance of equities tilts sharply in the Plaintiffs' favor. Accordingly, the court should enter the preliminary injunction.

<u>Inferences from Procedural Posture; Apple's Answer Not Docketed After Eight Months</u>

65. ~~63.~~ In determining the likelihood of success, and Apple's culpability for the alleged civil and criminal conduct, the Court may consider the procedural posture of this case, which was originally filed eight months ago in the New Hampshire District.

66. ~~64.~~ Apple has filed ~~four~~some five frivolous 12(b)(6) motions against this case, and a related case in the Maine district, asserting that Plaintiffs failed to even state a claim. Apple, by way of counsel Gibson Dunn, has taken conflicting positions regarding these claims that raise serious questions under the doctrine of judicial estoppel, which precludes opposing counsel from taking contradictory positions.

67. ~~65.~~ First, and most egregiously, Apple's pleadings have ruthlessly attacked Dr. Roberts[2], claiming contempt and "disregard for the law" for bringing this case.   To attribute wrongdoing to a physician who has touched the lives of so many people (see introduction) is not acceptable.   ~~There can be little question that Apple's control of the App Store is the subject of international discussion. Dr. Roberts' claims are in line with these discussions, and it is unfathomable how Apple could bring such attacks against him~~

---

[2]   Counsel is simultaneously filing a Notice of Possible Disqualification regarding Apple counsel Gibson Dunn, pursuant to California Bar Rules of Professional Conduct Rules 1.7 & 3.7 (conflict of interest/lawyer as witness). Gibson Dunn is currently a RICO defendant in a longstanding controversy with this Counsel and Plaintiffs' team member, pending certiorari petition to the Supreme Court. In brief, Gibson Dunn is alleged to have executed political retaliation against an aspiring brain surgeon, by taking a judicially estopped position to discredit said neurosurgeon, who had filed an evidence spoliation complaint with the Trump administration that resulted in a high-profile political resignation. It is reasonably evident that Gibson Dunn shall be called as witness in this case. It is unclear whether or not Apple has been informed of this conflict. In the interest of full disclosure, we notify the Court that Apple counsels' unusual and improper attacks on Dr. Roberts, and overall procedural posture, may be subject to disqualification concerns.

~~and his counsel for simply asking the Court to review whether or not his lifesaving app should have been allowed~~As noted, Apple routinely engages in such attacks against state legislators, according to POLITICO.

68. ~~66.~~ On one hand, Apple says Dr. Roberts' contemptuous claims don't state a claim, but on the other hand, last ~~week~~month Apple said these claims were so similar to Cameron, *Epic, & Pepper* as to warrant full consolidation.   Considering that Apple told the Supreme Court of the United States in Pepper that developers [such as Dr. Roberts] are the true parties with standing to bring antitrust claims, it is even more mystifying that Apple attempted to state his claims were somehow illicit – a damaging false allegation picked up by national press, unfortunately.   Of course, *Epic* has ~~completed bench trial~~reached a verdict, guilty on UCL, and Cameron is pending ~~class certification~~settlement, so it is unclear how Apple finds Dr. Roberts causes of action to be simultaneously in disregard for the law, and at the same time worthy of consolidation with valid, ~~pending~~adjudicated claims.

69. ~~67. Apple filed a request for consolidation under a Local Rule reserved for *sua sponte* judicial referrals.   Had this succeeded, Apple would have been exempted from an Answer, once again.~~ Should Apple still have failed to file an Answer by the hearing date of this motion, it is submitted that the Court can draw an appropriate inference as to their likelihood to prevail, and issue the injunction accordingly without delay.

## CONCLUSION

70. ~~68.~~ What is at stake in this case, of course, is not simply that a monopolist might continue to impose unlawful restraints ~~one~~on small developer~~s~~, Plaintiff's renowned Chief Physician Dr. Roberts.   The reinforcement and extension of Apple's monopoly power

threatens the competitive vigor of one of our most dynamic industries.  As our Complaint states, hundreds of thousands of person-years of our best developers are being discarded by Apple's tyrannical greed.  The consequences may not be limited to eliminating competition among third-party apps.  Rather, the resulting maintenance of Apple's monopoly power is a long-term threat to the very innovation that is leading driver of productivity and national economic welfare.  Ironically, this very argument was used against Microsoft; Apple's famous "1984" commercial protesting the IBM/Microsoft corporations is now downright eerie in hindsight of Apple's rise to power.  Apple's anticompetitive conduct consequently should be enjoined to prevent further, and perhaps irreversible, competitive injury during the pendency of this case.

It is time to realize the smartphone, even if it was once the subject of science fiction fantasy, is not exempt from laws meant to curtail Apple's greed.  For the foregoing reasons, the court should enter the requested preliminary injunction.

Respectfully submitted, this 824th day of AugustSeptember, 2021.

> */s/* Keith Mathews_
> Keith Mathews, *Pro Hac Vice*
> Counsel for Coronavirus Reporter, Primary Productions,
> CALID Inc, and Proposed Class Members
> Associated Attorneys of New England
> PO Box 278
> Manchester, NH 03105
> Ph. 603-622-8100
> keith@aaone.law

REQUEST TO CONSIDER ISSUANCE OF TEMPORARY RESTRAINING ORDER

1.  The standard for issuance of a TRO is effectively identical to the standard for issuance plead in the above PI motion. Because that motion applies to the entire App Store

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

institutional market, Plaintiff has waived a TRO request. However, the Court may additionally, *sua sponte*, consider a TRO for the narrower scope of "COVID 19 apps on the App Store." The case for such a TRO is equally compelling:

2. To prevail on a Section 1 claim, a plaintiff must show there is "(1) a contract, combination, or conspiracy between two or more entities; (2) in unreasonable restraint of trade; that (3) affects interstate commerce." Pro Search Plus, LLC v. VFM Leonardo, Inc., No. SACV 12-2102-JLS (ANx), 2013 WL 6229141, at *5 (C.D. Cal. Dec. 2, 2013). Coronavirus Reporter has already shown there is an agreement—Apple's Developer Agreement and App Store Review Guidelines—and that these adhesion contracts block all startups from authoring and distributing COVID-19 apps to iOS end users.

3. Plaintiff is likely to show that these adhesion terms are an unreasonable restraint of trade in the form of exclusive dealing. "Restraints that are not unreasonable per se are judged under the 'rule of reason.'" Ohio v. Am. Express Co., 138 S. Ct. 2274, 2284 (2018). "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its probable effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" CollegeNet, 355 F. Supp. 3d at 951 (quoting Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997)). "Generally, this requires 'a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects.'" Id. (quoting ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 271 (3d Cir. 2012)). Apple's conduct meets each step.

4. *First*, Apple's share in the market for app distribution is either 100% or 80%, depending upon which marketplace theory is applied. In either case, it meets the threshold as significant. In the market for COVID-19 startup apps, Apple controls 100% or 80%, respectively.

5. *Second*, Apple's conduct also forecloses a substantial share, because it prevents any

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC

startup from distributing a COVID-19 App.

6. *Finally*, Apple's exclusive dealing has anti-competitive effects. Because the analysis under Section 1 is materially identical to the analysis under Section 2, *see United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001), effects are addressed in the following section.

7. Plaintiff is likely to succeed under the rule of reason and thereby establish Apple's liability under either Section 1 or Section 2 of the Sherman Act:

8. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Express*, 138 S. Ct. at 2284 (internal citations omitted).

9. This test favors Plaintiff. *First*, Apple's conduct exploiting its market power substantially forecloses competition amongst emergency COVID pandemic response apps. Apple's actions here are illustrative. They blocked Dr Roberts' app, and surely others, which "caused a permanent loss of epidemiological data." They favored their own SDK, which is still unavailable nearly two years later. This is reckless endangerment of public health; medical discovery throughout history was defined by small one or two person teams.

10. *Second*, there are no procompetitive justifications for Apple's conduct. Any public health justification for requiring COVID apps be by institutions, rather than small startups, is pretextual and contradicted by human history as Dr Roberts noted. *Eastman Kodak*, 125 F.3d at 1223 ("A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual.").

11. For the foregoing reasons, in addition to pending consideration of a Motion for

~~Preliminary Injunction enjoining Apple's restriction of all apps, this narrowly tailored TRO addressing COVID-19 apps is submitted to the Court.~~

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 824th day of August September, 2021.

*/s/* Keith Mathews
Keith Mathews, *Pro Hac Vice*
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

Coronavirus Reporter *et al* v. Apple Inc. *et al*
Case No. 21-CV-5567-EMC