**No.** _____

===============================================

In The

# Supreme Court of the United States

————————— ♦ —————————

DR. JEFFREY ISAACS,

*Petitioner,*

v.

USC KECK SCHOOL OF MEDICINE,
TRUSTEES OF DARTMOUTH COLLEGE,
NEW HAMPSHIRE BOARD OF MEDICINE,
GIBSON DUNN,

*Respondents.*

————————— ♦ —————————

**On Petition For Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

————————— ♦ —————————

**PETITION FOR WRIT OF CERTIORARI**

————————— ♦ —————————

KEITH A. MATHEWS, ESQ.
ASSOCIATED ATTORNEYS
OF NEW ENGLAND
587 Union Street
Manchester, NH 03104
Ph. 603-622-8100
keith@aaone.law

===============================================

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

i

# QUESTIONS PRESENTED

Dr. Isaacs respectfully petitions the United States Supreme Court to address the following questions presented and grant a writ of *certiorari*.

1. Whether the Ninth Circuit erroneously determined that a student cannot state a retaliation claim under Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act, because "no adverse employment action" would exist.

2. Whether USC's continuous online broadcast of Petitioner's sealed and acquitted academic record represents an open-ended RICO predicate act that tolls the statute of limitations.

3. Whether the courts below erred in finding that a Gibson Dunn & Crutcher entertainment lawyer's decision to impose a campus ban against a former University of Southern California medical student warranted protection by the anti-SLAPP statute, and that the campus ban did not violate the First and Fourteenth Amendment because USC is a private school.

4. Whether the factual allegations of the Complaint, accepted as true as they must, preclude the District Court's reliance on waiver, *res judicata*, and the statute of limitations to dismiss Plaintiff-Appellant's claims against Defendant-Appellee University of Southern California Keck School of Medicine.

ii

**QUESTIONS PRESENTED** – Continued

5.  Whether the Complaint's allegations against
    a particular individual associated with the
    New Hampshire Board of Medicine are timely
    and sufficiently viable to survive a Rule
    12(b)(6) motion to dismiss.

Here marks the sixth *certiorari* petition concerning a most unfortunate series of events that relate back to a gross anatomy lab in October of 2005, when a fellow first-semester medical student asked Petitioner to stay in her bedroom on a "Keck SOM Surfing Club" trip to a Baja Mexico villa. Petitioner had no prior communication with said student, a daughter of a prominent NIH director, who had recently broken up with another classmate she had dated briefly that semester. A virtual soap opera ensued over a paragraph of text messages. Back in 2005, very few Americans sent text messages; today, the "text" would hardly raise an eyebrow even under heightened #metoo era standards, except for the fact that Petitioner has spent nearly a decade and a half in court trying to resume his promising medical career, a World Bank President resigned over the matter, and now, Gibson Dunn seeks to dismiss a landmark Apple anti-trust lawsuit over Petitioner's contested medical credentials.

Indeed, these events would be better left forgotten – something Petitioner intended to do when he settled the dispute in 2008, and moved on to excel at another medical school and achieve a perfect "99" on the National Boards. But Respondents, and their attorneys,

iii

**QUESTIONS PRESENTED** – Continued

have made a fourteen-year vocation out of oppressing the Petitioner, and unfortunately, some details must be retold.

At the Keck Surf Club Mexico trip, the classmate's ex-boyfriend became most upset that the NIH classmate had "moved on." This lead to her being subjected to ridicule and peer pressure from several of the ex-boyfriend's friends, also Keck classmates. This matter heightened to a disagreement in front of the library, where Petitioner explained to the NIH officer's daughter that he was on medications for a head injury, and wanted to be left alone. She responded "Do get better," sarcastically. Petitioner then replied to her with a paragraph of text messages where he relayed highly personal comments spread as rumor by the ex-boyfriend, including an allegation that she had vandalized a Keck "audience response" tablet with the words "Wanna F&*K"?

That lead to some sort of emotional outburst inside the Keck Library by the NIH classmate, when she realized the ex-boyfriend had generated slanderous rumors. The next day Petitioner was hauled into Katsufakis' office, where the Dean asked him "How does it feel to be caught with your pants down." The Dean took an "unusual" interest in the matter, personally counseling Petitioner, all the while making sadistic jokes unbecoming of a dean, and offering to "drive him to main campus" for further counseling. The NIH classmate, a month or so after, warned Petitioner "don't

iv

**QUESTIONS PRESENTED** – Continued

mess around. I got into Keck through connections, and I'll get a residency through connections."

Petitioner then noticed an email he sent to the classmate had a return-receipt at the NIH headquarters, then at a Keck neuroscience laboratory. Petitioner assumed the NIH classmate's threat was correct, that her father had some sort of influence at Keck, and was concerned his email to the classmate was forwarded to a neuroscientist. Petitioner sent a one-page federal pleading cover sheet to the classmate, containing a cease-and-desist for communication between the NIH and the neuroscience lab.

As it turns out, the Neuroscience lab was the Dean's office, and that lab had been funded by a sizeable NIH grant the Dean had received from the classmate's father's NIH division. Within 24 hours of Petitioner's federal cover sheet being sent, armed USC guards entered his classroom to deliver a stay-away order. Petitioner had unknowingly implicated the Dean in a federal lawsuit, based upon a concerning read-receipt (equally unusual as a text, back in 2005), when all he meant to do was stop what he believed was "chatter" by lab faculty. The Dean then encouraged the NIH classmate's ex-boyfriend to file a complaint against Isaacs with the Student Performance Committee, which he did with several friends. Certainly written in consultation with the Deans and USC counsel, it misrepresented substantial facts to the USC faculty, who

v

**QUESTIONS PRESENTED** – Continued

dismissed Isaacs for a purported failure to adhere to academic professionalism standards.

In short, the ex-boyfriend's SPC complaint duped the faculty into believing Petitioner was responsible for the unfortunate library scene, when in fact, it was a reaction to her betrayal by the ex-boyfriend, who had conveyed slanderous rumors. Petitioner was merely the messenger – but this got lost in a committee run by Katsufrakis for years.[1]

Katsufrakis has never been investigated to this day, in part because Petitioner reached a settlement with USC to clear his academic record, in exchange for dropping Katsufrakis from the Keck lawsuit. A year later, California-native Katsufrakis moved to Petitioner's hometown, entered into a longterm relationship with a twenty-year younger man who studied in Philadelphia, and worked his way up to become CEO of the National Boards. Katsufrakis' immediate USC successor was fired for a crack-cocaine fueled relationship with a teenage prostitute. His successor, Keck Dean Rohit Varma, was likewise terminated for inappropriate relations with a junior female researcher.

CEO Katsufrakis, very tired of reading fifteen years of federal lawsuits about the neurosurgeon "99"

---

[1] Katsufrakis created a committee at the National Boards to extirpate the national boards, hence removing himself from the actual vote. This evokes painful familiarity to Petitioner, who lived through a kangaroo court SPC hearing.

vi

**QUESTIONS PRESENTED** – Continued

board achieving student he expelled for "academic deficiencies," eliminated all scoring on the critically important National Board USMLE1, **effective January 2022**. Under Katsufrakis' direction, the National Boards literally extirpated the National Boards. Analogous self-destruction would be the College Boards eliminating all scoring on the SAT[2]. No longer will a brain surgeon need to excel in the objective test of merit that served this country well for half a century. The neurosurgeon of the future is just one corrupt USC dean away from operating on the general public. Petitioner cautions this Court that this represents yet another matter of national urgency surrounding this dreadful saga, and warrants appointment of a special master to investigate.

---

[2] Petitioner acknowledges a national trend towards reducing the significance of standardized tests. But the National Boards' extirpation of the USMLE 1 is far above and beyond any national movement. It would be akin to the College Board eliminating scoring on the SAT and making it pass fail. That simply hasn't happened. While some colleges have made SATs optional, the Board continues to score its examinations.

vii

## RELATED CASES

*Coronavirus Reporter et al. v. Apple Inc. et al.*, United States District Court for the Northern California District, 21-cv-5567.

*Jeffrey Isaacs v. USC Keck School of Medicine et al.*, 2:19-cv-2011, United States District Court for Central California, Judgment entered February 3rd, 2020.

*Jeffrey Isaacs v. USC Keck School of Medicine et al.*, 20-55239, United States District Court of Appeals for the Ninth Circuit, Judgement entered May 15, 2020.

*Jeffrey Isaacs v. USC Keck School of Medicine et al.*, 20-55239, United States Court of Appeals for the Ninth Circuit, Judgement entered May 15, 2020.

viii

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ................................  i

RELATED CASES ................................................  vii

TABLE OF CONTENTS ......................................  viii

TABLE OF AUTHORITIES................................  x

OPINIONS BELOW...........................................  1

JURISDICTIONAL STATEMENT ......................  1

CONSTITUTIONAL AND STATUTORY
  PROVISIONS .................................................  2

STATEMENT OF THE CASE.............................  3

ARGUMENT........................................................  9

1.  The Ninth Circuit Incredulously Held That
    Students Are Barred From Filing Retalia-
    tion Claims Under Section 504 of the Reha-
    bilitation Act................................................  9

2.  USC's Continuous Online Broadcast of Pe-
    titioner's Sealed and Acquitted Academic
    Record Represents an Open-Ended RICO
    Predicate Act. Moreover, the Statute of
    Limitations Should Have Been Subject to
    Equitable Tolling to Petitioner's Discovery
    of Said Broadcast in 2019..........................  10

ix

TABLE OF CONTENTS – Continued

Page

3. The District Court Erred in Finding That a Gibson Dunn & Crutcher Entertainment Lawyer's Decision to Impose a Campus Ban Against a Former University of Southern California Medical Student Warranted Protection by the Anti-SLAPP Statute, and That the Campus Ban Did Not Violate the First and Fourteenth Amendment Because USC is a Private School ............................. 15

4. The District Court Incorrectly Dismissed Dr. Isaacs' Claims Against Keck Based Upon Waiver, *Res Judicata*, and the Statute of Limitations ...................................... 22

5. Neither the Statute of Limitations nor the Eleventh Amendment Bars Dr. Isaacs's Claims Against The New Hampshire Board of Medicine ..................................... 31

CONCLUSION................................................... 33


APPENDIX

Memorandum, United States Court of Appeals for the Ninth Circuit (filed Apr. 22, 2021) ....... App. 1

Order Granting Motions to Dismiss and Special Motions to Strike, United States District Court for the Central District of California (filed Feb. 3, 2020) ........................................... App. 8

Order Denying Rehearing, United States Court of Appeals for the Ninth Circuit (filed May 28, 2021) .............................................................. App. 18

x

TABLE OF AUTHORITIES

Page

CASES

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987)...........................................28

*Briggs v. Eden Council for Hope and Opportunity*, 19 Cal. Rptr. 2d 471 (Cal. 1999) .................16

*Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*, 448 F. Supp. 2d 1172 (C.D. Cal. 2006) ............18

*Choyce v. SF Bay Area Independent Media Center*, 2013 U.S. Dist. Lexis 169813 (N.Dist.Cal 2013) ................................................................18, 19

*Clark v. Bear Stearns & Co.*, 966 F.2d 1318 (9th Cir. 1992) ................................................................27

*Dickman v. Kimball, Tirey & St. John, LLP*, 982 F. Supp. 2d 1157 (S.D. Cal. 2013) ..........................18

*Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ........................................................................18

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005)..................28, 33

*Macquarie Group Ltd. v. Pacific Corporate Group, LLC*, 2009 U.S. Dist. LEXIS (S.D. Cal. March 2, 2009)........................................................21

*Moore v. Conliffe*, 7 Cal. 4th 634 (1994) ...................21

*Mpoyo v. Litton Electro-Opitcal Sys.*, 430 F.3d 985 (9th Cir. 2005)..................................................28

*Robertson v. Isomedix, Inc.*, 28 F.3d 965 (9th Cir. 1994) ........................................................................27

xi

TABLE OF AUTHORITIES – Continued

Page

*Rogers v. Home Shopping Network, Inc.*, 57
F. Supp. 2d 973 (C.D. Cal. 1999) ...................... 16, 18

*Sandigo v. Ocwen Loan Servicing LLC*, 2019
U.S. Dist. Ct. LEXIS 87309 (N.D. Cal. May 23,
2019) ................................................................... 28

*Sidhu v. Flecto Co.*, 279 F.3d 896 (9th Cir. 2002) ....... 27

*United States ex rel. Newsham v. Lockheed
Missiles & Space Co.*, 190 F.3d 963 (9th Cir.
1999) ................................................................... 16

*T.B. v. San Diego Unified Sch. Dist.*, 806 F.3d 451
(9th Cir. 2015) ..................................................... 10

*Thuan Khuc v. Peninsular Invs., Inc.*, 2016 U.S.
Dist. LEXIS 94878 (N.D. Cal. July 20, 2016) ........ 18

*Wilcox v. Superior Ct. (Peters)*, 33 Cal. Rptr. 2d
446 (App. Div. 1994) ............................................. 16

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ................................................ 15

U.S. Const. amend. XI ......................................... 31, 32

U.S. Const. amend. XIV ............................................. 15

STATUTES AND RULES

§ 100.7 Conduct of investigations. (Section 504
of the Rehabilitation Act; Civil Rights Act of
1964) ..................................................................... 3

18 U.S.C. § 1962(c) ................................................... 17

xii

TABLE OF AUTHORITIES – Continued

Page

28 U.S.C. § 1251(b)(1) .....................................................2

28 U.S.C. § 1254(1) .......................................................1

28 U.S.C. § 1651 .............................................................2

Cal. Civ. Code § 425.16(a) .........................................17

California Anti-SLAPP Code of Civil Procedure
   – Section 425.16 .....................................................2

Rule 12(b)(6) ............................................ 12, 18, 22, 33

1

## OPINIONS BELOW

Petitioner filed declaratory judgment and RICO claims against Respondent USC in the California Central District on March 12, 2019 (19-cv-2011-DSF).

Petitioner re-filed this case, under FRCP 41(a), to include Respondent Gibson Dunn. That case, 19-cv-08000-DSF, is the underlying case to this petition. USC and Gibson Dunn filed a special anti-SLAPP motion to strike, dismissing the case and awarding attorney's fees to the Respondents.

Petitioner appealed to the Ninth Circuit on both the dismissal and the fees (see simultaneously filed Petition). The Ninth Circuit denied Petitioner-Appellant's *de novo* appeal of the District Court's dismissal on April 22, 2021.

A Petition for Rehearing *En Banc* was likewise denied on May 28, 2021. A request for publication of the order denying Isaacs' appeal filed on June 7, 2021 was ignored by the Ninth Circuit.

Under the "Order Rescinding Prior COVID Orders" issued July 19, 2021, this petition is timely filed in 150 days from the denial of a rehearing.

———◆———

## JURISDICTIONAL STATEMENT

The Supreme Court of the United States has jurisdiction under 28 U.S.C. § 1254(1) to review this Petition.

2

Under the All Writs Act, 28 U.S.C. § 1651, this Court has authority to directly issue declaratory judgement on the disputed settlement clauses that have resulted in conflicting rulings spanning multiple states and circuits.

Because this case concerns retaliation directed against an individual stemming from the termination of a United Nations World Bank President, the Court may consider re-opening the case below under original jurisdiction permitted under 28 U.S.C. § 1251(b)(1):

> The Supreme Court shall have original but not exclusive jurisdiction of: All actions or proceedings to which ambassadors, other public ministers, consuls, or vice consuls of foreign states are parties. . . .

———————◆———————

## CONSTITUTIONAL AND STATUTORY PROVISIONS

### California Anti-SLAPP Code of Civil Procedure – Section 425.16.

(a)   The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial

3

process. To this end, this section shall be construed broadly.

## § 100.7 Conduct of investigations. (Section 504 of the Rehabilitation Act; Civil Rights Act of 1964).

(e) Intimidatory or retaliatory acts prohibited.

No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder.

———————◆———————

## STATEMENT OF THE CASE

This appeal relates to a case brought by Petitioner Dr. Jeffrey Isaacs as part of his years-long efforts to enforce a federal court-ordered settlement agreement and resume his medical career. Dr. Isaacs enrolled in the University of Southern California Keck School of Medicine ("Keck") with the Class of 2009 to begin his journey to reach his dream of becoming a physician. Appeal Record Excerpt ("Rec.") at 57. Unfortunately, during his first semester, Dr. Isaacs encountered a

4

dispute with a classmate, and that dispute ultimately led to retaliation against him and his eventual departure from Keck for "failing to possess Keck academic professionalism standards," based in large part on a student complaint by an ex-boyfriend submitted at the direction of Keck officials. *Id.* These unfortunate circumstances began a fourteen-year pattern of Respondents' obstructive behavior, including deception, withheld and destroyed records, perjured testimony, baseless campus bans, and over a decade of denied federally funded educational opportunities. *Id.*

Litigation arose out of the Keck dispute and expulsion, and that litigation led to lengthy negotiations between Dr. Isaacs, his counsel, Keck officials, and Keck counsel. *Id.* The parties entered into two settlement agreements, the existence and provisions of which are central to understanding the underlying litigation at the District Court and the issues on appeal. These agreements, executed to resolve Federal court litigation, have been construed by Respondents, typically for their own purposes, as contrary to their plain language, not binding contracts, and entirely meaningless.

The first settlement agreement, completed and executed in 2007, sealed Dr. Isaacs' disciplinary records at Keck with an underlying intent to grant him "factual innocence." Rec. 65-66. Paragraph 2 of this Agreement, entitled "Sealing of Disciplinary Records," stated in part that "USC will not release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or

5

potential employers, unless it receives written consent from Isaacs or a subpoena or court order. *Id.* This provision was the only consideration that Dr. Isaacs obtained in exchange for dismissing claims he had and may have had against Keck officials. Rec. 66. After agreeing to this first settlement agreement, Dr. Isaacs wrote to Keck and stated that "[Keck] will be removing any burden on me to disclose these events in future career endeavors. I have been fortunate enough to receive a second chance [at medical school]."

The second settlement agreement completed and executed in 2008, acquitted Dr. Isaacs of all charges and controversies, cancelled all contracts between the parties, and dismissed administrative charges. *Id.* Keck counsel recognized the importance of these provisions to Dr. Isaacs, including revisiting particular language to address his disclosure obligations and stating that "the parties further agree that Isaacs is not required to disclose this matter to anyone." Rec. 67. Again, the right to non-disclosure based upon annulment of contracts between the parties constituted the only consideration obtained by Dr. Isaacs in exchange for dismissing Keck from ongoing litigation. Dr. Isaacs entered into these settlements in good faith with an understanding that he could rely on their provisions during his continued pursuit of a medical career. Rec. 69.

Dr. Isaacs subsequently obtained his medical degree from an international medical program, completing the academic program ahead of schedule and without incident. *Id.* His medical training included

6

several prestigious clerkships and after receiving his degree in 2010, he scored highly on the difficult and competitive United States Medical Licensure Exam Step 1. *Id.* Dr. Isaacs was well liked by his peers and instructors in medical school, and every other institution he attended. Isaacs was destined for a successful career as a physician and, due in large part to the settlement agreements with Keck, he had put that unfortunate experience seemingly behind him.

In 2011, Dr. Isaacs obtained a federally funded residency at Dartmouth Medical School and its associated teaching hospital, DHMC/Hitchcock. Rec. 72. Soon after he arrived at Dartmouth, however, Dr. Isaacs suffered mistreatment at the hands of his supervisors at the medical facility. Unbeknownst to Dr. Isaacs, Dartmouth learned of his Keck attendance and discipline, eventually faulting Dr. Isaacs for complying with the settlements. Rec. 74-75. Dartmouth subsequently terminated him from the residency program and failed to provide him with due process in response. Rec. 79.

Dartmouth subsequently alerted the New Hampshire Board of Medicine ("NH Board") of the situation and included its allegations about failure to disclose information about Keck on the application form. Rec. 84. The NH Board conducted an investigation followed by an official proceeding under the direction of Investigator Cahill.

The NH Board ruled against Dr. Isaacs after conducting a hearing at which he was not present. The

7

Board claimed that the Keck matter had never been sealed or acquitted. *Id.* The Board's reasoning was the result of Mr. Cahill withholding the settlement agreements, without any justification. *Id.* Evidence shows that Cahill was emailed the 2007 and 2008 settlement agreements by Dr. Isaacs, but the 2007 agreement never was entered into the hearing evidence.

Significantly, the Board's conclusions were opposite to those of the two other administrative bodies that assessed the effect of the settlement agreements on Dr. Isaacs's disclosure obligations. The New Hampshire employment tribunal concluded that Dr. Isaacs's Keck records and attendance had been expunged and his non-disclosure of Keck was permissible. Rec. 80. The American Association of Medical Colleges ("AAMC") also reviewed the circumstances and found that Dr. Isaacs acted properly. Rec. 81.

In 2019, for the first time, Dr. Isaacs learned that Keck had continually disclosed his Keck attendance and disciplinary status in 2006, immediately following his dismissal from that institution. Rec. 70. Dr. Isaacs found within his student file a copy of his profile in the American Association of Medical Colleges ("AAMC") database that disclosed his Keck-related information. *Id.* This database is nationally disseminated and must have been the manner in which Dartmouth, among others, learned of his Keck attendance, and in which the NH Board surmised administrative charges had never been dismissed.

8

Incredibly, the AAMC entry page was missing from the student file that Keck had produced in litigation discovery years earlier. *Id.* The only explanation for this omission is that Keck had intentionally withheld the damning document. *Id.*

Dr. Isaacs earned a medical degree, received favorable reviews of his work in prestigious clerkships, and landed a Dartmouth residency, all without knowing that his Keck enrollment and discipline was available for anyone in the medical education community to readily access. Rec. 70-71. Dr. Isaacs justifiably believed the records had been sealed and that he was under an obligation not to disclose anything from them.

Also in 2019, Dr. Isaacs engaged in a series of emails with James Fogelman, a partner at the international law firm of Gibson Dunn & Crutcher LLP ("Gibson Dunn"). Rec. 116. Mr. Fogelman, on his own initiative, told Dr. Isaacs that he was banned from the University of Southern California campus. *Id.* Thus, an entertainment lawyer at Gibson Dunn unilaterally issued a campus ban to a former USC medical student, to prevent him from going to campus to speak with the registrar about the settlements and file a campus police report. No due process or administrative process ever occurred at USC to implement a campus ban, further evidencing the fact that Fogelman issued it himself.

Isaacs filed lawsuit to protest the campus ban, and to obtain declaratory judgement to end a fourteen-year controversy over the interpretation of a settlement

9

agreement ordered in force by a United States District Judge. The case was dismissed under California Anti-SLAPP law, and Petitioner was ordered to pay nearly $250,000 in attorneys' fees.

————————◆————————

## ARGUMENT

**1.  The Ninth Circuit Incredulously Held That Students Are Barred From Filing Retaliation Claims Under Section 504 of the Rehabilitation Act.**

There are many strange, suspicious, or at best, inconsistent determinations of law and fact throughout Petitioner's journey through law to practice medicine. The Ninth Circuit declaration that a student cannot bring a retaliation against a school is one illustrative example. In page 5 of its Order, the Ninth Circuit outrageously held:

> "Under both the Rehabilitation Act and the Americans with Disabilities Act (ADA), . . . **Isaacs failed to allege that he was an employee of USC.** (emphasis added)"

This is the only circuit ever to hold that a student cannot bring a retaliation claim under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, or the Civil Rights Act of 1964. This ruling must be overturned by the Supreme Court. It is squarely at odds with the Department of Education's stated policy on retaliation, clearly published on https://www2.ed.gov/policy/rights/guid/ocr/retaliationoverview.html.

10

Notably, the Ninth Circuit has acknowledged student retaliation claims in the past. In *T.B. v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472 (9th Cir. 2015). Petitioner motioned the Ninth Circuit to publish their disruptive new holding. The request for publication was not even acknowledged, let alone approved; a mandate was issued to the lower court hours later, outright ignoring Petitioner-Appellant's motion for publication.

**2.  USC's Continuous Online Broadcast of Petitioner's Sealed and Acquitted Academic Record Represents an Open-Ended RICO Predicate Act. Moreover, the Statute of Limitations Should Have Been Subject to Equitable Tolling to Petitioner's Discovery of Said Broadcast in 2019.**

The Ninth Circuit order focuses largely on a June 2015 denial of a *certiorari* petition as the date upon which four-year RICO statute of limitations began to tick. In fact, the "June 2015" reference is to this Courts' May 26, 2015 denial of a *certiorari* petition seeking to overturn the New Hampshire Board of Medicine's revocation of Dr. Isaacs medical license. The petition, in summary, argued that the NH Board of Medicine withheld exonerating evidence – the 2007 & 2008 settlement agreements, when it declared "no evidence" the Keck matter was ever sealed. In fact, Dr. Isaacs had emailed the settlement agreements to Board Investigator Jeff Cahill – which forms the substance of the claims against the Board in this underlying action. The Ninth Circuit Order, at page 3, states the following:

11

"Isaacs's complaint alleges that in June of 2015 – when his appeal of the revocation of his medical license was dismissed – he 'became reasonably suspicious, and informed, that [USC] was not complying with the Settlement Agreements.' Because the basis of his RICO claim is his inability to practice medicine and reputational harm caused by the revocation of his license, it is undeniable that Isaacs was aware of his injury by June of 2015. Isaacs filed his current lawsuit on September 16, 2019 – over four years after his medical license was revoked and his injury was apparent. Accordingly, it is obvious from the face of the complaint that Isaacs's RICO claim is time barred."

This misguided interpretation errs on numerous grounds. The lower court, and the appeals court, likely relied upon Paragraph 192 of the Complaint because that is the only place in the Complaint referencing June 2015. Appeals Rec. 92. In that Paragraph, the Complaint describes the New Hampshire Board's statement in its decision that there was "no evidence" that Keck executed the settlements and fulfilled its obligations pursuant to these documents. *Id*. But that evidence was because Cahill withheld it; it had nothing to do with USC. Petitioner's statement about "reasonable awareness" pertains to the idea that in losing his appeal, he realized he was not receiving the "benefit of the bargain" of the USC settlements. That doesn't mean he had a claim against USC, nor that the SOL had been triggered. The simple fact is that in June 2015 Dr. Isaacs lacked any concrete evidence of Keck's

12

breach of the settlement agreements. In fact, Dr. Isaacs made extraordinary efforts to determine how the Keck files had been leaked, to no avail. He personally deposed nearly ten Dartmouth administrators as to how they learned about the Keck discipline. All stated they "did not recall" and would not reveal how they learned about Keck. Pleadings over the years are quite clear – Dr. Isaacs "suspected" Dean Katsufrakis had made telephone calls to Dartmouth and Arizona, but he had no proof of this.

Eventually, in March 2019, Dr. Isaacs filed claims against USC seeking declaratory judgement that would enforce his settlement agreement. His sole RICO alleged predicate act against USC was that "someone" had leaked the files. In March 2019, to be clear, Dr. Isaacs only claims against USC were 1) suspicion someone at USC had leaked the sealed records, and 2) a declaratory judgement claim. In short, the underlying 19-cv-2011 case was filed largely to obtain declaratory judgement and enforce a settlement agreement, without any direct evidence of USC's leak.[2] Gibson Dunn responded to that lawsuit with a 12(b)(6)

---

[2] Though Isaacs inferred that Katsufrakis had telephoned Dartmouth, Dartmouth's attorneys suggested that the school learned about the sealed records from PACER. A 2014 PACER subpoena adjudicated by the Western Texas District Court and US Attorney for Texas disproved that theory. Dartmouth's 2012 depositions denied the school learned either from Katsufrakis or PACER. As such, it remained a mystery until late 2019 as to how other schools, like Dartmouth, obtained the sealed disciplinary files.

13

motion that disavowed the intent of the settlement, arguing "nothing acquitted" Isaacs.

Petitioner had not interacted with USC since 2008. Eleven years later in 2019, USC disavowed the settlement. Isaacs told James Fogelman that he would like to meet with the registrar to better understand the status of his academic records. He also indicated he would like to re-open campus police complaints regarding federal bribery and harassment. In response, Fogelman banned Isaacs from campus – without any administrative due process from his client.

The campus ban resulted in Petitioner and his attorneys reviewing USC student files that had been responsive to a subpoena by Dartmouth. At that point, in late 2019, they located the AAMC Profile that had been withheld from discovery in 2008.

Hence, for the first time in a decade long "wild-goose chase" (as termed in the lower court by former AUSA Mark Josephs), Petitioner had actual evidence as to USC's non-compliance with the settlement agreements. He also was newly subjected to witness intimidation, in the form of a campus ban. ***The 2019 discovery of the AAMC profile fraud, and the enactment of a campus ban by an entertainment lawyer at Gibson Dunn prompted Petitioner to dismiss 19-cv-2011-DSF under FRCP Rule 41(a) and refile it as the underlying case, 19-cv-8000-DSF.***

The Ninth Circuit ordered that the "limitations period is triggered when an individual becomes aware

14

of or suspects" an injury. But in 2015, Petitioner did not know or suspect the AAMC profile was the culprit. Dartmouth had proffered PACER as the culprit – which would have had nothing to do with USC. A May 2015 denial of *cert* simply did not form the basis for "reasonable suspicion" against USC for breaching the settlements. As to Petitioner's suspicion that Katsufrakis had contacted Dartmouth, it is unclear if USC would even be liable for his leak, since he now works at the National Boards. Therefore, in June 2015, Petitioner had a complaint against the NH Board, and possibly Katsufrakis. Isaacs simply didn't know of the injury USC imposed when it defeated the entire settlement in 2007 by publishing the AAMC profile. That is the crux of this case.

Significantly, the Ninth Circuit characterized the dismissal as "illusory" for the purposes of awarding fees (see simultaneously filed attorneys' fees petition), but dismissed the case on a statute of limitations distinction involving the six months between the filing of the two cases. It can't be both ways, either the Rule 41(a) dismissal was illusory/trivial/legally insignificant or it wasn't, in which case Petitioner had filed his claims in a timely manner.

In any event, the May 2015 denial of a *cert* petition simply does not form the basis for triggering SOL. USC concealed (as did false Dartmouth depositions) the AAMC profile from Isaacs by improperly withholding it in 2008 federal discovery responses. The Complaint is clear that Petitioner and his lawyers discovered the

15

AAMC profile in late 2019. That fact must be taken as true.

Furthermore, the AAMC profile is an open-ended predicate act, which perpetually threatens Petitioner's career. As long as USC is broadcasting acquitted, sealed records, Dr. Isaacs is harmed. Therefore, as an ongoing act, the statute of limitations certainly hasn't expired. Similarly, the campus ban issued in 2019 would have tolled the SOL.

**3.   The District Court Erred in Finding That a Gibson Dunn & Crutcher Entertainment Lawyer's Decision to Impose a Campus Ban Against a Former University of Southern California Medical Student Warranted Protection by the Anti-SLAPP Statute, and That the Campus Ban Did Not Violate the First and Fourteenth Amendment Because USC is a Private School.**

The lower court's granting of the Anti-SLAPP Motion to Strike brought by Gibson Dunn was legally and factually incorrect. The relevant statements do not fall within the scope of the Anti-SLAPP statute, and even if they had, the District Court should not have applied the California statute in the manner that it did, which ignored the large body of caselaw addressing application of the statute in federal court. The court's application of the anti-SLAPP motion to Dr. Isaacs's claims was also wrong because, among other things, it ignored credible allegations contained in the Complaint. The

16

Court should reverse the District Court's granting of Gibson Dunn's Anti-SLAPP Motion.

From the perspective of the forest versus the trees, the lower court's action in rejecting Dr. Isaacs's claims, including constitutional ones, and protecting the purported free speech and petition rights of a large law firm like Gibson Dunn was breathtaking. The Ninth Circuit described the harm that California's Anti-SLAPP law was designed to address as a merit-less suit "brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned . . . " *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970 (9th Cir. 1999). Similarly, a District Court in this Circuit explained that the legislative purpose of the anti-SLAPP law was to address "suits [that] were being used to harass plaintiffs who spoke out on matters of public concern and often could not afford to defend even a meritless suit." *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 974-75 (C.D. Cal. 1999) (citing *Briggs v. Eden Council for Hope and Opportunity*, 19 Cal. Rptr. 2d 471, 479-80 (Cal. 1999). And a California court described suits targeted by the Anti-SLAPP statute as "generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Wilcox v. Superior Ct. (Peters)*, 33 Cal. Rptr. 2d 446, 450 (App. Div. 1994). Finally, the Anti-SLAPP statute itself states that the legislative purpose was that participation in

17

matters of public significance "should not be chilled through abuse of the judicial process." Cal. Civ. Code § 425.16(a).

Finding that Gibson Dunn, most certainly a "large private[ ] interest," requires protection from Dr. Isaacs, a "common citizen" trying only to resume his promising medical career, turns this legislative intent on its head. The courts below have it completely backwards. Gibson Dunn is a huge private law firm – a rich monstrosity needs protection from no one, whether from a purported vexatious litigant or, as here, an individual who ironically sought to exercise his own constitutional rights. The California legislature designed the anti-SLAPP statute to protect Dr. Isaacs from the likes of Gibson Dunn, not the other way around. The other way around, however, is the path the District Court unfortunately chose to follow, and the District Court's conclusion is not only inconsistent with the established purpose of the Anti-SLAPP statute, but also legally and factually meritless.

Apparently without recognizing it was doing so, the lower court applied the Anti-SLAPP statute to Dr. Isaacs' Federal claims. Dr. Isaacs's Declaratory Judgment claim in Count 1 of the Complaint is a claim based upon Federal law, the Declaratory Judgment Act, and the other claims follow from it, as they do from Count VII, the Complaint's Racketeering and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), also a Federal claim.

18

The Ninth Circuit held a decade ago that California's Anti-SLAPP statute does not apply to Federal claims. *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010). District Courts in the Ninth Circuit have followed *Hallmark Cards* and repeatedly rejected application of the California statute to Federal claims, *see Dickman v. Kimball, Tirey & St. John, LLP*, 982 F. Supp. 2d 1157, 1163 (S.D. Cal. 2013), including in cases that assert a combination of Federal and state claims. *E.g.*, *Thuan Khuc v. Peninsular Invs., Inc.*, 2016 U.S. Dist. LEXIS 94878, *7 (N.D. Cal. July 20, 2016) (Anti-SLAPP statute not applicable to plaintiff's RICO claim).

The application of Anti-SLAPP to Federal claims not only violates Ninth Circuit precedent, but also the Supremacy Cause of the Constitution. *Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*, 448 F. Supp. 2d 1172, 1181-82 (C.D. Cal. 2006) (declining to strike federal RICO claims as "applying [the state statute] to federal claims . . . [is a] violation of the Supremacy Clause of the Constitution.").

As a result of these conflicts, courts in the Ninth Circuit have held that the standard of review applicable to a motion pursuant to Rule 12(b)(6) applies to Anti-SLAPP motions that involve questions of fact. For example, the *Rogers* court concluded that "[i]f a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) . . . " *Rogers*, 57 F. Supp. 2d at 983; *see also Choyce v. SF Bay Area Independent Media Center*,

19

2013 U.S. Dist. Lexis 169813 (N.Dist.Cal 2013), 2013 U.S. Dist. LEXIS 169813 at *17 (quoting *Rogers*).

The District Court wrongly applied the California anti-SLAPP statute to strike Federal claims and failed, at least explicitly, to apply the Rule 12(b)(6) standard to Gibson Dunn's motion relating to Dr. Isaacs's state law claims.

*The Court's Application of the Anti-SLAPP Statute Wrongly Characterized Gibson Dunn's Statement as Keck's Legal Position and Ignored Dr. Isaacs's Relevant Allegations*

The lower court's application of the Anti-SLAPP statute, inappropriate as it was, suffered from several flaws. The court wrongly concluded that a Gibson Dunn attorney conveyed the position of Keck in making the relevant statements to Dr. Isaacs, and this finding led to the incorrect conclusion that these statements fit within the protections of the anti-SLAPP statute. The court also wrongly found that the California litigation privilege applied to the Gibson Dunn attorney's statements.

No evidence in the record supports the lower court's conclusion that the statements made by the Gibson Dunn attorney, James Fogelman, to Dr. Isaacs constituted Keck's legal position or were made on behalf of that institution. The emails between Mr. Fogelman and Dr. Isaacs were attached to the Complaint and to Dr. Isaacs's opposition to the anti-SLAPP Motion, and in none of them, *despite having the opportunity to do so*, did Mr. Fogelman express the purported

20

campus ban as the position of USC in litigation or
otherwise. Rec. 38, 40-41. Dr. Isaacs' opposition also in-
cluded an affidavit from his counsel regarding a tele-
phone conference in which Dr. Isaacs, his counsel, and
Mr. Fogelman participated. Rec. 42-44. During that
call, Dr. Isaacs's counsel specifically addressed the na-
ture of Mr. Fogelman's statements and whether they
were made on USC's behalf, and he further repre-
sented that Dr. Isaacs would drop Gibson Dunn as a
defendant if Mr. Fogelman expressed USC's legal posi-
tion in his communications with Dr. Isaacs. Rec. 44.
Given this opportunity, and the reward of being out of
the litigation below, Mr. Fogelman declined to answer.
*Id.*

Having declined every opportunity to say other-
wise, Mr. Fogelman's statements apparently were en-
tirely his own, and this circumstance removes these
statements from the scope of the anti-SLAPP statute.
Subsection (e) of the statute describes the types of
statements that it covers, and none of these apply to a
statement from a private attorney to Dr. Isaacs. The
statement was not made "in connection with an issue
under consideration" by a judicial body, nor was it
made in a "place open to the public . . . in connection
with an issue of public interest." Cal. Civil Code
425.16(e). Indeed, the lower court incorrectly labeled
the statements as USC's legal position. Rec. 12. This
conclusion is unsupported in the record.

Nor was the court correct in finding that the Cali-
fornia litigation privilege applied to the relevant state-
ments. Contrary to the court's conclusion, the litigation

21

privilege provided in Section 47 of the California Civil Code does not apply to Mr. Fogelman's statements because they were not made as part of the litigation between Dr. Isaacs and USC. They were extraneous, unnecessary threats against a witness. Further, the communications themselves are not the basis for Jeffrey Isaacs's claim. Rather, Fogelman's underlying decision to issue the campus ban is. Rec. 117. Accordingly, the litigation privilege cannot apply to the statements.

Litigation privileges do not apply in circumstances in which the relevant issue is not part of the actual litigation claim. *See*, *e.g.*, *Macquarie Group Ltd. v. Pacific Corporate Group, LLC*, 2009 U.S. Dist. LEXIS, **35-36 (S.D. Cal. March 2, 2009) (denying defendants' motion to strike allegations referencing defendants' prelawsuit statements based on litigation privilege because the communications were not bases for plaintiff's claims). Moreover, the litigation privilege pertains to liability and is not a rule of evidence. *See Moore v. Conliffe*, 7 Cal. 4th 634, 638 n.1 (1994).

The Ninth Circuit compounded these errors in finding that the campus ban didn't violate Petitioner's constitutional rights, because USC is a "private actor." (Order at 6). USC offers substantial public-access facilities in the greater Los Angeles area, included hospitals, sporting events, museums, and public lectures. Fogelman's blanket ban deprived Petitioner of his right to assemble, receive medical care, and right to free speech. Notably, USC receives substantial federal funding for many of these public facilities, and

22

therefore does execute functions "exclusively reserved to the State."

Lastly, the Complaint made clear that the campus ban was a RICO predicate act meant to intimidate a witness in a federal lawsuit. Meant to squelch Dr. Isaacs' rights to file a campus police report, or speak with the USC registrar about enforcing a *federal* lawsuit settlement agreement deemed *binding* by a *federal judge*, Fogelman's campus ban was improper for a whole host of reasons, some of them amounting to criminal witness intimidation. The campus ban – a most unusual one indeed that was issued by an entertainment lawyer – deserved to be subjected to discovery and heard by a jury. A 12(b)(6) dismissal would have been inappropriate; an anti-SLAPP ruling against Petitioner was abhorrent.

### 4. The District Court Incorrectly Dismissed Dr. Isaacs' Claims Against Keck Based Upon Waiver, *Res Judicata*, and the Statute of Limitations.

The lower court's denial of Dr. Isaacs' claims against Keck based upon "a combination of waiver and *res judicata*" and the statute of limitations, Rec. 8, was based upon a misreading of the factual allegations in the Complaint and a failure to take Dr. Isaacs' factual allegations as true for purposes of Keck's Motion to Dismiss. The Complaint alleges that Dr. Isaacs first learned of Keck's breach of the settlement agreements that the relevant parties executed in 2019, not the

23

2015 date of a denied *cert* petition to this Court, upon which the District Court mistakenly relied. The Complaint further alleges that Dr. Isaacs' discovery of Keck's malfeasance resulted in a harm different from and more extensive than Dr. Isaacs realized before this discovery. Taking these allegations as true, neither waiver, *res judicata*, nor the statute of limitation bars Dr. Isaacs's claims against Keck. Accordingly, the Court should reverse the Order of the District Court granting Keck's Motion to Dismiss.

The Complaint alleges several claims against Keck, each of which relies on the 2019 discovery by Dr. Isaacs of Keck's disclosure of his disciplinary status in Dr. Isaacs' AAMC profile prior to Dr. Isaacs' agreement to and execution of the settlement agreements. Dr. Isaacs executed these two settlement agreements in 2007 and 2008. The first agreement sealed Dr. Isaacs's disciplinary records at Keck with an underlying intent to grant him "factual innocence," and the second acquitted Dr. Isaacs of all charges and controversies, cancelled all contracts between the parties, and dismissed administrative charges. Rec. 65-67.

Yet in 2019, Dr. Isaacs discovered that Keck did not abide by the settlement agreements as Dr. Isaacs did going forward. Rec. 70. Dr. Isaacs not only discovered, for the first time, the AAMC profile edited in 2006 by USC Dean Katsufrakis[3], but further research

---

[3] Dean Katsufrakis' AAMC publication in 2006 was likewise false and fraudulent, because it incorrectly stated Isaacs was dismissed for "non-academic" (i.e. criminal) reasons. Dr. Isaacs' discipline was on academic grounds, that he had failed to meet

24

revealed that Keck or its counsel omitted this particular document from the purportedly complete student file that Keck produced to Dr. Isaacs in litigation discovery in 2008. *Id*. He further discovered that a student file Keck provided to Dartmouth in response to a subpoena contained the contested AAMC profile. The Complaint's claims against Keck rely upon these events and omissions.

The District Court Order granting Keck's motion to dismiss failed to apply the applicable standard of review to Dr. Isaacs's substantive claims against Keck. Rather, the Order dismissed these claims based upon waiver under the settlement agreements, *res judicata* involving prior litigation, and the four-year statute of limitations applicable to civil RICO claims. Rec. 7-8.

In reaching its decision, the lower court's first error was that the Complaint included claims against Keck "for acts prior to 2008 . . . " Rec. 8. This statement was incorrect, as none of the eight claims, or any of the three alternate claims, against Keck relies on events that predated the settlement agreements that Dr. Isaacs executed with Keck and its officials. The only parts of the Complaint that address events that

───────────

Keck's standards for a student physician. Despite this being properly alleged in both the USDC docket and the appellate record, both the District Court and Ninth Circuit ignored the fact, and further harmed Dr. Isaacs, by issuing orders stating Dr. Isaacs was dismissed for non-academic reasons. Hence Dr. Isaacs' 2019 discovery of the AAMC profile revealed a fraudulent and retaliatory publication by Katsufrakis that he had absolutely no knowledge or even mere suspicion of back in 2015.

25

occurred prior to 2008 involve background and Keck's 2006 alteration of the AAMC profile and placement of that profile in Dr. Isaacs's student file. As Dr. Isaacs was unaware of the AAMC page in this student file until last year, his reliance on discovery of that action does not predate the agreements.

Outside of describing purported claims as challenging the "enforceability of the settlements," Rec. 8, the lower court's Order did not identify the particular claims or allegations that led to the District Court's conclusion in this regard. Further, the District Court was wrong in suggesting that any of Dr. Isaacs's claims challenged enforcement of the settlement agreements. Dr. Isaacs alleged that the party that acted as if the settlement agreements were not enforceable was Keck. *See* Rec. 70-71. These matters are discussed in detail in the simultaneously filed *certiorari* petition to reverse attorney's fees; that petition is incorporated herein for further reference.

The District Court also erred in construing the Complaint's allegations as claiming that Dr. Isaacs first learned of Keck's disclosure of his disciplinary status in his AAMC profile in 2015. As discussed above, this was a mere reference to Petitioner exhausting all appeals and *certiorari* on May 26, 2015, and does not form a basis in fact for statutes of limitations against USC.

Dr. Isaacs did not obtain this evidence until 2019. That evidence was a screen shot of Dr. Isaacs's revised AAMC profile that Katsufrakis had printed and

26

included in Dr. Isaacs's student file. *Id*. The AAMC pro-file reflected that Dr. Isaacs's "Status" was "Dismissed – Non-Academic Reasons." Rec. 221. This also marked the first time Petitioner learned Katsufrakis defied the faculty intent and converted an academic matter to a non-academic (i.e. conduct violation) dismissal.

This entry violated the settlement agreements that Keck and its officials later executed, as Keck will-fully concealed the fact it refused to update the status.

Dr. Isaacs should have discovered the AAMC pro-file page years earlier from Keck's discovery responses in the litigation that led to one of the settlement agree-ments. In March 2008, USC counsel produced Dr. Isaacs' "KSOM student file" in response to a federal discovery request. This student file, represented as being produced in its entirety, did not include the AAMC profile page that Dean Katsufrakis inserted in the file. Rec. 70. Yet eleven years later, after taking a great toll on Isaacs, Dr. Isaacs discovered it in a stu-dent file possessed by Dartmouth, responsive to that college's subpoena. The only explanation for these cir-cumstances is concealment, as alleged in the Com-plaint. *Id*. Under the applicable standard of review, the Court need not accept this explanation – the Court only must accept the allegations describing the con-duct and omission as true.

The lower court's application of waiver applied, according to the court, only to claims against Keck that predated execution of the two settlements. Dr. Isaacs' claims against Keck do not in any manner rely on

27

anything that occurred prior execution of the settlement agreements. The 2008 concealment of the Keck Dean's 2006 insertion of the AAMC profile page into Dr. Isaacs' student file evidences settlement noncompliance. It is simply unreasonable to say that Keck's perpetual refusal to update the AAMC profile was waived, because the AAMC profile had a screen shot taken in 2006. Waiver simply does not apply to Dr. Isaacs's claims against Keck. Keck violated the 2007 settlement the minute it went into effect. The 2008 settlement relied upon fraudulent concealment of federal discovery. The underlying constructive fraud claim should have proceeded as well.

Nor does *res judicata* preclude Dr. Isaacs's claims. *Res judicata* applies to "all grounds of recovery that *could have been asserted*, whether they were or not, in a prior suit between the same parties on the same cause of action." *Robertson v. Isomedix, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994) (quoting *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992)) (emphasis added by *Robertson*). Courts apply a three-factor test in assessing *res judicata*, including whether the first action "(1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002). In determining whether two actions involve the same claim, courts look to the following: "(1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by

28

prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *Mpoyo v. Litton Electro-Opitcal Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

Application of this law reveals that the lower court was incorrect, and *res judicata* does not apply to preclude Dr. Isaacs' claims against Keck. Dr. Isaacs' claims against Keck do not constitute the same causes of action that he had asserted previously. Because the claims rely on Dr. Isaacs's 2019 discovery of the AAMC profile, of which he had not knowledge previously, this action relies on evidence of which Dr. Isaacs was unaware in the previous action against Keck. Accordingly, Dr. Isaacs did not and could not have asserted these claims against Keck in the previous action, and *res judicata* does not apply here. *See Sandigo v. Ocwen Loan Servicing LLC*, 2019 U.S. Dist. Ct. LEXIS 87309 (N.D. Cal. May 23, 2019) ("new evidence and facts are at issue here that make *res judicata* inappropriate").

The third and final basis for the lower court's dismissal of Dr. Isaacs's Complaint, the four-year applicable statute of limitations, also fails to bar Dr. Isaacs' claims against Keck. The statute of limitations period begins to run when a party knew or should have known of her/his injuries. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005). Dr. Isaacs learned of injuries and the extent of those injuries upon discovering the existence of the AAMC profile page that included his

29

disciplinary status in 2019. The Complaint alleges and
describes that these injuries continue to the present
time, as these allegations have resulted in Dr. Isaacs
being unable to resume his medical career despite his
continuing efforts. Keck's actions relating to his AAMC
profile caused these injuries.

Both the District Court and the Ninth Circuit in-
correctly found that Dr. Isaacs' harm ended with the
New Hampshire Board of Medicine's posting of its de-
cision and opinion in 2014, and the subsequent denial
of a *cert* petition in 2015. But this is simply incorrect.
The Board's revocation of Isaacs license in one state –
New Hampshire, does not carry the same magnitude
as a national publication of a non-academic conduct
dismissal. Physicians routinely lose medical licenses in
one state, and are permitted to rehabilitate in that
state, or obtain a license in another state. Dr. Isaacs
had no reasonable way of knowing in 2015 that he was
"blacklisted" for life, nationally, on the Keck AAMC
profile which contained Katsufrakis' fraudulent entry.
These are different events, of different scope and sig-
nificance. Although that publication exposed Dr.
Isaacs's circumstances at Keck to the public, Dr. Isaacs
did not fully understand the national ramifications of
Dartmouth's, and in turn the Board's, knowledge of a
fraudulent AAMC profile. He discovered that in 2019
and finally understood the true scope of his past and
continuing harm. In other words, in 2015 Dr. Isaacs
could have been hopeful (and indeed he was) that an-
other hospital, in another state, would train him and
sponsor his medical licensure. That did not happen,

30

but for the nationwide blacklisting on the AAMC pro-
file. This as a direct consequence of factual determina-
tion supports Petitioners' 2019 RICO claim against
USC, period.

He realized at that time that the execution of the
settlement agreements was essentially meaningless,
as the consideration he thought he received from those
agreements did not exist at the time. Rec. 70-71. The
settlements caused Dr. Isaacs to abandon his legal
claims against Keck, including the potential oppor-
tunity to return to that school. If he had known that
sealing his disciplinary record was already impossible
given Dean Katsufrakis' action, he likely would have
continued to pursue his case and could have received
an award of injunctive relief and/or damages. Rec. 71.

The lower court's dismissal based upon the statute
of limitations and its reliance on the 2015 appeal ig-
nores these allegations relating to the extent of Dr.
Isaacs's harm. Accepting these allegations as true, the
earliest the statute of limitations could have begun to
run was at the time of discovery in 2019, and the four-
year statute does not bar Dr. Isaacs's claims against
Keck.

Each of the legal doctrines upon which the lower
court relied was inapplicable, and the granting Keck's
motion to dismiss failed to treat Dr. Isaacs's factual al-
legations as true. The District Court contained no
other analysis or support for its dismissal of Dr.
Isaacs's claims. The Ninth Circuit failed to improve the
situation, simply doubling down on the debunked 2015

31

NH Board *certiorari* denial theory as the SOL trigger for Petitioner's claims against USC. Accordingly, without any of these three doctrines operating to preclude Dr. Isaacs's claims, with this Court properly accepting Dr. Isaacs's allegations as true, this Court should be left with no choice but to reverse the dismissal of the Complaint's claims against Keck.

5.   **Neither the Statute of Limitations nor the Eleventh Amendment Bars Dr. Isaacs's Claims Against The New Hampshire Board of Medicine.**

In granting the NH Board's motion to dismiss, the District Court relied on two doctrines, the Eleventh Amendment and the statute of limitations, neither of which precludes Dr. Isaacs' claims against the NH Board. Dr. Isaacs was not aware of the extent of his injury from the actions and omissions contained within his RICO claims until 2019, well within the applicable four-year statute of limitations. As for the Eleventh Amendment, Dr. Isaacs's claims against the NH Board are primarily against Mr. Cahill, investigator for the NH Board. While the Eleventh Amendment might bar a case against the NH Board, it does not preclude causes of action such as RICO against Mr. Cahill.

Dr. Isaacs' claims against the NH Board and its associated individuals arise out of Mr. Cahill's failure to inform the NH Board of Dr. Isaacs's settlement agreements with Keck that constituted exonerating evidence in the Board proceedings. Rec. 108. This

32

withholding of knowledge of the settlement agreements and their effect on Dr. Isaacs' disclosure obligations led directly to the Board's revocation of Dr. Isaacs' license, and, further to the Board publishing its decision, including its description of Dr. Isaacs's Keck history and its denial of the existence of the settlement agreements with that institution and their effect. *Id.* These allegations form part of Dr. Isaacs' RICO claim effectively against Mr. Cahill.

Although not evaluated by the District Court because of its reliance on the Eleventh Amendment, the Complaint presents an actionable RICO claim involving Mr. Cahill. Mr. Cahill, in concert with NH Board members and in association with the Dartmouth Defendants[4] in this action, committed predicate acts of,

---

[4] Dartmouth's counsel and Petitioner's attorney Keith Mathews reached a verbal agreement to "bury the hatchet" and meet to discuss re-enrollment with a Dartmouth program. After Isaacs dismissed Dartmouth from the underlying claim, Dartmouth failed to honor their verbal promise. The Court should assume the underlying claims against Dartmouth and Jim Yong Kim will be re-raised. As such, this case involves retaliation against Petitioner by a party that is/was a United Nations senior consul or quasi-consul. Although Kim wasn't United Nations World Bank President at the time of evidence spoliation, USC, Folt, and Gibson Dunn enacted excessive political retaliation against Petitioner at least in part on Dartmouth and Kim's behalf. In light of a compelling fourteen year pattern of evidence spoliation, absurd anti-SLAPP filings, campus bans by entertainment lawyers, and Ninth Circuit determinations that students can't file retaliation claims, the Court may rightfully conclude that the Respondents-Defendants exert undue influence in the lower courts. A special master may be assigned to ensure the proper adjudication of this case, and the related Apple case, under the United States' Supreme Court's original jurisdiction. Gibson

33

among others, obstruction of justice in choosing to withhold exonerating evidence form the Board. *See Living Designs*, 431 F.3d at 361 (enumerating the elements of a civil RICO claim). Combined with the predicate acts of other defendants, this conduct caused Dr. Isaacs the ongoing loss of his medical career and other significant harms.

———————◆———————

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the United States Supreme Court issue a *writ of certiorari* to review and reverse the lower court's improper dismissal of his Complaint.

Respectfully submitted,

KEITH A. MATHEWS, ESQ.
ASSOCIATED ATTORNEYS OF
   NEW ENGLAND
587 Union Street
Manchester, NH 03104
Ph. 603-622-8100
keith@aaone.law
*Counsel for Petitioner*
   *Jeffrey D. Isaacs, MD, MBA*

—————

Dunn and Apple should not be able to 12(b)(6) a nationally important anti-trust action filed by a world renowned scientist, simply because Petitioner was part of said scientist's COVID-19 response team. The endless political persecution of Petitioner, now at the highest of institutional significance, must be restrained.