Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

```
CORONAVIRUS REPORTER, CALID, INC.; )
PRIMARY PRODUCTIONS, LLC;          )
DR. JEFFREY D. ISAACS, on behalf   )
of themselves and all others       )
similarly situated,                )
                                   )
            Plaintiffs,            )
                                   )
   VS.                             ) NO. 21-cv-05567-EMC
                                   )
APPLE, INC.; and FEDERAL TRADE     )
COMMISSION,                        )
                                   )  San Francisco, California
            Defendants.            )
_____)
```

Thursday, November 4, 2021

### **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:  (By Zoom Webinar)

For Plaintiffs:

        ASSOCIATED ATTORNEYS OF NEW ENGLAND
        Post Office Box 278
        Manchester, New Hampshire  03105
        **BY:  KEITH MATHEWS, ESQ.**

For Defendant Apple, Inc.:

        GIBSON DUNN & CRUTCHER LLP
        555 Mission Street
        Suite 3000
        San Francisco, California  94105-0921
        **BY:  RACHEL S. BRASS, ESQ.**
        **JULIAN W. KLEINBRODT, ESQ.**

Also Present:

        **DR. JEFFREY D. ISAACS**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

<u>**Thursday - November 4, 2021**</u>                                    <u>**2:50 p.m.**</u>

<u>P R O C E E D I N G S</u>

        **THE COURTROOM DEPUTY:**  Calling Civil Action 21-5567,
Coronavirus Reporter, et al. versus Apple, Inc., et al.

    Counsel, please state your appearances for the record,
beginning with counsel for plaintiffs.

        **THE COURT:**  Um, are we frozen?

        **DR. ISAACS:**  I'm sorry.

    Good afternoon. I'm Jeffrey Isaacs.  And I'm representing
myself and my apps.

        **THE COURT:**  Okay.

    You're muted, Angie.

        **THE COURTROOM DEPUTY:**  All right.

        **MS. BRASS:**  Rachel Brass for Apple, Inc.

        **THE COURT:**  Thank you, Ms. Brass.

        **MR. CLINE:**  Julian Kleinbrodt for Apple, Inc.

        **THE COURT:**  Thank you, Mr. Kleinbrodt.

    And Mr. Mathews?

        **MR. MATHEWS:**  Yes.  My apologies.  I'm not sure what
happened there.  I just got disconnected.

        **THE COURT:**  All right.  And you are appearing on
behalf of?

        **THE COURTROOM DEPUTY:**  I believe he's frozen,
Your Honor.

        **THE COURT:**  Oh.  Okay.

1          **THE COURTROOM DEPUTY:**  Must not be --

2          **THE COURT:**  Problematic.  He's appearing on behalf of

3    Apple as well, or who --

4          **MS. BRASS:**  No, Your Honor, Mr. Mathews is counsel

5    for Ms. -- Coronavirus Reporter and Primary Productions, as

6    the plaintiffs.

7          **THE COURT:**  Okay, all right.  Well, we've got a

8    little problem if he's frozen.

9          **THE COURTROOM DEPUTY:**  He may need to exit and --

10   okay.

11     Mr. Mathews?

12        **MR. MATHEWS:**  Yes.  I apologize.  I'm not sure what

13   happened there.

14        **THE COURT:**  Your connection is weak.  You froze

15   completely.  It might help if you turn off your video and just

16   go with audio.  You might just shut your video down.

17        **MR. MATHEWS:**  Sure.

18        **THE COURT:**  Sometimes that helps connectivity.  If

19   for some reason we can't hear you, then we will have to try

20   something else, maybe phone in or something.

21        **MR. MATHEWS:**  My apologies, Your Honor.  My wifi is

22   usually pretty good.

23        **THE COURT:**  Yeah, okay.  Well, there are a lot of

24   issues here, and I'm not going to cover everything, but I do

25   want to cover a couple major issues here.  And the first one,

1    of course, is the question of relevant market, and market

2    definition.

3        And as I understand it, as this has evolved -- and correct

4    me if I'm wrong, plaintiffs -- that the principal markets on

5    which your antitrust claims are predicated consists of what

6    might be deemed two fore-markets, U.S. smartphones or U.S. iOS

7    smartphones, as kind of an alternative single-brand

8    fore-market.  And then the downstream markets, which are iOS

9    institutional app market, iOS notary stamp market, and iOS

10   application for loader market (Phonetic), and iOS user base

11   market.

12       When you put all that together, that speaks to a

13   single-brand market.  Which, as you know, is rarely recognized

14   in antitrust law.  And, and I have a problem understanding why

15   that would be so here.

16       So, for instance, the Coronavirus app -- Reporter app, I

17   mean, that's something that could benefit or could be used with

18   the proper licensing, et cetera, et cetera, on Android devices,

19   could it not?

20           DR. ISAACS:  Yeah, that's right, Your Honor.  I would

21   like to say you're spot-on as to the different marketplaces,

22   except that we state that, as you said, as an alternate

23   theory, as a single market.

24       So the main theory we rely upon for all the apps here -- I

25   speak for myself, but it's for Coronavirus and everybody -- is

1   the U.S. smartphone market.  Which is a not a single product

2   marketplace.  And that's where there's a discrepancy to the

3   market share.

4       Apple, we state they have 64 to 80 percent market share

5   there.  So they certainly market power and, we would say,

6   monopoly.

7       So we really bring in the Kodak single-market theory for

8   all the apps as an alternate theory.  And we don't think we

9   need that to prevail here.  We just state it in the case, that

10  that law does apply after all the fact-finding is done.  So we

11  state it as an alternate theory.

12      Now, some of the downstream markets are definitely

13  single-product.  And we can go into that.  But for the main

14  fore-market, it's definitely not a single-product marketplace.

15          **THE COURT:**  Well, given this is really, I think, a

16   two-sided market, I don't think we can ignore the downstream

17   market.  So don't we have to account for the fact that your

18   antitrust theories look to the downstream side, as well as the

19   fore side?

20      And to the extent that the downstream side is a singular

21  tie to a single brand, isn't that problematic?

22          **DR. ISAACS:**  No.  I would again say that it's not a

23   sin- -- it's not a two-sided marketplace here.  I'm not sure

24   which marketplace you're referring to, but I assume you're

25   speaking about the app marketplace being two-sided, because

1   that seems to be the main debate we've had in the pleadings

2   with Apple.  Because Judge Gonzalez Rogers did, of course,

3   find the app store to be a two-sided transactional platform.

4        We believe that is different in this case.  The way we've

5   set out the facts, it's really the app marketplace monopsony.

6   Like a book publisher.  In fact, today's news, FTC and DOJ are

7   looking at Penguin Books and Simon and Schuster with a

8   monopsony theory, which really -- which has really been

9   reinvigorated in our media age, in the last few years.  That's

10  why it took us a while, frankly, to come up with this monopsony

11  theory over the last few amendments we've done.

12       So we're looking at Apple is the only buyer of apps, just

13  like Penguin Books and Simon and Schuster would be the only

14  buyer of books from authors.  Or if Sony Video is the only

15  buyer of movies.  So we're saying it's not two-sided.

16       And, just one last point.  For free apps, it's especially

17  not two-sided, because there's no equal transaction, like *Epic*,

18  that Judge Gonzalez Rogers looked at.

19       A free app doesn't have a price.  So it's actually very

20  hard for us -- it took quite a while to develop a monopoly or

21  monopsony theory for a free app.  And there is no symmetric

22  opponent in size to the App Store for free apps.

23       So we would say -- the long -- long story short, the

24  answer is definitely no, we believe, for that -- for your

25  question.

1        **THE COURT:**  Well, but your -- your market, your

2    theory and your analogy to book publishers hinges on Apple

3    really being the buyer of apps, and then ultimately, you know,

4    buying it at one level, and then selling it at another level.

5        Here, that model doesn't seem to work.  They're not

6    buying -- Apple's not really buying it.  It's serving as an

7    intermediary, um --

8        **DR. ISAACS:**  Well, that's why -- (inaudible) almost a

9    hypothetical market --

10        (Reporter interruption)

11        **DR. ISAACS:**  Myself -- I'm sorry.

12        I would say we do have a footnote that it's almost a

13    hypothetical market.

14        And, again, this is difficult.  We don't know any other

15    case that brings -- protects free apps from censorship.  So

16    some of this is a bit hypothetical, in that if there was no App

17    Store monopoly, and every developer could sell within the

18    shopping mall their apps, then you wouldn't have this

19    monopsony.  And you wouldn't have it where the only buyer is

20    Apple.

21        But the FAC does cite that Apple bought a weather app that

22    they distributed as free, and they bought it for tens of

23    millions of dollars.  So there are instances where Apple

24    purchases free apps from developers.

25        And we would say, here, they are effectively purchasing

1   it.  They could bundle it with the iPhone; they could give it

2   away for free.  But that's not our only theory, because we

3   recognize that's a novel theory, and we believe it will

4   prevail.  But we do have four other downstream theories if that

5   were to not proceed.

6       But we believe that is our best theory, that they are a

7   monopsony buyer, even though it's largely free and

8   hypothetical.

9           **THE COURT:**  All right.  Let me hear from Apple.

10      Why -- why isn't there a potential claim, given Apple's

11  dominance in the distribution chain here?

12          **MS. BRASS:**  Yes, Your Honor.

13      Well, to start with, your answer on the distribution

14  chain.  And again, this is Rachel Brass for Apple.

15  Distribution chain is not a market.

16      I think the problem with this case is best stated by what

17  Mr. Isaacs just said.  He's arguing a hypothetical market.  But

18  the law is clear.  You need to look at referents to reasonable

19  interchangeability of use and cross elasticity of demand.

20  Which you cannot do in a hypothetical market.

21      You have to ask:  What is the product?  Single-brand

22  markets, as you say, are disfavored.

23      And you have to ask:  Is the market alleged something that

24  bears some relationship to the claim alleged?

25      So take, for example, the single-phone -- sorry.  The

1    smartphone market that's not a single-phone market -- a

2    single-brand market.  None of Mr. Isaacs' claims allege injury

3    to competition in that market.  If it is a market in theory, it

4    has nothing to do with the claims and injuries asserted here.

5         To the extent Apple might be a buyer for some apps, for

6    example, that also has nothing to do with the claims alleged

7    here.  Here, the claims are about apps on the App Store.  That

8    is a two-sided market.

9         And as the Supreme Court has explained in *AMEX*, where

10   something is a two-sided market, you need to define the market

11   with reference to that two-sided platform.

12        Coronavirus Reporter, Mr. Isaacs, the plaintiffs here,

13   they don't allege that they went and sought a sale of an app to

14   Apple, like the weather app he identified as an analogy.  They

15   allege that they participated in the app review process, and

16   with respect to Coronavirus Reporter and Primary Productions,

17   were rejected.  And they allege that for certain apps that were

18   on the App Store, they were dissatisfied with search ranking.

19        Those are the injuries that are alleged.  And those have

20   nothing to do with any of the markets Mr. Isaacs just

21   described.

22        And then, importantly, none of the factors that a court

23   looks to to determine whether facts are alleged that help you

24   identify the outer bounds of a market are in the complaint

25   here.  That's true if you look under the test from the Ninth

1    Circuit in *Hicks* on interchangeability of use and cross

2    elasticity of demand; that's true if you look at the *Brown Shoe*

3    factor.

4        You can use either of those tests to determine if a

5    relevant products market is alleged.  Not just a product

6    market, but one that is relevant to the claims asserted, and

7    under any standard.  That's not done here.

8        And I think, you know, the most direct case you might look

9    at for this is Judge Gonzalez Rogers' decision in the pistachio

10   case, which we cite in our brief, where she looks at similarly

11   scant allegations of fact and finds in the absence of

12   evidentiary fact, meeting the *Hicks* standard, there is no

13   relevant market alleged.

14           **THE COURT:**  Well, if -- if the market alleged here

15    were U.S. smartphones generally, which would include both iOS

16    as well as Android, would that be sufficiently defined?

17           **MS. BRASS:**  No, Your Honor.  Because the outer

18    boundaries of what constitutes a smartphone would not be

19    established.

20        But even if that were a market, it's not a relevant market

21   for any of the claims alleged.  It's not simply enough to say

22   something is a market, if it has no relationship to the claims

23   that are asserted.

24        Finally --

25           **THE COURT:**  If the claim asserted is -- is trying to

1    get an open market and have access to all smartphones, why

2    isn't that a sufficient relationship?  And that Apple is

3    impairing that access?

4        Why isn't that at least, quote, relevant?

5        **MS. BRASS:**  Well, one, Your Honor, several of the

6    plaintiffs here were on the App Store, suggesting that there

7    would not be an injury for impairing access to that market.

8        And two, I don't think that is the claim alleged here.

9    The claim alleged here is -- you know, unless it is that Apple

10   -- I'll -- to start with, I don't think that is the claim

11   alleged here.  That Apple controls the market for all

12   smartphones, such that applying standards to the App Store is

13   an abuse of monopoly power in that market.

14       **THE COURT:**  Well, it's Apple controls access to a

15   large portion of that market.  It may not be 100 percent, may

16   not be a monopoly, but it's got market power relative to even

17   that broader market of all U.S. smartphones.

18       And if it controls access of these app developers to that,

19   why -- explain to me again, why isn't that a, quote, relevant

20   market?

21       **MS. BRASS:**  Well, Your Honor, I don't think there are

22   facts in the complaint from which one can determine that there

23   is market power.

24       Mr. Isaacs -- sorry -- the complaint alleges that the

25   market is below 65 percent to Apple's share.  And as a matter

1    of law, that's insufficient standing, alone, to establish

2    market power.

3         Also, developers aren't accessing devices.  They're trying

4    to get into the store.  And so again, if it's a complaint about

5    access to the store, then smartphones are not the relevant

6    market.

7              THE COURT:  Well, so let me ask you, then, either

8    Mr. Mathews or Mr. Isaacs, is the claim access to the store?

9    Or access to the devices?

10             DR. ISAACS:  I believe the FAC is clear there.  We

11   talked about the network effect of some 180 million smartphone

12   or iPhone users, so -- and then the user-based access

13   downmarket, certainly, that Apple is selling for $99 for a

14   year to developers, access to that network affect.

15        So whether you look at under *Aspen* as an essential

16   facility, or an obligation or duty to deal under the MCI,

17   essential facility, just, we --

18             THE COURT:  Wait.  I'm not talking about the theory

19   yet.  You're jumping ahead of me.

20             DR. ISAACS:  Sorry.

21             THE COURT:  I asked a simple question.  What is the

22   access denial -- what is the access issue here?  Is it to the

23   devices, themselves?  Smartphones?  Or is it to the store?

24             DR. ISAACS:  Yeah, I would say the devices,

25   themselves, Apple blocks access to that by the user-based

1    access right, downmarket.  They select who gets access to that

2    network effect of smartphones.  And there's different ways we

3    plead that, theoretically.

4        But the fact is it's that network of 180 million devices

5    that we -- we think it's important.  People pay for those

6    devices, and the government pays for how they're connected,

7    through the origin of the internet.  So we're talking about the

8    physical.

9        I mean, to answer your question, we're talking about

10   180 million physical devices, and how they're connected.  And

11   Apple controls access to that, that they sell for $99 a year to

12   developers.

13            THE COURT:  All right.

14       So Ms. Brass, what about that?  If that's the theory, that

15   Apple stands in the way of using its market power to control

16   access to the ultimate devices, what's your comment with that?

17            MS. BRASS:  Um, Judge Chen, it's the same argument.

18    The facts, as alleged, for Apple's market share are

19    insufficient to establish market power as a matter of law.

20       And there are no other facts in the complaint that allege

21   that Apple has market share, other than assertions -- I mean,

22   has market power, other than assertions about market share.

23       And to the extent that Mr. Isaacs is arguing about network

24   effect, network effects are not a product.

25            THE COURT:  All right.  But if -- if it's just about

1    access to devices and if -- if there were sufficient

2    allegations to show enough market share to imply market power,

3    would that be enough to state a relevant market?

4            **MS. BRASS:**  I'm sorry, Your Honor, I think I lost

5    that question.  I'm sorry.  Can you --

6            **THE COURT:**  I guess it's the only -- you identified

7    as one of the problems with their theory, there are not enough

8    facts to establish the requisite market share.

9        Right?

10           **MS. BRASS:**  There's not facts to establish market

11   power.  The market share --

12           **THE COURT:**  Market power.

13           **MS. BRASS:**  -- is too low to establish market power.

14           **THE COURT:**  All right.

15           **MS. BRASS:**  And he's not in the smartphone market,

16   Your Honor.  And for most of the theories he's alleged -- this

17   goes back to my core argument -- it's still not a relevant

18   market.

19       For example, for the essential facilities argument that

20   Mr. Isaacs was arguing, you have to be a competitor in the

21   relevant market.

22       So, none of the plaintiffs here are smartphone

23   manufacturers.  And so, again, it may be a market, but it's not

24   the relevant market for any of the claims asserted.

25           **THE COURT:**  All right.  Well, that gets to the other

 1   issue about -- that you have raised about lack of competitive

 2   injury here.

 3       Right?

 4           **MS. BRASS:**  (Nods head)

 5           **THE COURT:**  That the injury here is not to Apple's

 6   competitors; it's not like Apple is trying to sell a competing

 7   app, and icing people out.  It is unhappiness with getting

 8   access to the store.

 9       How is that an antitrust injury?

10       How is there injury to the general competition, and

11   reduction, for instance, of general output?

12       There's individual grievances.  But, how is that

13   anti-competitive injury?

14           **DR. ISAACS:**  Um, can I answer that question,

15   Your Honor?

16           **THE COURT:**  Yeah, yeah.

17           **DR. ISAACS:**  Well, I would say we compete with Apple

18   in two respects here.  One, we are competing app developers,

19   Apple has a lot of apps they publish, they make money off of.

20   So we are competitors there.

21       And then we're also competitors --

22           **THE COURT:**  Have you identified any one of the

23   plaintiff products that are in competition with an Apple-owned

24   app?

25           **DR. ISAACS:**  Sure.  Like Web Collar (Phonetic) that I

designed, and Facetime 15.  They have a Covid app that they

would say is part of the operating system; we would say it's

an app, and that's for fact-finding.  And then, of course,

Dr. Roberts had a COVID-19 app.  So those are two, right

there.

I think we got into more with Apple Arcade in the

complaint.  I don't represent -- again, I believe they're in

there.

So in addition to being competitors of apps, we are also

competitors or would-be competitors as app distributors.

Because as the complaint says, any distributor could put up a

shop on the internet, and in five minutes -- "trivally"

(Phonetic) is the word used in the FAC, so we -- or a shopping

mall in a brick-and-mortar store.

So we'd like to be distributor of apps, we'd like -- we

are competitors of Apple.  But we're being disallowed from

competing with Apple there.  So, again, Apple's policies and

market power or market influence prevents us from being a

competitor.

Where we actually are competitors is app distributors.

The only way to distribute an iPhone app is the App Store.  And

it should be that -- you know, openly.  Every other computing

platform in history -- and that's emphasized throughout the

pleadings -- every other major computer platform in history --

Android, you know, the Mac, Mac operating system, Windows --

1    they allow competing distribution points.

2        So we're a competitor as a distributor, and a competitor

3    as an app -- as a competing app, you know, like the COVID-19 or

4    Facetime app.

5        **THE COURT:**  All right.  What about that argument,

6    Ms. Brass?  That there is antitrust competition in terms of

7    the distribution.  Maybe a small self-distribution, but

8    distribution, nonetheless.

9        **MS. BRASS:**  First, Your Honor, there are no

10    allegations in the complaint that any of the plaintiffs here

11    have ever attempted to open or build or program a store.  The

12    fact that one could theoretically do it as an app is not

13    antitrust injury.

14        Second, nothing he's talking about is injury to

15    competition.  It's injury, perhaps, to specific apps.  It's not

16    sure how -- clear how the apps that were allowed on the store

17    were denied access to the store.

18        And those that were on the store, where he com- -- the

19    plaintiff's complaining that there is unfair competition on the

20    store from other apps, that, again, doesn't have anything to do

21    with the market that has been argued.  The smartphone market.

22    You have to look --

23        **THE COURT:**  I thought there were allegations about

24    denial of access to the App Store because of the, you know,

25    health implications of what the criteria are, or blockchain

1    apps not being permitted.

2          **MS. BRASS:**  That's correct, Your Honor.  But those

3    complaints -- we have two sets of complaints here.  One is

4    complaints about people who were denied access under Apple

5    policy.  And we have other complaints about apps that

6    allegedly compete against certain Apple apps.  And we can't

7    conflate those in thinking about which market the injuries

8    arise in.

9          We also -- he can't show there's insufficient competition

10   for these apps in the allegations.  That's what he needs to

11   allege.

12         For example, for the COVID-19 app, the plaintiff alleges

13   that there are thousands of apps for COVID-19 that have been

14   allowed on to the App Store.  So that is not an injury to

15   competition.  That's an injury to Coronavirus Reporter.

16         There is an allegation that there is an Apple app that

17   competes with one of plaintiff's apps.  But that is not an

18   injury to competition in an alleged market.  That's competition

19   that the plaintiff doesn't like facing.  None of those are

20   cognizable antitrust injuries.

21         **THE COURT:**  All right.

22         Response to that, Mr. Isaacs?  Where's the -- the

23   aggregate market impairment, as opposed to injury to a specific

24   app?

25         **DR. ISAACS:**  Sure.  And that goes back to the

1    marketplace here for apps.  What we call the national app

2    market or national institutional app market.

3        And that really -- institutional could be -- you could say

4    a creators' market.  It's buying from authors.  Just like

5    Penguin Books or Sony Film, there's a market for films in this

6    country; we all know it.  There's a market for books in this

7    country; we all know it.  They're interchangeable; there's

8    elasticity of demand.  And there are -- similarly, apps are no

9    different.  They're created by authors, developers,

10   programmers, film producers.  It's all just creative works.

11       But this country has a Sherman law.  You know, to not have

12   one monopoly, one bottleneck.  And again, it's not

13   hypothetical.  We say it's kind of hypothetical.  But the

14   marketplace, it's real.  It's bottlenecked.  Creators' works,

15   the apps, just like books or films, are being bottlenecked.

16       And that's about as big of a competitive injury --

17           **THE COURT:**  What's the evidence --

18         **DR. ISAACS:**  (Inaudible)

19           **THE COURT:**  Excuse me.  What's the evidence of an

20   aggregative bottleneck?

21         **DR. ISAACS:**  The -- Apple introduced it, themselves.

22   China's free markets are four times the size of ours.  And an

23   entire -- every Corona smartphone app was not allowed -- or

24   startup was not allowed.  That's not just Coronavirus

25   Reporter.  That's every startup that wanted to contribute to

1  the pandemic was not allowed, because Apple set criteria.

2      So just in that submarket of apps, there's a massive

3  bottleneck.

4          THE COURT:  What's the evidence that you've alleged

5  that shows how many apps were denied versus how many apps that

6  actually have made it, to show some aggregative effect?

7          DR. ISAACS:  We would need that in discovery.  We

8  think that China -- the end result is the Chinese data, that

9  it's four times the size of the App Store.  So we have the end

10  result there.  We don't have the actual procedural or

11  statistics you are asking for.  We just don't have that at

12  this time.

13      But with 40,000 app rejections a week by Apple -- I think

14  that's the last count -- I would say the answer is probably,

15  probably strong evidence, Your Honor, is what I would surmise.

16  But I don't have that data.

17          THE COURT:  All right.

18      Ms. Brass, what about that?  There's 40,000 rejections a

19  week.  Doesn't that -- does that show some potential

20  aggregative impact?

21          MS. BRASS:  Two things, Your Honor.

22      First, as Mr. Isaacs has argued just now extensively, that

23  there is an app market.  And if that's correct, as we posit it

24  is, then that would be a single-brand market.  It is, for the

25  purpose of these claims.  And a single-brand market would be

1  disfavored.

2       It's not clear what the outer boundaries of that are.  But

3  if there is an app market, then the phones are not the basis of

4  competition; that's not the relevant market.

5       Second, there's no evidence that U.S. consumers don't have

6  sufficient choice, even if 40,000 apps are rejected.  And, of

7  course, there are competitor smartphones, and there are web

8  apps, and there are the internet -- is the internet, all of

9  which are, for example, with respect to COVID-19, alternative

10 places consumers could have gotten information about their

11 apps.

12      The mere fact that apps are allegedly rejected at an

13 alleged number doesn't tell you whether the Apple single-brand

14 App Store is a relevant market, or a market, at all.  Nor does

15 it, again, connect back to the claims that are asserted here.

16 Nor could it ever be an injury for the three apps that were

17 allowed to compete on the App Store.

18          **THE COURT:**  All right.  Well, those are the issues.

19  I understand there's questions about, under 12(b)(6), what the

20  requisite elements of antitrust claim are made.

21      But it seems to me there are these threshold questions

22 about definition, sufficient definition, identification of

23 relevant markets, and the existence or not of antitrust injury.

24      So I will take the matter under submission.  Thank you,

25 counsel.

1          **DR. ISAACS:**  Thank you.

2          **MR. MATHEWS:**  Thank Your Honor.

3          **MS. BRASS:**  Thank Your Honor.

4          **THE COURT:**  Thank you.

5      (Proceedings concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, November 15, 2021