UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, et al., | Case No.  21-cv-05567-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, AND DENYING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION, TO STRIKE, AND TO APPEND CLAIM** |
| APPLE INC., et al., | |
| Defendants. | |
| | Docket Nos. 20, 45, 51, 52, 74 |

## I.      INTRODUCTION

Plaintiffs bring this action for antitrust and RICO violations, and breach of contract and fraud against Apple, Inc. ("Apple") to challenge Apple's allegedly monopolist operation of its "App Store" through "curation" and "censor[ship]" of smartphone apps.  Docket No. 41 ("FAC") ¶ 1-2.  Plaintiffs seek to vindicate the right of "the end users of Apple's iPhone" to "enjoy unrestricted use of their smartphones" to run "innovative applications, written by third party developers."  *Id.* ¶ 5.

Now pending is Apple's motion to dismiss all of Plaintiffs' claims against Apple.  Docket No. 45.  Additionally, Plaintiffs two motions for preliminary injunction, Docket Nos. 20, 52, motion to strike Apple's motion to dismiss, Docket No. 51, and request to append a claim to its FAC, Docket No. 52, are also pending.  Finally, Apple's motion to quash Plaintiffs' subpoena request, Docket No. 74, is pending.  For the reasons explained below, the Court **GRANTS** Apple's motion to dismiss all of Plaintiffs' claims against Apple, and **DENIES AS MOOT** each of Plaintiffs' pending motions and Apple's motion to quash.

## II.    BACKGROUND

A.    Summary of Allegations

Plaintiffs bring this antitrust and breach of contract action against Apple, Inc. ("Apple") to challenge Apple's allegedly monopolist operation of its "App Store" through "curation" and "censor[ship]" of smartphone apps.  Docket No. 41 ("FAC") ¶ 1-2.  Plaintiffs seek to vindicate the right of "the end users of Apple's iPhone" to "enjoy unrestricted use of their smartphones" to run "innovative applications, written by third party developers."  *Id.* ¶ 5.

### 1.    Apple's App Approval Process

Apple launched the iPhone and its proprietary iOS ecosystem in 2007.  *See Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *17 (N.D. Cal. Sept. 10, 2021).  Apple introduced the App Store the following year.  *Id.* at *19.  App developers wishing to distribute apps on the App Store must enter into two agreements with Apple: the Developer Agreement and the Developer Program License Agreement ("DPLA").  Developers must also abide by the App Store Review Guidelines (the "Guidelines").[1]  The Developer Agreement governs the relationship between a developer and Apple, *see* Docket No. 42 ("Brass Decl."), Exh. 1 ("Developer Agreement"), while the DPLA governs the distribution of apps created using Apple's proprietary tools and software, *see id.*, Exh. 2 ("DPLA").  By signing the DPLA, developers "understand and agree" that Apple may reject apps in its "sole discretion."  *Id.* § 6.9(b). The Guidelines set out the standards Apple applies when exercising that discretion to review and approve apps for distribution on the App Store, a process known as "App Review."  *See generally id.,* Exh. 3 ("Guidelines").

### 2.    Plaintiffs' Apps

Plaintiffs allege they are developers of "a diverse group" of apps: Coronavirus Reporter, Bitcoin Lottery, CALID, WebCaller, and Caller-ID.  FAC ¶¶ 8, 27–30.  Two of these apps, Coronavirus Reporter and Bitcoin Lottery, were never approved for distribution on the App Store.  *Id.* ¶¶ 29, 53.

---

[1] The agreements and Guidelines are "central" to Plaintiffs' claims, FAC ¶ 273, and are incorporated by reference in the FAC.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also* FAC ¶¶ 19, 24, 56, 74, 113–14, 135, 145, 165, 186, 195–206, 245, 254–55, 258–59, 269–71.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Coronavirus Reporter sought to collect "bioinformatics data" from users about COVID-19

2    symptoms that it would then share with "other users and [unidentified] epidemiology researchers."

3    FAC ¶¶ 48, 52.  The Coronavirus Reporter team allegedly included Dr. Robert Roberts, a former

4    cardiologist for NASA.  *Id.* ¶ 47.  The Coronavirus Reporter app was developed in February 2020,

5    and, if approved, "this startup COVID app" would allegedly have been "first-to-market."  *Id.*  The

6    Coronavirus Reporter app was rejected by Apple on March 6, 2020, under Apple's policy

7    requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a

8    government organization or medical institution.  *Id.* ¶¶ 54, 56, 69, 94, 96, 98; *see also* Guidelines

9    § 5.1.1(ix) ("Apps that provide services in highly-regulated fields (such as banking and financial

10   services, healthcare, and air travel) or that require sensitive user information should be submitted

11   by a legal entity that provides the services, and not by an individual developer").  Apple allegedly

12   denied Coronavirus Reporter's appeal from rejection on March 26, 2020, which Plaintiffs alleged

13   was concurrent with "Apples internal discussions with its own partners" in order to "further

14   cement Apple's own monopolistic trust and medi[c]al endeavors."  FAC ¶ 56.

15   Similarly, Apple allegedly rejected Plaintiff Primary Productions' Bitcoin Lottery, a

16   "blockchain app" developed by Plaintiff Primary Productions, under its alleged policy "generally

17   block[ing] blockchain apps."  FAC ¶¶ 85–86.

18   Plaintiffs' other apps (CALID, Caller-ID, and WebCaller) allegedly were approved for

19   distribution on Apple's App Store.  FAC ¶¶ 97, 103.  CALID, "a cross-platform scheduling

20   platform with an initial focus on telehealth," *id.* ¶ 94, was approved after the developer addressed

21   several violations of Apple's Guidelines, including Apple's requirement that developers use

22   Apple's payment system for in-app purchases.  *Id.* ¶¶ 95, 97.  Although Plaintiffs state that they

23   later "abandoned" the app, *id.* ¶ 97, they allege "CALID was subject to ranking suppression," *id.* ¶

24   28.  Through "ranking suppression," Plaintiff allege that Apple rendered the app "invisible on App

25   Store searches" by end users.  *Id.*  Plaintiffs similarly allege that Apple "suppressed" Caller-ID

26   and WebCaller because it competed with Apple's own Facetime app and because Apple retaliated

27   against Plaintiff Isaacs after he "informed Apple he held a patent on web caller ID, and that

28   [Apple's] crony, Whitepages . . . violated his patent."  *Id.* ¶¶ 104–07, 305.  Plaintiffs concede,

however, that Isaac's patent was invalidated. *Id.* ¶ 305.

### 3. Plaintiffs' Antitrust Claim Theory

The core of Plaintiffs antitrust claims are challenges to Apple's alleged exercise of market power in reviewing proposed apps and to Apple's unilateral authority to approve or deny which apps are allowed on the App Store. Plaintiffs challenge Apple's unilateral control over the ability of developers to access and provide apps to iOS users, including Apple's alleged practice of suppressing the visibility of apps which compete with Apple's own apps or apps of Apple's "cronies." FAC ¶ 21-23, 127, 199.

Plaintiffs' FAC articulates at least fifteen different relevant markets to its antitrust claims against Apple:

> (1) a "Smartphone Enhanced National Internet Access Devices" market;
>
> (2) a "smartphone market";
>
> (3) a "single-product iOS Smartphone Enhanced Internet Access Device" market;
>
> (4) "[t]he iOS market";
>
> (5) the "market for smartphone enhanced commerce and information flow (devices and apps) transacted via the national internet backbone";
>
> (6) the "institutional app market";
>
> (7) the "iOS institutional app market";
>
> (8) the "iOS notary stamps" market;
>
> (9) the "iOS onboarding software" market;
>
> (10) the market for access rights to the iOS userbase;
>
> (11) the "national smartphone app distribution market";
>
> (12) the "iOS App market";
>
> (13) the "US iOS Device App market";
>
> (14) the "market of COVID startups"; and
>
> (15) "the App Market."

FAC ¶¶ 8 n.1, 11, 12, 17–18, 81, 121, 135–37, 142, 165–66, 168, 233, 235. Plaintiffs' Opposition

brief attempts to clarify that certain of the alleged markets are synonyms for other alleged markets, and that, to simplify for purposes of the instant motion, Plaintiffs are focused on "two relevant foremarkets" (apparently the "US smartphone market" and the "US iOS smartphone market" which "is an alternative single-produce market to the US smartphone market") and "five downstream markets":

> (1) the institutional app market (i.e. wholesale app competition);

> (2) the iOS institutional app market (iPhone app single-product wholesale marketplace);

> (3) iOS notary stamps market (permission tokens to launch iOS apps);

> (4) iOS onboarding software ('Mac Finder' capability disabled on all nonenterprise iOS devices); and

> (5) access rights to the iOS userbase").

Docket No. 55 ("Opp.") at 7 (citing FAC ¶¶ 8 n.1, 16, 18). Plaintiffs allege that its market definitions cover and "equally apply to free apps – a major component of the ecosystem" of iOS app purchases. FAC ¶ 16.

Plaintiffs' antitrust theory allegedly "flow[s] logically" from the key fact that "the only marketplace, the only seller of apps to end-users, is Apple itself" and thus Apple monopolizes an "institutional smartphone application software marketplace" in which Apple "purchase[s]" apps from developers—by approving or rejecting them through the App Review process—and then resells them to consumers on its own terms. *Id.* ¶¶ 9–11, 19.

Plaintiffs allege that "Apple's App Store retails approximately 80% of the apps in the US consumer-facing market for smartphone apps," but that the relevant market for its antitrust claims is the "national institutional app market" where Apple "is a monopsony buyer of developers' apps." *Id.* ¶ 121. Plaintiffs allege that "Apple has complete control of pricing and contractual terms in [the national institutional app market]" and, accordingly, "they can reject apps simply because the app competes with Apple's own competitor app, or its cronies." *Id.* ¶ 127. Plaintiffs allege that Apple monopolizes three additional downstream markets, (a) iOS notary stamps market (permission tokens to launch iOS apps), (b) iOS onboarding software, and (c) access rights to the iOS userbase, through Apple's unilateral control of access to those markets. FAC ¶¶ 135-41.

United States District Court
Northern District of California

4.      Class Allegations

Plaintiffs propose to represent various classes pursuant to "Fed R. Civ. P. 23(b)(1), (2), and (3)," including for "All U.S. iOS developers of any app that was excluded through disallowance and/or ranking suppression on the App Store," and "Any iOS developer who paid a $99 annual subscription fee[] to Apple for access to the iOS userbase and/or 'app notarization.'"  FAC ¶¶ 148-51.  Plaintiffs allege that the $99 annual fee is required for app developers to access the "App Store Connect developer portal" to develop and test apps on Apple's software, and to submit apps to for Apple to consider for inclusion on the App Store.  *Id.* ¶ 135.

5.      Causes of Action

Plaintiffs allege eleven causes of action against Apple:

(1)      Violation of § 2 of the Sherman Act for "interstate restriction of smartphone enhanced internet userbase access services, iOS notary stamp and iOS onboarding software markets."  FAC ¶¶ 160-172.

(2)      Violation of § 2 of the Sherman Act for "denial of essential facility in the institutional app markets" for Apple's "exclusionary behavior that denies essential facilities" that are necessary to compete in the smartphone market, such as denying "notary stamps."  *Id.* ¶¶ 180-88.

(3)      Violation of § 1 of the Sherman Act because the "DPLA [is an] unreasonable restraint of trade" by "limiting competition in the critically important US institutional app marketplace."  *Id.* ¶¶ 195-206.

(4)      Violation of § 2 of the Sherman Act for "ranking suppression as restraint of interstate trade."  *Id.* ¶¶ 207-212.

(5)      Violation of § 1 of the Sherman Act for "tying the App Store, Notary Stamps and Software Onboarding to the iOS device market."  *Id.* ¶¶ 213-217.  Plaintiffs allege that "Apple is able to unlawfully condition access to iOS device to the use of a second product—App Store app marketplace."  *Id.* ¶ 217.

(6)      Violation of § 2 of the Sherman Act for "$99 fee illegality."  FAC ¶¶ 231-234.  Plaintiffs allege "Apple unlawfully maintains is monopoly powers in the aforementioned markets" by "issuing an illegal demand of money from 20 million aspiring developers" of $99 each year "if they wish to access the iOS userbase or get their software notarized on an iOS device."  *Id.* ¶ 235.

(7)      "*Cameron* Antitrust Class Action Opt Out:" Plaintiffs CALID and Jeffrey Isaacs "assert claims for non-zero price apps

6

as specified in the already docketed complaint *Cameron v. Apple.*"  *Id.* ¶¶ 241-43.  Plaintiffs allege the *Cameron* case, No. 19-cv-3074-YGR (N.D. Cal.) is a "developer class-action antitrust suit" where the "class is restricted to app developers who sold apps for non-zero prices."  *Id.* ¶ 36.  Plaintiffs allege that certain Plaintiffs in this case are *Cameron* class action opt-outs, and state the *Cameron* causes of action in this suit through "reference to the *Cameron* complaint."  *Id.* ¶ 132.  Plaintiffs allege that Judge Gonzalez Rogers deemed this litigation not subject to consolidation with *Cameron.*  *Id.* ¶ 243.

(8)    Breach of Contract for Apple's pretextual refusal to approve the Coronavirus Reporter app for distribution on the App Store in violation of the DPLA and Developer Agreement.  *Id.* ¶¶ 244-260.

(9)    Breach of the Covenant of Good Faith and Fair Dealing for Apple's refusal to approve the Coronavirus Reporter app.  FAC ¶¶ 261-66.

(10)    Violation of the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1962(c) because "Apple and its cronies formed an enterprise meant to exploit the work of developers by screening their ideas for purported compliance with DPLA, meanwhile lifting and appropriating their ideas for their own competing apps[.]"  *Id.* ¶ 269.

(11)    Fraud for improper rejections of and ranking suppression of disfavored apps.  *Id.* ¶¶ 309-23.

Plaintiffs initially alleged a twelfth claim against the Federal Trade Commission ("FTC") under the Administrative Procedure Act,  FAC ¶¶ 324-25, but voluntarily dismissed and withdrew that claim on November 23, 201, *see* Docket No. 83.

Plaintiffs seek damages of an estimated $200 billion and a permanent injunction restraining Apple from "denying developers access to the smartphone enhance Internet userbase." FAC at 106-07.

B.    Procedural Background

On January 19, 2021, Plaintiff Coronavirus Reporter filed the first iteration of this lawsuit in the District of New Hampshire. *Coronavirus Reporter v. Apple, Inc.* ("DNH Docket."), No. 21-cv-47, Docket No. 1 (D.N.H.).  Coronavirus Reporter twice amended its complaint in response to then-pending motions to dismiss, and then voluntarily dismissed the case when the court ordered it transferred to this jurisdiction.  DNH Docket Nos. 17, 19, 26–27, 32–33, 39–40.

On May 17, 2021, Plaintiff Primary Productions—represented by the same counsel—filed

United States District Court
Northern District of California

1    a separate, nearly identical lawsuit in the District of Maine. *Primary Prods. LLC v. Apple Inc.*

2    ("D. Me. Docket."), No. 21-cv-137, Docket No, 1 (D. Me.). There, Primary Productions amended

3    its complaint in response to Apple's motion to dismiss. D. Me. Docket Nos. 17, 21. That case

4    was then transferred to this Court, and Apple moved to dismiss the action. *See Primary Prods.*

5    *LLC v. Apple Inc.*, No. 3:21-cv-6841-EMC, Docket Nos. 27 & 32 (N.D. Cal.). Thereafter, Plaintiff

6    Primary Productions voluntarily dismissed that action. *Primary Prods.*, No. 3:21-cv-6841-EMC,

7    Docket. 36.

8         Plaintiffs Coronavirus Reporter and CALID filed this putative class action on July 20,

9    2021, raising substantially similar claims to the prior two actions. Docket. 1. They then moved for

10   a preliminary injunction. Docket No. 20. Apple moved to dismiss the complaint, and Plaintiffs

11   again amended their complaint in response. Docket No. 41. The FAC—a putative class action

12   was brought on behalf of Coronavirus Reporter, CALID, Primary Productions LLC, Jeffrey

13   Isaacs, and two different classes of app developers affected by Apple's practices —is thus the

14   seventh complaint filed by one or more of these related plaintiffs, all making similar allegations

15   and claims.

16        Apple moves to dismiss the FAC. Docket No. 45 ("Motion to Dismiss"). After amending

17   their complaint, Plaintiffs did not withdraw their motion for preliminary injunction, Docket No.

18   20, which remains pending. Instead, Plaintiff's filed a *second* motion for preliminary injunction,

19   which is also pending. Docket No. 52. In that motion, Plaintiffs also request "appending" another

20   claim to their FAC, under the California Unfair Competition Law (although Plaintiffs did not seek

21   leave to amend their complaint as required under Fed. R. Civ. P. 15(a)(2)). *Id.*

22        Finally, in response to Apple's motion to dismiss the FAC, Plaintiffs filed a "motion to

23   strike" Apple's motion to dismiss (although Plaintiffs did not cite any legal authority authorizing

24   them to move to strike Apple's motion to dismiss). Docket No. 51 ("MTS"). *Cf.* 5C Wright &

25   Miller, Fed. Prac. & Proc. Civ. § 1380 (3d ed.) ("Rule 12(f) motions [to strike] only may be

26   directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other

27   documents outside of the pleadings are not subject to Rule 12(f).").

28

United States District Court
Northern District of California

### III.   LEGAL STANDARD

A.   Failure to State a Claim (Rule 12(b)(6))

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### IV.   ANALYSIS

A.   Antitrust Claims (Counts 1-7)

Apple argues that all seven of Plaintiffs' antitrust claims should be dismissed because Plaintiffs fail to allege facts sufficient to meet two threshold conditions to proceed on any antitrust theory: (1) Plaintiffs fail to allege a plausible relevant market for their claims, and (2) Plaintiffs fail to allege antitrust injury.

As explained below, the Court dismisses all of the antitrust claims for Plaintiffs' failure to satisfy these threshold conditions.  As such, the Court cannot and does not address whether

1  Plaintiffs have sufficiently plead facts to state substantive antitrust claims.

2          1.      Relevant Market for Antitrust Claims

3          "A threshold step in any antitrust case is to accurately define the relevant market, which

4  refers to 'the area of effective competition.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d

5  974, 992 (9th Cir. 2020) (citation omitted); *see also Image Tech. Servs., Inc. v. Eastman Kodak

6  Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field in which meaningful

7  competition is said to exist." (citing *United States v. Continental Can Co.*, 378 U.S. 441, 449

8  (1964))).  Market definition is an essential predicate to the entire case, for "[w]ithout a definition

9  of [the] market there is no way to measure [the defendant's] ability to lessen or destroy

10 competition.'" *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018).

11         Typically, the relevant market is the "arena within which significant substitution in

12 consumption or production occurs." *Id.* (citation omitted).  But courts should "combine different

13 products or services into 'a single market' when "that combination reflects commercial realities."

14 *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–337 (1962) (pointing out that "the

15 definition of the relevant market" must "'correspond to the commercial realities' of the industry")).

16 "The principle most fundamental to product market definition is 'cross-elasticity of demand' for

17 certain products or services." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291–92 (9th Cir. 1979).

18 "Commodities which are 'reasonably interchangeable' for the same or similar uses normally

19 should be included in the same product market for antitrust purposes." *Id.*  "This

20 interchangeability is largely gauged by the purchase of competing products for similar uses

21 considering the price, characteristics and adaptability of the competing commodities." *United

22 States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380–81 (1956).  "In defining the relevant

23 market, the court must look beyond the particular commodity produced by an alleged monopolist

24 because the relevant product market for determining monopoly power, or the threat of monopoly

25 control, depends upon the availability of alternative commodities for buyers." *Kaplan,* 611 F.3d at

26 292 (citing *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978)).  A plaintiff

27 cannot ignore economic reality and "arbitrarily choose the product market relevant to its claims";

28 rather, the plaintiff must "justify any proposed market by defining it with reference to the rule of

United States District Court
Northern District of California

10

1    reasonable interchangeability and cross-elasticity of demand." *Buccaneer Energy (USA) v.*

2    *Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) (internal quotation marks and

3    citation omitted).

4         Where a complaint fails to adequately allege a relevant market underlying its antitrust

5    claims, those claims must be dismissed.  *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D.

6    Cal. Mar. 11, 2021).

7                    a.    <u>Unclear Market Definitions</u>

8         First, Apple correctly observes that the FAC lacks clarity as to the relevant product

9    markets for Plaintiffs' antitrust claims.  The FAC articulates and references at least fifteen

10   different markets and does not always define the boundaries of or differences between those

11   markets.  *See e.g.,* FAC ¶¶ 8 n.1, 11, 12, 17–18, 81, 121, 135–37, 142, 165–66, 168, 233, 235;

12   Motion to Dismiss at 7-9.  For example, Plaintiffs mention the "the App Market" twice in the

13   complaint but do not define it.  FAC ¶¶ 109, 183.  It is not clear whether this is the same as,

14   distinct from or overlapping with the "national market of apps for smartphone enhanced internet

15   access devices," *id.* ¶ 121; "the US consumer-facing market for smartphone apps," *id.*; or the

16   undefined "app submarkets" referenced elsewhere, *id.* ¶¶ 168, 235.  Plaintiffs suggest at one point

17   that these "app markets . . . are downstream from the smartphone enhanced device market."  *Id.* ¶

18   183.  But this articulation would seem to contradict Plaintiffs' allegations that hardware and

19   software are "bundle[d]" together in a single "Smartphone Enhanced Internet Information and

20   Commerce Access Device" market, *id.* ¶¶ 15–16, which itself is an apparent sub-market of the

21   "market for smartphone enhanced commerce and information flow (devices and apps) transacted

22   via the national internet backbone," *id.* ¶ 234.  The FAC does not define these terms.  And,

23   depending on the boundaries of the alleged markets, they do not seem to correspond with the

24   products subject to the alleged antitrust conduct.  For instance, it is not clear why the Coronavirus

25   Reporter is an app or program that can only be used on Apple smartphones and not on other

26   smartphone enhanced Internet access devices, or any other device that has access to the internet.

27   Why can the app not be used on laptops and desktops?

28        Plaintiffs attempt to bring clarity to the FAC through its briefing by seeking to narrow the

United States District Court
Northern District of California

1   relevant markets upon which it relies, and abandoning many markets alleged in the FAC.

2   However, it is not permissible for Plaintiffs to amend their complaint through motion practice.

3   *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010).  But even if the Court were to

4   credit Plaintiffs' attempt at clarifying the scope of the FAC through briefing, Plaintiffs' newly

5   proposed relevant markets still rely on inconsistent explanations regarding the relevant product

6   markets.

7       Plaintiffs now argue that the principal markets on which their antitrust claims are two

8   foremarkets – "US Smartphones" or "an alternative single brand foremarket" of "US iOS

9   Smartphones" – and *four* downstream markets, "which by definition, Apple has 100% control

10  over: the iOS institutional App Market, the iOS notary stamp market, the iOS application loader

11  market and the iOS userbase market."  MTS ¶¶ 11-12.  But then, in Plaintiffs' Opposition to

12  Apple's Motion to Dismiss, they contend that, notwithstanding the various references to other

13  markets throughout the complaint, their antitrust claims are predicated on two foremarkets and *five*

14  downstream markets.  Docket No. 45 ("Opposition") at 7.  More notably, the term "foremarket"

15  does not appear in Plaintiffs' FAC; it is an entirely new concept unanchored to the FAC.

16      Even if the Court were to proceed from Plaintiffs' narrowest formulation of the relevant

17  markets for its claims – the two foremarkets and four downstream markets to which Plaintiffs refer

18  in their Motion to Strike, MTS ¶¶ 11-12 – this attempt at creating a narrower framework for the

19  product market analysis fails to provide sufficient clarity to pass muster.  Does the "market for

20  smartphone enhanced commerce and information flow (devices and apps) transacted via the

21  national internet backbone," FAC ¶ 234, correspond to Plaintiffs' now asserted "US smartphones"

22  foremarket or to one of Plaintiffs' single-brand downstream markets?  What is included in the

23  market for U.S. smartphones?  All brands?  What about devices such as tablets?  Do the included

24  products have to be Internet-enabled?  What if they access the Internet only through a Wi-Fi

25  connection?  And where do Plaintiffs' allegations about Apple's monopoly over "the iOS market,"

26  *id.* ¶ 124 fit into its proposed framework of two foremarkets and four downstream markets?  How

27  do the newly asserted markets relate to Plaintiffs' allege antitrust injury in the "market of COVID

28  startups"?  *Id.* ¶ 81.

1    In summary, the FAC does not provide sufficient clarity for the Court to assess the

2    threshold question of whether there is a relevant market for Plaintiffs antitrust claims.  One cannot

3    discern what is included and what is not, and thus analysis of cross-elasticity of demand is not

4    possible.  Nor do the newly asserted markets appear to correspond to the markets and allegations

5    pleaded in the FAC.

6    The Court may dismiss Plaintiffs' antitrust claims based on these findings alone.  *Sumotext*

7    *Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016)

8    ("The Court also finds the allegations of the relevant market to be unclear, and it disagrees with

9    Sumotext that the relevant market need not be alleged at the pleading stage."); *Newcal Indus., Inc.*

10   *v. Ikon Office Sol.*, 513 F.3d 1038, 1044 & n.3 (9th Cir. 2008) (a plaintiff alleging a claim under

11   either Section 1 or Section 2 of the Sherman Act must allege the existence of a relevant market

12   and that the defendant has power within that market); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059,

13   1064 (9th Cir. 2001) (affirming dismissal based on contradictory market definitions).

14                         b.    Plausibility of Alleged Product Markets

15   In light of the foregoing analysis that Plaintiffs' alleged product markets lack clarity, the

16   Court need not analyze the plausibility of any of the product markets which Plaintiffs allege.

17   Nonetheless, the Court will assume *arguendo* Plaintiffs' attempt to narrow the relevant markets to

18   two foremarkets and four downstream markets are defined with sufficient clarity, MTS ¶¶ 11-12,

19   and thus analyzes the plausibility of those six markets (while ignoring other markets that Plaintiffs

20   alleged in the FAC and now seem to abandon).  The Court finds that these alleged markets do not

21   satisfy Rule 12(b)(6)'s plausibility standard.

22   Plaintiffs' Motion to Strike proposes the following six markets to underlie Plaintiff's

23   antitrust claims:

24         (1) Foremarket 1: "US Smartphones." MTS ¶ 11; FAC ¶ 15
                ("Smartphone Enhanced Internet Information and Commerce
25              Access Device Marketplace"); *id.* ("A smartphone is an
                ecosystem of hardware AND software. . . The iPhone exists
26              within the marketplace for smartphones."); *id.* ¶ 16 ("The
                marketplace here is the smartphone internet access device."); *id.*
27              ¶ 121 ("There is a relevant national market of apps for
                smartphone enhance internet access devices, which are critical to
28              the flow of information and commerce.").

United States District Court
Northern District of California

13

(2) Foremarket 2: "an alternative single brand foremarket" of "US iOS Smartphones." MTS ¶ 12; FAC ¶ 18 ("Lastly, we define the single-product marketplace for iOS devices, a subset (80%) of the US smartphone internet access device marketplace."); *id.* ¶ 124 ("the iOS smartphone internet access device market is a relevant market under Sherman.").

(3) Downstream Market 1: "iOS institutional App Market." MTS ¶ 12; FAC ¶ 18 ("iOS Device Application Institutional Marketplace. . . Distributors buy apps, like film studios buy movie rights. . . Largely Theoretical Marketplace: Apple does not recognize it as a legitimate market in their DPLA agreement. Nonetheless, Apple monopsony "buys" millions of apps at a price of zero."). Plaintiffs allege that "by definition, Apple controls nearly 100% of the iOS institutional App marketplace . . . and hence no competing institutional app buyers." FAC ¶ 126.

(4) Downstream Market 2: "iOS notary stamp market." MTS ¶ 12. Plaintiffs allege that "Apple must issue a 'notarization' or digital encryption signature, in order for an app to launch . . . Apple is the sole producer of these notarizations stamps." FAC ¶ 135.

(5) Downstream Market 3: "iOS application loader market." MTS ¶ 12. Plaintiffs allege that "like the iOS app notarization stamp, the iOS app onboarding software is a critical component to access the critical infrastructure that is the national iOS 'network effect.'" FAC ¶ 136.

(6) Downstream Market 4: "iOS userbase market." MTS ¶ 12. Plaintiffs allege that there is a market "for access rights to the smartphone enhanced internet userbase" and "Apple. . . charges developers $99 for these (partial, selectively limited) access rights." FAC ¶ 140.

There are several problems under Rule 12(b)(6) with the relevant markets which Plaintiffs propose.

First, Plaintiffs do not plead facts sufficient to justify their proposed relevant markets. Recall that the "principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan*, 611 F.2d at 291–92. The FAC lacks any discussion of cross-elasticity of demand for certain products or services (a point Plaintiffs concede, Opp. at 7). Moreover, five of the six markets that Plaintiffs allege are single-brand markets in which Plaintiffs have drawn the definitional lines to such that the *only market participant* is inherently and necessarily Apple, MTS ¶¶ 11-12, however, Plaintiffs have not alleged facts required to justify defining these markets as *single-brand* markets.

United States District Court
Northern District of California

1    "Single-brand markets are, at a minimum, extremely rare" and courts have rejected such

2    market definitions "[e]ven where brand loyalty is intense." *Apple, Inc. v. Psystar Corp.*, 586 F.

3    Supp. 2d 1190, 1198 (N.D. Cal. 2008) (internal quotation marks and citation omitted). *But see id.*

4    "It is an understatement to say that single-brand markets are disfavored. From nearly the inception

5    of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets[.]"

6    *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019);

7    Herbert J. Hovenkamp, *Markets in IP & Antitrust*, 100 Geo. L.J. 2133, 2137 (2012) ("[A]ntitrust

8    law has found that a single firm's brand constitutes a relevant market in only a few situations.").

9    To be sure, "[a]ntitrust markets consisting of just a single brand, however, are not per se

10   prohibited. . . . In theory, it may be possible that, in rare and unforeseen circumstances, a relevant

11   market may consist of only one brand of a product." *Apple, Inc. v. Psystar Corp.* at 1198. On the

12   other hand, as the court in *Epic v. Apple* recently reiterated, "[a] single brand is *never* a relevant

13   market when the underlying product is fungible." *Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-

14   05640-YGR, 2021 WL 4128925, at *87 (N.D. Cal. Sept. 10, 2021) (citation omitted, emphasis in

15   the original).

16       Despite the foregoing, "in some instances one brand of a product can constitute a separate

17   market." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) ("*Eastman*

18   *Kodak*"). Determining whether a single-brand market is proper requires "a factual inquiry into the

19   'commercial realities' faced by consumers." *Id.* (quoting, *Grinnell Corp.*, 384 U.S. at 572). In

20   *Eastman Kodak*, the Supreme Court considered whether summary judgment was appropriate for

21   Kodak on Sections 1 and 2 claims where the plaintiffs had argued that Kodak possessed monopoly

22   power in the *aftermarket* of sales of parts and repair services, despite not having such power in the

23   foremarket of equipment sales. 504 U.S. at 466–471. In affirming the Ninth Circuit's reversal of

24   summary judgment, the Supreme Court identified two factors that supported the aftermarket

25   framework: the existence of significant (i) "information" costs and (ii) "switching costs." *Id.* at

26   473.

27       Since then, the Ninth Circuit in *Newcal Industries Inc. v. Ikon Office Solution* outlined four

28   factors that could indicate whether an alleged market is a properly defined single-brand

15

aftermarket under *Eastman Kodak* at the motion to dismiss stage.  *See* 513 F.3d 1038, 1049–50 (9th Cir. 2008).  The first indicator of an aftermarket is that the market is "wholly derivative from and dependent on the primary market."  *Id.* at 1049.  The second indicator is that the "illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market."  *Id.* at 1050.  The third indicator is that the defendant's market power "flows from its relationship with its consumers" and the defendant did "not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market."  *Id.*  The fourth indicator is that "[c]ompetition in the initial market. . . does not necessarily suffice to discipline anticompetitive practices in the aftermarket."  *Id.*

"[T]o establish a single-brand aftermarket under *Kodak* and *Newcal*, the restriction in the aftermarket must not have been sufficiently disclosed to consumers in advance to enable them to bind themselves to the restriction knowingly and voluntarily."  *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 987 (N.D. Cal. 2010).  Indeed, "[m]arket imperfections" may "prevent consumers from discovering" that purchasing a product in the initial market could restrict their freedom to shop in the aftermarket.  *Newcal*, 513 F.3d at 1048.  In other words, a plaintiff must show evidence "to rebut the economic presumption that [defendant's] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to" purchase in the foremarket.  *Newcal*, 513 F.3d at 1050.

As to Plaintiffs' attempt to allege a single-brand market, Plaintiffs provide no response to Apple's argument that they fail to allege facts going to the four factors as required by *Newcal* to survive a motion to dismiss to justify their proposed *single brand aftermarkets*.  513 F.3d at 1049–50.  Plaintiffs *cannot* satisfy *Newcal* based on the facts they have alleged.  Plaintiffs suggest that the four *single-brand* downstream markets (or aftermarkets) flow from the **single-brand foremarket** of iOS smartphones.  *See* FAC ¶¶ 125 ("the iOS Institutional App marketplace is downstream. . . from the single-product iOS device market."), 135 ("The citizens of our country have invested around a trillion dollars in the iOS network effect. . . the market for iOS app notarization stamps is a relevant antitrust market"), 136 ("Like the iOS app notarization stamp, the iOS app onboarding software is a critical component to access the critical infrastructure that is the

national iOS network effect."); MTS ¶ 12 ("Four downstream markets are alleged, which by definition, Apple has 100% control over."). Yet, Plaintiffs do not cite a single antitrust case that has *ever* recognized a ***single-brand foremarket***, and their attempt to define a single-brand foremarket market around "iOS smartphones" without any explanation for why that market should be so limited and without any reference to competitor products or substitutes runs afoul of the principle that "[a] single brand is *never* a relevant market when the underlying product is fungible." *Epic,* 2021 WL 4128925, at *87.

Moreover, Plaintiffs do not attempt to plead facts to satisfy *Newcal's* four factors to justify their proposed single brand aftermarkets. *Newcal* requires Plaintiffs to show (1) the aftermarket is wholly derivative from the primary market, (2) the illegal restraints of trade relate only to the aftermarket, (3) the defendant did not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market, and (4) competition in the initial market does not suffice to discipline anticompetitive practices in the aftermarket. 513 F.3d at 1048-50. Importantly, the *Newcal* factors require Plaintiffs to articulate the relationship between a *non-brand limited foremarket* and *the single-brand aftermarkets*. But, here, Plaintiffs do not plead any facts demonstrating the relationship between the non-brand limited foremarket of US Smartphones and the four single-brand aftermarkets. Thus, Plaintiffs fail to allege facts as required by *Newcal* to sustain their single-brand markets.

On a broader level, Plaintiffs fail to plead facts sufficient to justify any of the six alleged relevant markets under the standard rules for *any* market, let alone do they plead the specific facts required to justify its *five* single-brand markets as required by *Newcal* at the motion to dismiss stage. *See Buccaneer Energy*, 846 F.3d at 1313 (A plaintiff cannot ignore economic reality and "arbitrarily choose the product market relevant to its claims;" rather, the plaintiff must "justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand."). The asserted markets are not secondary markets derived from consumers who are unknowingly captured and held prisoner through a primary market. Instead, according to Plaintiffs' theory, the asserted markets appear to stand on their own, and, for the reasons stated above, lack plausibility.

Plaintiffs do not dispute Apple's arguments about lack of interchangeability analysis. They argue that their failure to provide analysis of cross-elasticity of demand in the FAC "is not fatal to Plaintiffs' claims" because each of the submarkets alleged are well-defined in themselves, and their boundaries can be refined through discovery. Opp. at 7-8 (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)). This is incorrect. "Authorities far too numerous to cite or discuss in detail have established" that "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'" *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," therefore, "the relevant market is legally insufficient." *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

But even if Plaintiffs' alleged Foremarket 1 of "US Smartphones" could be sustained, none of Plaintiffs' antitrust claims about Apple's actions are shown to impact that market. Plaintiffs must define "the relevant market, which refers to 'the area of effective competition.'" *Qualcomm.*, 969 F.3d at 992. Plaintiffs fail to define that area of effective competition in which they compete. They are not smartphone manufacturers. Nor do they provide any other basis for the Court to find that the market of US Smartphones is the "area of effective competition" for Plaintiffs' claims. *See e.g., Pistacchio v. Apple Inc.*, No. 4:20-CV-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) ("[T]he relevant market definition contains sparse supporting allegations. First, as noted, Pistacchio is required, and has not included appropriate allegations demonstrating that there are *not* appropriate economic substitutes for Apple Arcade on the iOS platform. . . . The complaint offers no specific allegations supporting the sole focus of the market definition on cloud gaming alternatives as opposed to the broader video game market generally, including those individually sold both in the Apple App Store or by competitors on computer or console platforms, nor does the complaint contain allegations supporting the narrowing of a market to consideration of a subscription based payment model.").

Second, the four downstream single-brand markets on which Plaintiffs' antitrust claims rely run afoul of a fundamental principle for antitrust market definition: they are not markets for products or services. *See e.g., Newcal*, 513 F.3d at 1045 ("First and foremost, the relevant market

18

must be a *product* market.  The consumers do not define the boundaries of the market; the products or producers do.") (Emphasis in original); *Kaplan*, 611 F.2d at 292 ("In arriving at an adequate market definition, price differential between competing products and services is a relevant factor to consider[.]").  For example, Plaintiffs alleged iOS Institutional App Market is defined as a market in which Apple "buy[s]" apps from developers by approving or rejecting them for distribution on the App Store.  But Plaintiffs themselves admit this "market" is "largely theoretical," "hypothetical," and untethered to the licensing arrangement on which the App Store is actually predicated.  *Id.* ¶¶ 18, 19, 121.  Plaintiffs acknowledge that Apple's app review process is not one in which Apple buys the apps of developers, but, rather the "DPLA and App Store employ language that a free app is 'For Sale' or 'Available' through the App Store after gaining 'approval' by Apple for 'adherence to iOS standards.'"  *Id.* ¶ 19.  The DPLA confirms this arrangement, explaining that "Applications that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store" and if "selected by Apple, Your Applications will be digitally signed by Apple and distributed[.]" DPLA § Purpose. The DPLA does not include any provisions indicating that Apple pays developers or "buys" apps through the app review process.  Rather than buying apps, as discussed in greater detail below, Apple enables the distribution of apps to end users through the app review process.

Similarly, there is no basis supporting Plaintiffs' notion that the proposed downstream markets of "iOS notary stamps," "iOS application loaders," and "iOS userbase" are markets for *products*.  Rather, as Plaintiffs acknowledge, each of these three markets refer to component parts a developer may access and use when a developer's app is approved for distribution on the App Store.  *See* FAC ¶¶ 135-40.  These three markets are neither *markets* nor do they describe *products* but integrated features of Apple's app approval process.  Plaintiffs' articulation of these markets is contrived and does not reflect the reality of an actually-existing product market.  Indeed, the Court in *Epic* rejected the alleged "foremarket for Apple's own operating system" on Apple mobile devices as "'artificial,'" "entirely litigation driven, misconceived, and bear[ing] little relationship to the reality of the marketplace" because the Court determined that the operating system was an

19

integrated feature of the mobile devices, and that it was "illogical to argue that there is a market for something that is not licensed or sold to anyone." *Epic*, 2021 WL 4128925, at *29. The *Epic* Court summarized that there were "fundamental factual flaws with Epic Games' market structure" because "[w]ithout a product, there is no market for the non-product, and the requisite analysis cannot occur." *Id.* at *86; *see also id.* ("Thus, where there is no product or market for smartphone operating systems, there are no derivative markets."). The *Epic* Court also rejected the proposed "payment solutions aftermarket" for "the independent reason that [the "In App Purchases" feature set out in Apple's DPLA] is not a product for which there is a market." *Id.* The same analysis applies here: in the absence of information demonstrating that Plaintiffs' downstream markets describe *actually existing products* that are sold or licensed, Plaintiffs' aftermarkets are "without a product, there is no market for the non-product, and the requisite analysis cannot occur." *Id.*

Third, the markets Plaintiffs allege fail to grapple with their own admission and economic reality that the "iOS App market is two-sided." FAC ¶ 12; *accord id.* ¶¶ 11, 17, 18, 123, 125. The Court in *Epic* addressed the nature of the Apple's iOS App marketplace, and Plaintiffs do not dispute its analysis or conclusion that as a two-sided market the iOS App marketplace is a market not for products but for *transactions*:

> As a threshold issue, the Court considers whether the App Store provides two-sided transaction services or as Epic Games argues "distribution services." The Supreme Court has seemingly resolved the question: two-sided transaction platforms sell transactions. In two-sided markets, a seller "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 138 S. Ct. at 2280. Here, try as it might, Epic Games cannot avoid the obvious. Plaintiff only sells to iOS users through the App Store on Apple's platform. No other channel exists for the transaction to characterize the market as one involving "distribution services." . . .Accordingly, the Court finds that the relevant App Store product is transactions[.]

*Epic*, 2021 WL 4128925, at *83. As such, Apple's iOS App two-sided app market is "best understood as supplying only one product—transactions—which is jointly consumed" by developers and consumers on opposing sides of the platform. *Amex*, 138 S. Ct. at 2286 n.8. Therefore, the relevant market must be some category of "transactions" between developers and consumers. *Epic*, 2021 WL 4128925, at *83–86; *accord Amex*, 138 S. Ct. at 2287 ("[W]e will analyze the two-

United States District Court
Northern District of California

sided market for credit-card transactions as a whole to determine whether the plaintiffs have shown that Amex's antisteering provisions have anticompetitive effects.").  As the court in *US Airways v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019), explained, "A transaction platform is a two-sided platform where the business "cannot make a sale to one side of the platform without simultaneously making a sale to the other. . . As a result, "[e]valuating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition."

Despite conceding the fact that the iOS App market is a two-sided market of transactions, Plaintiffs four proposed downstream single-brand markets each cut up the app marketplace into admittedly "hypothetical" and "theoretical," FAC ¶¶ 18-19, one-sided markets, with no reference to the *transaction between* developers and consumers that is the actual product on the platform. Instead, it posits Apple as the monopsony buyer of the apps.  *See* FAC ¶ 121 ("The other side of this market is the national institutional app market . . Apple is a monopsony buyer of developers' apps, in the institutional app market, because they are sole distributor on the retail side."). Specifically, Plaintiffs advance a *theory* that Apple is an "institutional buyer" of apps and that it "sells" notary stamps, onboarding software and userbase access to developers.  But this theoretical framework does not align with the economic reality that Plaintiffs concede: that the iOS App market is a two-sided market of transactions between developers and consumers.  Developers are engaged in a *transaction* with consumers, not selling to Apple.

As the court in *Epic* explained, although Apple may be involved in facilitating an exchange through its operation of the App Store platform, ultimately "users and developers consume App Store transactions."  2021 WL 4128925, at *83.  Plaintiffs' failure to allege relevant markets that encompass or even address the two-sided nature of the iOS App market renders their market definitions insufficient as a matter of law.  *Amex*, 138 S. Ct. at 2287 ("[C]ompetition cannot be accurately assessed by looking at only one side of the platform in isolation."); *Sabre Holdings Corp.*, 938 F.3d at 57 ("In other words: In cases involving two-sided transaction platforms, the relevant market must, as a matter of law, include both sides of the platform."); *Epic*, 2021 WL 4128925, at *86 ("Epic Games' aftermarket approach to market definition is inconsistent with its recognition that the App Store constitutes a two-sided transaction platform which it fails to

properly analyze.").  Plaintiffs offer no argument on this point.

In summary, missing from Plaintiffs' market definitions is the identification of *any* well-pleaded allegations that support the boundaries they seek to defined.  Plaintiffs fail to plead facts sufficient to adequately define any of their markets (making any kind of analysis on interchangeability and cross-elasticity of demand impossible), fail to rationalize and defend the five single-brand markets; do not define markets for actual products; and ignore the two-sided nature of the iOS app market.  "A threshold step in any antitrust case is to accurately define the relevant market."  *Qualcomm Inc.*, 969 F.3d at 992.  Because Plaintiffs have failed to "rigorously address[]" market definition, their complaint warrants dismissal.  *City of Oakland v. Oakland Raiders*, 445 F. Supp. 3d 587, 600 (N.D. Cal. 2020).

### 2.    Antitrust Injury

Apple also argues that Plaintiffs fail to plead antitrust injury.

To plausibly state antitrust claims in this market for transactions of apps (which cannot plausibly be limited to iOS apps based on the allegations in the FAC, as discussed above), Plaintiffs must allege injury to "competition in the market as a whole"—such as marketwide reduction in output or increase in prices—"not merely injury to itself as a competitor" in the market.  *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013).  This alleged harm also must be "'attributable to an anticompetitive aspect of the practice under scrutiny'"; "harm that could have occurred under the normal circumstances of free competition" does not suffice.  *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

Apple argues that Plaintiffs' theory of injury is that *their* apps were rejected from the App Store or subjected to alleged ranking suppression.  Motion to Dismiss at 6; FAC ¶¶ 28–30, 53, 87.  Yet, Apple contends, Plaintiffs make no allegation that Apple's conduct excluded Apple competitors, suppressed output of the market, increased app prices, or otherwise harmed competition *in the market* beyond Plaintiffs' conclusory allegations of "damage to an entire market," FAC ¶ 81, or unadorned references to "restricted output, quality, and innovation."  *Id.* ¶¶ 115, 191.  "[A] formulaic recitation of the elements of a cause of action will not do."  *Twombly*,

550 U.S. at 555.

Additionally, Apple argues that Plaintiffs ignore the nature of the App Store platform such that for every app that is allegedly "suppressed" in search rankings, another app's visibility is lifted.  Motion to Dismiss at 6.  The effect of "suppression" in search rankings affects the relative positions among products in the market; but there is no showing of harm to competition across the market.  Effects on *Plaintiffs'* apps alone, which may raise equitable issues as *between* app developers, do not establish *antitrust* injury.  As the Court noted in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), "[t]he antitrust laws . . . were enacted for the protection of competition not competitors." (Quotation marks omitted).

Finally, Apple argues that Plaintiffs cannot merely declare that every app rejection injures competition by decreasing output and constricting consumer choice, because "if that were the rule, the Sherman Act would inhibit competition by requiring all platforms to increase the number of available apps—no matter if they contained malware, were offensive, sought to scam users, or were inferior copycats that could confuse consumers."  Docket No. 64 ("Reply") at 8.  Relying on the *Epic*'s analysis, Apple contends that consumers instead "should be able to choose between the type of ecosystems and antitrust law should not artificially eliminate them."  *Epic*, 2021 WL 4128925, at *29.  The App Store's curation—which differentiates it from other platforms—helps "maintain[] a healthy ecosystem that ultimately benefits" users and developers.  *Id.* at *75.  Thus, Apple concludes, Plaintiffs offer no plausible theory that Apple's policies reduce the net quality of transactions in a relevant market, their allegations amount only to individual harm.  *See Gorlick*, 723 F.3d at 1025.

Plaintiffs respond by arguing that they plead "harm to competitors" or "harm to the market" throughout the FAC, and that it is enough that Plaintiffs plead the harm generally at the motion to dismiss stage.  Opp. at 11-12 (citing FAC ¶¶ 53, 81, 173, 174, 179, 200).  Additionally, Plaintiffs point to a Congressional Subcommittee report which they contend provides the requisite detail to sustain their allegations of marketwide harm.  Opp. at 12.

The Court disagrees.  The allegations of injury contained in the FAC are either confined to specific harms experienced by Plaintiffs or a small group of competitors, rather than harm to the

market.  None of the allegations in the FAC allege harm generally to the market of transactions for

apps across a relevant market.

Plaintiffs' allege various types of antitrust injury, all of which are insufficient:

- "Apple's refusal to sell notarization stamps or onboarding software . . . is intended to harm competition app developers, like Plaintiffs and Class Members."  FAC ¶ 173.

- "The artificial monopoly created by notarization stamps and software onboarding results in damages to nearly twenty million proposed class members of approximately one thousand dollars each. . . When the stamps aren't issued, further damages accrue from lost app revenues. . . In China, 'open' app stores are ten times the size of Apple's App Store in China."  FAC ¶ 174.

- "Much damage is done to the overall competition within the institutional app markets, as a result of Apple's anticompetitive practices in userbase access, notarization and onboarding.  But the damages extend beyond those markets, into the overall US economy, and even public health response, in the case of Coronavirus Reporter."  FAC ¶ 179

- "Apple's conduct and unlawful contractual restrains harm a market that forms a substantial part of the domestic economy, the smartphone enhanced internet device app market."  FAC ¶ 200.

The assertions at FAC ¶¶ 173, 179 and 200 amount to conclusory and "threadbare recitals"

of the elements of antitrust injury that are insufficient to state a claim.  *Iqbal*, 556 U.S. at 663; *see*

*also, e.g., NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d

1065, 1074 (N.D. Cal. 2018) (dismissing antitrust claims because "there are no non-conclusory

allegations that [Defendant's] actions restrained trade in the relevant market or injured overall

competition" and the allegations "lack factual enhancement and are conclusory."); *Eastman v.*

*Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 835 (N.D. Cal. 2015) (same); *Feitelson v. Google*

*Inc.,* 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) (same).  Additionally, as discussed above, these

allegations relate to harms in hypothetical, non-existent single-brand markets – not in a relevant,

actually-existing, two-sided, brand-differentiated market for app transactions.

Although the allegation at FAC ¶ 174 provides some factual basis for Plaintiffs' theory of

injury—asserting that Apple's App Review process necessarily injures competition by excluding a

number of developers from launching apps on Apple's App Store—this allegation on its own is

not sufficient to plead to antitrust injury for two reasons.  First, Plaintiffs ignore the App Store

serves a two-sided transaction market.  As *Epic* held, in a two-sided transaction market, there must

be consideration of the "effects on both sides of the market."  2021 WL 4128925, at *102.

Plaintiffs' theory of antitrust injury alleges injury on only one side of the transaction – developers

– but fails to grapple with the second side of the transaction market, consumers.  Indeed, that apps

which comply with Apple's generally applicable "Guidelines" regarding security, functionality

and reliability are approved over those that do not is consistent with "normal circumstances of free

competition" and may well serve the best interests of consumers.  *In re NFL's Sunday Ticket*

*Antitrust Litig.*, 933 F.3d at 1150.  It is not enough that conduct "has the effect of reducing

consumers' choices or increasing prices to consumers." *Brantley v. NBC Universal, Inc.*, 675 F.3d

1192, 1202 (9th Cir. 2012)).  That is because these effects may arise for procompetitive reasons,

such as increased interbrand competition.  *See Leegin Creative Leather Products, Inc. v. PSKS,*

*Inc.*, 551 U.S. 877, 891-93 (2007).  As the court held in *Epic*, Apple's "centralized app distribution

and the 'walled garden' approach differentiates Apple from Google."  2021 WL 4128925, at *102.

"That distinction ultimately increases consumer choice by allowing users who value open

distribution to purchase Android devices, while those who value security and the protection of a

'walled garden' to purchase iOS devices."  Although the conclusion in *Epic* is not necessarily

controlling here, Plaintiffs alleged theory of antitrust injury fails to give *any* consideration of the

consumer-side of the two-sided transaction market.  Failure to allege injury that harmed overall

competition in the relevant market—here, a two-sided market of transactions—undermines

Plaintiffs' theory of antitrust injury.  *See NorthBay Healthcare*, 305 F. Supp. 3d at 1074.

       Second, even if it is assumed that Apple exercised monopsonist market power in the apps

transaction market, its decisions as to which apps are allowed to sell through the App Store is not

an act that in itself causes harm the antitrust laws were designed to protect.  Plaintiffs failed to

make any allegation the Apple benefits from its rejection of apps or from suppression of apps in

the search function.  There is no showing that Apple is reaping the fruits of anti-competitive

conduct.  The deficiency of Plaintiffs' claim in asserting an antitrust injury is demonstrated by the

following analogy.  Query:  if the only newspaper in town decides which advertisements may

properly be posted or which advertisements to accept, does a rejected advertiser suffer an anti-trust injury? No. That is not the kind of injury antitrust laws are intended to protect. As noted above, antitrust law protections competition, not competitors. In contrast, if the newspaper attempted to squelch competition by telling advertisers if they dare advertise in an up-and-coming competing newspaper or radio station, they will be barred from its newspaper, that could suffice to show anti-trust injury. *See e.g., Lorain J. Co. v. United States*, 342 U.S. 143, 150–51, 152 (1951) ("The publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated § 2" of the Sherman Act). Plaintiffs do not allege facts any such antitrust injury in the FAC.

To be sure, Plaintiffs allege that:

> "Apple rejected Coronavirus Reporter on March 6, 2020, knowing apps from large institutions and strategic partners were in the pipeline but not yet ready. Apple specifically strategized to prevent the Coronavirus Reporter app, and *all* COVID startup firms, from setting a precedent or amassing a user base, which could jeopardize its own pipeline and/or the first-mover advantage of desirable institutional partners of a monopolistic trust." FAC ¶ 53.

If Apple were to reject or suppress Plaintiffs' apps to diminish competition for Apple's own apps or apps of other developers with whom Apple is conspiring, that might be deemed to inflict antitrust injury. But the FAC and ¶ 53 fail to plausibly allege such conduct with any specificity.

Finally, Plaintiffs' argument that by incorporating by reference a "House Subcommittee report" regarding Apple's business practices into the FAC they have sufficiently plead antitrust injury is unavailing. Opp. at 12. Although the FAC makes reference to the report and states that the report is incorporated by reference, FAC ¶¶ 37-45, Plaintiffs do not connect the findings in the report to their theory and allegations of antitrust injury to the entire market in this case. At most, Plaintiffs allege that aspects of Apple's business practices described in the report "directly harmed Plaintiffs and class members," FAC ¶¶ 40-41, but go no further in elaborating how the practices alleged in this case inflicted antitrust injury in the two-sided market relevant here.

Thus, in addition to Plaintiffs failing to define a relevant market for their antitrust claims, Plaintiffs fail to sufficiently plead antitrust injury in the FAC even if the Court were to assume a relevant market had been defined. This failure provides a second and independent basis for the

1     Court to dismiss Plaintiffs' antitrust claims (Claims 1-7).  Because Plaintiffs have failed to make

2     the threshold showings of a plausible a relevant market and alleging antitrust injury, the Court

3     need not analyze whether they have alleged facts sufficient to satisfy the substantive elements of

4     Plaintiffs' particular antitrust claims.  *See e.g., Amex*, 138 S. Ct. at 2285 (Market definition is an

5     essential predicate to the entire case, for "[w]ithout a definition of [the] market there is no way to

6     measure [the defendant's] ability to lessen or destroy competition.'").

7     B.     Contract Claims (Claims 8 and 9)

8            Plaintiffs bring two breach of contract claims: (1) breach of contract for Apple's pretextual

9     refusal to approve the Coronavirus Reporter app for distribution on the App Store in violation of

10    the DPLA and Developer Agreement, FAC ¶¶ 244-260 (Claim 8), and (2) breach of the covenant

11    of good faith and fair dealing for Apple's refusal to approve the Coronavirus Reporter app, *id.* ¶¶

12    261-66 (Claim 9).  Plaintiffs fail to state claims for breach of contract and, accordingly, these

13    claims are dismissed.

14           To state a breach of contract claim under California law, DPLA § 14.10, a plaintiff must

15    plead: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) breach; and (4)

16    damages.  *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App.

17    2011).  Plaintiffs fail to "identify the specific provision of the contract" at issue, much less allege

18    facts establishing breach.  *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012).

19           Plaintiffs allege that Apple breached the 'promise[]' in its "Developer Agreement as

20    amended in March 2020 . . . that entities with 'deeply rooted medical credentials' were permitted

21    to publish COVID apps on the App Store."  FAC ¶¶ 245, 254.  But nothing in the Developer

22    Agreement (or any other contract) contained such a promise, much less *obligated* Apple to

23    distribute any particular app through the App Store, even those submitted by institutions.  *See*

24    *Donohue*, 871 F. Supp. 2d at 931 (rejecting argument that a user guide contained contractual

25    promises because it "includes no 'promises' which plaintiff could have 'accepted'").  Plaintiffs do

26    not identify any contractual provision that they allege was breached.

27           Instead, Apple points out that the contract governing app distribution is the DPLA.  The

28    DPLA expressly states that approval decisions are in Apple's "sole discretion."  DPLA § 3.2(g)

United States District Court
Northern District of California

27

("Applications for iOS Products. . . **may be distributed only if selected by Apple (in its sole discretion**) for distribution via the App Store. . . as contemplated in this Agreement.") (Emphasis added). Plaintiffs agreed to this arrangement in exchange for use to Apple's propriety software, tools, and services. *See* DPLA § 1.1 (developers must "accept and agree to the terms" of the DPLA to "use the Apple Software or Services"). Thus, Plaintiffs fail to state a claim for breach of contract (Claim 8) because they fail to allege a breach.

Similarly, Plaintiffs' claim for breach of the covenant of good faith and fair dealing (Claim 9) fails because it re-hashes Plaintiffs' breach allegations (*compare* FAC ¶¶ 254, 260, *with id.* ¶¶ 263, 26). Plaintiffs do not allege that Apple frustrated any specific contractual term. *See Soundgarden*, 2020 WL 1815855, at *17. Thus, it is dismissed for the same reasons. *See Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855, at *17 (C.D. Cal. Apr. 6, 2020) ("no additional claim is actually stated" where allegations "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief"). Moreover, the "implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Donohue*, 871 F. Supp. 2d at 932 (quotation marks omitted). The express conferral of "sole discretion" upon Apple under the DPLA cannot be contradicted by the implied covenant. *See Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013) ("An implied covenant of good faith and fair dealing cannot contradict the express terms of a contract.").

C.      RICO and Fraud Claims (Claims 10 and 11)

To plead a civil RICO claim under § 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted).

Plaintiffs allege that Apple, unnamed "individuals within Apple," "Apple's App Review team," "PR firms, law firms, and rival developer cronies," FAC ¶¶ 269, 270, 273, formed a RICO enterprise and "engaged in a distinct pattern of predicate acts over a multi-year timespan," *id.* ¶ 274, including "wire fraud and mail fraud by assigning junior App Review members to issue false,

United States District Court
Northern District of California

pretextual reasons for rejection to small developers," *id.* ¶ 275, and "lifting and appropriating their ideas into their own competing apps, and suppressing the original creators' work by blocking app store distribution," *id.* ¶ 269.

Plaintiffs' RICO claim sounds in fraud and must be pled with particularity under Rule 9(b). *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc).  The FAC therefore "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quotation marks omitted). Plaintiffs' allegations do not meet Rule 9(b)'s standard.

Plaintiffs rely on vague, conclusory allusions to Apple's alleged practice of "assigning junior App Review members to issue false, pretextual reasons for rejection to small developers." FAC ¶ 275; *see also, e.g.*, *id.* ¶¶ 42, 87, 104, 257.  These general allegations do not identify the specific who, what, when, where, and how.  Plaintiffs' attempts to describe discrete instances of fraud are no more detailed.  For example, Plaintiffs point to a communication from Apple stating that Coronavirus Reporter was rejected because it contained "data that has not been vetted for accuracy by a reputable source" and was not associated with a "recognized institution."  *Id.* ¶ 278. There is no plausible allegation that this was false, *id.* ¶ 277, only, at most, that Apple's requirements were poorly considered, *id.* ¶¶ 277–78.  The decision was consistent with Apple's Guidelines.  *See* Guidelines § 5.1.1(ix).  Similarly, Plaintiffs suggest that Apple rejected Bitcoin Lottery because its "primary purpose" was to "encourage users to watch ads or perform marketing-oriented tasks," which was "not appropriate for the App Store."  *Id.* ¶ 280.  But here too, Plaintiffs do not dispute that the rejection was made pursuant to Apple's Guidelines.  *See* Guidelines § 3.2.2(vi) ("Apps should allow a user to get what they've paid for without performing additional tasks. . . Apps should not require users to rate the app, review the app, watch videos, download other apps. . . or take other similar actions in order to access functionality, content, use the app, or receive monetary or other compensation, including but not limited to gift cards and codes.").  Thus, Plaintiffs' RICO claim fails to sufficiently allege fraudulent behavior with particularity as required under Rule 9(b) and should be dismissed.  Rule 9(b) also applies to

29

Plaintiffs' derivative fraud claim (Count 11), and thus that claim fails for the same reason.

Additionally, Plaintiffs' RICO claim fails for another reason.  Plaintiffs must allege an enterprise that is *separate* from the "person employed by or associated with" that enterprise who engaged in the unlawful RICO conduct.  18 U.S.C. § 1962(c); *see also Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1396 (9th Cir. 1986).  In other words, "[i]f [a corporation] is the enterprise, it cannot also be the RICO defendant." *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984).  Plaintiffs' allegations make clear that the alleged enterprise *is* Apple itself.  According to the FAC, it consists of "Apple," *id.* ¶ 269, "Apple's App Review team," and "senior Apple management," *id.* ¶ 270.  Where, as here, the "enterprise consist[s] only of [the corporation] and its employees, the pleading . . . fail[s] for lack of distinctiveness." *Living Designs, Inc.*, 431 F.3d at 361.

Finally, Plaintiffs' assertions that the alleged enterprise consisted of Apple's "crony app developers," "law firms," and "PR firms" who allegedly "divert profits," "spread Apple's gospel," or obfuscate "Apple's anticompetitive agenda," FAC ¶¶ 271–72, fails because none of these groups are alleged to have participated in an alleged enterprise involving the predicate acts of wire and mail fraud.  The allegations are also conclusory.

Thus, the Court dismisses Plaintiffs' RICO and fraud claims (Claims 10 and 11).

D.  <u>Leave to Amend</u>

Based on the foregoing analysis, the Court dismisses all eleven of Plaintiffs' claims against Apple in the FAC.  Accordingly, because all of the claims against Apple are dismissed, so too are Plaintiffs' class allegations stemming from those claims.

The Court addresses whether Plaintiffs should be given leave to amend any or all of their claims.  While Fed. R. Civ. P. 15(a) states that leave to amend "shall be freely given when justice so requires," nonetheless "[a] district court acts within its discretion to deny leave to amend when amendment would be futile[.]" *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir. 2000).

Although Plaintiffs are correct to note that this will be the first ruling under rule 12(b)(6) concerning Plaintiffs' complaint, Apple is also correct in observing that between the various

1    iterations of this case being filed across jurisdictions and by different configurations of Plaintiffs –

2    all challenging the same conduct by Apple and all by the same counsel – this is Plaintiff's *seventh*

3    amended complaint on these claims.  *See supra* Procedural Background.  Plaintiffs have had the

4    benefit of responding to Apple's fully briefed motions to dismiss in this case and previous cases,

5    and, yet, in this seventh complaint they still fail to state any claims.  Accordingly, the Court finds

6    that it would be futile to grant leave to Plaintiffs to bring an *eighth* amended complaint, and thus

7    dismisses the claims with prejudice.

8    E.    Other Issues

9          1.    Plaintiffs' Motions for Preliminary Injunction and to Strike

10   Because the Plaintiffs' claims against Apple are dismissed with prejudice, Plaintiffs

11   pending motions for preliminary injunction are denied as moot. Docket Nos. 20, 52.

12   The Court denies Plaintiffs' motion to strike Apple's motion to dismiss, Docket No. 51.

13   There is no basis for a party to strike a motion.  *See* 5C Wright & Miller, Fed. Prac. & Proc. Civ. §

14   1380 (3d ed.) ("Rule 12(f) motions [to strike] only may be directed towards pleadings as defined

15   by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not

16   subject to Rule 12(f).").

17         2.    Plaintiffs' Motion to Append Claim

18   Plaintiffs' second motion for preliminary injunction additionally asserts that Plaintiffs are

19   authorized to append an "addendum [] two-pages in length that succinctly raises" a new claim

20   (Claim 12) under California' Unfair Competition Law, and proceeds to assume that "the operative

21   complaint" is now "the FAC + UCL Addendum."  Docket No. 51 at 3.  The Court need not

22   consider Plaintiffs' procedurally improper attempt to amend their complaint.  This addendum is a

23   nullity because Plaintiffs did not notice a motion for such relief, much less complied with the

24   Court's procedures for doing so.  *See Hocking v. City of Roseville*, 2007 WL 3240300, at *5 (E.D.

25   Cal. Nov. 2, 2007) ("Because this request was not submitted by properly noticed motion, it is not

26   presently before the court and the court therefore declines to address it at this time."); *see also*

27   N.D. Cal. L.R. 7-1 & 10 (explaining the rules for moving for leave to amend a complaint).  The

28   Court denies the request to append a claim to the FAC on this procedural grounds.

United States District Court
Northern District of California

1    Even if the Court were to consider Plaintiffs' request on the merits, it would deny the

2    motion.  Plaintiffs' proposed UCL claim draws from an article published in Politico describing

3    Apple's lobbying efforts in state legislature, which Plaintiff's characterize as allegedly "expos[ing]

4    a quid pro quo to rescind Apple's $25 million donation to an historically black college (HBCU) in

5    Georgia, alleged to be the most disgraceful scandal in Apple's forty-year history."  Docket No. 53

6    ("UCL Claim") ¶ 3.  Plaintiffs claim that this allegation presents additional predicate acts for their

7    RICO claim (Count 10), that the RICO enterprise should be amended to include the lobbyists and

8    law firms mentioned in the article, and that they bring a UCL claim under the "unfair" prong

9    derived from the RICO claim.  *Id.* ¶ 5.  Notably, the Politico article they reference was published

10   on August 20, 2021, which was 17 days *before* Plaintiffs filed their FAC.  There was no

11   superseding development warranting the amendment.  Moreover, this conduct has nothing to do

12   with Plaintiffs.  Plaintiffs do not include allegations about how they were injured by the actions

13   described in the article, and, thus, it is not apparent that the Plaintiffs have standing to pursue this

14   claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional

15   minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in

16   fact'").

17   Furthermore, the attempted amendment is problematic because Apple's First Amendment-

18   protected lobbying activity cannot form the basis for antitrust liability, RICO and UCL liability

19   under the *Noerr-Pennington* doctrine.  *See Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1059 (9th

20   Cir. 1998) ("This circuit has clarified that the *Noerr–Pennington* doctrine is not merely a narrow

21   interpretation of the Sherman Act in order to avoid a statutory clash with First Amendment values

22   . . . rather, the doctrine is a direct application of the Petition Clause, and we have used it to set

23   aside antitrust actions premised on state law, as well as those based on federal law."); *Sosa v.

24   DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (extending *Noerr-Pennington* to RICO);

25   *Multimedia Patent Tr. v. LG Elecs., Inc.*, 2013 WL 12073800, at *3 (S.D. Cal. Aug. 1, 2013)

26   (same for UCL).  Plaintiffs' asserted allegations appear meritless and it would likely be futile for

27   them to attempt to cure this deficiency.

28   Thus, on procedural grounds and on the merits, the Court denies Plaintiffs' attempt to add

United States District Court
Northern District of California

32

another claim to their complaint under the UCL.  Docket No. 52.

### 3.       Plaintiffs' Notices for Discovery and Apple's Motion to Quash

On October 25, 2021, Plaintiffs filed a notice informing the Court of recently submitted petitions for cert. requesting that the U.S. Supreme Court "invoke original jurisdiction and assign a special master to ensure" that proceedings involving antitrust claims against Apple, including this case, "are not contaminated by Gibson Dunn's [counsel for Apple] political retaliation against Dr. Isaacs," a party to this case.  Docket No. 65.  The information Plaintiffs bring to the Court's attention in the notice is not relevant this case and the Court takes no action on the notice.

Plaintiffs appear to refer to a case in which Isaacs alleged a RICO claim against Gibson, Dunn & Crutcher LLP but not any individual lawyers.  Plaintiffs do not allege that any attorneys are Apple's attorneys of record in this case.  That case was dismissed—with fees awarded to the defendants—and all appeals are exhausted.  *See Isaacs v. USC Keck Sch. of Med.*, 853 F. App'x 114, 117–18 (9th Cir. 2021); *Isaacs v. USC Keck Sch. of Med.*, No. 19-8000 DSF, Dkt. 112 (C.D. Cal. May 15, 2020).

Apple's counsel filed a declaration stating, "We are aware of no reasonable basis for Plaintiffs' assertion that counsel for Apple in this case (or, for that matter, any attorney of Gibson, Dunn & Crutcher LLP) would be a witness in this litigation. To the extent that Plaintiffs have asserted that Gibson, Dunn & Crutcher LLP as an entity may be a witness, we are aware of no reasonable basis for that statement either.  Nor are we aware of any reasonable basis for Plaintiffs' assertion that counsel for Apple have a conflict of interest or are subject to disqualification for any reason. Gibson Dunn has been retained by Apple to represent the company in this litigation, and we will continue to do so."  Docket No. 63 ¶¶ 2-3.

Plaintiffs also filed notices pursuant to California Code of Civil Procedure § 1987 purporting to require Apple executives and Lina Khan, Chair of the Federal Trade Commission, to appear for live examination at the hearing on November 4, 2021.  Docket Nos. 66-68.  Those state civil procedure notices have no effect in federal court and were improper.  *See Castillo-Antonio v. Hernandez*, 2019 WL 2716289, at *3 (N.D. Cal. June 28, 2019).  Plaintiffs did not seek nor obtain leave to present live testimony at the upcoming November 4 motions hearing, and in any event, no

1    live testimony is needed.  *See* N.D. Cal. L.R. 7-6 ("No oral testimony will be received in

2

3    connection with any motion, unless otherwise ordered by the assigned Judge.").  Furthermore, the

hearing has passed – any issues that were raised by the notices are now moot.

4         Finally, Apple moved to quash Plaintiffs' subpoena requests.  Docket No. 74.  However,

5

6    now that the Court has dismissed all of Plaintiffs' claims against Apple with prejudice, there is no

basis for Plaintiffs' subpoena requests.  Thus, Apple's motion to quash is also denied as moot.

7

### V.     <u>CONCLUSION</u>

8         For the foregoing reasons, the Court **GRANTS** Apple's motion to dismiss all of Plaintiffs'

9

10    claims against Apple.  Docket No. 45.  The Court **DENIES AS MOOT** Plaintiffs' pending

motions for preliminary injunction, to strike and to append claim, as well as Apple's motion to

11    quash.  Docket Nos. 20, 51, 52, 74.

12         This order disposes of Docket Nos. 20, 45, 51, 52, and 74.  The Clerk is instructed to enter

13    Judgment and close the case.

14

15         **IT IS SO ORDERED**.

16

17    Dated: November 30, 2021

18

19

20                       EDWARD M. CHEN
                        United States District Judge

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*