Keith Mathews
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, CALID INC, PRIMARY PRODUCTIONS LLC, DR. JEFFREY D. ISAACS, on behalf of themselves and all others similarly situated<br><br>        Plaintiffs,<br><br>vs.<br><br>APPLE INC., FEDERAL TRADE COMMISSION<br><br>        Defendants. | Case No. 3:21-cv-05567-EMC<br><br>**NOTICE OF MOTION & MOTION FOR RECONSIDERATION AND RELIEF FROM JUDGMENT**<br><br>**<u>Hearing</u>**<br><br>Date:    February 3, 2022<br>Time:   1:30PM<br>Place:   Courtroom 5, 17th Floor<br>           (videoconference)<br><br>The Honorable Edward M. Chen |

## <u>NOTICE OF MOTION AND MOTION PURSUANT TO FRCP RULES 59 & 60</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30PM on Thursday February 3, 2022, or as soon thereafter as possible, in Courtroom 5 of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, and/or by videoconference, Plaintiffs will and hereby do move this Court to Reconsider, and Relief from, the Court's Order granting Apple's Motion for 12(b)(6) dismissal.

This motion is made pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). This motion is based on this Notice of Motion and Motion, the accompanying Memorandum and the Exhibits thereto, and all other papers filed in this action and oral testimony or other information introduced at the hearing on this motion.

Local Rule 7-9, which requires parties to seek leave of the Court before filing motions for reconsideration prior to entry of judgment adjudicating all claims, does not apply to this Motion. <u>Nidec Corp., v. Victor Co. of Japan, Ltd.</u>, 2007 U.S. Dist. LEXIS 86414, *8 (N.D. Cal. 2007) ("As is clear from the plain language of the rule, Local Rule 7-9 applies to interlocutory orders, and does not apply to final judgments."), citing <u>Pacific Coast Fed'n of Fisherman's Ass'ns v. U.S. Bureau of Reclamation</u>, 2006 U.S. Dist. LEXIS 36894 (N.D. Cal. 2006).

Respectfully submitted, this 27th day of December, 2021.

<u>/s/ Keith Mathews</u>
Keith Mathews, *Pro Hac Vice*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), Plaintiffs respectfully ask this Court to rescind its November 30, 2021 Order Granting Defendant Apple's Motion to Dismiss, or otherwise grant relief from judgment and deny the 12(b)(6) in its entirety. From the forest versus the trees perspective, the Court's Order turned a blind eye to the dangers of app censorship, and gave little appreciation to the well-known challenges inherent with marketplace boundary definitions and "economic realities" for zero-priced digital goods. Coronavirus Reporter is the first case, and certainly the first-to-file class action, endeavoring to protect free apps from corporate and/or political suppression. Esoteric "Chicago School" marketplace price requirements fail to capture the damage to competitive freedom that results when free apps are curtailed.

Justice Clarence Thomas, in April 2021, expressed how a technology platform, like the App Store, could be subject to Sherman-like claims. Justice Thomas stated the solution to the unprecedented issues presented by the tech platforms could lie "in doctrines that limit the right of a private company to exclude." "A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail," he wrote. "But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is." *Coronavirus Reporter* had no alternative, despite this Court's erroneous finding of fact that a web browser served as a comparable alternative to an app, which squarely contradicts the Congressional Subcommittee finding. Such a finding of fact is of course disallowed in a 12(b)(6) order.

To save lives, *Coronavirus Reporter* needed to publish its tracing app on both iOS and Android, but was blocked by Apple. The FAC and oral testimony reasonably make Justice Thomas' point, that Apple excluded a rival in the free-app space. Defendant Apple must stand at trial by jury.

## LEGAL STANDARD

Motions for reconsideration of judgments are proper under Federal Rule of Civil Procedure 59(e) if filed within 28 days after the entry of the judgment. Motions for reconsideration brought under Rule 59(e) are appropriate where "the district court is presented with newly-discovered evidence or

committed clear error; the initial decision was manifestly unjust; or if there is an intervening change in controlling law." *United States v. Westlands Water District*, 134 F. Supp. 2d 1111, 1130 (E.D. Cal. 2001), citing *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).

A district court may alter or amend a judgment on this ground if the court, for example, based its ruling on incorrect factual assumptions (*Duarte v. Bardales*, 526 F.3d 563, 567 (9th Cir. 2008), abrogated on other grounds by *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014)). Likewise, altering the judgement is appropriate where the Court misunderstood a relevant regulatory scheme (*Flynn v. Dick Corp.,* 565 F. Supp. 2d 141, 145 (D.D.C. 2008)).

Manifest injustice is a narrow concept that may arises in rulings such as this that defy the statutory intent and expectations upon which a party reasonably relied. The moving party must identify a result that is fundamentally unfair in light of the governing law. (*Slate v. Am. Broad. Cos*., 12 F. Supp. 3d 30, 35-36 (D.D.C. 2013); see also *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007).) Under that rule, in cases such as this the moving party must identify a result that is fundamentally unfair considering the governing law. (*Slate v. Am. Broad. Cos*., 12 F. Supp. 3d 30, 35-36 (D.D.C. 2013); see also *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007).)

Motions for reconsideration pursuant to Rule 60(b) are "generally appropriate in three instances: 1) where there has been an intervening change of controlling law, 2) new evidence has come to light, or 3) when necessary to correct a clear error or prevent manifest injustice." *United States v. Westlands Water District*, 134 F. Supp. 2d 1111, 1130 (E.D. Cal. 2001), citing *Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc*., 5 F.3d 1255, 1263 (9th Cir.). The general purpose of Rule 60(b) is "to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." *Boughner v. Sec'y of Health, Educ. and Welfare*, 572 F.2d 976, 977 (3d Cir. 1978). FRCP 60(b)(1) allows a district court to undo or alter a final judgment based on, among other things, a "mistake." Although there is a split in the types of "mistakes" this subsection covers, the weight of authority now suggests that counsel can seek FRCP 60(b)(1) relief to correct legal errors, an area traditionally reserved for an appellate court. "The law in this circuit is that errors of law are cognizable under Rule 60(b)" (*Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982) (citation omitted)).

In short, Rule 60(b) provides six bases for reconsideration, including "mistake, inadvertence, surprise, or excusable neglect" as alleged by [movant]. Fed. R. Civ. P. 60(b)(1). In contrast, Rule 59(e) permits the filing of a motion to alter or amend a judgment. A motion under Rule 59(e) is a device to relitigate the original issue decided by the district court, and used to allege legal error. *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003).

Relief based on Rule 60(b)(2) on the grounds of newly discovered evidence is warranted if "(1) the moving party can show evidence relied on in fact constitutes 'newly discovered evidence' within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover this evidence; and (3) the newly discovered evidence must be of 'such magnitude that production of it earlier would have been likely to change the disposition of the case.'" *Feature Realty, Inc., v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003), quoting *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., Inc*., 833 F.2d 208, 211 (9th Cir. 1987). Evidence is "newly discovered" under Rule 60(b) where, as here, it was neither in the moving party's possession at the time of the trial nor discoverable with reasonable diligence. *Ibid* at 212. Additionally, Rule 60(b)(6) allows the subsequent decisions to be the basis for the ruling.

## GROUNDS FOR REVERSAL

### Marketplace for App Stores, versus Marketplace for Apps

Perhaps the single most complex issue intertwined throughout the FAC, the MTD, and the Court's Order is the distinction between the App Store and the relevant Sherman Act Marketplace for Smartphone Apps. To complicate matters, the FAC refers to the "Institutional App Market" as the "other side" of the "consumer facing" market:

> "Apple's App Store retails approximately 80% of the apps in the US consumer-facing market for smartphone apps. The other side of this market is the national institutional app market, which is a relevant market pursuant to Sherman Act. Apple is a monopsony buyer of developers' apps, in the institutional app market, because they are sole distributer on the retail side. Notably, this institutional market includes apps that are ultimately retailed as free to the end-user." *(FAC paragraph 121)*

In what Plaintiffs characterize as the 'core' or fundamental discrepancy underlying the Court's rejection of their marketplace definitions, the Court invoked the *Epic* verdict regarding the App Store

as a "two-sided platform", and applied it to the Institutional App marketplace – a wholesale, single-sided market. The Court henceforth incorrectly found that "while not controlling… this undermines Plaintiff's markets":

> "As *Epic* held, in a two-sided transaction market, there must be consideration of the "effects on both sides of the market." 2021 WL 4128925, at *102. Plaintiffs' theory of antitrust injury alleges injury on only one side of the transaction – developers – but fails to grapple with the second side of the transaction market, consumers… Although the conclusion in *Epic* is not necessarily controlling here, Plaintiffs alleged theory of antitrust injury fails to give *any* consideration of the consumer-side of the two-sided transaction market. Failure to allege injury that harmed overall competition in the relevant market—here, a two-sided market of transactions—undermines Plaintiffs' theory of antitrust injury." *(Order at p.25)*

The Court similarly raised this matter directly in the hearing:

> **THE COURT:** Well, given this is really, I think, a two-sided market, I don't think we can ignore the downstream market. So don't we have to account for the fact that your antitrust theories look to the downstream side, as well as the fore side?...

> **DR. ISAACS**: No. I would again say that it's [not] a two-sided marketplace here. I'm not sure which marketplace you're referring to, but I assume you're speaking about the app marketplace being two-sided, because that seems to be the main debate we've had in the pleadings with Apple. Because Judge Gonzalez Rogers did, of course, find the app store to be a two-sided transactional platform.

> We believe that is different in this case. The way we've set out the facts, it's really the app marketplace monopsony. Like a book publisher. In fact, today's news, FTC and DOJ are looking at Penguin Books and Simon and Schuster with a monopsony theory, which really -- which has really been reinvigorated in our media age, in the last few years. That's why it took us a while, frankly, to come up with this monopsony theory over the last few amendments we've done.

> So we're looking at Apple as the only buyer of apps, just like Penguin Books and Simon and Schuster would be the only buyer of books from authors. Or if Sony Video is the only buyer of movies. So we're saying it's not two-sided.

> And, just one last point. For free apps, it's especially not two-sided, because there's no equal transaction, like *Epic*, that Judge Gonzalez Rogers looked at.

> A free app doesn't have a price. So it's actually very hard for us -- it took quite a while to develop a monopoly or monopsony theory for a free app. And there is no symmetric [simultaneous transaction] to the App Store for free apps.

> So we would say -- the [long] story short, the answer is definitely no, we believe, for that -- for your question.

Hence, two distinct economic concepts interfered with each other, and resulted an erroneous conclusion by the Court insofar as it confounded the app developer supply chain with the App Store itself. Easily corrected, this should not require Ninth Circuit involvement. The first concept, a "two-sided" transactional platform, is one where buyers and sellers are matched and there is always "symmetry" (as Dr. Isaacs termed it) in a transaction with a buyer and a seller paying and receiving the same price. The transaction platform receives a fee – such as a stock market, where a buyer and seller exchange stock shares and pay a fee to the exchange. The second concept is that of corresponding supply and demand, in a market of a supply chain. Every economic market has a supply, and related demand, but that does not mean every market is a transaction platform. Likewise, an upstream purchaser may become a downstream supplier, in the case of a wholesaler. The FAC incorporated this latter concept, in saying Apple's "institutional" wholesale purchase of an app from a creator (developer) represented an "institutional app market." Apple, after purchasing an app from a developer, subsequently becomes the seller when it sells on the "consumer facing" App Store. In other words, the FAC referenced the "other side" of the Institutional App market, meaning the corresponding economic demand represented by the downstream retail App Store. That is different from saying the entire App Market is a two-sided transactional marketplace. The analogy in Plaintiff's book example relates a publisher buying book rights from an author in the "institutional wholesale book" market, who then turns around and sells the book to a bookstore, who has a consumer-facing distribution platform. In short, capitalist supply chains have multiple levels of supply and demand, by definition, and Plaintiffs have specifically denied that the entire app supply chain can be reduced to a single "two-sided transactional" platform.

The confounding problem, to the Court's credit, is that as long as iOS smartphones have existed, we largely only know of one "book store" – the App Store. Hence it is conceptually easy to confound the idea of app demand from creators, and app distributors. Apple has been the only "wholesale" demand in this market since it's existence, and of course, is the only "consumer-facing" supplier.

This clarification, finally, allows us to understand why the FAC called this wholesale market "largely hypothetical" – Apple's monopoly in the App Store market has never permitted an alternate buyer – or seller – of apps. The FAC footnote about "hypothetical" wholesale markets was directly addressed in the hearing:

> **Dr Isaacs**: I would say we do have a footnote that it's almost a hypothetical market. And, again, this is difficult. We don't know any other case that brings -- protects free apps from censorship. So some of this is a bit hypothetical, in that if there was no App Store monopoly, and every developer could sell within the shopping mall their apps, then you wouldn't have this monopsony. And you wouldn't have it where the only buyer is Apple.
>
> But the FAC does cite that Apple bought a weather app that they distributed as free, and they bought it for tens of millions of dollars. So there are instances where Apple purchases free apps from developers.
>
> And we would say, here, they are effectively purchasing it. They could bundle it with the iPhone; they could give it away for free. But that's not our only theory, because we recognize that's a novel theory, and we believe it will prevail. But we do have four other downstream theories if that were to not proceed.
>
> But we believe that is our best theory, that they are a monopsony buyer, even though it's largely free and hypothetical…
>
> But this country has a Sherman law. You know, to not have one monopoly, one bottleneck. And again, it's not hypothetical. We say it's kind of hypothetical. But the marketplace, it's real. It's bottlenecked. Creators' works, the apps, just like books or films, are being bottlenecked.
>
> And that's about as big of a competitive injury –
>
> **THE COURT:** Excuse me. What's the evidence of an aggregative bottleneck?
>
> **DR. ISAACS:** The -- Apple introduced it, themselves. China's free markets are four times the size of ours. And an entire -- every Corona smartphone app was not allowed -- or startup was not allowed. That's not just Coronavirus Reporter. That's every startup that wanted to contribute to the pandemic was not allowed, because Apple set criteria. So just in that submarket of apps, there's a massive bottleneck.
>
> **THE COURT:** What's the evidence that you've alleged that shows how many apps were denied versus how many apps that actually have made it, to show some aggregative effect?
>
> **DR. ISAACS:** We would need that in discovery. We think that China -- the end result is the Chinese data, that it's four times the size of the App Store. So we have the end result there. We

don't have the actual procedural or statistics you are asking for. We just don't have that at this time.

But with 40,000 app rejections a week by Apple -- I think that's the last count -- I would say the answer is probably, probably strong evidence, Your Honor, is what I would surmise. But I don't have that data.

Put simply, it is not a defect in the FAC that there are no other App Stores on the iPhone. This is not "purely theoretical," as the Court initially concluded in its order on the 12(b)(6) motion, but rather, "completely bottlenecked." Only one has existed since the inception of iOS in 2007. As Dr. Isaacs pointed out, clearly a bottleneck exists in the US smartphone app market, when we look to China's Android market, where multiple app stores exist, and see 4x the number of apps. Or the mere fact that Apple rejects 40,000 apps weekly means at least some competition is being unfairly suppressed. The Congressional Subcommittee spends several pages discussing the reduction in app choice and quality that results from the App Store monopoly.

Moreover, the market is not hypothetical because as mentioned in the FAC and hearing, Apple does routinely purchase free apps such as Dark Sky from developers, and then either bundles them (see Congressional Subcommittee report on bundling) or distributes them on the App Store. Hence the App Store is distinctly downstream – not symmetrical – with the Institutional App market. Furthermore, the FAC described the DPLA as an instrument that deflects from the reality – that developers of free apps are underpaid by the App Store monopsony. The Court accepted the DPLA as valid, with no analysis of whether or not a jury could find it to be a contract of adhesion. Accordingly, free apps are works with inherent value, and Apple is the monopsony purchaser of them. This is further discussed in the below section "*Coring* Markets." In short, companies pay money for user attention and ad revenue, and a free app has a value that Apple does not acknowledge or compensate developers for.

The FAC terminology referencing the "other side" of the "consumer facing" App Store was meant to identify the upstream creator/author/developer institutional supply market. It did not suggest the "other side" of a symmetric transactional marketplace. If there was any ambiguity, Dr. Isaacs covered this issue during his oral testimony and argument. As such, it seems wholly avoidable to bring this matter to the Ninth Circuit. The Court should recognize that there are upstream and downstream components of the app supply chain, distinct from the App Store, and these have been bottlenecked

since the smartphone was invented in the 2000s. A jury certainly could find this to be the case, especially in light of the censorship of important apps such as Coronavirus Reporter.

Therefore, the "Institutional App" market is not hypothetical, nor is it single-brand. It is just bottlenecked. This represents the single most "definitive error" in the Court's Order, and on this basis alone, the case should proceed to a discovery. A jury *could* find, and likely will find, that there is a relevant market for Institutional Apps purchased from developers.

### Cameron Opt-Out Causes of Action and Relevant Markets Stated A Claim

The Court acknowledged that "Plaintiffs in this case are *Cameron* class action opt-outs, and state the *Cameron* causes of action in this suit through "reference to the *Cameron* complaint." *Order at Page 7.* As the FAC further remarks, "For the sake of brevity, those causes of action derive from and reference the *Cameron* complaint. In the interest of judicial economy, and because Judge Gonzalez-Rogers already determined these cases are not similar, we will not repeat the *Cameron* claim theories and supporting facts herein."

Opposing Counsel had objected to a previous version of the FAC which verbatim repeated the *Cameron* causes of action, on the basis it was "cobblestone" and, outrageously, "in disregard for the law," despite the fact that *Cameron* would go on to settle the case for $100 million. To avoid confusion by the Court, Plaintiffs decided to separate the paid-app and free-app claims, by moving *Cameron* to an addendum. This, unfortunately, resulted in further confusion. This action by Defendant's counsel caused the court to fail to address any of the Cameron facts or marketplaces, let alone their causes of action.

Notably, Cameron did plead a relevant market for iOS Distribution Services, and alternatively, App Distribution Services, generally. Taking into consideration the above arguments regarding two-sided markets, the FAC pleaded a single-sided market as the Institutional Apps market, and via *Cameron,* the Distribution Services market (which *Epic* found to be two-sided, but that is disputed).

As it turns out, for free apps, the *Cameron* Distribution Services market applies, or would apply

with minimal revision. But certainly for the paid app Cameron opt-outs in this case, the *Cameron* claims

and marketplaces should be reviewed by the Court. Because there are likely to be other opt-outs from

*Cameron,* the Court's initial ruling (as it stands now) would unfairly allow Apple to raise *res judicata*

arguments that *Cameron* fails to state a claim for relief, or a relevant marketplace. That seems to be

exactly the sort of "unfair" order meant to be relieved by FRCP Rule 60, considering Bermans' law

firm received $30 million in CAND approved fees for that complaint, and the case settled, as argued

above, for $100 million. Why should our paid-app Plaintiffs be denied even acknowledgement or

review of these claims, given that substantial settlement? This failure to acknowledge any relevant

market for zero-priced digital goods represents manifest error insofar as it ignores the intent of Sherman

Act. This also represents an "unfair" outcome and/or a mistake under the language of FRCP 59 and

FRCP 60.

### Smartphone Userbase Access Rights and Application Loaders

The Court determined that userbase access rights were a "hypothetical and theoretical" market

that did not align with "economic reality," due to the fact that as a "downstream single-brand market"

it represented a "cut up [component] of the app marketplace," which is a two-sided market of

transactions. *Order, page 21.* However, the FAC describes a market downstream from the US

smartphone market that is neither hypothetical nor theoretical:

> "access rights to the smartphone enhanced internet userbase. Apple likewise charges
> developers $99 for these (partial, selectively limited) access rights. The nearest competitor
> charges $29 annually for rights, and offers a free bypass sideloading way for developers to
> reach their audience. This itself is indicative of anticompetitive restraint in the market, as
> pointed out by the Subcommittee. There is simply no way for a developer to access the
> smartphone enhanced iOS userbase (including their GPS, and all other low-level SDK calls,
> unavailable on a simple browser, which itself is strongly disfavored by users). A developer who
> foregoes Apple misses out on half the market – and 80% of 'app spending' capability. Dr.
> Roberts' app wouldn't have been scientifically valid, if it only accessed half the country's
> smartphone users." *(FAC, paragraph 140)*

As pointed out by the FAC, and the Congressional Subcommittee – this is a real market for developer rights to the API, and hence, userbase. Apple charges 3x the nearest competitor (Android) in what the Subcommittee estimates to be a $20 billion marketplace. This massive, live market, the Court must acknowledge, is not a hypothetical marketplace, not is it contrived or outside the bounds of economic reality. The elasticity of demand is also concretely bounded – there is only one reasonable alternative, Android, and for an app like Dr. Roberts, a developer in fact needs to purchase both Apple and Android. It is reasonably obvious that a pandemic tracking app that excluded Android or Apple users would be severely limited in functionality. The FAC also notes that GPS and other app-only functionality does not allow a web browser userbase as a reasonable alternative. The language in the above paragraph references a Subcommittee finding of a user preference to apps over websites. The Court could not, while viewing facts most favorably to Plaintiff, determine a COVID tracing app could exist merely as a website with no GPS capability. That finding is not within the Court's discretion.

The FAC does raise, in the alternative, a single-brand downstream iOS Userbase access market. The MTD Opposition correctly points out that for that single-brand downstream market, the cross-elasticity of demand is insignificant, as there are no substitutes. Nonetheless, as Dr. Isaacs pointed out in the hearing, and as the FAC points out, Plaintiffs don't need single-brand narrowing to prevail on userbase access rights. Apple controls access to 65%-80% (based on volume or spending) of app purchases, hence including Android's $29 userbase access rights as a substitute permits a relevant, non-single brand market.

This issue was directly addressed during the hearing:

> **THE COURT:** Well, so let me ask you, then, either Mr. Mathews or Mr. Isaacs, is the claim access to the store? Or access to the devices?

**DR. ISAACS**: I believe the FAC is clear there. We talked about the network effect of some 180 million smartphone or iPhone users, so -- and then the user-based access downmarket, certainly, that Apple is selling for $99 for a year to developers, access to that network affect.

As pointed out by Dr. Isaacs, this is a real sale for $99 that is not about access to the App Store, per se, but rather, the devices. It just so happens that the App Store is the only way that Apple allows end user app installation, but that doesn't make the userbase access right sale a "two-sided marketplace platform."

The FAC raises the application loader and notary stamp markets, which the Court places in the same "contrived" category as userbase access rights. Plaintiffs concede notary stamps (which do exist on Mac and Android) do not seem to have any historical precedent as a standalone economic market. But nonetheless, if competing App Stores were to flourish, one could imagine a thriving market for Apple notarized apps. Hence, again, this is better characterized as a bottleneck that existed since the inception of the iPhone, as opposed to a theoretical idea. As to application loaders, it is noted that the FAC describes that enterprise users pay for application loaders - $299 annually – and hence this market is rooted in reality and thriving to some degree. Not mentioned in the FAC, but today raised in response to the Court's finding of "contrived" market demand – it is noted the US Supreme Court spent much time on "Jailbreaking" software that effectively served as application loaders. Hence, the Supreme Court has, at least indirectly, acknowledged the demand for end user application loaders. Similarly, the "Finder" on Mac, and most other operating systems in history, have application loaders. The Court order found the application loader to be an integral "component" of the OS – but is it truly an integral component, if Apple removed it? This seems to be a fact for a jury to determine after weighing all the evidence, and inappropriate for 12(b)(6) dismissal as an impossibility. Therefore, Plaintiffs respectfully request the Court acknowledge that a jury may find a market exists for userbase access rights, and/or application loaders, or even notary stamps, and rescind the dismissal of this case.

### *Coring v. Apple*, based on DOJ and 26 AG Consensus, Defines Relevant Markets

As stated above, perhaps the single most complicating matter at issue is the distinction between the App Store and the relevant Sherman Act Marketplace for Institutional Apps. As evident, the FAC describes the Institutional Apps market, which is certainly not two-sided, and the *Cameron* addendum describes the App Store (Distribution Services) marketplace, which may or may not be two-sided. *The*

*Coring Company v. Apple*, was filed by this counsel last week in Southern Florida District. This case defines a relevant market for "Smartphone App Distribution Market" side-by-side with a relevant market for "Smartphone Apps." Hence the contrast between the "exchange" and the "wholesale" app markets is easily apparent in *Coring.* The *Coring* complaint is based almost entirely upon a case brought by the DOJ and 26 State Attorney Generals against Google. Plaintiffs submit that Apple, in fact, is the more appropriate defendant for those claims because Apple does not allow "sideloading," which the competitor does with Android.

*Coring's* only substantiative addition to the DOJ pleading is the "Smartphone App" market, which in turn was proposed to US Congress by an authoritative academic expert. In noting that defining a relevant market for free apps has been a "challenge," according to the "*Antitrust and Big Tech*" report to the United States Congress (full report, incorporated herein by reference, available at https://sgp.fas.org/crs/misc/R45910.pdf), *Coring* pleaded "cross elasticity of demand" and "substitutability" using SSNDQ. As the report explains:

> *"[Antitrust experts] maintain that antitrust law has an important role to play in zero-price markets. Some of these commentators have argued that zero-price transactions are not in fact "free" to consumers, and that consumers ultimately "pay" for putatively "free" goods and services with both their attention and personal data. According to this line of argument, many of these consumers may actually be overpaying. That is, some observers have argued that certain "free" products and services may have negative equilibrium prices under competitive conditions, meaning that firms in the relevant markets would pay consumers for their attention and the use of their data if faced with sufficiently robust competition.*
>
> *Other commentators have argued that firms offering zero-price products and services can compete on a variety of nonprice dimensions such as quality and privacy, and that antitrust law can promote consumer welfare in zero-price markets by ensuring that companies engage in these types of nonprice competition. This argument appears to have persuaded regulators at the DOJ. In a February 2019 speech, Makan Delrahim—the head of the Justice Department's Antitrust Division—contended that antitrust law applies "in full" to zero-price markets because firms offering "free" products and services compete on a variety of dimensions other than price.*
>
> *While many observers accordingly agree that zero-price markets are not categorically immune from antitrust scrutiny, the optimal approach to defining the scope of such markets remains open to debate.*

> *Some commentators have argued that regulators should modify the SSNIP test to account for quality-adjusted prices, creating a new methodology called the "small but significant and non-transitory decrease in quality" (SSNDQ) test. According to these academics, decreases in the quality of "free" services (e.g., a decline in the privacy protections offered by a social network) are tantamount to increases in the quality-adjusted prices of those services. Under the SSNDQ test, then, a firm offering "free" goods or services would possess monopoly power if it had the ability to profitably raise its quality-adjusted prices significantly above competitive levels… The SSNIP test as traditionally administered is accordingly "inoperable" in a number of zero-price technology markets."*

In our objection to the Motion to Dismiss, it was already noted that the Court should not require "SSNIP" type pleadings for free apps, and instead, defer to expert witnesses in discovery for defining free app elasticity and "zero-priced" inherent pricing alternatives. Nonetheless, SSNIP type boundaries were included for the US Smartphone foremarket, despite the Court's finding otherwise regarding notebooks and WIFI devices. But the Court should acknowledge, as above, that zero-price markets are different, and difficult, and allow expert debate on this subject at trial. Dr. Roberts shouldn't be penalized for what is believed (and Apple hasn't refuted this) to be the first free-app censorship case against Apple. It should be noted in the *Epic* case that the word "foremarket" was not even used in Quinn Emmanuel's Complaint, and Judge Gonzalez Rogers conceded that "intensive fact-finding" was necessary to determine a relevant market at *trial*. *Coronavirus Reporter* has met the "substance over form" bar for Sherman Act protection of free app censorship, but if for some reason the Court still feels otherwise, the Court should acknowledge that the *Coring* complaint specifically references SSNDQ, as proposed by a Congressional expert report, and thereby states a plausible relevant market for apps. If Apple cannot refute, in their opposition to this motion, that *Coring* states two distinct, relevant Sherman markets for Smartphone Apps and App Stores, then our present case here must go on. Leave to Amend the *Coring* (and DOJ/26 AG) definitions into this case would be non-futile, by definition, as it is already stated below for convenience, and hereby docketed. Put simply, Apple cannot reasonably claim the DOJ and 26 AGs, and the Congressional report on SSNDQ, are wrong, despite their

neverending hounding of Plaintiffs' works. The Court should consider the fact that Plaintiffs do not

have the resources of Apple, the DOJ or Quinn Emmanuel, and are at a clear disadvantage compared

to Apple and Gibson Dunn. The following are the primary definitions of markets in *Coring*:

> **The *Coring* complaint defines a relevant product market for the distribution of apps to users of iOS mobile devices (the "iOS App Distribution Market").** There is a relevant product market for the distribution of apps to users of all smartphone mobile devices (the "Smartphone App Distribution Market"). The market includes all channels by which iOS apps on smartphone devices may be distributed to consumers. This includes the dominant Apple App Store, which accounts for well over 99% of iOS mobile app distribution. It also includes Apple's enterprise application laoder, which allows corporate customers to directly install apps and bypass the App Store. Apple terms this "sideloading," but Plaintiffs emphasize that this was historically just normal "application loading" or "booting" in computing terminology. Competing app stores are not permitted on Apple devices, per their exclusionary iOS design and contracts of adhesion.
>
> The iOS App Distribution Market does not include mobile distribution of apps that are compatible with other OSs, such as Google Play Store. A monopolist app distributor on iOS mobile devices is not constrained from raising prices, or reducing quality or innovation, by app distribution on Apple's devices (or on any other mobile devices that use an alternative to iOS or on desktop devices), due to market imperfections such as high switching and information costs.
>
> In the face of a small price increase (or a small reduction of quality) in app distribution within iOS, a consumer would be highly unlikely to switch to a Google device for three primary reasons. First, the consumer who would switch away from using one or more iOS devices (e.g., smartphone and tablet) to a Google device (or devices) would lose much of her financial investment in the previously purchased mobile devices—often hundreds of dollars—as well as digital content consumable only through iOS apps. The consumer may also lose efficient, or any, access to many kinds of data on that device or data associated with those apps. Because of the functional and data integration between devices within the same ecosystem (e.g., among an iOS phone, iOS tablet, and peripherals like smartwatches, smart home speakers and "internet of things" devices), many consumers owning multiple iOS devices would be reluctant to switch to a Google device unless committing to switching all devices—a significant financial commitment. Second, many Americans pay for their devices under installment contracts, limiting their ability to switch mobile OS ecosystems. Third, even if a consumer is in the market for a new device (or multiple devices), she typically considers many other factors when deciding between an Apple device or one of the many devices that license the Android OS. These factors include the consumer's existing comfort with an OS, any previous investment in apps or other products that are compatible with an OS (e.g., a smartwatch), device design, processing power, and battery life. Different OSs have distinct designs, controls, and functions that consumers learn to navigate and become familiar with over time. These and other costs of switching mobile OSs deter most consumers from switching, and thus availing themselves of the app distribution alternatives available on another mobile OS.
>
> **Likewise, Coring Defines The Market for Smartphone Apps, or alternatively, iOS Apps, is a Relevant Antitrust Market**

To be useful to consumers, a smartphone must be able to run software applications, or "apps." The app market is downstream from the smartphone foremarket. An app cannot exist or function without a smartphone operating system. Apps let users perform most of the functions associated with mobile devices—tasks like navigation, web browsing, ordering groceries, playing games, and communicating through email and text messaging. A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), and SDKs ("software development kits") which app developers use to create apps that are compatible with the OS.

Apps may be free or may be a non-zero price to consumers, but even a free app has a wholesale valuation. Analogously, every film has a price sold to a film studio. A made-for-TV show, free through ad sponsorship or unlimited streaming agreements, has a price paid to its creators by the TV network or streaming service. Likewise, an author is paid for book rights by a publishing house. Apps are thereby priced by either their cost to consumer, or their total net valuation paid to a creator-developer.

After this underlying MTD Order issued on November 30th, on December 7th the USPTO issued a patent, of which Plaintiff Dr. Isaacs' Caller-ID app is the only licensee. Dr. Isaacs is an owner of the patent, as is *Coring*. Dr. Isaacs attempted to Meet & Confer with Gibson Dunn about amending his patent infringement claims into an SAC, but Gibson Dunn refused such Meet & Confer and told Dr. Isaacs he was not allowed to contact them, which amounted to witness intimidation. Dr. Isaacs sought independent advice from outside legal counsel as to whether or not he could amend his patent claims before the patent issued. The firm advised Dr. Isaacs that under no circumstances could he allege infringement, before the patent issued. Hence this matter constitutes "new evidence" and justice requires amendment to incorporate the new patent and inherent antitrust claims related to its issuance. Dr. Isaacs spent nearly $1 million, out of pocket, for patent prosecution and defense on this patent, with a top ranked national law firm. Dr. Isaacs has never amended his claims in this case, having just joined in the FAC. Dr Isaacs, contrary to Gibson Dunn's assertion, is not even a shareholder member of Primary Productions. Dr. Roberts and his family object to Gibson Dunn's characterization last week that Dr. Isaacs is "controlling" *Coronavirus Reporter*. Roberts and his family own approximately a majority of that company, with full voting rights. Dr. Roberts kindly offered Dr. Isaacs to work *under* Roberts' medical license and professorship at University of Arizona, to offer Dr. Isaacsan opportunity to utilize his talents that could benefit the medical profession, and which he was unfortunately otherwise unable to contribute to for over a decade. Dr. Isaacs, as a *pro se* party, will be filing a separate Rule 60 motion to elaborate on these issues. Nonetheless, Dr. Isaacs should be allowed to amend his

infringement claims in this case, and given as such, it would be grossly unfair not to allow Dr. Roberts and Primary Productions to proceed with any such amended claims, given they are non-futile. Although it is not contested that Dr. Isaacs helped draft the complaints, Dr. Roberts and Primary Productions both decided that a lawyer in academia and a larger law firm should ideally represent them as the case progresses. Attorney Kernan was just recently brought on this case, was tasked with obtaining marketplace discovery expert opinions, and was the first professor of "Social Media" in the country at UC Hastings Law. Attorney Mathews' has been working diligently to obtain litigation funding to allow a larger firm to assist with the class action aspects and discovery. Upon information and belief, should this case proceed to discovery, the Plaintiffs will receive substantial litigation funding. The parties object to the determination that it would be "futile" to improve the FAC, although for the reasons stated in this motion, the FAC is believed to adequately state a claim for relief.

### Vast Antitrust Injury is Properly Alleged in the FAC

Apple's anticompetitive conduct results in substantial competitive damages to the institutional app markets, as properly noticed in the FAC. A far cry from "conclusory statements," the FAC references Defendant Apple's blockade of *all* startups from contributing to the pandemic relief with apps, 40,000 weekly rejections, and "hundreds of thousands of person-years of our best developers [work] discarded by Apple." Further docketed evidence includes the fact that open app markets in China are at least 4x the size of restricted markets.

This matter was directly addressed during the hearing:

> **THE COURT**: Excuse me. What's the evidence of an aggregative bottleneck?
> **DR. ISAACS**: The -- Apple introduced it, themselves. China's free markets are four times the size of ours. And an entire -- every Corona smartphone app was not allowed -- or startup was not allowed. That's not just Coronavirus Reporter. That's every startup that wanted to contribute to the pandemic was not allowed, because Apple set criteria. So just in that submarket of apps, there's a massive bottleneck.
> **THE COURT**: What's the evidence that you've alleged that shows how many apps were denied versus how many apps that actually have made it, to show some aggregative effect?
>
> **DR. ISAACS**: We would need that in discovery. We think that China -- the end result is the Chinese data, that it's four times the size of the App Store. So we have the end result there. We don't have the actual procedural or statistics you are asking for. We just don't have that at this time.

But with 40,000 app rejections a week by Apple -- I think that's the last count -- I would

say the answer is probably, probably strong evidence, Your Honor, is what I would

surmise. But I don't have that data.

As Dr. Roberts remarked to CNBC, a startup blockade historically would have prevented the

discovery of penicillin. What if the 1900's wealthy maker of scientific lab equipment (the equivalent

of Apple's technology today) decided that independent scientists should be "curated" and blocked from

buying laboratory supplies? This is unacceptable, and certainly a jury could and would agree that a

startup ban is inappropriate restriction of competition. But the FAC goes far beyond damage to just

COVID startups – it referenced several pages of the Congressional Subcommittee report that specify

harm to the app markets, generally. The FAC also referenced "international consensus" amongst some

thirty-eight countries, and pending US senate legislation, all directly concerned with the App Store

bottleneck.

Section IIIa of the Subcommittee Report was included as an Exhibit to the FAC and referenced

by concept (rather than section identification) in the FAC:

### "REMOVING COMPETITORS FROM APP STORE

*Apple's conduct*: Apple has used its control over the App Store to altogether bar
developers of rival apps from the platform. A prominent example is Apple removing
or restricting screen-time apps after it decided to create its own screen-time tracker. Apple
told developers that their apps violated App Store policies, even though the company
"had allowed such practices for years and had approved hundreds of versions of their
apps." And when companies asked what they could do to make their app comply, Apple
simply responded, "Your app has an unresolved issue and has been removed from the
App Store."

Apple has claimed that its removal of these apps was motivated by privacy and safety
concerns, but its timing has been suspicious. When it reinstated these competing apps,
it did so the same day that the media reported that the Department of Justice (DOJ)
would be handling any potential antitrust investigation into Apple. Its remedy for its
alleged privacy concerns was bizarre—it allowed the apps back on so long as they
agreed not to "sell, use or disclose to third parties any data for any purpose."80 Apple
could have easily attached this proviso when it first flagged its concerns. As the CEO

of Freedom, a competing app, put it, "Why this last year of pain? And we end up exactly in the same place."

Even though Apple reinstated these apps, their claims may not be moot.82 Still, other plaintiffs can likely be found, as Apple has refused to approve apps that compete with its own "Find My Friends" app, as well as the mobile app for Steam, a video-game service. The rejection of Steam was explained by citing a "business conflict," which casts the launch of the Apple Arcade app a year later in a suspicious light. Further, payment-services apps have complained about being rejected from the App Store; Samsung reported its Pay Mini app was rejected without any explanation. Looking forward, Apple will compete with more apps on its App Store as it expands into services.

*Consumer harm*: Apple's conduct towards competitors harms consumers, illustrated concretely by the example of screen-time apps. After Apple removed rivals OurPact and Mobicip, consumers who turned to Apple's own screen-time tool found it "more complicated and less restrictive." Apple's product was also more susceptible to user circumvention and less nimble—it had no feature to allow parents to quickly disable features on their children's phones and required parents and children both to own iPhones. By denying rivals access to the App Store, Apple gives consumers fewer and worse options to choose from. And because switching app ecosystems entails such high costs, consumers will stay on the platform, even though they suffer decreased choice and quality. In the longer term, Apple removing its competitors creates fear of Apple's opportunism that deters new developers from entering and existing developers from innovating on their products. "

The FAC, already 108 pages in length, reasonably incorporated this information by Exhibit. It has become well-known in the media, and thirty-eight governments, that Apple's curation of apps raises anticompetition concerns. Plaintiffs should have been allowed to incorporate these concerns by reference, rather than reinventing the wheel and directly placing the content in the main FAC document.

The Court's conclusion that "Plaintiffs make no allegation that Apple's conduct excluded Apple competitors, suppressed output of the market, increased app prices, or otherwise harmed competition" is not reasonably supported by the pleadings. The Court claims "The allegations of injury contained in the FAC are either confined to specific harms experienced by Plaintiffs or a small group of competitors, rather than harm to the market," but that is simply untrue in light of the evidence provided by the international consensus documents, Subcommittee Report, and pleadings. But even if damage to competition was limited to COVID startups – this cost lives, and as Dr. Roberts said, would have been

akin to blocking independent scientists during the industrial revolution. This itself *is* widespread damage, even foregoing damage to other types of apps mentioned by the Subcommittee, such as screen time apps. And of course, Dr. Isaacs stated in the hearing that Plaintiffs need discovery to reveal the full scope of damage. The Court cannot deny discovery of the entire app censorship debate – that represents a manifest error and a harm itself to society and the fairness of the judicial process.

Finally, the Court relates the Epic finding of a "two-sided transaction" marketplace as an attempt to exonerate Apple, suggesting that consumers may benefit, at the fair expense to developers. But, *Epic* is simply not controlling here. Moreover, the above Subcommittee excerpt raises substantial concerns about damages to consumers.

Respectfully, with 40,000 weekly app rejections, a blanket ban on COVID startups, Chinese evidence of 4x size open markets, compelling evidence raised by the Subcommittee, international consensus by thirty-some countries, and Dr. Isaacs request for further discovery, the Court needs to rescind its plainly erroneous *Iqbal* interpretation that these all constitute "threadbare recitals." These represent substantiated, international outrage at dangerous censorship.

### Ranking Suppression Equals Competition Harm

The Court improperly accepted Apple's proposed finding of fact regarding ranking suppression: "Apple argues that Plaintiffs ignore the nature of the App Store platform such that for every app that is allegedly "suppressed" in search rankings, another app's visibility is lifted. Motion to Dismiss at 6. The effect of "suppression" in search rankings affects the relative positions among products in the market; but there is no showing of harm to competition across the market. Effects on *Plaintiffs'* apps alone, which may raise equitable issues as *between* app developers, do not establish *antitrust* injury."

*(Order at 23)*

Unfortunately, Apple can no longer be trusted as a company, and the Court's deference to their incorrect logic was not appropriate for 12(b)(6) dismissal. The Subcommittee Report raised detailed concerns about Apple's self-preference in ranking and bundling apps. But even foregoing the Subcommittee concerns, Apple's logic falls apart. Essentially, Apple argues that App Store rankings are a zero-sum game, where one app is lifted at another's expense, but in sum, the net selection of choice and quality are unaffected by rankings.

However, the reality is most users only look at the first ranking result – or perhaps the first three – or first ten, even. Imagine (which is what is alleged) Apple cherry picks the first several results, amongst the three million apps. If users only effectively see Apple's handpicked Top Three or Top Ten results, and those are picked for anti-competitive reasons, then it is not a zero-sum game. Apple (and their cronies) win this game, at the expense of other developers.

In short, ranking suppression requires complex game theory and statistical analysis of discovery data by experts. The Court should investigate this matter, via discovery, rather than accept Apple's implausible defense. The Court cannot blindly accept Apple's zero-sum game argument. Likely, as Plaintiff pointed out about, app ranking involves "human factors" that abrogate any zero-sum game theory.

### The FAC Pleaded Fraud with Particularity

The Court failed to acknowledge that Plaintiffs pleaded particular examples of wire fraud in their RICO claim, and likewise, in the Civil Fraud cause of action. Paragraphs 278, 280, 284-285 are screenshots from Apple that denote wire fraud directed at Coronavirus Reporter, Bitcoin Lottery, and CALID, respectfully. The Court overlooked that these screenshots definitively contain "who" "what" "when" & "where" components of particular fraud.

It is hereby submitted that the manifest error of the Court is in refuting the "why" of the fraud. In what appears to be a reference by the Court Order to these "discrete instances" of wire fraud, the Court opined that there was "no plausible allegation" that these communications were false. The Court gave the example of "data that has not been vetted for accuracy by a reputable source," a reference to self-reported COVID symptoms.

The FAC gave a clear example of a UK Oxford app that was allowed on the App Store, that allowed for self-reported COVID symptoms. That app, as the FAC states, had millions of daily users, and upon information and belief, many other apps on the App Store are platforms for self-reported symptoms. Hence Apple knowingly conveyed false interstate communications to Plaintiff that the App Store did not permit apps with self-reported symptom sharing, when it plainly did. The Court cannot impose its own opinion on this matter; a jury may, and likely will, agree with Plaintiffs that Apple has double standards when it reviews apps, and frequently conveys false interstate wire communications to developers.

Similarly, the statement that Coronavirus Reporter lacked institutional support was patently false, as Dr. Roberts provided a letter of support from University of Arizona – certainly a "recognized institution." But again, the overarching falsity of the statement is the insinuation that Apple does not permit apps with that level of institutional support on the App Store. Again, the FAC gives an example of an app with even less institutional support which was admitted on the App Store, which was believed to be a crony ("known developer") to Apple.

The examples for Bitcoin Lottery and CALID are analogous, and pleaded with particularity. As the FAC describes:

> "Most notably, Defendant Apple routinely engaged in wire fraud and mail fraud by assigning junior App Review members to issue false, pretextual reasons for rejection to small developers. Senior management knew of this practice and instructed said junior app reviewers to issue these statements by telephone calls whenever possible. Indeed, Apple's written reasons for rejection often differed substantially from reasons given by telephone. Specifically, members of the enterprise caused App Store Connect electronic communications to be relayed via interstate means, **that contained knowingly false content meant to mislead and or defraud developers into abandoning their apps, and/or believing their apps were not viable or legal, when in fact, they were.**"

In sum, the falsity of the transmission, beyond the particular pretextual "Guidelines" of self-reported symptoms, institutional support, et cetera, is ***the intent to make developers believe that their***

***apps were not viable, when in fact*, *they were,*** as evidenced by the other apps that did make it onto the App Store, and which the App Review team certainly knew about. Given this discrepancy, the Court cannot simply take Apple's word for it that these emails amounted to proper enforcement of the DPLA guidelines; a jury must weigh the Defendant's intent and the relevant evidence. This argument was raised in Paragraph 277 of the FAC, as well the Motion to Strike, but was never acknowledged by the Court, which represents a manifest error under FRCP 59, or at the very least, a mistake pursuant to FRCP 60 that shouldn't warrant a Ninth Circuit appeal as it is easily resolved. The facts here, quite simply, are being viewed in a light most favorable to Apple, which is not the applicable standard.

### A Valid RICO Enterprise Exists

The FAC names Apple as a Defendant under the doctrine of *respondeat superior*: "Apple is named as Defendant for this RICO claim under the principle of *respondeat superior*. The Ninth Circuit has adopted the reasoning of *Petro-Tec* and *Liquid Air*, holding that liability may arise under § 1962(a) under *respondeat superior* principles "when the individual or entity is benefited by its employee or agent's RICO violations." Here, "Apple's App Review team carried out the enterprise, along with senior Apple management, PR firms, law firms, and rival developer cronies."

The FAC was clear that "a large portion of Apple's employees, such as the programmers and retail staff, were likely unaware of said scheme." In the alternative, if the Court disagrees with Plaintiff's *respondeat superior* invocation, the FAC sought to name a "shareholder or director" to avoid "identity of enterprise and defendant." Naming an additional shareholder would be nearly trivial, and certainly not "futile" as the Court characterized any leave to amend. The Court is respectfully requested to rule upon the *respondeat superior* analysis, and if it does not find a mistake there, is requested to permit leave to amend of a director or shareholder.

Furthermore, the Court found that the enterprise members of law firms and lobbying firms did not commit wire fraud. But the proposed FAC addendum identifies a list of other predicate offenses, such as bribery and corruption of public officials, which did include the law firms. The Court asserted that Plaintiffs waived claims by delaying 14 days in filing the claim after the *Politico* article surfaced. Plaintiffs respectfully request reconsideration of this fact, as complying with Meet & Confer requirements, researching claims under Rule 11 standards, and taking a reasonable several days to notice the news release amounted to a fourteen-day normal delay.

Finally, Plaintiffs submit that it is premature to grant Apple lobbyists *Noerr Pennington* immunity for concerning *quid pro quo* bribery, witness intimidation, and corruption, which would clearly extend beyond "rightful petitioning of the government to enforce laws" – what *Noerr* is meant to protect. At the very least, discovery should proceed to identify the exact nature of the *quid pro quo*, and whether or not this damaged developers in Georgia. Plaintiffs do allege that illegal interference with an antitrust enforcement certainly damaged its business in Georgia, at the very least. This would be analogous to damage by an arsonist, worsened because that bad actor also sabotaged local firefighting facilities. There exists a reasonable foreseeability element that Apple's *quid pro quo* exacerbated their anti-competitive behavior by defeating local law enforcement. Had Georgia enacted legislation such as the "Open Apps Act," Coronavirus Reporter could have launched in that state.

**CONCLUSION**

For the aforementioned reasons, the Court is respectfully requested to reconsider and grant relief from its November 30 Order, by issuing a corrected Order Denying Defendant Apple's Motion to Dismiss.

Submitted on this 27th day of December, 2021.

/s/ Keith Mathews

Keith Mathews, *Pro Hac Vice*
Counsel for Coronavirus Reporter, Primary Productions
and CALID
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing **NOTICE PURSUANT TO FRCP RULES 59 & 60** was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 27th day of December, 2021.

/s/ Keith Mathews
Keith Mathews, *Pro Hac Vice*
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law