Dr. Jeffrey D. Isaacs
10312 Orchid Reserve
West Palm Beach, FL 33414

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>                        Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>               Defendants. | Case No. 3:21-cv-05567-EMC<br><br><br>**NOTICE OF MOTION AND<br>MOTION FOR SANCTIONS**<br><br><br><u>**Hearing**</u><br><br>Date:       March 3, 2022<br>Time:      1:30PM<br>Place:     Courtroom 5, 17th Floor<br>             (videoconference)<br><br>The Honorable Edward M. Chen |

## NOTICE OF MOTION FOR SANCTIONS PURSUANT TO THE INHERENT AUTHORITY OF THE UNITED STATES DISTRICT COURT AND FRCP 37

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30PM on Thursday March 3, 2022, or as soon thereafter as possible, in Courtroom 5 of the United States District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, and/or by videoconference, Plaintiff will and hereby does move this Court to sanction litigation conduct executed by Apple and Gibson Dunn & Crutcher.

This motion is made pursuant to Federal Rules of Civil Procedure Rule 37 and the Court's inherent authority to manage litigation. This motion is based on this Notice of Motion, the attached Memorandum and the Exhibits thereto, and all other papers filed in this action and live evidentiary testimony hereby requested. This notice supersedes Plaintiff's notice filed January 18th.

This motion concerns around thirty deleted App Store Connect ESI notices regarding the Top Ten ranked Caller-ID app. This motion also concerns "fraud on the court" by Gibson Dunn in "hampering the presentation of the opposing party's claim" through witness tampering, in Gibson Dunn's longstanding campaign of political retaliation against Dr. Isaacs for filing a previous Rule 37 Motion that Gibson Dunn has never contested caused a high-profile World Bank president resignation in 2019.

Submitted on this 24th day of January, 2022.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs, *Pro Se*

## MOTION FOR SANCTIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

### Standard of Review

United States District Courts are empowered to "'protect the administration of justice by levying sanctions in response to abusive litigation practices.'" *Kovilic Const. Co., v. Missbrenner*, 106 F.3d 768, 772-73 (7th Cir. 1997); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co*., 771 F.2d 5, 11 (1st Cir. 1985), cert. denied, 475 U.S. 1018 (1986). The source of the court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R*., 370 U.S. 626, 630-631 (1962). See also *Brockton Sav. Bank v. Peat, Marwick, Mtichell & Co*., 771 F.2d 5, 11 (1st Cir. 1985), cert. denied, 475 U.S. 1018 (1986). That authority extends to all matters that come before the court. There is no limitation as to the type of proceedings - criminal or civil, trial or appeal - in which sanctions may issue. See, e.g., *United States v. Kouri-Perez*, 1999 U.S. App. Lexis 8811 (1st Cir. May 7, 1999) (inherent power sanction of $4,000 imposed on criminal defense counsel for violating civility order by filing motion for purpose of *harassing and humiliating prosecutor*.)

The imposition of inherent power sanctions is appropriate only where the offender has willfully abused judicial process or otherwise conducted litigation in bad faith. *In re Itel Sec. Litig*., 791 F.2d 672, 675 (9th Cir. 1986), cert. denied, 479 U.S. 1033 91987); *Link v. Walbash R.R.,* 370 U.S. 626, 632 (1962).

The Supreme Court has held that federal courts have the power to impose sanctions pursuant to the court's inherent power even if the violation is subject to sanctions under existing statutes or rules. However, the Court limited its holding by stating that when available the court should utilize the rules and statutes rather than its inherent power to sanction litigants.

The Supreme Court has described fraud on the court as "a wrong against the institutions set up to protect and safeguard the public." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238,246(1944). "Fraud on the court" is used as shorthand to describe a variety of improper acts that may lead to sanctions under the rules of civil procedure or pursuant to a court's inherent powers in managing its docket. *E.g.*, *Stanley Shenker & Assocs. v. World Wrestling Fed'n. Entm't*, 48 Conn. Supp. 357 (Conn. Super. Ct. 2003). As the First Circuit stated in *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989): "Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms." A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. The *Rockdale* court noted that determining whether a fraud on the court has been committed is fact-specific and must be done on a case-by-case basis. Courts will only find fraud on the court where there is clear and convincing evidence of the fraud. *E.g.*, *Hull v. Municipality of San Juan*, 356 F.3d 98 (1st Cir. 2004); *Maynard v. Nygren*, 332 F.3d 462 (7th Cir. 2003); *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047,1048(8th Cir.1991)

Generally, fraud on the court is a fraud "directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents. It is thus fraud where the impartial functions of the court have been directly corrupted." Fraud on the Court, 16 Nev. L. J. 707 (2016). Statutory authority exists under 18 U.S. Code § 1512  and is instructive to defining conduct between the parties, or its agents/attorneys, that interferes with court machinery itself, *i.e*, witness tampering:

18 U.S. Code § 1512 - Tampering with a witness, victim, or an informant
    **(b)**Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—(1) influence, delay, or prevent the testimony of any person in an official

proceeding; (2)cause or induce any person to— (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B)alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(c)Whoever corruptly—(1)alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2)otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(d)Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from— (1)attending or testifying in an official proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

A party that has despoiled evidence can be sanctioned by a district court under two sources of authority: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who fails to obey an order to provide or permit discovery." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Absent a failure to obey a discovery order, the Court does not have authority under Rule 37 to sanction a party. *Kinnally v. Rogers Corp.,* 2008 WL 4850116 (D. Ariz. Nov. 6, 2008) Accordingly, the existence of a discovery order, or lack thereof, will invoke the Court's inherent authority to levy sanctions. A terminating sanction, such as default judgment, is appropriate only when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995)). "[Default judgment or dismissal] under a court's inherent powers is justified in extreme circumstances, in response to abusive litigation practices, and to insure the orderly administration of justice and the integrity of the court's orders." *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988). An adverse inference is a sanction carried out as an instruction to the trier of fact that "evidence made unavailable by a party was unfavorable to that party." *Lewis*, 261 F.R.D. at 521 (quoting *Nursing Home Pension Fund v. Oracle Corp*., 254 F.R.D. 559, 563 (N.D. Cal. 2008)). In order for the Court to impose an adverse inference it must establish that: "(1) the party having control over the evidence had an

obligation to preserve it; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense." Id. The "culpable state of mind" includes negligence. Id. The Ninth Circuit explained that the adverse inference sanction is based on two rationales: (1) "the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than the party in the same position who does not destroy the document" and (2) the "prophylactic and punitive effect" of allowing the trier of fact to draw the adverse inference, which deters evidence destruction. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). The Defendant has a duty to preserve evidence it knew or should have known was relevant or may be relevant to future litigation. *Sunrider Corp. v. Bountiful Biotech Corp.*, 2010 WL 4590766, at *29 (C.D. Cal. Oct. 8, 2010). The obligation to preserve relevant evidence attaches when litigation is "pending or reasonably foreseeable." Id. (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)).

> Federal Rule of Civil Procedure 37(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

Rule 37(e) of the Federal Rules of Civil Procedure (FRCP) was enacted to allow courts to impose sanctions when ESI cannot be recovered due to a party's intentional tampering with potentially relevant ESI. But what happens when ESI is not completely lost or destroyed? What recourse is available when ESI has been altered or may still be partially recoverable? In these instances, courts may rely on their inherent power to sanction a litigant for the attempted spoliation of ESI. The American Bar (https://www.americanbar.org/groups/construction_industry/publications/under_construction/2020/su

mmer2020/sanctions-for-lost-or-destroyed-esi/) provides a case study illustrating how courts may use their inherent authority to sanction when the requirements of Rule 37(e) are not met.

In *Chambers*, the Supreme Court explained that the inherent powers of a trial court, at a minimum, are available to fill any void in the rules and statutes:

> *"These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices."* (501 U.S. at 46.)

## Introduction

A bipartisan 16-6 vote by the Senate Judiciary Committee advanced the *American Innovation and Choice Online Act* to the United States Senate on Thursday, January 20, 2022. (See https://thehill.com/policy/technology/590659-senate-panel-advances-bill-blocking-tech-giants-from-favoring-own-products) That bill would permit sideloading – the same exact judicial redress Plaintiffs sought via preliminary injunction and/or permanent injunction by jury, to curtail censorship of free digital products such as the life-saving Coronavirus Reporter app developed by world-renowned cardiologist Dr Robert Roberts. The FAC describes an "international consensus" of over thirty countries, including South Korea, Russia, United Kingdom, and all EU member states that have either passed, or have pending, legislation to address app censorship. The Congressional Subcommittee *(FAC Exhibit A)* found that Apple engages in anti-competitive conduct by suppressing or censoring small developers like Coronavirus Reporter, whom they directly compete with.

Today, there exists evolving civil litigation to curtail Apple's anti-competitive conduct, moving forward in parallel to the "international consensus" that includes both houses of Congress. There exists the *Epic* case that proceeded to bench trial and won a UCL claim, with other bench findings under appeal. There exists a *Cameron* class action developer settlement for over $100 million. And there

exists Plaintiff Dr. Jeffrey Isaacs claims as both a *Cameron* opt-out, and censored free app developer, that were dismissed prior to any discovery – let alone jury trial – as a result of Apple and Gibson Dunn's improper litigation conduct as described herein.

Plaintiff Coronavirus Reporter commenced this lawsuit in the New Hampshire District in January 2021. As the first antitrust lawsuit against Apple to concern free digital products, the streamlined NHD Complaint invoked an original Sherman Act cause of action to describe exclusionary behavior by Apple that resulted in anticompetitive effect on national taxpayer funded internet backbone. Apple responded by way of an *ad hominem* MTD attacking the NHD Complaint as "grandiose theories about Apple's purported role as a gatekeeper to "the global internet backbone." Not only was the NHD Complaint "grandiose" – for seeking the same relief as thirty other countries – it was, according to Apple, somehow illegal itself: "Plaintiff brings antitrust and contract claims that exhibit a cavalier disregard for the law and facts." (*NHD 12-cv-47 Dkt 19 pg. 9*)

The same day the NHD Complaint was filed, CNBC Apple Correspondent Kif Leswing contacted Coronavirus Reporter to find out the identity of NASA & John Glenn's consultant physician and MBCK inventor central to the NHD Complaint and conducted a forty-five minute interview of Dr. Robert Roberts. In light of this fact, Apple assented to an FAC being filed in the NHD that identified Dr. Roberts and included his CV. Attorney Mathews sought to incorporate a new client with a related free app censorship claim, *Primary Productions*, into an SAC filed in the NHD. Apple opposed the NHD Plaintiff's "once as a matter of course" right to file an SAC, which Plaintiffs identify as "manifest error" by the NH USDJ. As a result, *Primary Productions* was forced to file in the Maine District a complaint – and an SAC– which tracked the *Coronavirus Reporter* Sherman theory. The *Coronavirus Reporter* case was subsequently moved, at Apple's demand, to the Northern District, which resulted in the filing of the Complaint in this case, which augmented with claims from *Epic* and *Cameron*, both

then-pending, to defend Apple's attacks that their own claim was "in disregard for the law." Plaintiffs also incorporated putative class action claims, in light of six-months of rapidly emerging international antitrust developments indicating the scale of the problem Dr. Roberts faced affected a large number of developers domestically and internationally.

In September 2021, Apple launched FaceTime 15. As the FAC describes, FaceTime 15 added desperately needed cross-platform web links. Dr. Jeffrey Isaacs, the programmer who worked under Dr. Robert Roberts for Coronavirus Reporter, had developed a WebCaller iOS app with cross-platform weblink capability back in 2019. Also in September 2021, the USPTO indicated to Dr. Isaacs that his patent for the Top Ten Caller-ID app would be allowed, and thus, had a high likelihood of being issued in the near future. In light of these two developments, Dr. Isaacs decided to appear in the FAC *Pro Se* and bring claims for the censorship of WebCaller and Caller-ID. The FAC also expanded and clarified monopsony Sherman Act theories developed by Attorney Mathews and Dr. Isaacs. The FAC joined Primary Productions into the case, as finally agreed by the parties.

In sum, at the time of filing of the FAC, the corporate parties had amended their free digital Sherman Act product definitions substantially once or twice[1]. Dr. Isaacs has yet to amend his Sherman Act and patent claims brought about by recent events. Around the time of the FAC filing, Epic won a UCL claim against Apple, and the parties sought to append or amend a UCL claim while Dr. Isaacs amended his patent claim. All these events, as evident, directly stemmed from matters beyond Plaintiffs' control and were not reasonably foreseeable prior to the event.

Apple and Gibson Dunn tell a different story. In their scandalous vernacular, this lawsuit encompasses "**Frankenstein's lab where dead claims are stitched together in an attempt at**

---

[1] Gibson Dunn claimed in April that Plaintiffs had amended four times: "they are now on their *fourth* complaint" (Docket 32, p.8). In the MTD, they oppose leave to amend a purported "eighth" amendment. Like the farce of *fifteen* purported relevant Sherman markets, this evidences a uniform attempt to cast Plaintiff's work as erratic right after they surface his head injury diagnosis.

**resurrection**" (*Docket 64, p.9*). When *Coronavirus Reporter* filed its Motion for Preliminary Injunction, Apple responded with an opposition citing Dr. Isaacs' 1997 head injury as "**neuropsychiatric illness**." (*Docket 32 p.6*). Apple falsely claimed "**Coronavirus Reporter's only apparent connection to health or medicine is that Jeffrey Isaacs**" in a false declaration signed under oath by Gibson Dunn's Brass. (*Docket 32 p.6*). This discrepancy did not go unnoticed; Law360 ran an article explaining how "the startup is headlined by renowned cardiologist Dr. Robert Roberts, developer of the leading test used to diagnose heart attacks, according to court filings. Yet Roberts is mentioned in Apple's opposition brief just once." (*Exhibit B*, "*COVID App Programmer Accuses Gibson Dunn Of Retaliation*"). When Dr. Isaacs' patent was granted reissue, after a seven year "Alice" review by the Federal Circuit and USPTO, the first thing Gibson Dunn did was scream to the Florida District Court that Dr. Isaacs "is a **former physician who suffers from a neuropsychiatric illness**" (See FLSD *Coring v. Apple,* Motion to Transfer Venue*)*. In addition to subjecting Dr. Isaacs to unnecessary, irrelevant discrimination and humiliation for a head injury assault, Apple's desire to win a global anti-trust debate on the basis of an app developers' head injury begs the question: has Apple run out of any remotely meritorious defense to the antitrust debate? Surely Gibson Dunn, the top ranked litigation firm, would put forth that defense if it existed. This unacceptable conduct alone warrants an adverse inference under the standard of review.

No other Apple antitrust proceeding sustains abuse against a developer by employing terms such as "neuropsychiatric" and "Frankenstein," upon thorough review of related pending and recently pending cases. As a basis for comparison, the *Epic* parties held considerable animosity towards each other, but Plaintiff is unaware of any statements by Apple that contain anything close to constant insinuations – or outright mockery – of head injuries and related allegations stemming from head-injury treatment that were acquitted fifteen years ago. The closest antitrust *ad hominem* attack that surfaced

in this review is Facebook's attack on FTC Chair Khan, seeking her recusal because she wrote law review articles on digital products while studying at Yale. (*See* *https://www.barrons.com/articles/facebook-amazon-ftc-lina-khan-antitrust-51626288178*).

Apple has repeatedly and falsely claimed that Dr. Isaacs controls all the Plaintiffs in this case. In FLSD last week, they incorrectly stated "These claims were brought by [Dr.] Isaacs either in his individual capacity or on behalf of various entities under his control, including Coronavirus Reporter, CALID Inc., and Primary Productions." They also acknowledged that the patent infringement claims could not have been filed back in September, but omitted to mention their improper conduct in blocking Meet & Confer on amending it into this CAND proceeding: "[Dr.] Isaacs first threatened suit on September 20, 2021—even though the '698 patent had been deemed ineligible at that time and the '847 patent had not yet issued." (*Coring* Motion to Transfer Venue, p.6). Dr. Roberts was scheduled to testify at the Preliminary Injunction hearing as to his authority at the company and the institutional support he brought from University of Arizona. Dr. Isaacs is able to testify at this Motion for Sanctions hearing, and hereby requests such time allocation, as to the fact that Dr. Roberts is his senior at Coronavirus Reporter, and moreover his senior as a renowned cardiologist and MBCK inventor, and all litigation by that Corporation require Dr. Roberts' authorization as he is a near-majority shareholder. Likewise, Dr. Isaacs is able to testify that he has no control over Primary Productions, and is neither a founder nor member shareholder of that corporation.

The repetitive, harmful nature of Gibson Dunn and Apple's focus on Dr. Isaacs in this case is the subject of this Motion for Sanctions, even more than that falsity and/or irrelevance of their particular statements. Gibson Dunn never missed an opportunity[2], on an almost daily basis, to inflict worry,

---

[2] Multiple individuals have remarked that Gibson Dunn's Brass was visibly flustered during the MTD Hearing, when an unexpected technical glitch resulted in Dr. Isaacs' well-articulated Sherman monopsony claim theory presentation. This shattered a years-long campaign of *ad hominem* attacks on Dr. Isaacs "Frankenstein" claim theories, "neuropsychiatric" head injury, etc. That hearing video has already been requested for preservation and use in this motion adjudication and/or subsequent proceeding.

mayhem, humiliation, and doubt into an aspiring neurosurgeon who collaborated with a world-renowned medical inventor to save lives during the pandemic. For example, Gibson Dunn needlessly attacked Dr. Isaacs as "not adequate to do either job" as Class Action counsel. Dr. Isaacs never attempted to be class action counsel. Attorney S. Michael Kernan, a Harvard graduate and the first social media law professor in the country at the esteemed UC system, was hired as class counsel. Likewise, Attorney Mathews has zealously represented class members for a decade in cases ranging from Boy Scouts of America to Bank of America. This unusual focus on Dr. Isaacs is not an acceptable way to win international antitrust litigation. Dr. Isaacs can and will testify at the hearing of his sincere effort to have worked under Dr. Roberts to finally put his medical degree to use – something he waited his whole life for, and what may have been his last chance to contribute to medicine in a meaningful way in light of the unfortunate adversity his career faced.

Gibson Dunn improperly[3] referred to Dr. Isaacs as a "serial litigant" last week in the Florida district, after improperly blocking the amendment of that patent[4] to this case. Gibson Dunn knows Dr. Isaacs has been traumatized by the toll a decade spent enforcing an acquittal agreement took on him, and he can and will testify to that fact at a hearing. The fact is Dr. Isaacs' acquittal was validated by

---

[3] Gibson Dunn cannot reasonably believe Dr. Isaacs' decade long legal saga to reconcile three competent authorities' enforcement of a USC settlement agreement was something he would ever have wished, in lieu of a promising medical career. It is submitted that Gibson Dunn's purported stance towards Dr. Isaacs' civil proceedings is meant to deflect from his criminal complaints to FBI (see below) and the White House, which the firm has never refuted resulted in a material outcome.

[4] Last week, Gibson Dunn launched several new *ad hominem* attacks from Miami. One is that Dr. Isaacs is evading this district for his patent claims. In their *Motion to Transfer Venue*, the firm says FLSD is "as far away as possible from **the venue Mr. Isaacs seeks to evade.**" But the written record is clear; Dr. Isaacs sought to amend the patent infringement case into this proceeding in California Northern District, in "the interest of judicial economy," and Gibson Dunn blocked his Meet & Confer request (see below). Another attack from Miami called *Coring* and App Place "**inventions of Mr. Isaacs imagination.**" *Coring* incorporation paperwork was filed in December 2021. App Place actually is an invention of Dr. Isaacs' imagination, but not in a disparaging way meant to shame Dr. Isaacs' head injury; it was referenced in an IP lawyer memo about blockchain previously docketed in this case. The third *ad hominem* attack levied by Apple last week accuses Dr. Isaacs of misrepresenting his Florida residency to the court. In fact, Dr. Isaacs was granted Florida's "Homestead" residency last year. Gibson Dunn has vociferously and repeatedly accused Dr. Isaacs of things that are simply untrue according to the evidence. Yet a fourth attack uses scandalous, violent language that "**Mr. Isaacs trained his sights on Apple,**" but Dr. Isaacs will testify at the evidentiary hearing that he was not the first of the Plaintiffs in this case to suggest suing Apple, and indeed, he actually talked one co-Plaintiff out of an Apple lawsuit, but later changed his position.

three competent authorities – the American Academy of Medicine, the NH Employment Tribunal, and the NH Board of Medicine. The NH Board of Medicine, in a partially contrasting opinion, determined that the acquittal had never been executed. When Dr. Isaacs sought to enforce that acquittal, Gibson Dunn argued the acquittal was unenforceable, and ordered Isaacs to pay $250,000 in USC attorney's fees. A dissenting Ninth Circuit Judge rebuked that it was "not reasonable" that the exoneration was unenforceable. In sum, Dr. Isaacs was unwillingy pulled from Dartmouth residency to spend a decade in the legal system in enforcing his acquittal so he could practice medicine. That meant working with Dr. Roberts on COVID-19 was his "last chance" in all probability. That's a far cry from being a "serial litigant."

Gibson Dunn and Apple shared a mutual motive to issue such false, abusive statements that to 1) shift the focus away from the fact that Apple rejected a COVID-19 app by a world renowned physician and 2) obfuscate Dr. Isaacs' long term political dispute with Gibson Dunn. Here the parties and their counsel, by an unusual coincidence, could strategically "kill two birds with one stone" by discrediting Dr. Isaacs from Coronavirus Reporter while simultaneously discrediting Dr. Isaacs' political retaliation case against the firm and USC, which was pending SCOTUS appeal until last week

## Factual Background

Gibson Dunn did not enter this proceeding with a blank slate. Coronavirus Reporter's Attorney Keith Mathews remarked to Law360 that he had "grave concerns" about the firm's conflicted dual role as witness and lawyer. The firm was a RICO defendant and respondent in the United States Supreme Court for a *certiorari* petition filed by Dr. Isaacs (See *Docket 65* US Supreme Court No. 21-592). The petition and underlying case describe a now decade-long political retaliation against Dr Isaacs in which Gibson Dunn was alleged lead participant. Dr. Isaacs, awarded a Doctor of Medicine in 2010 (Exhibit A – Doctorate Diploma), is a medical doctor. Dr. Isaacs has referred to himself in this present case as

an "aspiring neurosurgeon" which is factually supported by his AAMC (American Academy of Medical Colleges) registration (Exhibit A - AAMC/ECFMG correspondence for 2022 neurosurgery application), only available to those who possess an MD or equivalent. The AAMC is a national authority on physician credentialing and residency application. The AAMC and ECFMG both independently refer to Plaintiff as "Dr. Isaacs." On April 25, 2012, the AAMC initiated and subsequently terminated investigation into Dr. Isaacs' attendance at USC Keck School of Medicine. On May 13, 2012, the AAMC terminated the investigation after Dr. Isaacs provided evidence of an acquittal and expungement seal of contested academic records. *Id*. Also in 2012, a New Hampshire Employment Tribunal held a proceeding under oath on the same matter, and similarly exonerated Dr. Isaacs. In short, two competent authorities conducted fair hearings and reached a factual conclusion that Dr. Isaacs had been acquitted of allegations at USC. Dartmouth College residency program directors testified under oath that Dr. Isaacs medical knowledge was satisfactory, and that they would defer to the AAMC determination regarding the USC allegations. The NH Board of Medicine (NHBOM) reached a partially contrasting conclusion than that reached by AAMC and the NH Tribunal, finding "no evidence" USC had ever acquitted Dr. Isaacs, despite acknowledging the settlement agreement language where USC was required to do so. In short, three competent authorities found evidence that USC acquitted Isaacs, but Gibson Dunn (see below) would argue otherwise in what became a RICO case against that firm. Separately, a New Hampshire USDC found, on an accidentally unopposed Motion for Summary Judgment, that Dartmouth could terminate Dr. Isaacs because his disability – stemming from the 1997 head injury, also at Dartmouth as an undergrad – was not subject to accommodation requirements under ADA. (See *12-cv-40 NHD*). Just prior to the MSJ, Dr. Isaacs had filed a Motion for Rule 37 Sanctions, alleging that Dr Jim Yong Kim (Dartmouth's President, prior to World Bank appointment by Barack Obama) had intentionally deleted Dr. Isaacs' entire Dartmouth

residency file. The spoliated email account was alleged to have evidence that, in fact, Dr. Isaacs' Dartmouth-Hitchcock Medical Center Residency position was constructively terminated when the program learned of the expunged USC matter.

As a result of the Rule 37 Motion, Dr. Isaacs has spent nearly his entire adult life trying to enforce the USC expungement and acquittal documents issued in 2007 and 2008, respectively. In early 2018, Dr. Isaacs filed an APA action with the FBI (*18-cv-10886* Mass.) seeking investigation of Dr. Kim's evidence spoliation.

In Summer 2018, the FBI completed an intake interview of Dr. Isaacs regarding the email spoliation. Then US Attorney General Jeff Sessions was notified of the case in late Summer 2018, as was the White House. Dr. Jim Yong Kim, whose Obama appointment had been renewed by the Trump White House earlier that year, reached a termination agreement from his position sometime in late Fall/early Winter 2018. In both SCOTUS petitions already docketed in this case, and two other federal courts, Dr. Isaacs has asserted that Kim's abrupt departure from his newly-renewed Presidential appointment stemmed directly from his culpability with the Rule 37 violation at DHMC. Gibson Dunn and counsel for Dartmouth have never refuted multiple assertions by Dr. Isaacs of this link.

As a result of the three opinions on the USC acquittal, which took several years to exhaust appeals to SCOTUS, in 2019 Dr. Isaacs retained a former federal prosecutor to bring a declaratory judgement and RICO action against USC and Gibson Dunn in the Central California District, with the goal of resuming his medical training by requiring USC to abide by the acquittal agreement. Gibson Dunn was alleged to have falsely denied the plain existence of the acquittal clause (which even the NHBOM conceded) in the relevant settlement documents. The firm was alleged to have acted as USC's administrator of those settlement documents. USC won a dismissal of the RICO claims on statute of limitations grounds; no trial on the merits occurred. Notably, a dissenting Ninth Circuit judge found

the USC and Gibson Dunn posture "not reasonable" that the acquittal settlement agreement was intended to be "unenforceable." That matter was pending *cert* petition until last week.

Dr. Isaacs did what he should have done in light of a decade of administrative proceedings launched against him and a NH USDJ ruling on his medical disability. He worked tirelessly on app development as a programmer, saving consumers $100 million or more with his Web Caller-ID invention that Gibson Dunn referred to last week disrespectfully as "whatever that is." (*Motion to Transfer Venue*, p.19) This is consistent with the disdain for developers noted by the Congressional Subcommittee – only the iPhone is a godsend (see "*Economic Miracle*" argument in *Opposition to Preliminary Injunction*) other developers' work is bug-ridden worthy of censorship (see *Safari bug, Pegasus spyware in pending Motion for Relief*). After his Caller-ID success, Dr. Isaacs was then fortunate enough to obtain a position working under the esteemed Dr. Robert Roberts on the Coronavirus Reporter App.

Enter Gibson Dunn to this case, with a dual objective to 1) defend their key client Apple from the first Class Action lawsuit for censored free digital products, 2) defend what was an ongoing RICO claim involving political retaliation at the highest levels of academia.

## Witness Tampering and Evidence Spoliation Conduct Warrant Independent Discovery and Evidentiary Hearing

Plaintiff Dr. Jeffrey Isaacs participated in a Sanctions Meet & Confer with Gibson Dunn on September 1, 2021, prior to joinder of Caller-ID and WebCaller into this case. During that sanctions conference, as argued above, Gibson Dunn broke out in laughter when Plaintiff Dr. Jeffrey Isaacs asked them to address him as "Doctor."[5]  Dr. Isaacs offered to produce evidence that he worked under Dr.

---

[5] Plaintiff counts over one hundred references to "Mr. Isaacs" by Gibson Dunn in the pleadings and hearing transcript. Each instance, it is submitted, is intended to personally inflect unnecessary grief and humiliation upon Dr. Isaacs in an attempt to gain strategic advantage in both this antitrust lawsuit, and a political retaliation RICO case against Gibson Dunn that started without Apple's involvement.

Roberts on the app, and therefore asked the firm to retract its statement about "neuropsychiatric" head injury and acquitted USC matter, that happened while Dr. Isaacs was undergoing medication for head injury, as false and/or irrelevant. As Dr. Roberts' programmer and junior medical consultant, Dr. Isaacs' own medical history was irrelevant to an antitrust case about Apple's rejection of Coronavirus Reporter by a Fields Medal scientist. Gibson Dunn refused to retract the false, scandalous and irrelevant statements about Dr. Isaacs, and therefore **Gibson Dunn is on record as positing that Dr. Isaacs' head injury is relevant to Apple's international antitrust case(s)**.

Shortly after that Sanctions M&C, and the filing of the FAC, Gibson Dunn sent Dr. Isaacs a letter threatening him not to contact them about for any litigation related activity. The latter clearly intended to resuscitate old, acquitted allegations against Dr. Isaacs, and to cause him trauma in reliving them, and he will testify as to such. Moreover, the letter blocked the "machinery" and "operations" of this Court, as Dr. Isaacs – a *pro se* party as recognized by clerk filings and orders – could not advance important items to the Court given the blockade. In addition to fraud on the court, the intimidation against Dr. Isaacs constituted witness tampering.

The witness blockade directive had the desired effect of causing great distress to Dr. Isaacs and mayhem in this litigation, which he will testify about at the upcoming hearing. Dr. Isaacs was unable to Meet & Confer about amending the soon-to-reissue patent, as well as numerous other issues. UC Law Professor S. Michael Kernan wrote, on his own initiative, that he has "never seen a defendant try this hard to avoid Meet & Confers." This resulted in the Court issuing its MTD order about the invalidated '698 patent that was not based on the best available knowledge. Gibson Dunn's fraud on the Court directly caused the Court to spend valuable time analyzing and issuing an order about the Caller-ID patent that was not based on current facts, but which could have been based on said facts but-for Gibson Dunn's conduct. That is not acceptable nor should that be condoned.

Fraud on the court exists when "clear and convincing" evidence demonstrates interference with the judicial process itself. Here, that clear and convincing standard exists. Gibson Dunn does not deny they have blocked Plaintiff from proceeding – they merely dismiss it as irrelevant, like everything else about Dr. Isaacs. There is no real debate as to whether their blockade "unfairly hamper[ed] the presentation of the opposing party's claim or defense." That did this in plain sight, under thin pretense of the authority of an unrelated statute; as such, this "case-by-case" review of the many "stylistic boundaries" of fraud on the court is necessary to censure "calculated schemes." This was indeed a calculated scheme, where Gibson Dunn feigned 'confusion' as to whether or not Plaintiff was *pro se*. The clerk, as indicated above, clearly assigned *Pro Se* status to Dr. Jeffrey Isaacs. Caller-ID and WebCaller have nothing to do Dr. Roberts and his Coronavirus Reporter. If Gibson Dunn had any objection or confusion to such assignment, they had a right – and an obligation – to motion the Court. Rather, they took the law into their own hands – improperly – in order to mount their campaign of disarray and abuse against *Pro Se* Dr. Jeffrey Isaacs.

ESI Evidence Spoliation

This Motion is filed requesting evidentiary hearing and discovery into what appears to be a material ESI spoliation issue with the Apple App Store Connect Developer Portal. As pictured in the FAC, the Resolution Center for the Caller-ID App produces a blank white screen upon login. This appears to be unique to the Caller-ID app, as all other apps show full correspondence history in the Resolution Center. Indeed, the co-Plaintiffs have produced in the FAC screen captures showing their Resolution Center data, which represents pleading specificity of wire fraud. Dr. Isaacs is unable to provide this specific evidence, because his Resolution Center data was erased.

The evidence that does exist shows significant aberrations, as nearly thirty App Store rejections were sent in a short period of time between February and June 2019. Coronavirus Reporter, on the

other hand, only had a few such rejection notices. Plaintiff estimates the thirty rejections, by quantity alone, would put Caller-ID four to six standard deviations above the norm, when analyzing the 40,000 weekly rejections collectively. Apple's treatment of the Caller-ID app is unusual beyond mere quantity. The rejections, as best as Plaintiff can recall, were unusually vague, intentionally frustrating, and largely incoherent. The thirty rejections caused Plaintiff to re-code and resubmit around thirty iterations of Caller-ID. In developer terms, Apple put him on a wild goose hunt, to repair unknown issues with his app.

Notably, Apple was aware of the '698 patent matter for at least two years prior to this App Store anomaly. Apple was aware, or should have been aware, that the patent was under USPTO continued reexamination and/or Federal Circuit review. Apple had a duty to preserve any relevant evidence to the Caller-ID patent since 2016, on that basis alone. Apple also received an evidence preservation letter from Dr. Isaacs in early 2020. Attorney Mathews sent an evidence preservation letter and request to Meet & Confer about evidence preservation to Apple in July 2021. Gibson Dunn refused to Meet & Confer on evidence preservation.

Additionally, Caller-ID would have been subject to evidence preservation in the *Cameron* case, as Caller-ID had IAP/paid app features, and was formerly a Top Ten app. Apple did not know Caller-ID would opt-out of that settlement until after the evidence was spoliated.

It appears beyond doubt that Apple had an obligation to preserve the Resolution Center evidence and was on notice via several Court orders from this District to preserve it. Apple appears to have breached their duty to preserve the evidence, and the question is – was this willful or negligent, and is the evidence recoverable or not? It would seem the evidence may be in possession of *Cameron* counsel, as that case pleading referenced rejected apps being subject matter to the lawsuit, and presumably, discovery that cost $30 million.

Plaintiff is willing to testify in the requested evidentiary hearing that the thirty-some rejections were unusual and would likely support claims under RICO, Sherman, and willful patent infringement. Plaintiff had several phone calls with Apple in addition to the written correspondence; during these calls all issues raised in the FAC were discussed: the Orave copycat, the patent prosecution, and the pretextual/vague/false reasons for rejection.

Apple and Gibson Dunn refused to Meet & Confer with Plaintiff on this matter. Gibson Dunn blocked Plaintiff from being able to properly communicate with them about this matter and the patent reissue. As Gibson Dunn is Plaintiff's interface to communication with the Court, especially in light of Meet & Confer requirements, Gibson Dunn's refusal to communicate on these matters constituted "fraud on the court" by interference with the "machinery" and "operations" of the proceeding itself. Moreover, Plaintiff hereby acknowledges the possibility that the ESI has not been deleted, but merely withheld from Plaintiff to provoke mayhem, confusion, and distracting allegations in this proceeding. Furthermore, Gibson Dunn, fully aware Plaintiff has spent a decade dealing with the aftermath of the Dartmouth Rule 37 motion, may have schemed to put Plaintiff on a path of another Rule 37 claim, in order to discredit his original Rule 37 claim. In short, something has happened to this ESI, counsel improperly refused to Meet & Confer over it, and live evidentiary testimony and discovery are warranted to elucidate the disappearance.

## Conclusion

Defendant Apple and Gibson Dunn have directed sustained and repetitive litigation abuse towards Dr. Jeffrey Isaacs during the course of this proceeding to attain improper strategic litigation advantage. In what should have been a anti-trust dispute with Apple unrelated to the prior university dispute with Dr. Kim, Gibson Dunn has made concerted efforts to link the case, dissociate Dr. Roberts as a majority shareholder, and victim-shame Dr. Isaacs. Dr. Isaacs' medical career was set back – for

at least a decade – subsequent to what most would call a tragic, violent head injury assault from an intoxicated Dartmouth College student in 1997. Dr. Isaacs, who achieved neurosurgery level boards after recovering from his head injury, went on to work under the acclaimed Dr. Robert Roberts on the Coronavirus Reporter App. Dr. Isaacs also invented Web Caller-ID, which is estimated to have saved the US economy over $100 million by offering free caller ID to consumers. This case should progress, like other antitrust cases have, in an orderly fashion. The Motion to Dismiss was attained improperly for the reasons described above, and the Defendant should be sanctioned accordingly.

## Oral Argument

Under the Local Rules, the Court may permit an evidentiary hearing if motioned by a party. Plaintiff hereby motions for such hearing, and to permit testimony by: Dr. Jeffrey Isaacs, Dr. Robert Roberts, an Apple senior/chief-level officer knowledgeable with this lawsuit and the evidence spoliation, and an individual(s) knowledgeable as to the alleged political retaliation involving Gibson Dunn.

## Proposed Sanction

A 12(b)(6) dismissal is a highly unfavored form of adjudication. In this case, a 12(b)(6) would unfairly reward Apple for improper litigation conduct, including 1) blocking a witness from proceeding with court-mandated activities, 2) withholding or deleting ESI evidence from that witness, and 3) subjecting that witness to an unreasonable barrage of litigation statements meant to humiliate and intimidate on the basis of head-injury and/or acquitted medical school allegations. As a result, an appropriate sanction would be to estop the party, here the defendant, from filing any additional dispositive motions in this case. An adverse inference may also be appropriate after the evidentiary hearing is complete. An adverse inference determination may be held in abeyance until the pre-trial proceedings.

Submitted on this 24th day of January, 2022.


/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs, *Pro Se*
10312 Orchid Reserve, WPB FL 33412




**CERTIFICATE OF SERVICE**


I, Jeffrey Isaacs, do declare as follows:


I certify that a copy of the foregoing **NOTICE OF MOTION AND MOTION FOR SANCTIONS** was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.


Executed on this 24th day of January, 2022.



/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs, *Pro Se*
10312 Orchid Reserve, WPB FL 33412