Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>                Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>            Defendant. | Case No. 3:21-cv-5567-EMC<br><br><br>**NOTICE OF MOTION AND<br>MOTION TO REOPEN CASE**<br><br><br>**<u>Hearing</u>**<br><br>Date:     May 23, 2025<br>Time:    1:30PM<br>Place:   Courtroom 5, 17th Floor<br>             (videoconference)<br><br>The Honorable Edward M. Chen |

## NOTICE OF MOTION TO REOPEN CASE PURSUANT TO FRCP 60(b)

TO: ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 23, 2025, at 1:30 PM, or as soon thereafter as may be heard, Dr. Jeffrey D. Isaacs will motion the United States District Court for the Northern District of California, at 450 Golden Gate Avenue, San Francisco, California, Courtroom 5, 17th Floor (or by videoconference), for an order to reopen this case pursuant to Federal Rule of Civil Procedure 60(b). This motion will be made on the grounds of significant new developments in the economic and legal landscape impacting the case's original dismissal under Rule 12(b)(6), particularly concerning the market for "iOS notary stamps" in light of recent regulatory changes and judiciary rulings.

This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the exhibits attached thereto, a requested Evidentiary Hearing, and all other records filed in this action. An Evidentiary Hearing with witnesses will substantiate the claim that Apple Inc. charges for digital notarization stamps / services to run software on the iPhone, constituting a significant factor for juridical evaluation under *Brown Shoe Co. v. United States* standards.

Given the extensive preparation required for such a hearing, the Plaintiffs respectfully request that if the Court opts to modify the evidentiary hearing or subject matter, it provides notification at least three weeks in advance of the scheduled hearing date. Absent such cancellation, subpoenas will be issued to appropriate witnesses three weeks prior to the hearing.

Submitted on this 12th day of April, 2024.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs

**MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT** .................................................................................................................... **1**

**MEMORANDUM OF POINTS AND AUTHORITIES** ....................................................... **1**

I.       INTRODUCTION ........................................................................................................ 1
II.      LEGAL STANDARD FOR MOTION TO REOPEN UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5) AND 60(B)(6) ................................................................... 4

**ANALYSIS OF LAW** ................................................................................................................ **6**

III.     REEVALUATION AS STRICT ENFORCEMENT: GLOBAL PATTERN OF ANTITRUST LAW EVASION EVIDENCED BY APPLE'S MALICIOUS COMPLIANCE IN THIS DISTRICT .................................... 9
IV.      APPLE'S DISPARAGEMENT OF MEDICAL DISABILITY UNDERMINED NOTARIZATION MARKET RECOGNITION ............................................................................................................ 12
V.       CHANGE IN CASE LAW REGARDING SINGLE-BRAND NOTARY STAMP MARKETS .................... 15
VI.      THE RECENT EPIC-GOOGLE VERDICT IN THIS DISTRICT DEMONSTRATES THE UTILITY OF SINGLE-BRAND MARKETS FOR JURIDICIAL ASSESSMENT OF SMARTPHONE APP DISTRIBUTION CONDUCT ................................................................................................................ 16
VII.     A COMPELLING DEMAND EXISTS FOR ADJUDICATING FREE APP DEVELOPER INJURY ........... 18
VIII.    DOJ COMPLAINT SUPPORTS PRIVATE SUITS TO REDRESS DAMAGE TO THE CROSS-PLATFORM VIDEO MARKET ....................................................................................................... 19
IX.      REOPENING IN LIEU OF CERTIORARI: A PATH TOWARD EXPEDITED ENFORCEMENT ............. 21

**CONCLUSION** ..................................................................................................................... **22**

X.       REQUEST FOR RELIEF ............................................................................................. 24
XI.      EVIDENTIAL HEARING LIMITED DISCOVERY ............................................................. 25
XII.     ORAL ARGUMENT ................................................................................................. 26

**CERTIFICATE OF SERVICE** ........................................................................................... **26**

<u>CASES</u>

*Agostini v. Felton*, 521 U.S. 203 (1997)-------------------------------------------------------------------------5

*Epic Games, Inc. v. Apple Inc*--------------------------------------------------------------------------------------7

*Foman v. Davis* ----------------------------------------------------------------------------------------------------6

*In Re Google Play Antitrust* (CAND-21-md- 02981-JD) --------------------------------------------------- 16

*Klapprott v. United States*, 335 U.S. 601 (1949)------------------------------------------------------------4

*Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847 (1988)-----------------------------------5

*Northern Pacific Railway Co. v. United States*, 356 US 1 (1958) --------------------------------------2

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)----------------------------------------------5

*United States vs. Apple* (2024, New Jersey District).----------------------------------------------------- 19

<u>RULES</u>

Federal Rule of Civil Procedure 60(b)--------------------------------------------------------------------------4

<u>REGULATIONS</u>

Digital Markets Act (DMA)--------------------------------------------------------------------------------------------1

**MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Recent, authoritative developments within the European Union, specifically the implementation of the Digital Markets Act (DMA), have brought to light the actuality and significance of "iOS notary stamps[1]" as a distinct market—a reality that was previously obscured and is now incontrovertibly demonstrated by Apple's own altered business practices in response to the new regulatory environment.

Furthermore, the recent pivotal ruling in favor of *Epic Games* against Google successfully employed single-brand market theories akin to those initially presented in the instant case. This substantial legal victory erodes the foundation upon which this Court's dismissal was based, as it directly contravenes the understanding that such market theories are inherently disfavored.

The underlying lawsuit was brought to prevent ongoing censorship of software and to establish a Developer Compensation Fund to mitigate damages from Apple's historic monopoly. It asserts that the vast network capabilities of interconnected smartphones are the property of the customers who paid for them. Apple iPhone users should enjoy unrestricted use of their smartphones to run necessary applications, such as *Coronavirus Reporter*, that ultimately are the *raison d'être* of this network. Apple previously sought consolidation of this case with *Cameron*, but notably, the

---

[1] This Court's previous dismissal under Rule 12(b)(6) was primarily anchored in the absence of a plausibly alleged relevant market for antitrust claims, particularly targeting the market for "iOS notary stamps" which, at that juncture, was deemed not tethered to any commercial or economic reality, as well as disfavoring single-brand markets, a principle echoed in the *Epic Games* precedent.

Honorable Yvonne Gonzales Rogers determined that this case, concerning censorship of free apps, is different and worthy of independent adjudication. That remains the case today, more than ever.

In this lawsuit's appeal, Apple declared to the United States Court of Appeals that "censorship is not an antitrust injury." Apple's position throughout the underlying litigation is wholly inexcusable and necessitates a clear correction. Reopening this censorship case is warranted and urgently necessary, in light of the evolving legal and regulatory landscape discussed herein.

Apple's censorship mechanism functions primarily by tying app distribution ("App Store") to its iPhone smartphone, and using a "notary stamp" to mark each piece of software approved in the App Store. The FAC invokes a *per se* tying claim between the iPhone and App Store; this is pernicious conduct under *Northern Pacific*. That tying claim also alleges a Notary Stamp tax – which amounts to the largest Stamp Tax in history.  Apple also conceded during appeal that Notarization stamps are a tangible thing – an Apple mark of approval – refuting their MTD submission to this Court that that Notarization Stamps aren't a product, and don't reflect economic reality. During oral argument, Apple made the specific concession that notary stamps are indeed a digital product Apple designed to "mark software as approved."

The tying of the iPhone to Notary Stamps, an electronic signature to censor and charge commissions on software, is plainly alleged in the FAC's Tying Count V. Such description of tying practices uniquely positions our case in the antitrust landscape; upon information and belief, this lawsuit was the first (and remains the only) to assert a notary stamp antitrust theory. This is significant, as we shall elucidate in this motion, because omitting this theory allowed malicious compliance with EU App Store antitrust legislation.

Apple's requirement that third-party software be endorsed with a digital Notary Stamp to run on an iPhone device evidences two distinct products: the notary stamp, and the smartphone. Notably, Apple can't defend this conduct with the *Microsoft* exemption for software platforms, because there

is no platform in either of these two markets. For this reason, notary stamps are a powerful market definition under Sherman Act, augmenting App Store markets, that have the potential to ameliorate Apple's conduct efficiently.

No computing platform in history had such a notarization requirement. Apple's mandatory notary stamp single handedly turned computers into supra-competitive profit tax centers, and even authoritarian technology, where Apple decides the fate of every developer. This acknowledgment is in direct contrast to the District Court's dismissal of the notary stamp as a fictional creation of the Plaintiffs. Such a characterization fails to grasp the impact of notarization as a gatekeeping tool in the software industry, and is precisely why a marketplace should be determined by fact-finding, per *Brown Shoe*, and not on a motion to dismiss. Apple's notarization scheme represents far more than a mere procedural hurdle or a fictionalized market—it is a monetization and control strategy deftly positioned to exploit the indispensability of software distribution within the modern digital ecosystem.

Embedding the notarization stamp requirement within a computing system showcases one of the most pernicious tying arrangements presently conceivable—a mechanism monopolizing approval and access within a field where openness[2] and competition birth innovation and consumer value. This is not an obscure argument buried within the complexities of computational theory; it is the recognition of a monopolist seizing control over the very arteries that feed the software industry. The stark reality is that the practice of requiring notarization redefines power dynamics between platform providers and software creators, setting dangerous precedents on market control and operational freedom that the drafters of the Sherman Act envisioned in 1890.

---

[2] iPhone is based on IP and Unix open-source standards, evolved over decades long initiatives at MIT and other institutions. To see Apple commercially monopolize these technologies meant to facilitate open computing is disheartening and disrespectful to those who built the foundations of the modern internet.

## II.   LEGAL STANDARD FOR MOTION TO REOPEN UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5) AND 60(B)(6)

Federal Rule of Civil Procedure 60(b) provides the grounds on which a party can seek relief from a final judgment or order. The relevant subsections for this motion include:

Rule 60(b)(5): This provision allows for relief from a judgment if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." This rule is pertinent when ongoing conditions change such that the judgment's continued application is inequitable. Case law supports its application when legislative or regulatory changes affect the underlying principles of a court's final judgment, making its enforcement unfair in the new context.

Rule 60(b)(6): This catch-all provision is meant to embody the broadest spectrum of circumstances that permits the court to relieve a party from a final judgment for "any other reason that justifies relief." It is designed to address extraordinary circumstances that are not contemplated by the other subsections of Rule 60(b). The U.S. Supreme Court in *Klapprott v. United States*, 335 U.S. 601 (1949), noted that Rule 60(b)(6) provides courts with authority "to vacate judgments whenever such action is appropriate to accomplish justice," thereby giving courts ample scope to act when necessary to prevent a clear injustice.

The recent *Epic-Google* verdict, which demonstrated the feasibility and judicial acceptance of single-brand market theories in antitrust litigation similar to those presented in our case, reflects a significant change in the controlling legal principles relevant to our claims. This verdict supports an argument under Rule 60(b)(5) that applying the previous dismissal prospectively is no longer equitable due to a significant shift in the legal landscape regarding single-brand markets.

Moreover, the comprehensive changes introduced by the EU Digital Markets Act (DMA) which exposed the actuality and significance of "iOS notary stamps" as a distinct market, represent

an extraordinary circumstance that was not and could not have been foreseen at the time of the initial dismissal. This aligns with Rule 60(b)(6), as these developments justify relief to prevent the manifest injustice of barring a potentially meritorious antitrust claim based on outdated legal standards.

A cornerstone for the argumentation in supporting a motion under FRCP 60(b)(5) and 60(b)(6) can be anchored on the precedent set by *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). In *Rufo*, the Supreme Court clarified that Rule 60(b)(5) could indeed cater to circumstances where a significant change in factual conditions or in law warrants the revision of a decree. Especially in antitrust contexts, where market dynamics are perpetually in flux, *Rufo* underscores the judiciary's responsibility to adapt legal conclusions to present realities.

Furthermore, the invocation of Rule 60(b)(6) for "any other reason justifying relief" warrants flexibility, allowing for a broad constellation of extraordinary circumstances. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) elaborates on preventing manifest injustice as a critical metric guiding the Court's discretion under this clause. In *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the Supreme Court emphasized that Rule 60(b)(6) relief is available under circumstances suggesting that the judgment may no longer be equitable. Furthermore, in *Agostini v. Felton*, 521 U.S. 203 (1997), the Court overturned its previous judgment due to significant changes in factual conditions and law, affirming the use of Rule 60(b)(5) when the factual or legal landscape has significantly altered since judgment.

These precedents provide a strong foundation for arguing that both the evolving jurisprudence around single-brand markets and the regulatory changes represented by the DMA constitute significant shifts in both factual and legal landscapes, demanding reopening of underlying case. The legal standards outlined by FRCP 60(b)(5) and 60(b)(6) are squarely met in this instance. The *Epic-Google* verdict and the implications of the EU DMA epitomize the type of significant changes in law and fact that the drafters of Rule 60 intended to address.

A dismissal under Rule 12(b)(6) occurs at a preliminary stage in the proceedings, before any fact-finding or evidentiary assessment has taken place. This procedural posture is significantly different from a resolution post-trial or post-MSJ, where the court has engaged substantially with the factual underpinnings and evidentiary record of the case. Consequently, the threshold for revisiting a 12(b)(6) dismissal should inherently consider, under Rule 60(b), the preliminary nature of the initial adjudication.

The Supreme Court in *Foman v. Davis* laid out factors that courts should consider when deciding whether to grant leave to amend a pleading. When a case was dismissed under Rule 12(b)(6) without leave to amend, particularly before substantive engagement with the merits, the *Foman* factors offer a relevant framework for assessing a Rule 60 motion to reopen the case. When new information is available, *Foman's* "futility of amendment" element is lodestar under Rule 60. The very essence of a Rule 60 motion in this context is to assert that, in light of new considerations, amendment would not be futile but potentially lead to a different outcome that aligns with justice and equity. *Foman* criteria are rendered unequivocal by new circumstances in this case and leave to amend should be granted.

## ANALYSIS OF LAW

The European Union's Digital Markets Act (DMA) represents a landmark piece of legislation designed to foster fair competition and innovation within the digital sector. Implemented last month, the DMA has mandated significant changes to the operational practices of major tech companies, including Apple. A central tenet of this regulation is the requirement for gatekeeper platforms, like Apple's iPhone, to allow developers to directly distribute their applications, effectively circumventing monopolized app store channels. Under FRCP Rule 60(b)(6), this regulatory shift revealed emerging circumstances concerning "notarization" and the underlying economics of the

"Apple Ecosystem." Such new developments significantly alter the legal landscape and warrant re-opening.

This Court, in its order of dismissal, underscored that the "alleged markets of notary stamps in particular do not pass muster on economic reality" reflecting a stance that the proposed relevant market did not correspond to the commercial realities of the tech industry. *Order at p. 12*. Single-brand markets were especially scrutinized, as they were deemed "disfavored," drawing support from *Epic Games, Inc. v. Apple Inc.,* where the concept of a single brand Operating System constituting a relevant market was deemed artificial and not representative of the competitive environment.

The clarity of newfound regulatory landscape not only underscores the viability of the "iOS notary stamps" market but also showcases its growing importance and Apple's acknowledgment thereof, as evidenced by their response to the newly enacted EU DMA. This evolution in the economic landscape, coupled with the jurisprudential shift evidenced by Epic Games' success in employing single-brand market theories against Google, constitutes a "significant change in the law" (FRCP 60(b)(5)).

In what consensus press coverage has termed "malicious compliance," Apple has responded to the DMA's directives by introducing a "Core Technology Fee (CTF)," ostensibly in compliance with the law. *Exhibit A*. However, this fee is best interpreted as a strategic maneuver to undermine the spirit of the DMA, as it imposes a financial burden on developers seeking to utilize direct app distribution methods. This fee can be seen as an attempt to retain control over the iPhone profitability while nominally adhering to the new legal framework. The fee effectively perpetuates the cost barrier for developers, thus maintaining a status quo that the DMA seeks to disrupt, and raising questions about the true openness of the iPhone ecosystem even under the new European regulations.

Defendant Apple refers to "Core Technology Fee" (CTF) as a measure to recoup the company's investment in its platform. The CTF imposes a charge of approximately €0.50 per app

installation, applied uniformly to both free and paid applications on an annual basis. *Exhibit B*. This bad faith surtax by Apple, while superficially framed as a compliance measure with the DMA, effectively institutes a *de facto* "Notary Stamp Fee" for Apple's notarization process. It appears to be a strategic effort to sidestep the DMA's intention to open up the digital market to fair competition.

The CTF is a thinly veiled attempt to preserve Apple's censorship capabilities and economic leverage over its userbase, despite the introduction of the DMA. The fee acts as a gatekeeping mechanism, disincentivizing developers—particularly those offering free apps—from pursuing direct distribution by imposing a cost that may not be recuperable. It serves as a punitive financial barrier under the guise of a technology fee, which other computer platforms do not impose despite similar, if not equivalent, investments in their development.

By labeling the CTF as a necessary compensation for Apple's investment, the company fails to recognize that investment in platform technology is a standard cost of business borne by all technology manufacturers and is typically recouped through the sale of the hardware itself, not through per-use fees on software developers who add value to the hardware. The imposition of the CTF, therefore, does not align with industry norms and can be seen as an effort to maintain a stranglehold on the ecosystem it has created.

Relevant to the United States Market, the EU CTF evidences that Apple desperately seeks to hang on to the notary taxes it has imposed domestically for nearly two decades. Here, in the US, the stamps are simply obscured as part of the "Apple Ecosystem" through supra-competitive $99 developer memberships, and most importantly, 30% tax on paid app sales. This, fundamentally, was how Apple caused Plaintiff's notary stamp theory to be "laughed out" of a United States District Court as "untethered to reality." But time has shown that there was nothing funny about the "notary stamp" Sherman theory. Without notarization, there would be nothing to charge for, neither CTF,

IAP commissions, or annual developer fees would be necessary. Notarization fees are alive and well in the United States and Europe, despite DMA intent otherwise.

Hence, the CTF can be characterized as nothing more than a residual "Notary Stamp Tax," a remnant of the obfuscating Apple Ecosystem that the DMA tried to dismantle. This direct continuation of a monopolistic practice, albeit under a different moniker, clearly underscores the ongoing and crucial relevance of the "iOS notary stamps" market as a litigable antitrust concern.

In dismissing "iOS notary stamps," the Court held notary stamps "are neither *markets* nor do they describe *products* but integrated features of Apple's app approval process. Plaintiffs' articulation of these markets is contrived and does not reflect the reality of an actually-existing product market." *Order at 19.* The EU regulatory shift has indeed now revealed that CTF, i.e. notary stamps, are a fee, approximately €0.50, applied to even free apps. This fee was and is levied in the United States, and results in Apple's growing "services" revenues as alleged by DOJ. When these charges are properly dismantled, as the EU attempted, it is strikingly clear that Apple differs from every other computing platform in its intent to – and active practice – impose notarization fees.

The reality of notary stamps is a matter for jury deliberation pursuant to *Brown Shoe*. The Court should recognize these disputed product markets, and under 12(b)(6) standards, err on the side favorable to Plaintiff. Concluding the markets don't exist, or that they are bundled in other Apple components,  is not within the discretion of the Court. Plaintiff hereby requests an evidentiary hearing with witnesses from industry experts and the parties to this case.

### III.   REEVALUATION AS STRICT ENFORCEMENT: GLOBAL PATTERN OF ANTITRUST LAW EVASION EVIDENCED BY APPLE'S MALICIOUS COMPLIANCE IN THIS DISTRICT

Apple's actions in the Northern California District, marked by a calculated defiance of the *Epic* injunction, are not isolated incidents but rather a component of a broader strategy of defiance against anticompetitive law enforcement worldwide. The parallels between Apple's conduct in

response to this District's *Epic* injunction and its reaction to the EU DMA are unmistakably clear. Both instances exhibit a deliberate attempt to subvert the objectives of antitrust enforcement through superficial compliance measures that, in reality, further entrench Apple's monopolistic control. This pattern of behavior—evident in its global operations—underscores not just a defiance of specific legal orders but a fundamental resistance to the principles of competition law, including the Sherman Act.

Given this context, the reopening of this case occurs at a critical juncture in the fight against monopolistic malpractice by Defendant Apple. Apple's strategic evasion of antitrust laws, characterized by a global pattern of malicious compliance, warrants a stringent reevaluation of its practices and the imposition of measures that truly dismantle its anti-competitive barriers. Allowing Apple to continue its current course of action unchallenged would not only undermine the efficacy of competition law but would also set a perilous precedent, signaling to corporate giants that strategic compliance loopholes are a viable means to evade substantive legal scrutiny. It is, therefore, incumbent upon this Court to take decisive action, reopening this case on the merits, thereby mitigating Defendant's calculated pattern of evasion.

Currently under review in this District's *Epic* case, the introduction of the StoreKit External Purchase Link Entitlement (US), as detailed in Apple's Notice filed on January 16, 2024—the very day the U.S. Supreme Court declined further review—embodies a guise of adherence that belies a deeper commitment to preserving its market dominance at the expense of fair competition and innovation. Apple's implementation of policies and protocols ostensibly designed to align with this District's orders instead mounts new barriers to competition, betraying both the letter and spirit of the injunction. The mechanism, far from fostering a competitive marketplace, imposes onerous conditions on developers seeking to utilize external purchase links within their apps, effectively bypassing the intended remedial effects of the Gonzales Rogers Court's *Epic* decision. Such actions, as alleged by esteemed *amici* including Meta, Microsoft, and Twitter/X, underscore a systematic

effort by Apple to circumvent judicial mandates aimed at promoting transparency, choice, and competition. Exhibit C, *Microsoft Amici Brief, p.7.*

The purported compliance strategy outlined by Apple, particularly its maintenance of a 27% commission on out-of-app purchases facilitated through external links, stands as a stark testament to its continued exercise of monopolistic control. This commission structure, barely distinguishable from the original In-App Purchase fees, ensures that no genuine alternative to Apple's proprietary system can emerge, stifling innovation and entrenching its market position under the guise of compliance (*Ibid* p.9).

Apple's conduct post-injunction does not represent a good faith effort to rectify the anticompetitive harms identified the Northern California District, but rather signifies a strategic continuation of those very practices under a different guise. The detailed account provided by the *amici curiae* of the tangible and adverse impacts of Apple's actions not only on developers but also on consumers, highlights the extent Apple will go to evade Sherman Act. This case, with their unfounded attacks on FAC tying claims and its disabled writer, squarely fits that pattern.

This Court is thus implored to scrutinize Apple's malicious compliance for what it truly is: a calculated effort to subvert judicial efforts aimed at ensuring fair competition within the app distribution market. Such defiance warrants not leniency or an unfavored 12(b)(6) dismissal but stringent enforcement of the Plaintiffs' rights. It is imperative that this Court holds Apple accountable for its actions, which blatantly contravene both the letter and the spirit of the District's orders in other cases. For this case, that means accepting that FAC Count V Tying is plausible – certainly not fictitious – and permitting a trial by jury on the matter.

## IV.   APPLE'S   DISPARAGEMENT   OF   MEDICAL   DISABILITY UNDERMINED NOTARIZATION MARKET RECOGNITION

In an unprecedented strategy that marred the integrity of judicial proceedings, Apple Inc., represented by Gibson Dunn, sought to discredit the innovative market claims surrounding notary stamps by targeting the medical condition of the Plaintiff, a tactic that not only poisoned the Court's perception of the case but also violated the principles of the Americans with Disabilities Act (ADA). This approach, aimed at undermining Plaintiff's unique and original markets like notary stamps, brazenly emphasized Dr. Isaacs' neurological impairment, improperly influencing the Court's view and amounting to a denial of access to justice.

In the conduct of litigation, parties are expected to adhere to professional standards that uphold dignity, respect, and fairness, principles enshrined not only in legal ethics but also in statutes such as the Americans with Disabilities Act (ADA). It is with profound concern that these standards appear to have been compromised through the disparagement of an individual based on disability. The unfortunate attempts to undermine the credibility and integrity of a plaintiff through references to their medical or neurological conditions does not align with the spirit of equitable and respectful legal discourse. Such actions diverge markedly from the substantive legal issues at hand, in this case, the examination of alleged antitrust violations and monopolistic practices in the tech industry. The focus on disability, rather than the merits of the legal arguments, is both irrelevant and inappropriate.

This conduct not only violates the basic tenets of decency but potentially contravenes the protections afforded by the Americans with Disabilities Act. The ADA was enacted to prevent discrimination against individuals with disabilities in all areas of public life, including in legal proceedings. It asserts that individuals with disabilities should be treated with the same respect and given the same opportunities as anyone else. That is plainly not what happened here.

In light of the foregoing, Plaintiff requests that the Court acknowledge the impropriety of disparaging remarks related to disabilities made in the context of this litigation. Furthermore, appropriate remedies to ensure that such conduct does not taint the equitable administration of justice may include striking any references to the plaintiff's medical condition and investigating related concerns. *See Declaration of Jeffrey D. Isaacs*.

The disparagement began when Apple, in their opposition to the Motion for Preliminary Injunction, cited Dr. Isaacs' 1997 head injury, labeling it as "**neuropsychiatric illness**" in a manner that was both irrelevant and discriminatory (*DE 32 p.6*). This narrative was further inflated by false claims about Dr. Isaacs' professional background, attempting to sever any legitimate connection he had to health or medicine, despite the contrary evidence presented by the involvement of renowned cardiologist Dr. Robert Roberts in the project. Such tactics deviated sharply from factual arguments, resorting instead to an *ad hominem* attack that sought to redirect the Court's focus from the merits of the case to the plaintiff's medical disability.

Gibson Dunn ramped up improper mentions of Dr. Isaacs medical history as his antitrust theories progressed. Gibson Dunn outlandishly broadcast that Isaacs "is a **former physician who suffers from a neuropsychiatric illness**" to help win their antitrust case. This is unacceptable. *Coring v. Apple,* MTV p.1.

The language used by Apple and Gibson Dunn in their filings was notably contemptuous, referring to the lawsuit as "**Frankenstein's lab where dead claims are stitched together in an attempt at resurrection**" (*DE 64, p.9*), a metaphor that not so subtly mirrored their strategy of portraying the plaintiff as damaged and thereby discrediting his claims. This pattern of behavior is not merely an isolated instance of poor judgment but reflects a systemic approach by Apple to leverage personal attacks as a means to evade substantive legal debate, particularly when confronted with claims it perceives as threatening to its monopolistic practices.

There exists no doubt that Apple, by way of Gibson Dunn, sought to undermine free app censorship antitrust claims on the basis of Isaacs' disability. Apple frequently remarked "Dr. Isaacs is steering the ship," and that "these claims brought by [Dr.] Isaacs either in his individual capacity or on behalf of various entities under his control, including Coronavirus Reporter, CALID Inc., and Primary Productions." Those pleadings were at the very least misleading, and in most cases completely untrue. Dr. Isaacs is not a member of Primary Productions LLC and has absolutely no control of that entity. He is a minority holder of Coronavirus Reporter, and Dr. Roberts and his family have overseen all aspects of this litigation in connection with their attorney, Mr. Keith Mathews.

Moreover, the strategy employed by Apple and Gibson Dunn represents a pattern of malicious litigation conduct and compliance. In this case, an attempt to dismiss a legitimate case was done at in violation of the ADA. The case's unique position—where the plaintiff's neurological condition was maliciously spotlighted—signals a distressing trend in Apple's defense mechanisms, aligning more closely with malicious compliance than with legitimate legal argumentation.

Therefore, this particular case was dismissed as a result of Apple's malicious litigation conduct, which broadly parallels the pattern malicious compliance conduct observed in EU and Epic. This reprehensible strategy by Apple not only tainted the judicial process but also set a dangerous precedent that could discourage future litigants with disabilities from pursuing valid claims, for fear of undue humiliation and discrimination. The CTF has "exonerated" Dr. Isaacs and proven that notarization fees are indeed what Apple is fighting for tooth and nail.

Apple's targeted disparagement of the plaintiff on the basis of his disability, designed to discredit his antitrust claims, mirrors its broader pattern of malicious compliance and evasion of legal accountability, as observed in its response to the EU DMA and the *Epic* case. Such conduct undermines the sanctity of the judicial process. Pending litigation concerns potential witness retaliation against Dr. Isaacs stemming from the aforementioned conduct. *Exhibit D.*

## V.   CHANGE IN CASE LAW REGARDING SINGLE-BRAND NOTARY STAMP MARKETS

This Court relied heavily on *Epic-Apple* throughout its analysis of the FAC's markets, drawing a parallel between the FAC's notary stamps and *Epic's* single-brand Operating System market. This comparison now fails, given the newly emerged circumstances. This new landscape renders the Court's comparison to Operating System components inapt, or at the very least, subject to evidentiary debate. The Court determined:

> "no basis supports Plaintiffs' notion that the proposed downstream
> markets of "iOS notary stamps" … are markets for products… [the notarization]
> markets refer to component parts a developer may access and use when a
> developer's app is approved for distribution on the App Store. These three
> markets are neither markets nor do they describe products but integrated features
> of Apple's app approval process." *Order at 19*. It is "illogical to argue that there
> is a market for something that is not licensed or sold to anyone." *Epic, 2021 WL
> 4128925, at *29*. "In the absence of information demonstrating that Plaintiffs'
> downstream markets describe actually existing products that are sold or licensed,
> Plaintiffs' aftermarkets are 'without a product, there is no market for the non-
> product, and the requisite analysis cannot occur.'" *Id*.

In light of the Court's reasoning, it is now evident FRCP 60 should be invoked and the case reopened. The Court's logic must now be applied to the new circumstances and landscape. First, there no longer exists an "absence of information" demonstrating that notary stamps are "actually existing products that are sold or licensed." The aforementioned EU DMA malicious compliance aptly proves otherwise. Apple is fighting tooth and nail to maintain the income it receives, domestically and

abroad, from selling notarization services. There is nothing else that could substantiate the Core Technology Fee other than notarization, as experts will prove at trial. Apple's assertion that CTF represents payments for "ongoing product development" is pretext. Product development could, and indeed historically is, priced into the device sales. There is no reason why Apple couldn't charge its CTF in the price of the iPhone, but for the fact that the CTF is an ongoing notary stamp tax for *future* software launching and censorship rights. That is why it can't be charged at time of device purchase. This fact is abundantly clear to any expert computer scientist, and the Court must allow this theory to proceed.

## VI.   THE RECENT EPIC-GOOGLE VERDICT IN THIS DISTRICT DEMONSTRATES THE UTILITY OF SINGLE-BRAND MARKETS FOR JURIDICIAL ASSESSMENT OF SMARTPHONE APP DISTRIBUTION CONDUCT

The legal landscape regarding single-brand markets, as applied to digital smartphone app distribution, has likewise fundamentally changed in the last several months. Three months ago, a Northern California District Jury found antitrust injury due to monopolization of smartphone app distribution. See *In Re Google Play Antitrust* (CAND-21-md- 02981-JD), Exhibit E. The San Francisco jury needed only three hours to "call a spade a spade" and denounce improper tying restraints yielding duopoly control over the entire app industry. The duopoly exists in that Apple's controls 80% of US app distribution, versus Android's 20%.

This ruling directly applies to and concerns identical conduct alleged in this lawsuit, hence the Court should immediately reopen the case on these grounds alone. It is abundantly clear the thresholds the Google jury faced were in all regards higher than Apple. Google's Android allows sideloading. Google Play is tied to the Android software platform, whereas App Store is tied to a physical iPhone device. Since the Google Jury found anticompetitive app distribution conduct under

the rule-of-reason, certainly Apple's hardware tying, which is more pernicious, violates Sherman. FAC¶224 invoked *per se* tying since the outset of this case.

In the underlying case opinion, the Court treated the App Store as a single-brand market, downstream from the US Smartphone device market. Plaintiffs have at all times alleged that they "didn't need" single brand theory in order to prevail, because of Apple's aforementioned 80% stranglehold over app distribution. But holding that aside, even under this Court's view that a single-brand market was alleged for app distribution, that is now permitted and valid case law under *Epic-Google*. This Court must reopen the case on this basis alone to allow a single-brand App Store to proceed to a jury verdict, to maintain consistency with Epic-Google.

It is noted that Google filed several post-verdict motions under Rule 59 and other procedures, all of which failed to reverse that verdict. Hence, this District permits single-brand market theories to be applied to smartphone app distribution markets. The dismissal of the underlying lawsuit now rests on invalidated assumptions from *Epic-Apple* that were disproven by a jury in *Epic-Google*.

The first jury to address smartphone app distribution has spoken unambiguously. At least a dozen major news bureaus published the *Epic-Google* verdict "spells trouble for app stores," "threatens to roil an app store duopoly," "puts Apple back under pressure," "is bad news for Apple," etc. In that light, separate and apart from the aforementioned notary stamp matter, the *Epic-Google* verdict supports this Court reopening this case for adjudication on the merits of claims regarding app store distribution. For a USDC Northern California jury to enforce Sherman Act upon Google for single-brand app distribution, but dismiss Apple's more egregious conduct in the FAC, would be conflicting interpretation.

## VII.   A COMPELLING DEMAND EXISTS FOR ADJUDICATING FREE APP DEVELOPER INJURY

The Court should also consider new information about the compelling demand for adjudication of claims Apple censors and monopolized free app developers. PhantomAlert was a COVID-19 app censored by Apple several weeks after Coronavirus Reporter. That developer had protocols underway to liase with the Ethiopian government – where COVID had spread prior to reaching America – in March 2022, which were blocked by Apple. That developer, upon information and belief, just filed antitrust claims in the DC USDC after waiting three years to observe this underlying case's progress. *Exhibit F*. Similarly, The Coring Company had an open-source "App Place" competitor to the App Store, which permitted better safety and cryptocurrency functionality by way of its open platform. That case was transferred to this District from Southern Florida, but has been held in voluntary abeyance, also awaiting this case's outcome. *Exhibit G*.

This present lawsuit sought to consolidate different developer teams, who did not know one another, from Maine and New Hampshire. It also was first-to-file a free app censorship putative class, as recognized by the YGR Cameron Court. But rather than recognize this effort to consolidate, the Court incorrectly, and at Apple's suggestion, faulted Plaintiffs for having eight cumulative complaints. It thus denied leave to amend to each and every Plaintiff, including Dr. Isaacs, who had never even amended once of a "matter of course." The recent DOJ filing further evidences that Isaacs' cross-platform video app was the subjected to the type of antitrust injury that resulted from Apple's conduct.

In short, there now exists irrefutable information that a substantial number of developers seek adjudication of this matter and a Developer Compensation Fund. A consolidated class action, as this lawsuit attempted to bring three years ago, is warranted and mandated, given these circumstances. This new, undeniable legal landscape also independently invokes and warrants FRCP 60 reopening.

In light of the new information about other cases, and the fact that no other lawsuit has yet to represent a free-app class, as *Cameron* did for paid apps, it is imperative that this Court reopen this case and allow for the creation of a Developer Compensation Fund for free apps.

## VIII. DOJ COMPLAINT SUPPORTS PRIVATE SUITS TO REDRESS DAMAGE TO THE CROSS-PLATFORM VIDEO MARKET

The DOJ's comprehensive investigation into Apple's business practices has uncovered substantial evidence pointing to the company's deliberate actions to undermine competition and innovation, especially in the realm of cross-platform video applications. DOJ's findings, described extensively in their complaint, reveal Apple's strategic manipulation of market dynamics to disadvantage and disincentivize the development and proliferation of cross-platform video services. Exhibit H, *United States vs. Apple* (cv-24-4055, USDC NJ).

DOJ's much needed complaint against Apple declares it is "Protecting competition and the innovation that competition inevitably ushers in for consumers, developers, publishers, content creators, and device manufacturers" *Id. p.18.* The DOJ Complaint not only underscores DOJ's commitment to safeguarding competitive integrity, but also specifically substantiates Dr. Isaacs litigation's core grievance—Apple's detrimental impact on the cross-platform video market.

DOJ alleges identical conduct the FAC regarding WebCaller: "Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime." *Id. p.120*. The DOJ points to Apple's "exclusionary conduct [which]... has delayed or suppressed the emergence of cross-platform technologies," (Id. p.129), elucidating a pattern of behavior that chokes innovation and competition. This pattern is strikingly similar to the barriers WebCaller encountered, bolstering the argument for reopening the case based on newfound evidence and a parallel legal assessment by a federal body. This alone is independent grounds for FRCP reopening of Dr. Isaacs' WebCaller lawsuit.

DOJ has also directly alleged Apple is in malicious compliance of this District's antitrust orders:

> "when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple reportedly allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app." *Id. p.123.*

Similarly, DOJ presents evidence that in 2022, Apple CEO Tim Cook made statements constituting willful antitrust law evasion. This comment alone, regarding cross platform video apps like WebCaller, independently warrants reopening of this case:

> "In 2022, Apple's CEO Tim Cook was asked whether Apple would fix iPhone-to- Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."" *Id. p.92.*

The DOJ's comprehensive complaint lays a foundation spotlighting the ramifications of Apple's anticompetitive practices on cross-platform video applications, and a private right-of-action and Developer Compensation Fund, as described by the FAC, now seems certain. Plaintiffs should not be penalized for attempting to mitigate Apple's monopoly three years before PhantomAlert, Coring, or the inevitable other private cases that will follow DOJ. This class action should proceed.

Plaintiffs implore the Court to reconsider the dismissal of this case, taking into account the formidable evidence and legal arguments presented by the DOJ that resonate with the FAC. By reopening the case, the Court has an opportunity to address the material harm caused by Apple's monopolistic practices, reaffirming the principles of competition law and ensuring a fair, competitive market landscape for cross-platform video applications, COVID-19 applications, and all others represented in the putative class.

The EU DMA, aimed at curbing anti-competitive practices among tech giants, has forced transparency and operational adjustments upon Apple, compelling them to disclose previously obscured aspects of their business model. Apple's response to the DMA, specifically the unbundling of notary stamp fees from its broader service offerings, serves as a vindication of Plaintiff's claims and theories presented in this action four years prior. This unbundling has not only validated the existence of a distinct notary stamps "CTF" market but has also exposed Apple's monopolistic control and pricing strategies within this market. Rather than a neurologically impaired Plaintiff "in the hinterlands," in Gibson Dunn's own words, Dr. Isaacs was spot-on, four years ahead of this matter become front-and-center.

The Court's initial dismissal was predicated on the then-apparent absence of a discernible market for notary stamps, an absence now contradicted by developments directly traceable to the EU DMA's enforcement. The change in the economic landscape, as revealed by these developments, constitutes an extraordinary circumstance warranting relief under Rule 60(b)(6), as it fundamentally alters the legal and factual basis upon which the dismissal rested.

## IX. REOPENING IN LIEU OF CERTIORARI: A PATH TOWARD EXPEDITED ENFORCEMENT

The decision by this Court to reopen the case on the grounds of new extraordinary circumstances, and shifts in legal interpretations, would be judicially efficient and avert a pending Supreme Court review. Exhibit I, SCOTUS Case No. 23-1089.  A reopening of the case under these premises acknowledges the potential merit in the Plaintiffs' claims and would save at least a year from the *certiorari* process. It would save three years, including the new circumstances described herein. Given this Court's familiarity with the complexities and more recent developments of the case, it is well-positioned to conduct a thorough and timely reconsideration. The doctrine of judicial economy underscores the efficient utilization of judicial resources to expedite the resolution of legal

disputes. By reopening the case, this Court not only aligns with the principles encapsulated within this doctrine but also alleviates the Supreme Court the sizeable task of a *certiorari* review on Apple. It is within this Court's purview to effectively mitigate further protraction of legal proceedings by reassessing the grounds for dismissal in light of the newly emerged circumstances that warrant reopening on several independent grounds. This proactive approach preserves judicial resources and expedites the deliverance of a resolution.

## CONCLUSION

Apple's reaction to new regulations, epitomized by the implementation of the Core Technology Fee (CTF) as a form of 'malicious compliance,' exhibits a pattern of strategically circumventing the essence of regulatory mandates aimed at fostering market competition. This behavior not only underscores the necessity for judicial oversight but also presents a clear illustration of how corporate maneuvering to maintain market dominance can effectively sidestep legislative intentions. This pattern, matched by Apple's conduct in this jurisdiction, presents an extraordinary circumstance warranting relief under the catch-all provision of Rule 60(b)(6). The antitrust landscape, particularly within the technology sector, is marked by rapid evolution. The recognition of single-brand markets and the adjudication of monopolistic practices in digital platform contexts (e.g., the Epic-Google verdict) reflect an evolving judicial perspective on antitrust enforcement in the digital age. Dismissing claims based on preconceived notions of market structures, without allowing for the presentation of evidence that might illustrate novel market dynamics, especially those influenced by recent regulatory changes, contradicts the forward-moving trajectory of Apple antitrust jurisprudence.

In light of the demonstrable and extreme efforts by Apple to avoid genuine compliance with antitrust enforcement — efforts that constitute a direct evasion of felony statutes — it is submitted that an "unfavored" 12(b)(6) dismissal is particularly inappropriate under the current circumstances.

Reopening this case is not only substantiated by the gravity of Apple's conduct but is necessitated by the overriding interests of law enforcement principles. The Court is hereby motioned to reconsider its prior dismissal and reopen the case, allowing for a comprehensive reevaluation of the claims in light of the heightened scrutiny demanded by the circumstances.

Addressing national concerns regarding censorship and the rights of developers within the digital marketplace, it is evident matters remain of significant public interest and merit judicial examination. At the time of dismissal, the economic reality of notary stamps as a distinct market and Apple's involvement therein was obscured, not due to any oversight by Plaintiff but rather due to Apple's strategic bundling and obfuscation of these sales within broader services, namely the App Store In-App Purchases (IAP) and Developer Program Annual Fees. Last week, prompted by the implementation of the EU Digital Markets Act ("DMA"), Apple unveiled its practices surrounding the sale of notary stamps, revealing a fee of €0.50 per notary stamp CTF fee charged to developers for each app installation. This legislative change and Apple's response have precipitated a seismic shift in the economic landscape, laying bare the reality of a market that Plaintiff, with considerable foresight, contended existed four years ago.

Apple's approach to compliance with antitrust orders — evidenced through a pattern of actions taken in this jurisdiction and abroad — signals a deliberate attempt to fulfill the letter of the law while effectively voiding its spirit. This District's orders in the *Epic* litigation and the regulatory framework established by the EU's DMA were both aimed at curbing Apple's monopolistic practices. However, Apple's responses have been superficial at best, designed to stave off the imposition of genuine competitive dynamics within the marketplace while ostensibly adhering to the formality of legal obligations.

This manipulation and subversion of legal mandates constitute not mere contraventions of civil statutes but implicate the commission of felony offenses under the Sherman Act. Antitrust

violations, by their nature, strike at the heart of the fair and open market principles that underpin our economic system. When compliance with antitrust orders is carried out in bad faith, it not only contravenes the specific tenets of those orders but amounts to a serious and insidious form of legal defiance that undermines the foundational purposes of antitrust statutes.

Given the preceding context, the Court's dismissal of our case under Rule 12(b)(6) warrants cancellation, in favor of adjudication on merit. The principle of law enforcement, fundamental to the judicial process, requires that actions which bear the hallmarks of felony conduct — most notably, deliberate attempts to undermine the enforcement of statutes and court orders designed to mitigate antitrust injury — must be met with heightened scrutiny. Apple's willful, malicious compliance presents a danger not only to market competition but to the integrity of the legal system's response to monopolistic abuses. In also evidences Sherman Act felony intent, which this Court cannot turn a blind eye to.

Additionally, this Court must consider the corroborating nature of allegations laid out by the Department of Justice regarding Apple's monopolistic behavior and the specific grievances enumerated in the present case. The precedence of malicious compliance, in light of similar allegations corroborated at the federal level, underscores the imperative for this Court to reopen the underlying case, especially when such dismissal has inevitably shielded behaviors tantamount to felony crimes from due judicial scrutiny.

## X.    REQUEST FOR RELIEF

Accordingly, Plaintiff respectfully requests that this Court:

A. Reopen the case pursuant to Federal Rule of Civil Procedure 60(b);

B. Vacate the dismissal order dated November 30, 2021;

C. Allow immediate limited discovery to proceed in light of the new, unequivocal change in economic, regulatory, and case law legal landscape; and

D. Grant such other and further relief as the Court deems just and proper.

## XI.   EVIDENTIAL HEARING LIMITED DISCOVERY

Plaintiff respectfully notices that three weeks prior to hearing, Plaintiff, and/or co-Plaintiff counsel shall effect limited discovery to fully uncover the extent, nature, and implications of Apple's sale and management of notary stamps. This discovery is crucial for several reasons:

A. Clarification of the Economic Landscape: Discovery will provide essential insights into Apple's previously obscured economic activities related to notary stamps, including but not limited to pricing strategies, market control mechanisms, and the impact on developers and competitors.

B. Evidence Collection: Internal memoranda, communications, and financial records pertaining to the unbundling of notary stamp fees and the operational changes instigated by the EU Digital Markets Act will be pivotal in substantiating the Plaintiff's claims that were dismissed under the presumption of an absent market.

C. Equity and Fairness: Allowing discovery ensures that the Plaintiff has a fair opportunity to present this case in light of the new developments, adhering to the principles of justice and equity that underpin the Federal Rules of Civil Procedure and the legal system at large.

Therefore, Plaintiff seeks the Court's permission to conduct discovery to obtain:

All internal memoranda and communications relating to notary stamp / notarization services sales, including domestic and EU Digital Markets Act compliance policies.

Third party competitor evidence and expert and testimony concerning this matter.

Any other documents or communications that reveal Apple's practices, policies, and perspectives on notary stamps, notarization services, and their market significance.

Plaintiff asserts that this discovery is essential for a comprehensive understanding of the case merits and for the just resolution of the issues at hand.

## XII.   ORAL ARGUMENT

Under the Local Rules, the Court may permit an evidentiary hearing if motioned by a party. Plaintiff hereby motions for such hearing, and to permit testimony by:   individual(s) reasonably believed to be knowledgeable as to the notarization practices in the computer and smartphone industry and their economic implications.

Submitted on this 12th day of April, 2024.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

## CERTIFICATE OF SERVICE

I, Jeffrey Isaacs, do declare as follows:

I certify that a copy of the foregoing **NOTICE OF MOTION AND MOTION TO REOPEN CASE** was delivered electronically to counsel for the Defendant.

Executed on this 12th day of April, 2024.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449