Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


CORONAVIRUS REPORTER,
CALID INC,
PRIMARY PRODUCTIONS LLC,
DR. JEFFREY D. ISAACS,
on behalf of themselves and all others similarly
situated

              Plaintiffs,

vs.

APPLE INC.
          Defendant.

Case No. 3:21-cv-5567-EMC


**DECLARATION OF
JEFFREY DAVID ISAACS
IN SUPPORT OF FRCP 60(b)**

## Declaration of Jeffrey David Isaacs

I, Jeffrey David Isaacs, declare as follow:

1. I am a Plaintiff in the underlying case and file this declaration to support the reopening of this lawsuit. I am over the age of 18 and am competent to make this declaration. I make each of the following statements based on my own personal knowledge, and I could, if necessary, testify to the truth of them.

2. I was the primary computer programmer/developer for WebCaller, Caller-ID, and Coronavirus Reporter, three "apps" in the underlying lawsuit.

3. My relevant credentials include an A.B. in Computer Science with Honors from Dartmouth College. I have an MBA from Insead & Wharton in International Business Administration. I have a Doctorate of Medicine, and conducted the majority of my MD clinical training at Cleveland Clinic, Mount Sinai School of Medicine, St. George's School of Medicine (London), Guy's and Thomas' (London).  I achieved a USMLE medical board score of 99, above that of the average neurosurgeon. I studied law at Vanderbilt University for approximately 1.5 years, where I had been awarded a full scholarship. I left law school to attend medical school, however I have been actively involved in federal litigation for my entire adult life, mostly to enforce a valid 2007 acquittal of false charges that were improperly levied against me in 2006.

4. I was awarded a United States Reissue Patent for my work with Google in implementing Web Caller ID, which served over 300 million individuals and saved approximately $100 million to consumers.

5. I developed the Coronavirus Reporter app in conjunction with Dr. Robert Roberts, who invented the MBCK test. We developed this app in February 2020, when most people

did not think Covid-19 would arrive in the United States. We were, upon information and belief, the first genuine Covid app to be ready on March 1.

6. My computer science experience began at what was then an unusually young age. As a seven year old, I spend hours with my neighbor using the new 256k Mac. He became the first Director of Apple's App Store. I worked 50 hours a week each summer between ages 15-20 with one of the first global computational biology teams, as part of the Human Genome Project. We worked on mRNA sequencing published in Science Magazine in 1995. I worked on the Science publications and data analysis and some of the earliest cross-platform apps.

7. The team I worked with immersed me in the relatively early culture of internet computing, teaching and informally mentoring subjects over luncheons such as open source software, Richard Stallman's (an icon at the time) MIT unix labs, and similar teams at Harvard associated with our group. I then worked in venture capital after graduating college, investing in the first "web" companies to go public in the late 90s. I worked for two years at Merrill Lynch's Technology Investment Banking Group covering these same industries.

8. In light of this experience, I believe I possess knowledge and expertise relevant to the Apple antitrust matter, and am qualified to allege plausible, initial stage market definitions regarding smartphone computing devices.

9. I have diligently studied Apple's conduct specifically regarding Sherman Act for at least the past four years. This includes reading nearly every news article, many blog articles, and most antitrust legal pleadings filed by Epic, DOJ, Cameron, and other related cases.

I would estimate I have spent between 10-40 hours a week for most of the last four years researching and learning about this case.

10. In my mind there is no reasonable doubt Apple is guilty of felonious, willful, and egregious violation of the Sherman Act of 1890. The company has lost what made it special in the early days, and now is blatantly gambling its remaining reputation to "maliciously comply" with federal and global regulations.

11. This assertion is based on their conduct that monopolizes and exploits the US Smartphone Market, and related App Distribution (App Store) markets and notary stamp / notarization services markets. I have personally witnessed them misappropriate my ideas, retaliate against patent holders, retaliate against antitrust litigants, and censor apps for their own gain.

12. As a computer scientist with relatively deep roots in the internet's commercial development, it seems abundantly clear to me Apple utilizes a notarization mechanism to exert anticompetitive control over the smartphone market. I developed this theory four years ago for this lawsuit.

13. The recent events in the EU DMA matter last month substantiate what was obvious to me four years ago – Apple is fighting to maintain notarization so that they can keep their growing 25% services revenue share, a de facto tax on the internet. I am not aware of any other major computing platform that imposes such notarization requirements. Every other platform let users/purchasers of computers use their device as they choose.

14. I believe that acknowledging anticompetitive ties between the smartphone and the app distribution and notarization presents a straightforward legal theory that challenges Apple's monopoly.

15. Having advocated for this theory, I believe I have been subjected to substantial, unnecessary, and improper misconduct. I would like to testify to those matters in further detail at an evidentiary hearing. They are also discussed in Exhibit D, a Google action concerning my Web Caller-ID patent.

16. One of the most obvious conduct violations is how Apple referred to my disability throughout this antitrust litigation. It was irrelevant, inaccurate, and or scandalous, and meant to discredit me as a witness to significant antitrust proceedings. There was no place for it in these proceedings, and it evidences their tenuous defense.

17. Federal courts have recognized my medical disability since 2014 or earlier.

18. Apple's focus on my disability resulted in substantial press coverage, litigation mayhem (as documented in an unadjudicated Motion for Sanctions), and in my opinion, premature dismissal of this lawsuit. This has caused me substantial harms, as my lifelong work in computing has been dirided and not judged on the merits. It has resulted in public misunderstanding, and even misattribution that I was somehow negligent in drafting this present lawsuit. More than one person remarked that I was [unfairly] laughed out of court on my notary stamps and related theories. To me, it is unfathomable for this to have occurred in the year 2024, and in California.

19. Apple and their attorneys repeatedly mentioned my disability in their pleadings, despite my requests for them to cease such inappropriate statements. Notably, they never once referenced any of the aforementioned credentials I possess for this antitrust lawsuit. This cannot be tolerated, and I demand full ADA compliance by the Court.

20. It appears Apple's litigation focus on my disability evidences their lack of meritorious defenses, and I therefore request the Court impose an adverse inference instruction for

the jury. To be clear, Apple, to cover their willful Sherman Act violations, did so by deflecting to my disability status. That is illegal under 18 USC Section 1512. I request referral to the US Marshal and or DOJ, in the event this Court does not promptly permit jury adjudication of these matters.

21. I have issued objections, too numerous to list here, to Defendant's use of Gibson Dunn as counsel, because they were actively involved in a twenty year effort to subvert an acquittal that cleared my name.

22. In light of the foregoing, I hereby publicly request the Apple Board of Directors investigate this matter and issue a public determination and apology. Within sixty (60) days, Apple shall issue a report to this Court including whether or not they approve or assent to Gibson Dunn's filings centered around my disability and acquitted allegations. I reserve all rights through the statutes to seek justice based upon this investigation and determination.

23. This antitrust case should proceed on the merits of the claims we filed in the FAC, not on pleadings improperly cast about my disability and acquitted medical training controversy.

24. I am aware of the *United States v. Apple* Sherman relevant markets and how they overlap and differ from our FAC markets. Specifically, the DOJ defines US Smartphone and Superphone markets as platforms, rather than devices. I believe both our device, and DOJ's platform definitions, possess unique merits and are worthy of expert analysis during discovery, and juridical deliberation pursuant to *Brown Shoe*. Ultimately a jury decides this matter. My own personal intuition is that historical precedent rules in favor of a device foremarket, rather than Apple's "Ecosystem" marketing vernacular

suggesting a platform. But there are merits to both definitions. I am able to work with

both definitions, given my three decades of expertise in these areas. Should this case

proceed, as it should, I would envision adding the DOJ platform definition as an

alternative market definition to our Complaint. That way, the most comprehensive claim

possible is stated for proper review during discovery and jury. It should be noted that

under the device theory, notary stamps are *per se* tied, resulting in simpler trial process.

For a platform market, notary stamp may simply be evidence of monopolization of the

platform, and may require more cumbersome rule-of-reason analysis. Nevertheless, I

believe either method would ultimately prevail and a jury should decide how to define

the exact market contours.

I declare under penalty of perjury under the laws of the State of
Florida and the United States that the foregoing is true and correct
to the best of my knowledge. Executed on the 12th day of April,
2024 in Wellington Florida.

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.